# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | **Case No. 23-cr-184 (RDM)** |
| | : | |
| JARED LANE WISE, | : | |
| | : | |
| Defendant. | : | |

## UNITED STATES' OPPOSITION TO DEFENDANT'S
## MOTION TO TRANSFER VENUE

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits its Opposition to defendant Jared Lane Wise's Motion for Transfer of Venue. ECF No. 41 ("Mot."). The defendant, who is charged in connection with events at the U.S. Capitol on January 6, 2021, has moved to transfer venue in this case to the District of Oregon. Mot. at 1. The defendant fails to establish that he "cannot obtain a fair and impartial trial" in this district, Fed. R. Crim. P. 21(a), and this Court, following the D.C. Circuit's opinion in *United States v. Webster*, 22-3064, 2024 WL 2712697, at *2 (D.C. Cir. May 28, 2024), should deny his motion.[1]

---

[1] In addition to the D.C. Circuit's opinion affirming the denial of a motion to transfer venue in *Webster*, judges on this Court have denied motions for change of venue in dozens of January 6 prosecutions, and no judge has granted a change of venue in a January 6 case. *See, e.g.*, *United States v. Ramey*, 22-cr-184, Minute Entry (D.D.C. Jan. 30, 2023) (DLF); *United States v. Eckerman, et al.*, 21-cr-623, Minute Order (D.D.C. Jan. 26, 2023) (CRC); *United States v. Pollock, et al.*, 21-cr-447, Minute Entry (D.D.C. Jan. 25, 2023) (CJN); *United States v. Gossjankowski*, 21-cr-12, ECF No. 114 (D.D.C. Jan. 25, 2023) (PLF); *United States v. Adams*, 21-cr-212, ECF No. 60 (D.D.C. Jan. 24, 2023) (ABJ); *United States v. Rhine*, 21-cr-687, ECF No. 78 (D.D.C. Jan. 24, 2023) (RC); *United States v. Oliveras*, 21-cr-738, ECF No. 52 (D.D.C. Jan. 17, 2023) (BAH); *United States v. Sheppard*, 21-cr-203, ECF No. 62 (D.D.C. Dec. 28, 2022) (JDB); *United States v. Samsel, et al.*, 21-cr-537, ECF No. 227 (D.D.C. Dec. 14, 2022) (JMC); *United States v. Gillespie*, 22-cr-60, ECF No. 41 (D.D.C. Nov. 29, 2022) (BAH); *United States v. Barnett*, 21-cr-38, ECF No. 90 (D.D.C. Nov. 23, 2022) (CRC); *United States v. Bender, et al.*, 21-cr-508, ECF No. 78 (D.D.C. Nov. 22, 2022) (BAH); *United States v. Sandoval*, 21-cr-195, ECF No. 88 (D.D.C. Nov. 18, 2022) (TFH); *United States v. Vargas Santos*, 21-cr-47, Minute Entry (D.D.C. Nov. 16, 2022)

## BACKGROUND

The defendant was charged, by criminal complaint on April 12, 2023, with four misdemeanor offenses, ECF No. 1, and was arrested on May 1, 2023, ECF No. 5.[2]  On May 31, 2023, a grand jury returned an Indictment charging the defendant with the following six offenses:

Count One:    Civil Disorder and Aiding and Abetting, in violation of 18 U.S.C. §§ 231(a)(3), 2.

Count Two:    Assaulting, Resisting, or Impeding Certain Officers and Aiding and Abetting, in violation of 18 U.S.C. §§ 111(a)(1), 2.

Count Three:  Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1).

---

(RDM); *United States v. Nordean, et al.*, 21-cr-175, ECF No. 531 (D.D.C. Nov. 9, 2022) (TJK); *United States v. Ballenger*, 21-cr-719, ECF. No. 75 (D.D.C. Oct. 28, 2022) (JEB); *United States v. Eicher*, 22-cr-38, ECF No. 34 (D.D.C. Oct. 20, 2022) (CKK); *United States v. Schwartz, et al.*, 21-cr-178, ECF No. 142 (D.D.C. Oct. 11, 2022) (APM); *United States v. Nassif*, 21-cr-421, ECF No. 42 (D.D.C. Sep. 12, 2022) (JDB); *United States v. Brock*, 21-cr-140, ECF No. 58 (D.D.C. Aug. 31, 2022) (JDB); *United States v. Jensen*, 21-cr-6, Minute Entry (D.D.C. Aug. 26, 2022) (TJK); *United States v. Seitz*, 21-cr-279, Minute Order (D.D.C. Aug. 17, 2022) (DLF); *United States v. Strand*, 21-cr-85, ECF No. 89 (D.D.C. Aug. 17, 2022) (CRC); *United States v. Williams*, 21-cr-618, ECF No. 63 (D.D.C. Aug. 12, 2022) (ABJ); *United States v. Herrera*, 21-cr-619, ECF No. 54 (D.D.C. August 4, 2022) (BAH); *United States v. Garcia*, 21-cr-129, ECF No. 83 (D.D.C. July 22, 2022) (ABJ); *United States v. Rusyn, et al.*, 21-cr-303, Minute Entry (D.D.C. July 21, 2022) (ABJ); *United States v. Bledsoe*, 21-cr-204, Minute Order (D.D.C. July 15, 2022) (BAH); *United States v. Calhoun*, 21-cr-116, Minute Order (D.D.C. July 11, 2022) (DLF); *United States v. Rhodes, et al.*, 22-cr-15, ECF No. 176 (D.D.C. June 28, 2022) (APM); *United States v. Williams*, 21-cr-377, Minute Entry (D.D.C. June 10, 2022) (BAH); *United States v. McHugh*, 21-cr-453, Minute Entry (D.D.C. May 4, 2022) (JDB); *United States v. Hale-Cusanelli*, 21-cr-37, Minute Entry (D.D.C. Apr. 29, 2022) (TNM); *United States v. Webster*, 21-cr-208, ECF No. 78 (D.D.C. Apr. 18, 2022) (APM); *United States v. Alford*, 21-cr-263, ECF No. 46 (D.D.C. Apr. 18, 2022) (TSC); *United States v. Brooks*, 21-cr-503, ECF No. 31 (D.D.C. Jan. 24, 2022) (RCL); *United States v. Bochene*, 21-cr-418, 2022 WL 123893, at *2 (D.D.C. Jan. 12, 2022) (RDM); *United States v. Fitzsimons*, 21-cr-158, Minute Order (D.D.C. Dec. 14, 2021) (RC); *United States v. Reffitt*, 21-cr-32, Minute Order (D.D.C. Oct. 15, 2021) (DLF); *United States v. Caldwell*, 21-cr-28, ECF No. 415 (D.D.C. Sept. 14, 2021) (APM).

[2] For a fulsome recitation of facts, the United States respectfully incorporates the background section set out in the United States' Opposition to Defendant's Motion To Dismiss Counts One and Two of the Indictment or Require a Bill of Particulars and Motion for a Bill of Particulars, ECF No. 50, at 2–3.

Count Four:    Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2).

Count Five:    Disorderly Conduct in a Capitol Building or Grounds, in violation of 40 U.S.C. § 5104(e)(2)(D).

Count Six:    Parading, Demonstrating, and Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).

*See* ECF No. 9.

On June 11, 2024, the defendant filed a motion for a change of venue.  *See* Mot.  He contends that prejudice should be presumed in this district for several reasons: (1) the pretrial publicity surrounding the events of January 6, (2) the characteristics of the D.C. jury pool, and (3) the results of surveys of potential jurors.  *See id.*  The United States now responds.

## LEGAL STANDARD

The Constitution provides that "[t]he trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed."  U.S. Const. Art. III, § 2, cl. 3.  The Sixth Amendment similarly guarantees the right to be tried "by an impartial jury of the State and district wherein the crime shall have been committed."  U.S. Const. amend. VI.  "So when 'extraordinary local prejudice' prevents impartiality, courts must transfer the trial to a location where an impartial jury can be drawn."  *Webster*, 2024 WL 2712697, at *2 (citing *Skilling v. United States*, 561 U.S. 358, 378 (2010)).  "Prejudice across an entire jury pool can be presumed only in the extreme case, where prejudicial publicity so poisoned the proceedings that it was impossible for the accused to receive a fair trial by an impartial jury."  *Id.*  "The Supreme Court has found presumptive prejudice in only the rare case where a jury pool was so 'pervasively exposed' to prejudicial pretrial publicity about the defendant and the case that '[a]ny subsequent court proceedings in [that] community . . . [w]ould be but a hollow formality.'"  *Id.* (citing *Rideau v. Louisiana*, 373 U.S. 723, 726 (1963)); *see also* Fed. R. Crim. P. 21(a) (requiring transfer to another district if "so great a

prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there").

The primary safeguard of the right to an impartial jury is "an adequate voir dire to identify unqualified jurors." *Morgan v. Illinois*, 504 U.S. 719, 729 (1992). Thus, the best course when faced with a pretrial publicity claim is ordinarily "to proceed to voir dire to ascertain whether the prospective jurors have, in fact, been influenced by pretrial publicity." *United States v. Campa*, 459 F.3d 1121, 1146 (11th Cir. 2006) (en banc). "[I]f an impartial jury actually cannot be selected, that fact should become evident at the voir dire." *United States v. Haldeman*, 559 F.2d 31, 63 (D.C. Cir. 1976) (en banc) (per curiam). And, after voir dire, "it may be found that, despite earlier prognostications, removal of the trial is unnecessary." *Jones v. Gasch*, 404 F.2d 1231, 1238 (D.C. Cir. 1967).

## ARGUMENT

The defendant's motion for a change of venue is without merit. In *Webster*, the D.C. Circuit affirmed the denial of a similar motion to change venue brought by a January 6 defendant— a high-profile defendant who was the first to go to trial for assaulting an officer that day. *Webster*, 2024 WL 2712697, at *2. Webster, who relied on many of the same arguments that the defendant raises here, failed to "clear that very high bar" to establish the presumption of prejudice that would require a court to transfer venue. *Id.* at *3. Specifically, the D.C. Circuit found that the District of Columbia's high rates of voting for Democratic Party candidates, the size and structure of the District of Columbia's jury pool, and a pretrial poll showing that D.C. residents had a negative impression of participants in the January 6 attack did not establish prejudice. *Id.* at *3–*4. The panel further observed, "[t]he record lacks any evidence of pervasive (or much of any) media coverage aimed at Webster and his conduct," finding the results of a Google search for Webster's name and the limited number of newspaper articles about his case insufficient. *Id.* *Webster*

forecloses many of the defendant's arguments here, and none of the defendant's remaining points are sufficient to establish the kind of prejudice needed to grant a motion to change venue.

I.    **The Pretrial Publicity Related to January 6 Does Not Support a Presumption of Prejudice in This District.**

The defendant contends that a change of venue is warranted based on pretrial publicity. *See* Mot. 7–12.  As in *Webster,* where the D.C. Circuit observed, in a high-profile assault case, that "nothing in the record suggests that the District's jury pool had any preconceived notions about Webster or his guilt or innocence, or even knew who he was," that argument fails.  *Webster*, 2024 WL 2712697, at *3.  "The mere existence of intense pretrial publicity is not enough to make a trial unfair, nor is the fact that potential jurors have been exposed to this publicity."  *United States v. Childress*, 58 F.3d 693, 706 (D.C. Cir. 1995); *see Murphy v. Florida*, 421 U.S. 794, 799 (1975) (juror exposure to "news accounts of the crime with which [a defendant] is charged" does not "alone presumptively deprive[] the defendant of due process").  Indeed, "every case of public interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely any one can be found among those best fitted for jurors who has not read or heard of it, and who has not some impression or some opinion in respect to its merits."  *Reynolds v. United States*, 98 U.S. 145, 155–56 (1878).  Thus, the "mere existence of any preconceived notion as to the guilt or innocence of an accused, without more," is insufficient to establish prejudice.  *Irvin v. Dowd*, 366 U.S. 717, 723 (1961).  "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."  *Id.*

The Supreme Court has recognized only a narrow category of cases in which prejudice is presumed to exist without regard to prospective jurors' answers during voir dire.  *See Rideau*, 373 U.S. 723.  In *Rideau*, the defendant's confession—obtained while he was in jail and without an attorney present—was broadcast three times shortly before trial on a local television station to

audiences ranging from 24,000 to 53,000 individuals in a parish of approximately 150,000 people. *Id.* at 724 (majority opinion), 728–29 (Clark, J., dissenting).  The Court concluded that, "to the tens of thousands of people who saw and heard it," the televised confession "in a very real sense *was* Rideau's trial—at which he pleaded guilty to murder."  *Rideau*, 373 U.S. at 726.  Thus, the Court "d[id] not hesitate to hold, without pausing to examine a particularized transcript of the voir dire," that these "kangaroo court proceedings" violated due process.  *Id.* at 726–27.

Since *Rideau*, the Supreme Court has emphasized that a "presumption of prejudice . . . attends only the extreme case," *Skilling*, 561 U.S. at 381, and the Court has repeatedly "held in other cases that trials have been fair in spite of widespread publicity," *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 554 (1976).  The D.C. Circuit described the standard as a "very high bar." *Webster,* 2024 WL 2712697, at *3.  In the half century since *Rideau*, the Supreme Court has never presumed prejudice based on pretrial publicity.  *But see Estes v. Texas*, 381 U.S. 532 (1965) (presuming prejudice based on media interference with courtroom proceedings); *Sheppard v. Maxwell*, 384 U.S. 333 (1966) (same).  In fact, in addition to the recent ruling in *Webster*, courts have declined to transfer venue in some of the most high-profile prosecutions in recent American history.  *See In re Tsarnaev*, 780 F.3d 14, 15 (1st Cir. 2015) (per curiam) (capital prosecution of Boston Marathon bomber); *Skilling*, 561 U.S. at 399 (fraud trial of CEO of Enron Corporation); *United States v. Yousef*, 327 F.3d 56, 155 (2d Cir. 2003) (trial of participant in 1993 World Trade Center bombing); *United States v. Moussaoui*, 43 F. App'x 612, 613 (4th Cir. 2002) (per curiam) (unpublished) (terrorism prosecution for conspirator in September 11, 2001 attacks); *Haldeman*, 559 F.2d at 70 (Watergate prosecution of former Attorney General John Mitchell and other Nixon aides).

In *Skilling*, the Supreme Court considered several factors in determining that prejudice

should not be presumed where former Enron executive Jeffrey Skilling was tried in Houston, where Enron was based. *Skilling*, 561 U.S. at 382–83. First, the Court considered the "size and characteristics of the community." *Id.* at 382. Unlike *Rideau*, where the murder "was committed in a parish of only 150,000 residents," Houston was home to more than 4.5 million people eligible for jury service. *Id.* at 382. Second, "although news stories about Skilling were not kind, they contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight." *Id.* Third, "over four years elapsed between Enron's bankruptcy and Skilling's trial," and "the decibel level of media attention diminished somewhat in the years following Enron's collapse." *Id.* at 383. "Finally, and of prime significance, Skilling's jury acquitted him of nine insider-trading counts," which undermined any "supposition of juror bias." *Id.*

Although these *Skilling* factors are not exhaustive, courts have found them useful when considering claims of presumptive prejudice based on pretrial publicity. *See, e.g.*, *In re Tsarnaev*, 780 F.3d at 21–22; *United States v. Petters*, 663 F.3d 375, 385 (8th Cir. 2011). And contrary to the defendant's contention, those factors do not support a presumption of prejudice in this case.

### A.    Size and characteristics of the community

The defendant suggests that an impartial jury cannot be found in Washington, D.C., despite the District's population of nearly 700,000. *See* Mot. at 4. But *Skilling* approvingly cited a state case in which there was "a reduced likelihood of prejudice" because the "venire was drawn from a pool of over 600,000 individuals." *Skilling*, 561 U.S. at 382 (quoting *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1044 (1991)). And *Webster* ultimately forecloses this argument. As the D.C. Circuit found, "The District's size is no impediment to producing a fair jury. It consists of more than 600,000 individuals. *Contrast Rideau*, 373 U.S. at 724 (presuming prejudice when news

coverage blanketed community of 150,000). 'Given this large, diverse pool of potential jurors,' there is no basis to conclude '12 impartial individuals could not be empaneled.'" *Webster*, 2024 WL 2712697, at *4 (quoting *Skilling*, 561 U.S. at 382).

      **B.**    **Nature of the pretrial publicity**

      Nor does this case involve a "confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight." *Skilling*, 561 U.S. at 382.  Even news stories that are "not kind," *Skilling*, 561 U.S. at 382, or are "hostile in tone and accusatory in content," *Haldeman*, 559 F.2d at 61, do not alone raise a presumption of prejudice. In *Webster,* the D.C. Circuit found that two news articles focusing on the facts of the defendant's case were insufficient.  "Both simply recite the facts of the allegations confronting Webster, his surrender to authorities, and the details of his bond hearing.  They also include a counternarrative from Webster's defense attorney. . . .  Without more, such routine and objective press coverage of a criminal prosecution does not trench upon the defendant's right to a fair trial." *Webster*, 2024 WL 2712697, at *3.  As in *Skilling*, *Haldeman*, and *Webster*, the news coverage of Wise is "neither as inherently prejudicial nor as unforgettable as the spectacle of Rideau's dramatically staged and broadcast confession."  *Id.*  Indeed, although any media characterizations of Wise would be inadmissible, the photos and videos of Wise that have been disseminated would be both admissible and highly relevant at trial.  *Compare Sheppard*, 384 U.S. at 360 (noting that information reported by the media was "clearly inadmissible" and that "[t]he exclusion of such evidence in court is rendered meaningless when news media make it available to the public"), *with Murray v. Schriro*, 882 F.3d 778, 805 (9th Cir. 2018) ("There was no inflammatory barrage of information that would be inadmissible at trial.  Rather, the news reports focused on relaying mainly evidence presented at trial."); *Henderson v. Dugger*, 925 F.2d 1309, 1314 (11th Cir. 1991) ("[B]ecause we have found

[the defendant's] confessions were admissible, the damage if any from the [pretrial] publicity is negligible.").

The defendant argues that prejudice should be presumed based on statements by the President and other political leaders and public figures. *See* Mot. at 8 & ECF No. 41-4. As an initial matter, statements by the President and public figures, like those cited by the defendant, are ordinarily reported across the entire country, and exposure to these statements is hardly unique to Washington, D.C. But, in any event, harsh condemnation of a defendant's actions is not uncommon in high-profile criminal cases, and it does not suffice to establish prejudice. In *Skilling*, the news stories about the defendant's involvement in Enron's collapse "were not kind," but they "contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight." *Skilling*, 561 U.S. at 382. And in *Haldeman*, although some of the coverage of the Watergate scandal was "hostile in tone and accusatory in content," the bulk of the coverage "consist[ed] of straightforward, unemotional factual accounts of events and of the progress of official and unofficial investigations." *Haldeman*, 559 F.2d at 61. The D.C. Circuit concluded that the coverage "was neither as inherently prejudicial nor as unforgettable as the spectacle of Rideau's dramatically staged and broadcast confession." *Id.* The same is true here, where news coverage has not reported on any confession or other similarly prejudicial information about Wise.

The defendant repeatedly relies of pretrial publicity of the fact that, on the Upper West Terrace, while police were being assaulted, the defendant called out "Yeah, fuck them! Yeah, kill 'em!" and "Kill 'em! Kill 'em! Kill 'em!" Mot. at 8–10. But, notably, the defendant does not offer any argument that these statements were coerced by government investigators, as in *Rideau*, 373 U.S. at 1419, or will be inadmissible at trial, as in *Sheppard*, 384 U.S. at 360. "Indeed, much

of what [the defendant] calls 'publicity' consists of factual news media accounts of the events of that period.  The publicity [the defendant] has received, while 'not kind,' has not been of the grossly prejudicial character that attended *Rideau*."  *In re Tsarnaev*, 780 F.3d 14, 22 (1st Cir. 2015) (quoting *Skilling*, 561 U.S. at 382).

The defendant asserts that a fair trial cannot be had in D.C. because of the volume of news coverage of January 6.  *See* Mot. at 7–13.  But even "massive" news coverage of a crime does not require prejudice to be presumed.  *Haldeman*, 559 F.2d at 61.  And a comparatively small percentage of the news coverage of January 6 has focused on Wise.  In *Webster*, the D.C. Circuit focused on the publicity the specific defendant, not January 6 as a whole, received.  *Webster,* 2024 WL 2712697, at *4.  Unlike most cases involving pretrial publicity, where the news coverage focuses on the responsibility of a single defendant (as in *Rideau* or *Tsarnaev*) or small number of codefendants (as in *Skilling* and *Haldeman*), the events of January 6 involved thousands of participants and have so far resulted in charges against more than 1,400 people.  The Court can guard against any spillover prejudice from the broader coverage of January 6 by conducting a careful voir dire and properly instructing the jury about the need to determine a defendant's individual guilt, just as Judge Mehta did in *Webster*.  *Webster*, 2024 WL 2712697, at *6 (describing that voir dire as a "searching inquiry").

And, in any event, any threat of such spillover prejudice is not limited to Washington, D.C. because much of the news coverage of January 6 has been national in scope.  *See Haldeman*, 559 F.2d at 64 n.43 (observing that "a change of venue would have been of only doubtful value" where much of the news coverage was "national in [its] reach" and the crime was of national interest); *United States v. Bochene*, 21-cr-418 (RDM), 2022 WL 123893, at *3 (D.D.C. Jan. 12, 2022) ("The fact that there has been 'ongoing media coverage' of the breach of the Capitol and subsequent

prosecutions, 'both locally and nationally,' means that the influence of that coverage would be present 'wherever the trial is held.'" (quoting *Tsarnaev*, 780 F. 3d at 22)). Indeed, almost all of the news stories that the defendant cites, regarding January 6 coverage generally, were published by media organizations with wide national footprints, not purely local outlets. *See* Mot. at nn.22–26.[3] As the Select Litigation poll demonstrates, the number of potential jurors exposed to "[a] lot" of news coverage of January 6 differs only slightly between Washington, D.C. and Atlanta. ECF No. 41-1 at 14 (Question 8) (33% to 30% in the 2022 poll); ECF No. 41-2 at 7 (Question 8) (38% to 33% in the 2023 poll). Thus, the nature and extent of the pretrial publicity do not support a presumption of prejudice.

## C.     Passage of time before trial

In *Skilling*, the Court considered the fact that "over four years elapsed between Enron's bankruptcy and Skilling's trial." *Skilling*, 561 U.S. at 383. In this case, 41 months have already elapsed since the events of January 6, and more time will elapse before trial. This is far more than in *Rideau*, where the defendant's trial came two months after his televised confession. *Rideau*,

---

[3] Notably, even the news article the defendant cites regarding to his personal conduct comes from *national*, as opposed to *local* news sources. *See* Mot. at nn.13 (CNN), 14 (Washington Post), 15–16 (NBC News), 17 (The Wall Street Journal) & 18 (The New York Times). In fact, a Google search reveals that the news coverage of his case appears particularly acute from news outlets located in the District of Oregon, rather than the District of Columbia. *See, e.g.*, Ryan Haas, Former FBI agent who lived in Bend formally charged for his actions during Jan. 6 insurrection, Oregon Public Broadcasting (June 1, 2023), https://www.opb.org/article/2023/06/01/january-6-insurrection-capitol-riot-bend-oregon-fbi-agent/; Central Oregon Daily News, Bend man, an ex-FBI supervisor, indicted for Jan. 6 Capitol riot (June 2, 2023), https://www.centraloregon-daily.com/archives/central-oregon-daily/bend-man-an-ex-fbi-supervisor-indicted-for-jan-6-capitol-riot/article_ada50ed6-717f-55da-9fad-3406da10e3f0.html; Dan Tilkin, Bend resident, ex-FBI agent facing Capitol riot charges pleads not guilty, KOIN 6 (June 8, 2023), https://www.koin.com/news/oregon/bend-resident-ex-fbi-agent-facing-capitol-riot-charges-pleads-not-guilty/ (Portland CBS affiliate); Bend Bulletin, Ex-FBI agent from Bend arrested on Capitol riot charges (May 3, 2023), https://www.bendbulletin.com/localstate/crimeandjustice/ex-fbi-agent-from-bend-arrested-on-capitol-riot-charges/article_16b0bb0d-c7e2-5241-9b37-e08cfd9fb8d6.html.

373 U.S. at 724.  In *Webster*, the D.C. Circuit was unpersuaded by defendant's claim about the passage of time—and there, only 12 months had elapsed, far less than the time here.  *Webster*, 2024 WL 2712697, at *4.

Although January 6 continues to be in the news, the "decibel level of media attention [has] diminished somewhat," *Skilling*, 561 U.S. at 383.  Moreover, only a relatively small percentage of the recent stories have mentioned Wise himself, and much of the reporting has been national is scope, rather than limited to Washington, D.C.  Thus, like Webster, the defendant "puts the cart before the horse: He must first show prejudice before arguing that the prejudice did not dissipate. He has failed to do so." *Webster*, 2024 WL 2712697, at *4.

### D.    The jury verdict

Because Wise has not yet gone to trial, the final *Skilling* factor—whether the "jury's verdict . . . undermine[s] in any way the supposition of juror bias," *Skilling*, 561 U.S. at 383—does not directly apply.  But the fact that *Skilling* considered this factor to be "of prime significance," *id.*, underscores how unusual it is to presume prejudice before trial.  Ordinarily, a case should proceed to trial in the district where the crime was committed, and courts can examine after trial whether the record supports a finding of actual or presumed prejudice.  In short, none of the *Skilling* factors supports the defendant's contention that the Court should presume prejudice and order a transfer of venue without even conducting voir dire.

## II.   The Characteristics of the District of Columbia's Jury Pool Do Not Support a Change of Venue.

The defendant also contends that a D.C. jury cannot be impartial because of various characteristics of the District's jury pool: the political makeup of the District's electorate, the impact of January 6 on D.C. residents, and the prevalence of federal employees in the District.  *See*

Mot. at 3–7. *Webster* rejected similar claims about the jury pool and the makeup of the District's electorate. *Webster*, 2024 WL 2712697, at *4. None of these claims has merit.

A.     **The District of Columbia's political makeup does not support a change of venue.**

The defendant contends that he cannot obtain a fair trial in the District of Columbia because "the District of Columbia voted overwhelmingly for President Biden." Mot. at 7. *Webster* forecloses this argument. *Webster*, 2024 WL 2712697, at *4. As the unanimous panel found, "the political inclinations of a populace writ large say nothing about an individual's ability to serve impartially in adjudicating the criminal conduct of an individual . . . , we have held that District juries could impartially adjudicate other criminal cases arising out of political matters, including Watergate." *Id.* As the *Webster* panel mentioned, the en banc D.C. Circuit rejected a nearly identical claim in *Haldeman*, where the dissent concluded that a venue change was required because "Washington, D.C. is unique in its overwhelming concentration of supporters of the Democratic Party" and the Democratic candidate received 81.8% and 78.1% of the vote when Richard Nixon ran for President in 1968 and 1972, respectively. *Haldeman*, 559 F.2d at 160 (MacKinnon, J., concurring in part and dissenting in part). The majority rejected the relevance of this fact, observing that authority cited by the dissent gave no "intimation that a community's voting patterns are at all pertinent to venue." *Id.* at 64 n.43; *see also United States v. Chapin*, 515 F.2d 1274, 1286 (D.C. Cir. 1975) (rejecting the argument that "because of [the defendant's] connection with the Nixon administration and his participation in a 'dirty tricks' campaign aimed at Democratic candidates and with racial overtones, a truly fair and impartial jury could not have been drawn from the District's heavily black, and overwhelmingly Democratic, population"). Thus, as *Webster* held, the District's voting record does not establish that this Court will be unable to select "an unbiased jury capable of basing its verdict solely on the evidence introduced at trial."

*Haldeman*, 559 F.2d at 70.

    **B.**    **The impact of January 6 on Washington D.C. does not support a change of venue.**

    The defendant contends that a D.C. jury could not be impartial because D.C. residents have been particularly affected by events surrounding January 6, including the deployment of the National Guard, the mayor's declaration of a state of emergency, road closures, and a curfew.  *See* Mot. at 5–6.  But January 6 is now over three years in the past.  Many D.C. residents do not live or work near the Capitol where the roads were closed and the National Guard was deployed.  There is no reason to believe that the District's entire population of nearly 700,000 people was so affected by these events that the Court cannot seat an impartial jury here.

    Indeed, courts routinely conclude that defendants can receive a fair trial in the location where they committed their crimes, despite the fact that some members of the community were victimized.  *See In re Tsarnaev*, 780 F.3d 14, 15 (1st Cir. 2015) (Boston Marathon bombing); *Skilling*, 561 U.S. at 399 (Enron collapse); *United States v. Yousef*, 327 F.3d 56, 155 (2d Cir. 2003) (1993 World Trade Center bombing); *United States v. Moussaoui*, 43 F. App'x 612, 613 (4th Cir. 2002) (per curiam) (unpublished) (September 11, 2001 attacks, including on the Pentagon).  In *Skilling*, the Supreme Court rejected the contention that Enron's "sheer number of victims" in the Houston area "trigger[ed] a presumption of prejudice."  *Skilling*, 561 U.S. at 384.  "Although the widespread community impact necessitated careful identification and inspection of prospective jurors' connections to Enron," the voir dire was "well suited to that task."  *Id.*  In this case too, voir dire can adequately identify those D.C. residents who were so affected by January 6 that they cannot impartially serve as jurors.  There is no reason to presume prejudice.

C.      **The number of federal employees who reside in the District of Columbia does not support a change of venue.**

The defendant argues that the Court should presume prejudice in this District because the jury pool would contain a high percentage of federal government employees or their friends and family members. *See* Mot. at 4–5. But the defendant does not explain how merely being employed by the federal government would render a person incapable of serving as an impartial juror. Although some federal employees, such as the U.S. Capitol Police, were affected by the events of January 6, many others were neither directly nor indirectly impacted. Indeed, many federal employees were nowhere near the Capitol on January 6 given the maximum telework posture of many federal agencies at the time. And the storming of the Capitol on January 6 was not aimed at the federal government in general, but specifically at Congress' certification of the Electoral College vote. There is therefore no reason to believe that federal employees with little or no connection to the events at the Capitol could not be impartial in this case. *See United States v. Bochene*, 21-cr-418 (RDM), 2022 WL 123893, at *2 (D.D.C. Jan. 12, 2022) (January 6 defendant's claim that federal employees would "have a vested interest in supporting their employer" was "exactly the kind of conjecture that is insufficient to warrant transfer prior to jury selection").

Even assuming (incorrectly) that every federal employee is affected by improper bias, the Court could draw a jury from those District residents who are not employed by the federal government. According to the Office of Personnel Management, around 141,000 non-Postal Service employees worked in Washington, D.C., in 2017. OPM, Federal Civilian Employment, available at https://www.opm.gov/policy-data-oversight/data-analysis-documentation/federal-employment-reports/reports-publications/federal-civilian-employment/. But many federal employees who work in the District live outside the District and would not be part of the jury pool. And the District has nearly 700,000 residents. Thus, even if every federal employee were

disqualified, the Court would be able to pick a jury in this District.

> **D.    That the defendant once lived in Washington, D.C. does not justify a change in venue.**

The defendant complains that venue should be transferred from Washington, D.C. because Wise has connections to Washington, D.C. and previously lived in the area. Mot. at 4. ("Mr. Wise lived in Washington D.C. for ten years and worked there from 2004 to 2016. . . .  Mr. Wise worked closely with many different departments and agencies in Washington D.C., creating an extensive web of connections — direct and indirect, personal and professional."). Curiously, the defendant's solution is to transfer venue to the district where the defendant currently resides. Moreover, the defendant nowhere grapples with the reality that it far from unusual for defendants to be tried in communities where they have lived and worked for long periods of time and where they may have extensive networks. This is precisely the type of conflict of interest voir dire is well suited to address. *See Bochene*, 579 F. Supp. 3d at 181 (D.D.C. 2022) (noting "it is the well established procedure in this circuit to refuse defendants' pre-voir dire requests for a change of venue" (quoting *Haldeman*, 559 F.2d at 60) (cleaned up)); *United States v. Bakker*, 925 F.2d 728, 732 (4th Cir. 1991) ("Only where voir dire reveals that an impartial jury cannot be impaneled would a change of venue be justified."). The defendant offers no basis for the Court to conclude that he is so unusually famous or well-connected in the District—eight years after he moved—that an impartial jury could not be empaneled. *See Webster*, 2024 WL 2712697, at *4 ("'Given this large, diverse pool of potential jurors,' there is no basis to conclude '12 impartial individuals could not be empaneled.'" (quoting *Skilling*, 561 U.S. 382)).

## III.    The Polls Submitted by the Defendant Do Not Support a Change of Venue.

The defendant relies on polls conducted by Select Litigation, a private litigation consulting firm, at the request of the Federal Public Defender for the District of Columbia. *See* ECF Nos. 41-

1, 41-2.  Select Litigation conducted telephone polls in 2022 and 2023 of potential jurors in the District of Columbia and in the Atlanta Division of the Northern District of Georgia and contracted with a media research firm to analyze news media coverage of January 6 in both of those jurisdictions.  Those polls do not support the defendant's request for a venue transfer.

### A.   Courts have repeatedly declined to find a presumption of prejudice based on pretrial polling without conducting voir dire.

The defendant argues that this Court should find a presumption of prejudice based on polls of prospective jurors.  But "courts have commonly rejected such polls as unpersuasive in favor of effective voir dire as a preferable way to ferret out any bias."  *United States v. Causey*, 2005 WL 8160703, at *7 (S.D. Tex. 2005).  As one circuit has observed, the Supreme Court's emphasis on the important role of voir dire in addressing pretrial publicity "undercuts" the "argument that poll percentages . . . decide the question of a presumption of prejudice."  *In re Tsarnaev*, 780 F.3d 14, 23 (1st Cir. 2015) (per curiam); *see Mu'Min v. Virginia*, 500 U.S. 415, 427 (1991) (observing that, "[p]articularly with respect to pretrial publicity, . . . primary reliance on the judgment of the trial court makes good sense").

Indeed, the D.C. Circuit has now twice rejected a claim of presumed prejudice based on the results of a pre-voir dire survey, including recently in *Webster*.  *Webster*, 2024 WL 2712697, at *4; *Haldeman*, 559 F.2d at 64.  The D.C. Circuit was unpersuaded by Webster's pretrial poll, which "surveyed 400 individuals registered to vote in the District and concluded that they had a decidedly negative impression of individuals arrested in conjunction with the activities of January 6, 2021."  *Webster*, 2024 WL 2712697, at *3 (cleaned up).  The Court found that the poll's focus on "the jury pool's opinion of January 6th and its perpetrators"—which is also the focus of the defendant's polls—"misses the point."  *Id.*  As the panel explained:

We expect jurors to view significant criminal events in their hometown with an

unapproving eye, whether it is the January 6th attack on the Capitol, a murder, or
an armed robbery spree. Generalized disapproval of criminal conduct—even the
specific conduct at issue in a defendant's case—says nothing about a juror's ability
to be impartial in deciding whether a particular individual committed a crime or
not. What the Constitution forbids is for a juror to hold a firmly entrenched view
about an individual defendant's guilt or innocence before the trial starts.

*Webster*, 2024 WL 2712697, at *4. That reasoning is fatal to defendant's polling-based argument.

Just as in *Webster*, the defendant's polls at most show "[g]eneralized disapproval of criminal

conduct." *Id.* It thus "says nothing about a juror's ability to be impartial" in judging this specific

defendant's conduct, and does not establish presumptive prejudice here. *Id.*

In *Haldeman*, seven former Nixon administration officials (including the former Attorney

General of the United States) were prosecuted for their role in the Watergate scandal. *Id.* at 51.

According to a poll commissioned by the defense in that case, 93% of the Washington, D.C.

population knew of the charges against the defendants and 61% had formed the opinion that they

were guilty. *Id.* at 144, 178 n.2 (MacKinnon, J., concurring in part and dissenting in

part). Recognizing that the case had produced a "massive" amount of pretrial publicity, *id.* at 61,

the D.C. Circuit nevertheless held that the district court "was correct" to deny the defendants' "pre-

voir dire requests for . . . a change of venue," *id.* at 63–64. The court observed that the district

court "did not err in relying less heavily on a poll taken in private by private pollsters and paid for

by one side than on a recorded, comprehensive voir dire examination conducted by the judge in

the presence of all parties and their counsel." *Id.* at 64 n.43; *see Jones*, 404 F.2d at 1238 (observing

that it is "upon the voir dire examination," and "usually only then, that a fully adequate appraisal

of the claim [of local community prejudice] can be made").

There are good reasons to rely on voir dire, rather that public-opinion polls, when assessing

whether prejudice should be presumed. First, polling lacks many of the safeguards of court-

supervised voir dire, including the involvement of both parties in formulating the questions.

Surveys that are not carefully worded and properly conducted can produce misleading results, such as by asking leading questions or providing the respondents with facts that will influence their responses. *See Campa*, 459 F.3d at 1146 (noting problems with "non-neutral" and "ambiguous" questions). Second, polling lacks the formality that attends in-court proceedings under oath, and it does not afford the court the "face-to-face opportunity to gauge demeanor and credibility." *Skilling*, 561 U.S. at 395. Third, polls ordinarily inform the court only the extent to which prospective jurors have heard about a case and formed an opinion about it. But that is not the ultimate question when picking a jury. A prospective juror is not disqualified simply because he has "formed some impression or opinion as to the merits of the case." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). Instead, "[i]t is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id.* at 723. But pre-trial surveys are poorly suited to answering that ultimate question, which is best asked in the context of face-to-face voir dire under oath. *See Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981) (observing that the trial judge's function in voir dire "is not unlike that of the jurors later in the trial" because "[b]oth must reach conclusions as to impartiality and credibility by relying on their own evaluations of demeanor evidence and of responses to questions"). As *Webster* reflects, pretrial surveys may simply show a community's "general disapproval" of a crime, which is to be expected, and which, the D.C. Circuit found, is not indicative of jurors' inability to fairly judge a case. *Webster*, 2024 WL 2712697, at *4. The defendant's polls, like Webster's, "do[] not answer the essential question: Can the District's potential jurors "lay aside [their] impression or opinion" of [defendant] or events on January 6th and "render a verdict based on the evidence presented in court"? *Webster*, 2024 WL 2712697, at *4 (quoting *United States v. Nassif*, 628 F. Supp. 3d 169, 187 (D.D.C. 2022) (quoting *Irvin*, 366 U.S. at 723), *aff'd*, 97 F.4th 968 (D.C. Cir. 2024)). It thus

"misses the point," and this Court need not give substantial weight to the polling when considering whether to presume prejudice. *Id.* at *4. But, as explained below, the polls submitted by the defendant do not support a presumption of prejudice in any event.

**B.      The Select Litigation polls do not demonstrate pervasive prejudice in the District of Columbia.**

Contrary to the defendant's contention, the Select Litigation polls do not support a presumption of prejudice in this District. The D.C. Circuit made this funding in *Webster*, which involved the same poll, and is thus dispositive of defendant's claim. *Webster*, 2024 WL 2712697, at *3–*4 (finding that Webster's arguments based on a "poll purporting to gauge the sentiments of the District's jury pool . . . misses the point"); *see* Attachment 1, Motion to Change Venue, *United States v. Webster*, 21-cr-408, ECF No. 49-1 (D.D.C. filed Feb. 9, 2022) (Select Litigation poll attached to Webster's motion to change venue). Not only did the D.C. Circuit find that this poll failed to establish prejudice against Webster, but it also noted that the poll suggested that jurors would in fact be able to set aside their views and deliberate fairly. "For example, when asked how they were likely to vote if they were on a jury for a defendant charged with crimes for his or her activities on January 6th, 46% of respondents either volunteered that they did not know how they would vote or that their vote depended" on other factors, or refused to speculate about how they would decide such a case." *Webster*, 2024 WL 2712697, at *4.

**VI.      Voir Dire Is the Appropriate Means of Selecting an Impartial Jury.**

The Supreme Court and the D.C. Circuit have long made clear that a careful voir dire is the appropriate way to address prejudicial pretrial publicity, except in those extreme cases where prejudice is presumed. *See Skilling*, 561 U.S. at 381–82. In *Webster*, the Court rejected an argument that the *voir dire* in that January 6 case was inadequate to secure an impartial jury. 2024 WL 2712697. It necessarily follows that the Circuit did not believe voir dire is inadequate *ex ante.*

The Supreme Court observed in *Skilling* that voir dire was "well suited to th[e] task" of probing the crime's "widespread community impact."  561 U.S. at 384.  And the Court has said that "[i]t is fair to assume that the method we have relied on since the beginning"—voir dire— "usually identifies bias."  *Patton v. Yount*, 467 U.S. 1025, 1038 (1984) (citing *United States v. Burr*, 25 F. Cas. 49, 51 (C.C.D. Va. 1807) (Marshall, C.J.)).  Similarly, the D.C. Circuit has said that "voir dire has long been recognized as an effective method of routing out [publicity-based] bias, especially when conducted in a careful and thoroughgoing manner."  *In re Nat'l Broadcasting Co.*, 653 F.2d 609, 617 (D.C. Cir. 1981); *see Haldeman*, 559 F.2d at 63 ("[I]f an impartial jury actually cannot be selected, that fact should become evident at the voir dire.").

## VII.   The January 6-Related Jury Trials That Have Already Occurred Have Demonstrated the Availability of a Significant Number of Fair, Impartial Jurors in the D.C. Venire.

At this point, a significant number of January 6 cases have proceeded to jury trials, and the Court in each of those cases has been able to select a jury without undue expenditure of time or effort.  *See Murphy*, 421 U.S. at 802–03 ("The length to which the trial court must go to select jurors who appear to be impartial is another factor relevant in evaluating those jurors' assurances of impartiality."); *Haldeman*, 559 F.2d at 63 (observing that "if an impartial jury actually cannot be selected, that fact should become evident at the voir dire").  The D.C. Circuit affirmed the adequacy of this *voir dire* process in *Webster.  Webster,* 2024 WL 2712697, at *5.

Judges presiding over nearly all of the early January 6 trials were able to select a jury in one or two days.  *See United States v. Reffitt*, 21-cr-32, Minute Entries (D.D.C. Feb. 28 & Mar. 1, 2022); *United States v. Robertson*, 21-cr-34, Minute Entry (D.D.C. Apr. 5, 2022); *United States v. Thompson*, 21-cr-161, Minute Entry (D.D.C. Apr. 11, 2022); *United States v. Webster*, 21-cr-208, Minute Entry (D.D.C. Apr. 25, 2022); *United States v. Hale-Cusanelli*, 21-cr-37, Minute Entry (D.D.C. May 23, 2022); *United States v. Anthony Williams*, 21-cr-377, Minute Entry (D.D.C. June

27, 2022); *United States v. Bledsoe*, 21-cr-204, Minute Entry (D.D.C. July 18, 2022); *United States v. Herrera*, 21-cr-619, Minute Entry (D.D.C. Aug. 15, 2022); *United States v. Jensen*, 21-cr-6, Minute Entries (D.D.C. Sept. 19 & 20, 2022); *United States v. Strand*, 21-cr-85, Minute Entry (D.D.C. Sept. 20, 2022); *United States v. Alford*, 21-cr-263, Minute Entry (D.D.C. Sept. 29, 2022); *United States v. Riley Williams*, 21-cr-618, Minute Entries (D.D.C. Nov. 7 & 8, 2022); *United States v. Schwartz*, 21-cr-178, Minute Entries (D.D.C. Nov. 22 & 29, 2022); *United States v. Gillespie*, 22-cr-60, Minute Entry (D.D.C. Dec. 19, 2022); *United States v. Barnett*, 21-cr-38, Minute Entries (D.D.C. Jan. 9 & 10, 2023); *United States v. Sheppard*, 21-cr-203, Minute Entries (D.D.C. Jan. 20 & 23, 2023); *United States v. Eckerman*, 21-cr-623, Minute Entry (D.D.C. Jan. 23, 2023).  The primary exceptions have trials involving seditious conspiracy charges.  *See United States v. Rhodes, et al.*, 22-cr-15, Minute Entries (D.D.C. Sept. 27, 28, 29; Dec. 6, 7, 8, 9, 2022).  And, using the first five jury trials as exemplars, the voir dire that took place undermines the defendant's claim that prejudice should be presumed.

In *Reffitt*, the Court individually examined 56 prospective jurors and qualified 38 of them (about 68% of those examined).  *See Reffitt*, 21-cr-32, ECF No. 136 at 121.  The Court asked all the prospective jurors whether they had "an opinion about Mr. Reffitt's guilt or innocence in this case" and whether they had any "strong feelings or opinions" about the events of January 6 or any political beliefs that it would make it difficult to be a "fair and impartial" juror.  *Reffitt*, 21-cr-32, ECF No. 133 at 23, 30.  The Court then followed up during individual voir dire.  Of the 18 jurors that were struck for cause, only nine (or 16% of the 56 people examined) indicated that they had such strong feelings about the events of January 6 that they could not serve as fair or impartial

jurors.[4]

In *Thompson*, the Court individually examined 34 prospective jurors, and qualified 25 of them (or 73%).  *See Thompson*, 21-cr-161, ECF No. 106 at 170, 172, 181, 190, 193.  The court asked the entire venire 47 standard questions, and then followed up on their affirmative answers during individual voir dire.  *Id.* at 4–5, 35.  Of the nine prospective jurors struck for cause, only three (or about 9% of those examined) were stricken based on an inability to be impartial, as opposed to some other cause.[5]

Similarly, in *Robertson*, the Court individually examined 49 prospective jurors and qualified 34 of them (or about 69% of those examined).  *See Robertson*, 21-cr-34, ECF No. 106 at 73.  The Court asked all prospective jurors whether they had "such strong feelings" about the events of January 6 that it would be "difficult" to follow the court's instructions "and render a fair and impartial verdict."  *Robertson*, 21-cr-34, ECF No. 104 at 14.  It asked whether anything about the allegations in that case would prevent prospective jurors from "being neutral and fair" and whether their political views would affect their ability to be "fair and impartial."  *Id.* at 13, 15.  The Court followed up on affirmative answers to those questions during individual voir dire.  Of the 15 prospective jurors struck for cause, only nine (or 18% of the 49 people examined) indicated

---

[4] For those struck based on a professed inability to be impartial, see *Reffitt*, 21-cr-32, ECF No. 133 at 49–54 (Juror 328), 61–68 (Juror 1541), 112–29 (Juror 1046); ECF No. 134 at 41–42 (Juror 443), 43–47 (Juror 45), 71–78 (Juror 1747), 93–104 (Juror 432), 132–43 (Juror 514); ECF No. 135 at 80–91 (Juror 1484).  For those struck for other reasons, see *Reffitt*, 21-cr-32, ECF No. 134 at 35–41 (Juror 313, worked at Library of Congress); ECF No. 134 at 78–93 and ECF No. 135 at 3 (Juror 728, moved out of D.C.); ECF No. 135 at 6–8 (Juror 1650, over 70 and declined to serve), 62–73 (Juror 548, unavailability), 100–04 (Juror 715, anxiety and views on guns), 120 (Juror 548, medical appointments); ECF No. 136 at 41–43 (Juror 1240, health hardship), 53–65 (Juror 464, worked at Library of Congress), 65–86 (Juror 1054, prior knowledge of facts).

[5] For the three stricken for bias, see *Thompson*, 21-cr-161, ECF No. 106 at 51–53 (Juror 1242), 85–86 (Juror 328), 158–59 (Juror 999).  For the six stricken for hardship or inability to focus, see *Thompson*, 21-cr-161, ECF No. 106 at 44 (Juror 1513), 45 (Juror 1267), 49–50 (Juror 503), 50–51 (Juror 1290), 86–93 (Juror 229), 109–10 (Juror 1266).

that they had such strong feelings about the January 6 events that they could not be fair or impartial.[6]

In *Webster*, the Court individually examined 53 jurors and qualified 35 of them (or 66%), *Webster*, 21-cr-208, ECF No. 115 at 6, though it later excused one of those 35 based on hardship, *Webster*, 21-cr-208, ECF No. 114 at 217–18. The Court asked all prospective jurors whether they had "strong feelings" about the events of January 6 or about the former President that would "make it difficult for [the prospective juror] to serve as a fair and impartial juror in this case." *Webster*, 21-cr-208, ECF No. 113 at 19. During individual voir dire, the Court followed up on affirmative answers to clarify whether prospective jurors could set aside their feelings and decide the case fairly. *See, e.g.*, *id.* at 32–33, 41–42, 54–56, 63, 65–66. Only 10 out of 53 prospective jurors (or about 19%) were stricken based on a professed or imputed inability to be impartial, as opposed to some other reason.[7] The *Webster* Court observed that this number "was actually relatively low" and therefore "doesn't bear out the concerns that were at root in the venue transfer motion" in that

---

[6] For those struck based on a professed inability to be impartial, see *Robertson*, 21-cr-34, ECF No. 104 at 26–34 (Juror 1431), 97–100 (Juror 1567); ECF No. 105 at 20–29 (Juror 936), 35–41 (Juror 799), 59–70 (Juror 696), 88–92 (Juror 429); ECF No. 106 at 27–36 (Juror 1010), 36–39 (Juror 585), 58–63 (Juror 1160). For those struck for other reasons, see *Robertson*, 21-cr-34, ECF No. 104 at 23–26 (Juror 1566, hardship related to care for elderly sisters), 83–84 (Juror 1027, moved out of D.C.); ECF No. 105 at 55–59 (Juror 1122, language concerns), 92–94 (Juror 505, work hardship); ECF No. 106 at 16–21 (Juror 474, work trip); 50–53 (Juror 846, preplanned trip).

[7] The D.C. Circuit found that the court should have struck one additional juror for cause, but "that single error in a lengthy voir dire process does not indict the process itself given the absence of any prejudice tied to the jurors who actually decided Webster's case." *Webster*, 2024 WL 2712697, at *7. Nine of the 19 stricken jurors were excused based on hardship or a religious belief. *See Webster*, 21-cr-208, ECF No. 113 at 46 (Juror 1464), 49–50 (Juror 1132), 61 (Juror 1153), 68 (Juror 951), 78 (Juror 419); *Webster*, 21-cr-208, ECF No. 114 at 102–04, 207, 217 (Juror 571), 188 (Juror 1114), 191 (Juror 176), 203–04 (Juror 1262). Of the ten other stricken jurors, three professed an ability to be impartial but were nevertheless stricken based on a connection to the events or to the U.S. Attorney's Office. *See Webster*, 21-cr-208, ECF No. 113 at 58–60 (Juror 689 was a deputy chief of staff for a member of congress); *Webster*, 21-cr-208, ECF No. 114 at 139–41 (Juror 625's former mother-in-law was a member of congress); 196–98 (Juror 780 was a former Assistant U.S. Attorney in D.C.).

case. *Webster*, 21-cr-208, ECF No. 115 at 7.

In *Hale-Cusanelli*, the Court individually examined 47 prospective jurors and qualified 32 of them (or 68%). *Hale-Cusanelli*, 21-cr-37, ECF No. 91 at 106, 111. The Court asked prospective jurors questions similar to those asked in the other trials. *See Hale-Cusanelli*, 21-cr-37, ECF No. 90 at 72–74 (Questions 16, 20). Of the 15 prospective jurors struck for cause, 11 (or 23% of those examined) were stricken based on a connection to the events of January 6 or a professed inability to be impartial.[8]

In these first five jury trials, the percentage of prospective jurors stricken for cause based on partiality is far lower than in *Irvin*, where the Supreme Court said that "statement[s] of impartiality" by some prospective jurors could be given "little weight" based on the number of other prospective jurors who "admitted prejudice." *Irvin*, 366 U.S. at 728. In *Irvin*, 268 of 430 prospective jurors (or 62%) were stricken for cause based on "fixed opinions as to the guilt of petitioner." *Id.* at 727. The percentage of partiality-based strikes in these first five January 6-related jury trials—between 9% and 23% of those examined—is far lower than the 62% in *Irvin*. The percentage in these cases is lower even than in *Murphy*, where 20 of 78 prospective jurors (25%) were "excused because they indicated an opinion as to petitioner's guilt." *Murphy*, 421 U.S. at 803. *Murphy* said that this percentage "by no means suggests a community with sentiment so poisoned against petitioner as to impeach the indifference of jurors who displayed no animus of their own." *Id.* As in *Murphy*, the number of prospective jurors indicating bias does not call into question the qualifications of others whose statements of impartiality the Court has credited.

---

[8] *See Hale-Cusanelli*, 21-cr-37, ECF No. 90 at 61-62 (Juror 499), 67-68 (Juror 872), 84-85 (Juror 206), 91-94 (Juror 653); ECF No. 91 at 2-5 (Juror 1129), 32 (Juror 182), 36 (Juror 176), 61-62 (Juror 890), 75-78 (Juror 870), 94-97 (Juror 1111), 97-104 (Juror 1412). For the four jurors excused for hardship, see *Hale-Cusanelli*, 21-cr-37, ECF No. 90 at 77-79 (Juror 1524), 99 (Juror 1094); ECF No. 91 at 12 (Juror 1014), 31 (Juror 899).

Far from showing that "an impartial jury actually cannot be selected," *Haldeman*, 559 F.2d at 63, the first five January 6-related jury trials confirmed that voir dire can adequately screen out prospective jurors who cannot be fair and impartial, while leaving more than sufficient qualified jurors to hear the case.  The Court should deny the defendant's request for a venue transfer and should instead rely on a thorough voir dire to protect the defendant's right to an impartial jury.

## VIII.   A Jury Questionnaire Is Not Necessary in This Case.

The defendant also contends that this Court should use a jury questionnaire in selecting a jury.  Mot. at 14.  The defendant is incorrect.  Although this Court has discretion to use a written questionnaire, it need not do so because it can select an impartial jury using only in-person voir dire.[9]  Issues of pre-trial publicity and potential prejudice are more meaningfully explored by in-

---

[9] Some judges in this District have used written questionnaires to aid in screening potential jurors in particular cases.  *See, e.g., United States v. Stone*, 613 F. Supp. 3d 1, 6 (D.D.C. 2020); *United States v. Lorenzana-Cordon*, 03-cr-331, 2016 WL 11664054, at *1 (D.D.C. Feb. 22, 2016).  Beyond the seditious conspiracy cases, at least one judge used a questionnaire in a January 6 trial.  *United States v. Alford*, 21-cr-263, ECF Nos. 46 at 15, 50 (D.D.C. Apr. 18, 2022) (TSC).  Other district judges have denied requests for jury questionnaires, upon seeing that "other courts in this District have empaneled juries in January 6 cases without resorting to enhanced protocols."  *Nassif*, 628 F. Supp. 3d at 188.  That jury questionnaires have been utilized in vanishingly few cases is unsurprising, because the practice is not common in this District.  As one district judge noted in denying a requested jury questionnaire:

> The Court has now overseen jury selection in two January 6 cases in its courtroom, and it can say, based on its own experience and the experience of multiple other judges in the courthouse, that the ordinary voir dire process has been effective in identifying potential jurors who are already familiar with the particular case before the Court or who have strong opinions about the events of January 6 in general. Use of a questionnaire has been the exception rather than the rule, and the cases where questionnaires were used have been those where there has been considerable publicity about a group to which the co-defendants and alleged co-conspirators belonged as well as some of the individual defendants personally.

*United States v. Rodriguez*, 21-cr-246, ECF No. 141.  Judges in many January 6 cases have achieved the efficiency often served by questionnaires by using a hybrid voir dire in which the court initially asks questions of the entire venire, with prospective jurors noting their answers on notecards, followed by individual questioning.

person examination than by use of a jury questionnaire.  "[W]ritten answers [do] not give counsel or the court any exposure to the demeanor of the juror in answering the . . . questions."  *Mu'Min*, 500 U.S. at 425.  A prospective juror's tone of voice and demeanor are important.  *See Rosales-Lopez*, 451 U.S. at 188 (observing that the court "must reach conclusions" based on its "own evaluation[] of demeanor evidence and of response to questions").  Indeed, "[h]ow a person says something can be as telling as what a person says."  *United States v. Jackson*, 863 F. Supp. 1449, 1459 (D. Kan. 1994); *see also Mu'Min*, 500 U.S. at 433 (O'Connor, J., concurring) ("A particular juror's tone of voice or demeanor might have suggested to the trial judge that the juror had formed an opinion about the case and should therefore be excused.").  And even where a questionnaire is used, in-person follow-up questioning is important to give the court the "face-to-face opportunity to gauge demeanor and credibility."  *Skilling*, 561 U.S. at 395.  A jury questionnaire would not materially assist jury selection in this case, since there is no suggestion that this particular defendant has received unusually significant, unfavorable pretrial publicity, and any potential prejudice due to general media coverage of the events of January 6, 2021 can be adequately probed through in-person voir dire examination.

## CONCLUSION

For the foregoing reasons, the defendant's motion to transfer venue should be denied.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052


By:      */s/ Anthony W. Mariano*
ANTHONY W. MARIANO
MA Bar No. 688559
Trial Attorney, Detailee

Capitol Siege Section
United States Attorney's Office
for the District of Columbia
601 D Street N.W.
Washington, D.C. 20530
(202) 476-0319
Anthony.Mariano2@usdoj.gov