### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | **Case No. 23-cr-184 (RDM)** |
| | **:** | |
| **JARED LANE WISE,** | **:** | |
| | **:** | |
| **Defendant.** | **:** | |

### UNITED STATES' OPPOSITION TO DEFENDANT'S
### MOTION TO SUPPRESS EVIDENCE

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits its Opposition to defendant Jared Lane Wise's Motion To Suppress Evidence. ECF No. 43 ("Mot."). In the motion, the defendant seeks to suppress evidence seized pursuant to warrants issued on May 5, 2022, November 23, 2022, and April 24, 2023. Because each of these warrants was supported by probable cause, and law enforcement reasonably relied, in good faith, on the issuance of these warrant to seize evidence, the defendant's motion to suppress should be denied.

### BACKGROUND

#### I.     The Defendant's January 6, 2021 Conduct

For a fulsome recitation of facts, the United States respectfully incorporates the background section set out in the United States' Opposition to Defendant's Motion To Dismiss Counts One and Two of the Indictment or Require a Bill of Particulars and Motion for a Bill of Particulars, ECF No. 50, at 2–3.

1

## II.        The May 5, 2022 Warrant

On May 5, 2022, the Honorable Robin M. Meriweather, United States Magistrate Judge for the U.S. District Court for the District of Columbia issued a search warrant to search information associated with the defendant's telephone account that was held by AT&T Corporation (AT&T).   *In the Matter of the Search of Information Associated with One Cell Phone Account Stored at Premises Controlled by AT&T Corporation Pursuant to 18 U.S.C. 2703 for Investigation of Violation of 18 U.S.C. § 1752 and 40 U.S.C. §§ 5104(e) and (f)*, 22-sc-1185 (D.D.C. May 5, 2022) (Government's Exhibit A).   The warrant authorized the search of information, in the custody of AT&T, which was associated with the defendant's cell phone account, including subscriber information, toll records, and other records and information (not including the contents of communications) related to wire and electronic communications sent or received, for the period November 1, 2020 through February 1, 2021.   *See* Exhibit A at Attachments A & B.   The warrant authorized the seizure of the certain information related to violations of 18 U.S.C. § 1752 and 40 U.S.C. §§ 5104(e) and (f).   *See id.* at Attachment B.   While the warrant authorized the search of information for the period November 1, 2020 through February 1, 2021, the warrant authorized the seizure only of evidence related to the noted offenses. *See id.*

In support of the probable cause for the warrant, the application for the warrant was supported by an affidavit, which included facts related to the January 6, 2021 riot generally, *see id.* at ¶¶ 7–37, and facts related to the defendant's background and personal conduct on January 6, 2021 specifically, *see id.* at ¶¶ 38–45.   As to the defendant's offense conduct, the affidavit detailed that the defendant had been identified on Metropolitan Police Department ("MPD") body-worn

camera ("BWC") footage.   *Id.* at ¶ 44.   While on BWC, the affidavit explains, the defendant told an MPD officer, "You're disgusting.   I'm former law enforcement.   You're disgusting…. Shame on you."   *Id.*   The warrant included photographs from these moments and identified that the defendant was, in fact, a former law enforcement officer, having worked as an FBI Special Agent and then Supervisory Special Agent for approximately 13 years, before resigning in 2017.   *Id.* The affidavit also identified the defendant in U.S. Capitol CCTV footage inside the Capitol building.   *Id.* at ¶ 45.

In addition, the affidavit also provided information establishing the defendant's cell phone number, *id.* at ¶¶ 38, 42, and that the cell phone provider was AT&T, *id.* at ¶ 39.   The affidavit also stated that that records previously received from AT&T yielded positive results for the defendant's cell phone number was active on AT&T cell towers providing service to the geographic area that included the interior of the United States Capitol building at 2:15 p.m., 2:22 p.m., 2:26 p.m., and 2:29 p.m.   *Id.* at ¶¶ 40–41.   The affidavit also included facts related to the information AT&T collects and stores.   *See id.* at ¶¶ 46–48.

### III.   The November 23, 2022 Warrant

On November 23, 2022, the Honorable Zia M. Faruqui, United States Magistrate Judge for the U.S. District Court for the District of Columbia issued a second search warrant to search information associated with the defendant's telephone account that was held by AT&T.   *In the Matter of the Search of the Monitoring of Global Positioning System Information and Cell Site Location Data for One AT&T Corporation Cell Phone and Search of Information Associated with the Same Number in Violation of 18 U.S.C. §§ 1752(a)(1) and (a)(2) and 40 U.S.C. §§ 5104(e)(2)(D) and (e)(2)(G)*, 22-sc-2947 (D.D.C. Nov. 23, 2022) (Government's Exhibit B).

The warrant authorized the search of information, in the custody of AT&T, which was associated with the defendant's cell phone account, including subscriber information, toll records, and the contents of communications for the period November 3, 2020 through January 31, 2021, and prospective information about the location of the cell phone.   *See* Exhibit B at Attachments A & B.   With respect to the historical subscriber information and toll records, the warrant authorized the seizure of certain information related to violations of 18 U.S.C. §§ 1752(a)(1) and (a)(2) and 40 U.S.C. §§ 5104(e)(2)(D) and (e)(2)(G).   *See id.* at Attachment B-2.   While the warrant authorized the search of information for the period November 1, 2020 through February 1, 2021, the warrant authorized the seizure only of evidence related to the noted offenses.   *See id.*

In support of the probable cause for the warrant—as it relates to the historical information that is the subject of the defendant's motion—the application for the warrant was supported by an affidavit, which included many of the same supporting facts from the May 2022 warrant affidavit. Specifically, the November 2022 warrant affidavit included the details outlined in the prior section, included the facts related to the January 6, 2021 riot generally, *see id.* at ¶¶ 8–38, facts related to the defendant's background and personal conduct on January 6, 2021 specifically, *see id.* at ¶¶ 39–49, and facts related to the information AT&T collects and stores, *see id.* at ¶¶ 57–64.   The affidavit included the same facts as those outlined in the prior section establishing the defendant's cell phone number, *id.* at ¶¶ 39, 43, that the cell phone provider was AT&T, *id.* at ¶ 39, and that the defendant's cell phone number was active on AT&T cell towers providing service to the geographic area that included the interior of the United States Capitol building at 2:15 p.m., 2:22 p.m., 2:26 p.m., and 2:29 p.m., *id.* at ¶¶ 41–42.

4

In addition to this probable cause, which was substantially similar to that identified in the May 2022 warrant, the November 2022 warrant affidavit added further facts developed since the May 2022 warrant.   Specifically, the affidavit added: "On May 9, 2022, a search warrant was issued to AT&T and the return showed that WISE utilized an iPhone XR . . . .   The return also showed WISE had 62 phone calls and 46 text messages on January 6, 2021."   *Id.* at ¶ 47.   The affidavit also added, "Based on my training and experience and my conversations with other special agents, I know that many persons who came to the Capitol on January 6, 2021, engaged in planning between the time of the November 2020 election and January 6, 2021, and that they communicated with other like-minded individuals about their purpose in coming to the Capitol using their smartphones."   *Id.* at ¶ 48.   The affidavit also added, "I also know that many of these individuals present used their smartphones to take photos of themselves and others at the Capitol and shared those photos with other like-minded individuals using a variety of communications media available through smartphone applications.   Paragraph 45, above, includes a photograph of WISE holding his cell phone with his arm raised."   *Id.* at ¶ 49.[1]

## IV.   The April 2, 2023 Traffic Stop

On April 2, 2023, before the defendant was arrested in this matter, an officer with California Highway Patriot ("CHP") conducted a traffic stop of the defendant in the area of Turlock, California.   The traffic stop was unrelated to the federal investigation into the defendant's role in the January 6, 2021 riot.[2]   At approximately 10:58 a.m., the officer noticed a

---

[1]  The November 2022 included additional facts relevant to the collection of prospective location information.   Exhibit B at ¶¶ 50–52.   Because the defendant has not moved to suppress the prospective location information, that information is not otherwise discussed here.
[2]  The traffic stop occurred prior to the defendant's April 12, 2023 arrest warrant being issued.

dark grey colored Mazda CX-7 with a black and white Texas license plate.   The officer ran a vehicle registration check on the license plate through CHP dispatch.   The vehicle returned clear. The officer decided to make a traffic enforcement stop of the vehicle based on the registration return, which indicated the car's color was blue, rather than what the officer observed to be grey. The officer knew, based on his training and experience, that there are many vehicles in the state of California that have had their Vehicle Identification Number (VIN) switched in Texas.   Altering a vehicle's VIN is a traffic violation in California.   CA Veh. Code § 10750 (2023) ("No person shall intentionally deface, destroy, or alter the motor number, other distinguishing number, or identification mark of a vehicle required or employed for registration purposes without written authorization from the department, nor shall any person place or stamp any serial, motor, or other number or mark upon a vehicle, except one assigned thereto by the department.").

The traffic stopped occurred shortly thereafter, at approximately 11:00 a.m.   The officer advised the defendant of the reason for the stop—including both the discrepancy in the vehicle's color and the officer's knowledge of VIN switching in Texas—and requested the defendant's license and registration.   The officer retreated to check the defendant's license and registration. As this happened, the defendant began holding his cell phone out the driver's side window of vehicle and started to film the traffic stop.   After checking the defendant's license and registration, the officer returned to the defendant's vehicle and provided the defendant with his license and registration documents and advised the defendant he was "free to leave."   In other words, the traffic stop had ended.

But after he was told he was free to leave, the defendant became verbally aggressive and irritated with the officer.   The defendant insisted he was stopped unlawfully and said there was

another reason why the officer made the traffic stop.   The officer continued to advise the defendant of the reason for the stop and told him multiple times the stop was over and that he was "free to leave."   As the officer returned to his patrol vehicle, the defendant exited his vehicle, carrying his cell phone, and appeared to be recording the officer and his vehicle.   The defendant approached the officer in a slightly aggressive manner and continued to appear upset that he was stopped.   The defendant requested the officer's name and badge number, which the officer then provided.   The officer again advised the defendant that the traffic stop was over and he was free to leave.   After approximately two minutes, the defendant returned to his vehicle and departed.

## V.   The April 24, 2023 Warrant

On April 12, 2023, the Honorable Moxila A. Upadhyaya, United States Magistrate Judge for the U.S. District Court for the District of Columbia issued an arrest warrant for the defendant. ECF No. 5.   At the time, the United States understood that the defendant was in the Eastern District of California.   Accordingly, on April 13, 2023, the FBI sought and a search warrant was granted in that district, by the Honorable Carolyn K. Delaney, United States Magistrate Judge for the U.S. District Court for the Eastern District of California, for the search and seizure of any digital devices on the defendant's person.   *See In the Matter of the Search of the Person of Jared L. Wise*, 2:23-sw-379 (E.D. Cal. April 13, 2023) (Government's Exhibit C).   That warrant was supported by probable cause, included facts related to the January 6, 2021 riot generally, *see id.* at ¶¶ 19–49, facts related to the defendant's background and personal conduct on January 6, 2021 specifically, *see id.* at ¶¶ 50–60, and facts related to use of cell phones and the ability of cell phones to store information, *see id.* at ¶¶ 61–62, 65–66.   Because the defendant left the Eastern District of California prior to being apprehended, that warrant was never executed.

Once the defendant returned to his residence in the District of Oregon, the United States sought a separate warrant to search his residence, vehicle, and person for relevant evidence. On April 24, 2023, the Honorable Mustafa T. Kasubhai, United States Magistrate Judge for the U.S. District Court for the District of Oregon issued a search warrant to search the defendant's residence, vehicle, and person. *In the Matter of the Search of Premises located at [REDACTED], Bend, Oregon, a 2009 Mazda CX7, and the person Jared Lane Wise, as described in Attachment A*, 6:23-mc-341 (D. Or. Apr. 24, 2023) (Government's Exhibit D). Attachment A, which identified the specific residence, vehicle, and person to be searched, included, for each, a specific description and one or multiple photographs. *See* Exhibit D at Attachment A. The warrant authorized the seizure of the certain information related to violations of various statutes, including the offenses the defendant had been charged with already—18 U.S.C. §§ 1752(a)(1) and (a)(2) and 40 U.S.C. §§ 5104(e)(2)(D) and (e)(2)(G)—and other offenses which there was probable cause to believe the defendant or others had committed on January 6, 2021. *See id.* at Attachment B (including violations of Sections 1512(c)(2), 111, 231, 371, and 372, among others). Among other items, the warrant authorized the seizure of digital devices and clothing worn by the defendant at the U.S. Capitol. *See id.*

In support of the probable cause for the warrant, the application for the warrant was supported by an affidavit, which included facts related to the January 6, 2021 riot generally, *see id.* at ¶¶ 17–47, facts related to the defendant's background and personal conduct on January 6, 2021 specifically, *see id.* at ¶¶ 48–59, and facts related to use of cell phones and the ability of cell phones to store information, *see id.* at ¶¶ 60–62, 65–66, 68–69. Consistent with standard practice

in the District of Oregon, the affidavit included an attestation that the affiant had conferred with a federal prosecutor regarding the warrant.   *Id.* at ¶ 86.

As to the defendant's offense conduct, the affidavit incorporated substantially the same facts as those included in the November 2022 warrant affidavit, but provided additional details not captured in the previous warrants.   Specifically, the warrant noted that, according to U.S. Capitol CCTV footage, the defendant entered the U.S. Capitol building at approximately 2:23 p.m., through the Senate Wing Door.   *Id.* at ¶ 52.   The affidavit included a photograph from this moment.   *Id.*   The affidavit went further in explaining the defendant's conduct inside the Capitol building and the clothing he was wearing: "After entering through the Senate Wing Door, WISE clapped his hands and raised his arms in triumph.   WISE walked through the Crypt and past the Memorial Door, ultimately returning and exiting through a window adjacent to the Senate Wing Door.   While inside the U.S. Capitol building, WISE is seen wearing a blue jacket and a dark facemask and carrying a dark backpack."   *Id.* at ¶ 53.   The affidavit included photographs of the defendant in the area of the Memorial Door.   *Id.*   The affidavit noted that the defendant exited the Capitol building at approximately 2:32 p.m., through a window adjacent to the Senate Wing Door.   *Id.* at ¶ 54.   The affidavit included photographs from these moments.   *Id.*   The affidavit also provided additional detail regarding the defendant's engagement with MPD officers, including the approximate timing and that the defendant engaged in this conduct while officers were being assaulted directly in front of him:

> A review of MPD BWC footage revealed WISE engaging with police officers.   At approximately 4:21 PM EST, on the Upper West Terrace, WISE tells MPD officers, "You guys are disgusting. I'm former—I'm former law enforcement.   You're disgusting.   You are the Nazi.   You are the Gestapo.   You can't see it. . . . Shame on you!   Shame on you!   Shame on you!"   When violence against law enforcement began in front of WISE, including officers being knocked to the

ground directly in front of him, WISE turned in the direction of the violence and
shouted, "Yeah, fuck them!   Yeah, kill 'em!"   A few seconds later, as assaults
continued, he shouted in the direction of the rioters attacking the police line, "Kill
'em!   Kill 'em!   Kill 'em!" . . . .   WISE appears wearing a blue jacket and black
hat and carrying a dark backpack.

*Id.* at ¶ 55.   The affidavit included three photographs from these moments, including one in which

the defendant is holding out his phone toward the violence, in a manner consistent with recording.

*Id.*   The affidavit also included evidence establishing the defendant's residence at the subject

premises and the subject vehicle's association with the defendant.   *Id.* at ¶¶ 56.

The affidavit also included updated information regarding the defendant's continued use

of his known cell phone.   In addition to the information provided in prior warrant affidavits, the

April 24, 2023 affidavit added the following:

On May 9, 2022, a search warrant was issued to AT&T.   The information received,
confirmed that WISE's Phone is an Apple iPhone XR . . . and showed that WISE's
Phone was used on January 6, 2021, to make approximately 62 phone calls and
send/receive approximately 46 text messages.   Some of the text messages showed
video file attachments.   On November 28, 2022, a subsequent warrant was issued
to AT&T and the information provided confirmed that WISE was still actively
using WISE's Phone.   On April 18, 2023, a subsequent warrant was issued to
AT&T and the information provided confirmed that WISE was still actively using
WISE's Phone.

*Id.* at ¶ 57.   The affidavit added,

As described above, there is evidence that WISE had in his possession a digital
device while at the U.S. Capitol on January 6, 2021.   In addition, based on photos
and videos of the offenses that date, numerous persons committing the Target
Offenses possessed digital devices that they used to record and post photos and
videos of themselves and others committing those offenses.   Further, based on the
investigation, numerous persons committing the Target Offenses possessed digital
devices to communicate with other individuals to plan their attendance at the
gatherings, to coordinate with other participants at the gatherings, and to post on
social media and digital forums about the gatherings.

*Id.* at ¶ 59.   The affidavit provided additional details regarding the ubiquity of cell phone usage, *see id.* at ¶ 60, information that it "is common for individuals to back up or preserve copies of digital media (such as photos and videos) across multiple devices," *id.* at ¶ 61, and information explaining, with respect to digital information, "[e]ven when files have been deleted, they can be recovered months or years later using forensic tools," *id.* at ¶ 65(a).

Pursuant to this search warrant, on May 1, 2023, law enforcement seized—from the defendant's person and residence—the defendant's digital devices and clothing worn by the defendant at the U.S. Capitol on January 6, 2021. Specifically, law enforcement seized:

1.   A black Apple iPhone, seized from the person of the defendant.

2.   A silver Apple MacBook Pro, seized from the defendant's residence.

3.   An AT&T prepaid LG Phoenix 5 phone (still in manufacturer's packaging), seized from the defendant's residence.

4.   A black hat, seized from the defendant's residence.

5.   A pair of black gloves, seized from the defendant's residence.

6.   An Arcteryx jacket, seized from the defendant's residence.

The clothing seized appeared consistent with what the defendant wore at the Capitol on January 6, 2021.   No items were seized from the defendant's vehicle.

## VI.   The Charges and the Instant Motion

For this conduct, the defendant was charged, by criminal complaint on April 12, 2023, with four misdemeanor offenses, ECF No. 1, and was arrested on May 1, 2023, ECF No. 5.   On May 31, 2023, a grand jury returned an Indictment charging the defendant with the following six offenses:

Count One:     Civil Disorder and Aiding and Abetting, in violation of 18 U.S.C. §§ 231(a)(3), 2.

Count Two:     Assaulting, Resisting, or Impeding Certain Officers and Aiding and Abetting, in violation of 18 U.S.C. §§ 111(a)(1), 2.

Count Three:  Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1).

Count Four:    Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2).

Count Five:    Disorderly Conduct in a Capitol Building or Grounds, in violation of 40 U.S.C. § 5104(e)(2)(D).

Count Six:      Parading, Demonstrating, and Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).

*See* ECF No. 9.

On June 11, 2024, the defendant filed a motion to suppress evidence seized pursuant to the May 5, 2022, November 23, 2022, and April 24, 2023 warrants.   *See* Mot.   The United States now responds.

## LEGAL STANDARD

### I.    Probable Cause To Search and Seize Generally

The Fourth Amendment requires that search warrants be supported by probable cause and state with particularity the places that will be searched and the things that will be seized.   U.S. CONST. Amend. IV.   "The law is clear that an affidavit in support of a warrant application 'must provide the magistrate with a substantial basis for determining the existence of probable cause,' and it cannot consist of 'wholly conclusory statement[s].'"   *United States v. Manafort*, 314 F. Supp. 3d 258, 266 (D.D.C. 2018) (quoting *Illinois v. Gates*, 462 U.S. 213, 239 (1983)).   "The proponent of a motion to suppress bears the burden of establishing that his Fourth Amendment

rights were violated by the challenged search or seizure." *Id*. at 263 (citing *Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978)).

In evaluating probable cause, the assessment should be a "practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Cardoza*, 713 F.3d 656, 659 (D.C. Cir. 2013) (quoting *Gates*, 462 U.S. at 238). The sufficiency of the showing underlying the issuance of a search warrant requires "not a prima facie showing," *Gates*, 462 U.S. at 235 (quoting *Spinelli v. United States*, 393 U.S. 410, 419 (1969)), but only a "fair probability," *id.* at 238. In *District of Columbia v. Wesby*, 583 U.S. 48 (2018), the Supreme Court further reaffirmed that:

> Because probable cause deals with probabilities and depends on the totality of the circumstances, it is a fluid concept that is not readily, or even usefully, reduced to a neat set of legal rules. It requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.

*Id.* at 57 (cleaned up) (quoting *Maryland v. Pringle*, 540 U.S. 366, 371 (2003); *Gate*, 462 U.S. at 232, 243–44, n.13).

As articulated by the Supreme Court, "[p]robable cause is 'not a high bar.'" *Id.* (quoting *Kayley v. United States*, 571 U.S. 320, 338 (2014)). Probable cause is satisfied when the search warrant application provides (1) a substantial basis for concluding that a search will uncover evidence of wrongdoing from a particular location, and (2) that a nexus exists between the item seized and criminal behavior. *See, e.g.*, *United States v. Griffith*, 867 F.3d 1265, 1271 (D.C. Cir. 2017). To satisfy the nexus requirement, the magistrate needs only to determine that there is a "reasonable basis to infer from the nature of the illegal activity observed, that relevant evidence will be found in the residence." *United States v. Thomas*, 989 F.2d 1252, 1255 (D.C. Cir. 1993).

This nexus can be established by, in addition to the affiant describing the facts of the case, the affiant's reasonable inferences based on her training and experience as articulated in the affidavit. *See United States v. Burroughs*, 882 F. Supp. 2d at 122.

## II.   Staleness

Part of the analysis about whether there is probable cause to search is the recency of the supporting evidence in the affidavit.   *See United States v. Washington*, 775 F.3d 405 (D.C. Cir. 2014); *see also United States v. Webb*, 255 F.3d 890, 904 (D.C. Cir. 2001).   However, the determination of whether information is "fresh" or "stale" is not merely a rote calculus of the days elapsed since the crime.   *See Walczyk v. Rio*, 496 F.3d 139, 162 (2d Cir. 2007) ("The law sensibly draws no bright-line rule for staleness."); *United States v. Ali*, 870 F. Supp. 2d 10, 33 (D.D.C. 2012) ("[I]n determining probable cause for the issuance of a search warrant, time alone, of course, is not controlling." (quoting *Schoeneman v. United States*, 317 F.2d 173, 177–78 (D.C. Cir. 1963))).

The question instead "is whether, at the time an affidavit is presented to a magistrate, it establishes probable cause that evidence will be found at the location of the search."   *Ali*, 870 F. Supp. 2d at 33.   To this point, the D.C. Circuit has provided gloss and caution when attempting to reduce a staleness analysis to a mathematical function:

> The likelihood that the evidence sought is still in place is a function not simply of watch and calendar but of variables that do not punch a clock: the character of the crime (chance encounter in the night or regenerating conspiracy?), of the criminal (nomadic or entrenched?), of the thing to be seized (perishable and easily transferable or of enduring utility to its holder?), of the place to be searched (mere criminal forum of convenience or secure operational base?), etc.

*United States v. Bruner*, 657 F.2d 1278, 1298 (D.C. Cir. 1981) (quoting *Andresen v. State*, 331 A.2d 78, 106 (Md. Ct. Spec. App. 1975), *aff'd*, 427 U.S. 463 (1976)); *see also United States v.*

*Savoy*, 889 F. Supp. 2d 78, 88–89 (D.D.C. 2012) ("Courts need not simply look to the number of days or months between events in determining whether information is stale.   Rather they may look to the type of criminal activity alleged, the characteristics of the suspect and the evidence sought, and the nature of the place to be searched.").

In keeping with *Bruner*, courts in this district have used of a "totality of the circumstances" test when reviewing the warrant decision of an issuing judge.   *See, e.g.*, *United States v. Ginyard*, 628 F. Supp. 3d 31, 47 (D.D.C. 2022) ("Based on the totality of the circumstances, Judge Wellner [of the Superior Court of the District of Columbia] had a substantial basis for concluding that evidence of violation of animal cruelty laws would be found at [the defendant's] residence."). Moreover, when making a determination about the staleness of an affidavit for a search warrant, it is necessary to make an individualized determination about the particular warrant relative to other cases with similar charges and what courts have found regarding "staleness" in those cases. *United States v. Edelin*, 128 F. Supp. 2d 23, 46–47 (D.D.C. 2001).   "[W]hen the evidence sought is of a type that would be maintained after the criminal activity ceased, then older information can still be considered reliable when used to obtain a search warrant." *Id.* (collecting cases wherein warrants with information aged eighteen months, two years, two and a half years, and three and one-half years was still "fresh" for purposes of the Fourth Amendment in light of the nature of the crime and the items sought).

Even if information contained in a warrant is stale, suppression is often not the proper remedy.   Rather, "evidence obtained from a search should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment." *United States v. Leon*, 468 U.S. 897,

919 (1984) (quoting *United States v. Peltier*, 422 U.S. 531, 542 (1975)).   As discussed below, "In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient."   *Washington*, 775 F.3d at 407 (quoting *Leon*, 468 U.S. at 921).   Thus, courts "ordinarily do not suppress evidence seized pursuant to a search warrant unless the warrant affidavit was 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'"   *Cardoza*, 713 F.3d at 659 (quoting *Leon*, 468 U.S. at 923).   This principle also applies to the staleness analysis.   *See United States v. Matthews*, 753 F.3d 1321, 1325–26 (D.C. Cir. 2014); *Webb*, 255 F.3d at 904–05.

To this end, a court's scrutiny of a magistrate court's issuance of a warrant should not take the form of de novo review.   *Gates*, 462 U.S. at 236.   "A grudging or negative attitude by reviewing courts towards warrants is inconsistent with the Fourth Amendment's strong preference for searches conducted pursuant to a warrant; courts should not invalidate warrants by interpreting affidavits in a hypertechnical, rather than a common sense, manner."   *Id.* (cleaned up) (quoting *United States v. Ventresca*, 380 U.S. 102, 108–09 (1983).   Therefore, "the traditional standard of review of an issuing magistrate's probable cause determination has been that so long as the magistrate had a 'substantial basis for concluding' that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more."   *Id.* at 236–37 (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)).

## III.   The Exclusionary Rule

The government may not use evidence seized during an unlawful search as proof against the victim of the unlawful search at criminal trials.   *See Wong Sun v. United States*, 371 U.S. 471,

484 (1963).   Exclusion is not constitutionally required, but instead is a "judicially created means of deterring illegal searches and seizures." *Penn. Bd. of Prob. & Parole v. Scott*, 524 U.S. 357 (1998).   It is applied "only where its deterrence benefits outweigh its 'substantial social costs.'" *Id.* (quoting *Leon*, 468 U.S. at 907).   Suppression of evidence through the rule "has always been our last resort, not our first impulse." *Hudson v. Michigan*, 547 U.S. 586, 591 (2006).

Accordingly, even in the case of an unlawful seizure, the exclusionary rule does not apply automatically.   "The fact that a Fourth Amendment violation occurred—*i.e.*, that a search or arrest was unreasonable—does not necessarily mean that the exclusionary rule applies." *Herring v. United States*, 555 U.S. 135, 140 (2009).   Instead, because the exclusionary rule "serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence," the exclusionary rule should apply only where the error "rise[s] to that level." *Id.* at 144.   The Supreme Court reasoned that several principles explained the distinction: (1) "the exclusionary rule is not an individual right and applies only where it results in appreciable deterrence," *id.* at 141 (cleaned up) (quoting *Leon*, 468 U.S. at 909); (2) "the benefits of deterrence must outweigh the costs," *id.*; (3) "[t]he extent to which the exclusionary rule is justified by these deterrence principles varies with the culpability of the law enforcement conduct," *id.* at 143; (4) "[t]he pertinent analysis of deterrence and culpability is objective, not an inquiry into the subjective awareness of arresting officers," *id.* at 145 (internal quotation marks omitted); (5) "when police mistakes are the result of negligence such as that described here, rather than systemic error or reckless disregard of constitutional requirements, any marginal deterrence does not 'pay its way,'" *id.* at 147 (quoting *Leon*, 468 U.S. at 907–08).   Merely negligent conduct is insufficient to invoke the exclusionary rule because it provides only a marginal deterrent effect. *See id.* at 144 n.4.

Moreover, because "[s]uppression of evidence . . . has always been our last resort," the Supreme Court has required that there be more than a "but for" relationship between the illegality and the seizure. *Hudson*, 547 U.S. at 591–92. Suppression does not apply where the connection is attenuated. Attenuation exists when the causal relationship between the illegality and the seizure is remote, and it also "occurs when, even given a direct causal connection, the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained." *Id.* at 593. In assessing whether the constitutional violation is sufficiently attenuated that the exclusionary rule need not apply, courts considers three critical factors: (1) the time elapsed between the illegality and the acquisition of the evidence, (2) the presence of intervening circumstances, and (3) the purpose and flagrancy of the official misconduct. *See Utah v. Strieff*, 579 U.S. 232, 239 (2016) (citing *Brown v. Illinois*, 422 U.S. 590, 603 (1975)).

## IV.   The Good Faith Exception

The Supreme Court has created a "good faith" exception to the exclusionary rule. Under this exception, "suppression of evidence is usually not required when officers conduct a search in reasonable reliance on a search warrant issued by a detached and neutral magistrate." *Cardoza*, 713 F.3d at 658 (citing *Leon*, 468 U.S. at 913). As such, "[s]o long as the officer relied in objective good faith on the issuing judge's determination, reviewing courts may not apply the exclusionary rule." *United States v. Spencer*, 530 F.3d 1003, 1006–07 (D.C. Cir. 2008). In *Spencer*, the D.C. Circuit noted that "the degree of police deference to the magistrate which is perceived by courts as reasonable under *Leon* exceeds significantly that great deference owed the magistrate by reviewing courts under *Gates*." *Id*. at 1007 (cleaned up) (quoting 1 Wayne R.

Lafave, SEARCH AND SEIZURE § 1.3(f), at 97–98 (4th ed. 2004)).   In short, police officers are "entitled to presume that the magistrate knows what he is doing."   *Id.*   And for good reason. There is a strong preference for law enforcement officials to seek a warrant rather to rely on exigency or another Fourth Amendment exception to justify a search.   *See Massachusetts v. Sheppard*, 468 U.S. 981, 990 (1984) (The "exclusionary rule was adopted to deter unlawful searches by police, not to punish the errors of magistrates and judges." (quoting *Gates*, 462 U.S. at 263)).   In keeping with this strong preference, the defendant, in turn, bears a heavy burden to suppress the results of a search based on a warrant authorized by a magistrate judge because an "affidavit offered in support of a search warrant enjoys a 'presumption of validity.'"   *United States v. Rhine*, 21-cr-687, 2023 WL 2682258, at *2 (D.D.C. Mar. 29, 2023) (quoting *United States v. Maynard*, 615 F.3d 544, 550 (D.C. Cir. 2010)).

In cases where law enforcement relies on a warrant that is later determined to lack probable cause, the reviewing court must balance the deterrent value of excluding evidence against the fact that such exclusion unacceptably impedes the Court's truth-finding functions.   *See Leon*, 468 U.S. at 907; *United States v. Payner*, 447 U.S. 727, 734 (1980); *Stone v. Powell*, 428 U.S. 465, 490 (1976).   As one judge in this District put it:

> When the police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs.   But when the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force, and "exclusion cannot 'pay its way.'"

*Ali*, 870 F. Supp. 2d at 24 (quoting *Davis v. United States*, 564 U.S. 229, 238 (2011)). Consequently, the reviewing court must determine the objective reasonableness of the officers'

reliance by considering "'whether a reasonably well trained officer would have known that the search was illegal' in light of 'all of the circumstances.'" *Id*. (quoting *Herring*, 555 U.S. at 145). "This good faith exception to the exclusionary rule applies not only when a reviewing court concludes that the affidavit in support of the warrant lacked probable cause, but also to warrants later found to be overbroad." *Manafort*, 313 F. Supp. 3d 213, 236 (D.D.C. 2018).

The good faith exception is not without its limits.   The good faith exception will not apply in certain limited circumstances: (1) where "the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth," *Leon*, 468 U.S. at 923 (citing *Franks v. Delaware*, 438 U.S. 154 (1978)); (2) "where the issuing magistrate wholly abandoned his judicial role in the manner condemned in *Lo–Ji Sales, Inc. v. New York*, 442 U.S. 319 [(1979)]," *id.*; (3) where the affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," *id.* (quoting *Brown*, 422 U.S. at 610–11); and (4) "depending on the circumstances of the particular case, a warrant may be so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid," *id.*

## V.   Traffic Stops

A traffic stop is "reasonable under the Fourth Amendment" where an officer has "probable cause to believe [the defendant] had violated the traffic code."   *Wren v. United States*, 517 U.S. 806, 819 (1996).   In fact, under binding precedent, reasonable suspicion is enough.   *See United States v. Arvizu*, 534 U.S. 266, 274 (2002) ("[T]he likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance

of the evidence standard.").   "Although a mere 'hunch' does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause."   *Kansas v. Glover*, 589 U.S. 376, 380 (2020) (quoting *Prado Navarette v. California*, 572 U.S. 393, 397 (2014)).

## ARGUMENT

The defendant's motion to suppress is without merit, as to the May 5, 2022, the November 23, 2022, and April 24, 2023 warrants.

**I.     The May 5, 2022 Warrant Was Not Overbroad and the Evidence Seized Should Not Be Excluded.**

### a.   The May 5, 2022 Warrant Was Not Overbroad.

The defendant seeks to suppress all evidence "before or after January 6, 2021" seized based on the May 5, 2022 search warrant, on the grounds that the warrant "contained no basis for search records from November 1, 2020 to February 1, 2021."   Mot. at 5–6.   Importantly, the defendant does not seek to suppress *all* evidence seized pursuant to the May 2022 warrant, but only "any AT&T records from *before or after* January 6, 2021."   *Id.* at 6.   The defendant's criticism is that the warrant was overbroad to the extent that it did not provide probable cause "for a date range that wide."   *Id.*

As an initial matter, the defendant does not contest that the warrant contains probable cause for the statutes identified—18 U.S.C. § 1752 and 40 U.S.C. §§ 5104(e) and (f).   *See* Exhibit A at ¶ 5.   Nor could he.   The evidence establishing probable cause for these offenses is substantial. In addition to general background information about the January 6, 2021 riot, *see id.* at ¶¶ 7–37, the affidavit supporting the warrant sets out clearly the defendant's offense: that the defendant was

identified on MPD BWC footage, *id.* at ¶ 44, that he engaged with law enforcement on the grounds by making remarks such as "You're disgusting" and "shame on you," *id.*, that he identified himself as former law enforcement, *id.*, and that he was identified on U.S. Capitol CCTV footage inside the Capitol building, *id.* at ¶ 45.   These allegations are more than sufficient to establish probable cause for the Section 1752 and Section 5104 offenses.

And, importantly, it is precisely those statutes that provided the limits for what the government was permitted to seize under the warrant.   *Id.* at Attachment B.II (identifying "[i]nformation to be seized" as "All information described above in Section I that constitutes fruits, contraband, evidence and instrumentalities of violations of 18 U.S.C. § 1752 (Unlawful Entry on Restricted Buildings or Grounds) and 40 U.S.C. §§ 5104(e) and (f) (Unlawful Entry of Capitol Grounds))").   That limitation—restricting the seizure to evidence of these specific crimes— makes the seizure appropriate and defeats the defendant's overbreadth claim.   "A warrant authorizing the search of electronic data is sufficiently particular if its scope is limited to evidence pertaining to a specific crime."   *United States v. Smith*, 19-cr-324, 2021 WL 2982144, at *8 (D.D.C. July 15, 2021); *see also United States v. Bishop*, 910 F.3d 335, 337 (7th Cir. 2018) ("It is enough . . . if the warrant cabins the things being looked for by stating what crime is under investigation.").   On this basis, courts regularly grant warrants seeking authorization to search the entire contents of cell phones and other digital devices.   *See Bishop*, 910 F.3d at 337.

But, here, the warrant was even more narrow: it sought the disclosure for the search of only materials between November 1, 2020 and February 1, 2021.   It is a sensible time period, covering roughly the time period between the 2020 presidential election and the weeks following the January 6, 2021 riot.   Plainly, it was in this period of time where evidence related to the relevant

criminal conduct—including evidence of motive, planning, coordination, conduct on January 6, 2021, and efforts to conceal or cover up that conduct—would most likely be found.   Indeed, evidence has shown in trial after trial in this District that, in January 6 cases, relevant evidence is often found on digital media far later than February 1, 2021—including, and up to, the present day. All of that evidence would be relevant to the Section 1752 and 5104 offenses identified in the warrant—offenses for which the defendant does not contest probable cause is established.

But the warrant here did not even authorize the seizure of all information between November 1, 2020 and February 1, 2021.   While the information to be disclosed was tethered to that time period, seizure was appropriately limited to evidence of criminal conduct, including evidence of, for example, "the Account user's state of mind, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, related to the criminal activity under investigation," "[a]ny plan to unlawfully enter the U.S. Capitol," "[a]ny awareness of the official proceeding that was to take place at Congress on January 6, 2021," and "[e]vidence concerning efforts after the fact to conceal evidence of those offenses."   Exhibit A at Attachment B.II.   All of this evidence is relevant to the alleged crimes, and its seizure was supported by the probable cause established by the warrant for the crimes committed by the defendant, and others, on January 6, 2021.   *See United States v. Castro*, 881 F.3d 961, 965 (6th Cir. 2018) ("A warrant that empowers police to search for something satisfies the particularity requirement if its text constrains the search to evidence of a specific crime.").

The defendant complains that the May 2022 warrant does not establish probable cause for the specific fact that, for example, the defendant may have had coconspirators in storming the Capitol.   *See* Mot. at 6.   But where, as here, the seizure is limited to evidence of the crime for

which there is probable cause, the warrant is appropriate.   The defendant does not contest that there was probable cause for the crimes alleged, that evidence of communications with others could constitute evidence of those crimes, or that AT&T was likely to contain such records. Where the search is cabined by reference to the crime, as it is here, that is sufficient.

Judge Howell's decision is *United States v. Smith*, 2021 WL 2982144, is instructive.   In that case, the defendant challenged as overly broad a warrant seeking "any items or materials relating to the offense of First Degree Child Sexual Abuse" and authorizing the extraction of "all electronic data" stored in the electronic devices.   *Id.* at *9.   The defendant's complaint was similar to that raised here: "Defendant essentially argues that the only evidence for which law enforcement had probable cause to search were the text messages and images described in the affidavit, and that the warrant was invalid insofar as it permitted the search of data files outside of defendant's text messages and images during a specific time period, even though the search was cabined to evidence of First Degree Child Sexual Abuse."   *Id.* at *8.   Judge Howell concluded:

> The 2017 warrant was not fatally lacking in particularity.   The nature of the offense here, First Degree Child Sexual Abuse, sufficiently limited the scope of the search. Investigators knew based on the offense that they were supposed to be searching for a narrowly defined category of evidence, such as photographs, communications, online activities, and user-attribution.   In *Andresen v. Maryland*, the Supreme Court upheld a warrant that provided for the relatively broad search for "fruits, instrumentalities and evidence of [a] crime" found anywhere in the defendant's files, in addition to a list of "particularly described documents."   427 U.S. at 479. The warrant at issue here, which approved the seizure of any evidence relating to first degree sexual abuse on any of defendant's electronic devices, is similar to that at issue in *Andresen*.

*Id.* at *9.   Notably, the warrant in *Smith* was found valid even without *any* date limitation.   *See id.*   The court did not require the warrant to artificially restrict the seizure to only the time period discussed in the warrant affidavit: "While the sexual abuse described in the affidavit allegedly

occurred between May 2016 and April 2017, at the latest, the warrant was not required to limit the object of the search to files generated during that time period if doing so would exclude relevant evidence." *Id.* at *10.   The same should hold here.   Because the warrant was sufficiently particularized by its limitation to the relevant statutes, the Court should deny the motion to suppress.   "This warrant was as specific as circumstances allowed," and "[t]he Constitution does not require more."   *Bishop*, 910 F.3d at 338.

Because the defendant has failed to establish that the May 5, 2022 search warrant's time period was overbroad such that the warrant lacked probable cause, his motion to suppress the evidence recovered pursuant to that warrant should be denied.

### b.   Even if the May 5, 2022 Warrant Were Not Supported by Probable Cause, the Exclusionary Rule Does Not Apply.

But even if the defendant prevailed in his overbreadth argument, he would not be entitled to the exclusionary remedy he seeks because the FBI reasonably relied in good faith on the search warrant.   The defendant's motion does not contest, nor could it, that the affiant "relied in objective good faith on the issuing judge's determination."   *Spencer*, 530 F.3d at 1006–07.   Under such circumstances, "reviewing courts may not apply the exclusionary rule."   *Id.*   There can be no dispute that the warrant was "issued by a detached and neutral magistrate."   *Cardoza*, 713 F.3d at 658.   And, for good reason, the affiant was "entitled to presume that the magistrate knows what he is doing."   *Spencer*, 530 F.3d at 1007.   Given the probable cause established and the narrow time period for which responsive records were sought, the affiant's reliance on the warrant was plainly an objectively reasonable one.   That reasonableness is further supported by the routine issuance of similar warrants, covering the same—or longer—time periods, in the context of January 6, 2021 investigations.   The defendant has failed to overcome the "presumption of

validity" attending to the warrant.   *Maynard*, 615 F.3d at 550.   Nor has the defendant established the kind of "deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights" that would justify exclusion.   *Davis*, 564 U.S. at 238.

The defendant's argument suggests that the May 5, 2022 warrant would have been on substantially firmer footing if it had simply included the same language employed by the November 23, 2022 warrant: "Based on my training and experience and my conversations with other special agents, I know that many persons who came to the Capitol on January 6, 2021, engaged in planning between the time of the November 2020 election and January 6, 2021, and that they communicated with other like-minded individuals about their purpose in coming to the Capitol using their smartphones."   Exhibit B at ¶ 48.   But that coordination took place prior to January 6, 2021 is a reasonable inference from the nature of the day and the facts summarized throughout the warrant, even if it is not explicitly stated.   That the warrant could have been clearer had it included the same language used in the November 2022 warrant is not the point; it is precisely that type of analysis, which elevates the "hypertechnical" above the "common sense," that does not support suppression.   *Gates*, 462 U.S. at 236.

Accordingly, even if the Court determines the probable cause in support of the May 5, 2022 warrant was deficient, or that the warrant was temporally overbroad, the Court should not exclude any evidence because the FBI reasonably relied in good faith on the warrant in executing the search.

## II.   The November 23, 2022 Warrant Was Supported by Probable Cause and the Evidence Seized Should Not Be Excluded.

The defendant seeks to suppress evidence from the November 23, 2022 search warrant for two reasons.   First, the defendant argues that suppression is appropriate under a fruit of the

poisonous tree analysis: that, because the November 2022 affidavit cited evidence uncovered by the May 2022 warrant, if the May 2022 warrant's evidence is suppressed, then the November 2022 warrant would lack probable cause.   Mot. at 6.   Second, the defendant argues if the May 2022 warrant's evidence is not suppressed, the November 2022 warrant still lacks probable cause.   *Id.* at 7.

For the same reasons the Court should deny the motion to suppress evidence seized pursuant to the May 5, 2022 warrant, the Court should deny the defendant's motion to suppress evidence seized pursuant to the November 23, 2022 warrant.   The warrants are substantially similar, though the November 2022 warrant sought disclosure of the contents of communications, which the May 2022 warrant did not.   *Compare* Exhibit A at Attachment B, *with* Exhibit B at Attachment B.   The warrants' affidavits are supported by substantially similar probable cause as to the defendant's personal conduct.   *Compare* Exhibit A at ¶¶ 38–45, *with* Exhibit B at ¶¶ 39–49.   Without repeating them at length, for the same reasons the May 2022 warrant was supported by probable cause, the November 2022 warrant is as well.

In fact, the November 2022 affidavit included additional evidence supporting probable cause.   Specifically, the affidavit included the following: "Based on my training and experience and my conversations with other special agents, I know that many persons who came to the Capitol on January 6, 2021, engaged in planning between the time of the November 2020 election and January 6, 2021, and that they communicated with other like-minded individuals about their purpose in coming to the Capitol using their smartphones."   Exhibit B at ¶ 48.   No counsel, let alone a neutral magistrate evaluating the fluid concept of probable cause, could meaningfully contest this reasonable inference gathered from the evidence that day.   And this additional

statement provides further support for the time period employed by the November 2022 warrant. So, too, does the additional evidence cited from the May 2022 warrant: that that defendant "had 62 phone calls and 46 text messages on January 6, 2021." *Id.* at ¶ 47. All this information supported the magistrate judge's conclusion that the warrant was supported by probable cause.

Uniquely to the November 2022 warrant, the defendant argues that, if the evidence seized pursuant to the May 5, 2022 warrant is suppressed, then the November 2022 warrant would become infirm as well. Specifically, the defendant complains that, in the November 2022 warrant, the affiant "indicated that the search of AT&T records from the first search warrant showed many calls and texts on January 6." Mot at 6. This is true. The November 2022 included a pertinent summary of the results of the May 5, 2022 warrant: "The return also showed WISE had 62 phone calls and 46 text messages on January 6, 2021." Exhibit B at ¶ 47. But this summary is related to the defendant's communications *on* January 6, 2021, and the defendant has not even argued for the suppression of that evidence. *See* Mot. at 6 ("[E]vidence from the search warrant issued May 5, 2022, specifically any AT&T records from *before or after* January 6, 2021, should be suppressed." (emphasis added)). Nor could he, as there is no plausible argument that the seizure of January 6, 2021 evidence was temporally overbroad. Because the defendant has not sought suppression of the January 6, 2021 evidence, the November 2022 warrant would not be altered, and the Court should find it was supported by probable cause.

But even if the Court were to suppress the evidence seized pursuant to the May 2022 warrant, the November 2022 warrant would still be supported by probable cause. The additional language included in the affidavit—that "many persons who came to the Capitol on January 6, 2021, engaged in planning between the time of the November 2020 election and January 6, 2021,

and that they communicated with other like-minded individuals about their purpose in coming to the Capitol using their smartphones," Exhibit B at ¶ 48—supports a finding a probable cause even without the evidence of the defendant's personal phone calls and text messages.

Finally, for the same reasons that the good faith exception would preclude suppression of evidence as to the May 2022 warrant, the same conclusion holds for the November 2022 warrant. Indeed, that a similar warrant was sworn out a second time, by a different magistrate judge, underscores the objective reasonableness of the affiant's reliance on the warrant.   The defendant does not argue to the contrary, nor does he engage with the law on the good faith exception at all.

Because the defendant has failed to establish that the probable cause underpinning the November 23, 2022 search warrant was deficient, and because, even if it were, he would not be entitled to the exclusionary remedy he seeks, the Court should deny the motion.

**III.    The April 24, 2023 Warrant Was Supported by Probable Cause and the Evidence Seized Should Not Be Excluded.**

The defendant raises two separate attacks on the April 24, 2023 search warrant.   First, the defendant argues that the information provided to establish probable cause in the April 24, 2023 warrant affidavit was stale, such that probable cause did not exist for the warrant in its entirety. Mot. at 9–12.   Second, the defendant raises a separate challenge as to the search of the defendant's vehicle.   Specifically, the defendant complains that the warrant, as to the subject vehicle, relied on a photograph taken at what the defense argues was an improper traffic stop, and, in the absence

of that photograph, there would be no probable cause to search the defendant's vehicle.[3]    *Id.* at 7–
9.    Both arguments are meritless, and the Court should deny the motion.

### a.    The April 24, 2023 Warrant's Probable Cause Was Not Stale.

The defendant's principal criticism of the April 24, 2023 warrant is that the information
provided to establish probable cause was stale.    Mot. at 9–12.    But here, the totality of the
circumstances within the affidavit clearly established that there was sufficient probable cause for
the magistrate to issue the warrant.    *See Bruner*, 657 F.2d. at 1298; *Ginyard*, 628 F.Supp.3d at 47.
Accordingly, the motion to suppress should be denied.

The probable cause set out in the April 2023 search warrant affidavit was significant.    The
warrant explicitly identified that according to U.S. Capitol CCTV footage, the defendant entered
the U.S. Capitol building at approximately 2:23 p.m., through the Senate Wing Door.    Exhibit D
at ¶ 52.    The affidavit explained that, based on CCTV footage, he clapped his hands and raised
his arms in triumph before walking through the Crypt and past the Memorial Door and, ultimately,
exiting at 2:32 p.m. through a window adjacent to the Senate Wing Door.    *Id.* at ¶ 53.    Later, on
the Upper West Terrace, the affidavit set out how the defendant called law enforcement "Nazis"
and "the Gestapo," and called out for rioters to "Kill 'em!" as they assaulted law enforcement
directly in front of him.    *Id.* at ¶ 55.    Throughout, the affidavit identified, in photographs and
words, the particular clothing the defendant was wearing in the Capitol building and on its grounds.
*Id.* at ¶¶ 52–53, 55.    The affidavit relayed that, on January 6, 2021, the defendant was regularly
using his cell phone to make calls and send texts, including videos.    *Id.* at ¶ 57.    The affidavit

---

[3] As noted above, nothing was seized from the defendant's vehicle.

provided a photograph showing the defendant using his cell phone, on the Upper West Terrace, in a manner consistent with recording.   *Id.* at ¶ 59.

Of course, many of the facts relied upon to establish probable cause in the affidavit in support of the April 2023 warrant related to January 6, 2021.   That is when the crime was committed.   The defense may want to end the analysis there and simply calculate the time elapsed; but that is not the inquiry.   *See Savoy*, 889 F. Supp. 2d at 88–89 ("Courts need not simply look to the number of days or months between events in determining whether information is stale.   Rather they may look to the type of criminal activity alleged, the characteristics of the suspect and the evidence sought, and the nature of the place to be searched.").   Under the totality of the circumstances analysis, the April 2023 warrant is plainly sufficient.   The April 2023 affidavit did not merely recite the January 6, 2021 conduct and stop.   It provided more recent information establishing the defendant's location, *see* Exhibit D at ¶ 56, and his continued use of the cell phone subject to the warrant, *see* Exhibit D at ¶ 57.   The affiant also stated in the April 2023 affidavit, "in my training and experience, it is common for individuals to back up or preserve copies of digital media (such as photos and videos) across multiple devices to prevent loss."   Exhibit D at ¶ 61.   The affiant added, "Moreover, here, as widely reported in the news media related to this matter, many individuals committing the Target Offenses kept and posted videos, photos, and commentary about their participation in these offenses, essentially bragging about their participation."   *Id.*   The affiant also included information indicating that, even if the digital contents had been deleted, they may still be recoverable through the devices:

> Computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a digital device, deleted, or viewed via the Internet.   Electronic files downloaded to a digital device can be stored for years at little or no cost.   Even when files have been deleted, they can be recovered months

> or years later using forensic tools.   When a person "deletes" a file on a digital
> device, the data contained in the file does not actually disappear; rather, that data
> remains on the digital device until it is overwritten by new data.   Therefore, deleted
> files or remnants of deleted files, may reside in free space or slack space—that is,
> in space on the digital device that is not currently being used by an active file—for
> long periods of time before they are overwritten.

Exhibit D at ¶ 65(a).   All these facts, along with others throughout the affidavit, support the finding of probable cause, despite the fact that the crime had occurred more than two years prior.

Under the totality of the circumstances test, the court should consider "the type of criminal activity," "the evidence sought," and "the nature of the place to be searched."   *Savoy*, 889 F. Supp. 2d at 88–89; *see also Bruner*, 657 F.2d. at 1298.   Here, each factor supports the magistrate judge's decision to issue the warrant.

First, the nature of the evidence sought supports the magistrate judge's conclusion that staleness was not a concern.   The April 2023 warrant authorized the seizure of digital devices and clothing.   *See* Exhibit D at Attachment B.   Both are the types of evidence less susceptible to staleness concerns.   *See Edelin*, 128 F. Supp. 2d at 46–47 ("[O]lder information can still be considered reliable when used to obtain a search warrant" if the evidence sought is of the type that would be maintained after the crime.").   Clothing is a durable good that is not perishable like food, drugs, or even contraband.   Indeed, several courts have recognized that clothing connected to crimes is not stale for purposes of warrants.   *See, e.g.*, *United States v. Robinson*, 741 F.3d 588 (5th Cir. 2014) (stating clothing seen in photographs two years prior was not stale); *United States v. Baker*, 888 F. Supp. 1521 (D. Haw. 1995) (finding that clothing and jewelry were likely still in a house even after 18 months during an ongoing illegal operation); *United States v. Pelham*, 749 F. Supp. 304 (D.D.C. 1990) (black hooded sweat jacket obtained via search warrant after 6 months).   Clothing is drastically different than other kinds of evidence.   For example, drugs

move to and from an illegal market and are often physically consumed by those who possess them, and thus one would not expect narcotics evidence to remain fresh for long. *See United States v. Johnson*, 437 F.3d 69, 72 (D.C. Cir. 2006). Firearms, too, are dangerous, and in the context of those who possess such weapons illegally, often transferred or disposed of in rapid fashion. *Cf. United States v. Jenkins*, 984 F.3d 1038, 1044–45 (D.C. Cir. 2021).

Digital devices are an even more straightforward category. Where "the records or documents in question are digital, staleness is even less of a problem" than for tangible objects. *Ali*, 870 F. Supp. 2d at 34. "[N]umerous courts have recognized that digital files remain on computers for extensive periods of time, even if they have been deleted," such that "the passage of time does not necessarily render the evidence stale." *United States v. Coon*, 2011 WL 1871165, at *3 (W.D.N.Y. May 16, 2011) (collecting cases). "[T]he nature of digital evidence . . . weighs against a finding of staleness." *United States v. Payne*, 394 F. App'x 891, 894 (3d Cir. 2010) (quoting *United States v. Payne*, 519 F. Supp. 2d 466, 477 (D.N.J. 2007)). There is, therefore, no staleness concern with respect to the search of the defendant's devices.

Next, the locations to be searched in this case—the defendant's residence and vehicle— also combat staleness concerns. A person's home is far from a "mere criminal forum of convenience" and is instead a "secure base of operation." *Bruner*, 657 F.2d at 1298. The same must be said of a person's vehicle, which is associated with long-term, rather than fleeting, use. That a person's home would be likely to store their clothing does not require a sensational inference. *Burroughs*, 882 F. Supp. 2d at 122–23 ("It takes a leap of logic to believe a narcotics trafficker would record transactions and store that information in a safety deposit box, but not to

infer that a robber would keep cellular telephones and an iPod in his apartment.").   So too with digital devices, which people regularly carry on their person, in their home, or in their car.

Finally, the nature of the crime being investigated also combats any staleness concerns and supports the magistrate judge's original finding.   As search after search has shown, many January 6 defendants have retained clothing and other evidence of their participation in the events of January 6, 2021.   As this Court knows, the January 6 riot at the Capitol is different from other crimes.   Participants in the riot extensively filmed their conduct, *see, e.g.*, *United States v. Sullivan*, 21-cr-78, ECF No. 1-1, and expressed pride in what they were doing and an awareness of the historical nature of their conduct, *see, e.g.*, *United States v. Thomas*, 21-cr-552, ECF No. 203 at 36–39.   Many of the rioters at the Capitol collected souvenirs from the building, *see United States v. Harkrider*, 21-cr-117, ECF No. 291 at ¶¶ 25–26, stole from the police officers defending the building, *see, e.g.*, *United States v. Ackerman*, 24-cr-60, ECF No. 22 at 2, or simply kept the clothes that they wore that day, *see, e.g.*, *United States v. Ramakrishnan*, 23-cr-247, ECF 28 at 9–10.   The sheer aggregate quantity of crimes that took place at the Capitol on January 6, 2021, and the historic nature of those crimes, coupled with defendants consistently boasting about their involvement on that day further enhance the likelihood that people would keep evidence related to that day.

For all these reasons, the totality of the circumstances in this case amply supports the magistrate's finding of probable cause.   Accordingly, because the defendant has failed to establish that the probable cause underpinning the April 24, 2023 search warrant was stale, his motion to suppress the evidence recovered pursuant to that warrant should be denied.

>    **b.  Even if the April 24, 2023 Warrant's Probable Cause Was Stale, the
>        Exclusionary Rule Does Not Apply.**

But even if the defendant prevailed in his staleness argument, he would not be entitled to

the exclusionary remedy he seeks, because the FBI reasonably relied in good faith on the search

warrant.   As with the other warrants discussed above, the defendant has not even argued that the

affiant did not reasonably rely in good faith on the warrant approved by the magistrate judge.    The

arguments in favor of the good faith exception are similar here as they are for the other warrants.

Here too, the defendant cannot contest that the warrant was "issued by a detached and neutral

magistrate," *Cardoza*, 713 F.3d at 658, nor that the affiant was "entitled to presume that the

magistrate knows what he is doing," *Spencer*, 530 F.3d at 1007.   Given the probable cause

established, the affiant's reliance on the warrant was plainly and objectively reasonable one, and

the defendant has failed to overcome the "presumption of validity" attending to the warrant.

*Maynard*, 615 F.3d at 550.   Nor has the defendant established the kind of "deliberate, reckless, or

grossly negligent disregard for Fourth Amendment rights" that would justify exclusion.   *Davis*,

564 U.S. at 238.   "At the very least," the Court should "conclude[] that the warrants were not so

lacking in fresh information so as to make the executing officers' reliance on them objectively

unreasonable."   *Ali*, 870 F. Supp. 2d at 34; *see Matthews*, 753 F.3d at 1325–26 (declining to

determine whether a period of three years made evidence "stale" because the officers were

executing a warrant that contained "a judicial mandate to an officer to conduct a search" (quoting

*Leon*, 468 U.S. at 920 n.21)).

The reasonableness of the affiant's reliance on the warrant is bolstered by the routine

issuance of similar warrants, seeking, at the time of arrest, digital devices and clothing from

defendants, in the context of January 6, 2021 investigations.   These warrants are not just granted,

but they are regularly fruitful—as they were in this case.   For example, in the context of ongoing January 6 investigations and prosecutions, the United States proffers the following relevant facts:

- In May 2024, a search of a January 6 defendant's residence was conducted in the Northern District of New York, which resulted in the seizure of a stocking cap and a jacket worn inside the U.S. Capitol on January 6, 2021.   That search also resulted in the seizure of a cell phone, which appeared new and had text messages sent in 2024 regarding conduct on January 6, 2021, as well as relevant location data and an image.

- In April 2024, in a January 6-related search in the Eastern District of Louisiana, law enforcement seized a flag on a flagpole stolen from the U.S. Capitol on January 6, a cell phone the defendant had on him on January 6, and a hat worn inside Capitol on January 6.

- In a March 2024 search of a January 6 defendant, in the Southern District of Ohio, law enforcement recovered a cell phone containing photographs from January 6.

- In another March 2024 search of a January 6 defendant, in the Eastern District of Michigan, law enforcement recovered a backpack, mask, and a jacket worn on January 6, 2021.

Fruitful searches taking place years after January 6, 2021 are not the exception; examples are plentiful, including the case of this defendant, from whom clothing (gloves, a jacket, and a hat) was seized matching what he wore at the Capitol on January 6, 2021.

But even setting those other similar warrants aside, in this case, the probable cause for seizure—as it relates to digital devices—had been approved by not one, but *two* magistrate court judges from different districts.   Specifically, prior to the issuance of the instant warrant, there was a period of time in which the United States anticipated arresting the defendant while he was in the Eastern District of California.   Accordingly, the United States sought and a magistrate judge in

that district approved, a substantially similar warrant to search and seize digital devices from the person of the defendant.    *See* Exhibit C.    Where not one, but two federal magistrate judges have told a federal agent that there is probable cause for a search, the agent must be able to rely on their authority in carrying out the search.    Under such circumstances, the affiant would reasonably have relied on the warrant approved by a magistrate, and, given the concurrence by a federal prosecutor and a separate magistrate, the affiant would not have had cause to question its validity.    Indeed, it is difficult to imagine a situation where multiple judges and lawyers have reviewed the warrant, with approval, but the agent should be expected to have had a more thorough understanding of the Fourth Amendment above all, with the benefit of hindsight.

Accordingly, even if the Court determines the probable cause in support of the April 24, 2023 warrant was stale, the Court should not exclude any evidence, because the FBI reasonably relied in good faith on the warrant in executing the search.

### c.   The April 2, 2023 Traffic Stop Was Proper.

The defendant also complains that the April 2, 2023 traffic stop was improper.    Mot. at 7–9.    On that basis, the defendant argues the evidence seized from the defendant's vehicle should be excluded.    *Id.*    But the traffic stop here was perfectly appropriate.    In this case, the officer observed, in California, a car with a Texas license plate.    Upon checking the registration, the officer observed that the vehicle's color did not match the color indicated on its registration.    The officer considered, based on his training and experience that there are many vehicles in the state of California that have had their Vehicle Identification Numbers (VINs) switched in Texas. Switching a VIN is illegal in California.    CA Veh. Code § 10750 (2023).    The prohibition on VIN switching is at least in part related to its association with car theft, as reflected in the location

of the California statute in a "Special Antitheft Laws" division of the California Code.   *See also United States v. Brown*, 60 F.4th 1179, 1182 (8th Cir. 2023) (finding a traffic stop reasonable where officer testified "a color discrepancy might indicate that a vehicle is stolen, the driver has a suspended license, or the registration is expired," and the court agreed "[t]hese are all valid reasons to make a traffic stop").   Considering the Texas plate and the discrepancy in the color of the vehicle, the officer conducted a brief traffic stop.   While "color discrepancy alone could not support reasonable suspicion of vehicle theft to make a traffic stop absent any evidence suggesting otherwise," *Brown*, 60 F.4th at 1183, the officer also relied on the one-of-state license plate and his training and experience regarding VIN-switching in Texas.

The defendant complaints that "[b]ecause color is not required for registration of a car in California, allegedly driving a car whose color appears to be gray while the registration says blue is not a traffic violation."   Mot. at 7–8.   But, here, it appears the stop was based on reasonable suspicion of VIN switching, which is unlawful in California.   But even if the officer had stopped the defendant because he mistakenly believed a car's registration must accurately state its color, that is precisely the type of mistake of law that would not undermine a reasonable suspicion stop. *See Heien v. North Carolina*, 574 U.S. 54, 61 (2014) ("[R]easonable men make mistakes of law, too, and such mistakes are no less compatible with the concept of reasonable suspicion.").

But even if the defendant's traffic stop was improper, there was no seizure at the time the relevant photograph of the defendant was taken.   Indeed, the opposite was true.   The traffic stop was conducted, the defendant's license and registration were checked and returned, and the defendant was told he was free to leave.   It was over.   *See Arizona v. Johnson*, 555 U.S. 323, 333 (2009) ("Normally, the stop ends when the police have no further need to control the scene, and

inform the driver and passengers they are free to leave."); *United States v. Maynard*, 615 F.3d 544, 553 (D.C. Cir. 2010) (holding that the seizure of the defendant was over after the defendant's license and registration was returned and he was told he was free to leave), *aff'd in part sub nom. United States v. Jones*, 565 U.S. 400 (2012).    But the defendant did not leave.    Instead, after being repeatedly told he was free to leave, the defendant—who has, in other filings, opined that he is in a "unique position to admonish law enforcement," ECF No. 33 at 32 n.8—*chose* to exit his vehicle, pull out his cell phone, and start recording the officer who had stopped him.    It was then that the photograph subsequently used in the search warrant—seen below—was taken.    In other words, the defendant voluntarily remained to reprimand a police officer, and now complains when the officer happened to document the scene using a police-issued cruiser camera.



There is no constitutional infirmity in the police recording someone who approaches them.    While the Constitution may protect the defendant from police misconduct, it does not protect him from

his own choices.   *See Van Hook v. Anderson*, 488 F.3d 411, 428 (6th Cir. 2007) ("The Constitution

protects a suspect from official coercion—it does not protect a suspect from himself.").

> **d.   Even if the April 2, 2023 Traffic Stop Were Improper, the Exclusionary Rule Does Not Apply, and, in Any Event, the April 24, 2023 Warrant Was Still Supported by Probable Cause.**

But even to the extent the Court agrees that the April 2, 2023 traffic stop was improper,

and that the remedy is suppression of the photograph taken, that would not affect the April 24,

2023 warrant.   And even if it did, the exclusionary rule would not apply.

The defendant argues that "the photograph was crucial in identifying Mr. Wise's car" and,

accordingly, "the evidence seized from Mr. Wise's car as a result of the search warrant issued on

April 24, 2023 should be suppressed."   Mot. at 9.   As an initial matter, the photograph was not

"crucial" to the April 24, 2023 warrant at all.   *See generally* Exhibit D.   The April 2023 affidavit

recites facts tying the vehicle to the defendant: it identifies the vehicle as being registered to the

defendant, *see* Exhibit D at ¶ 2, and it cites surveillance confirming the vehicle's presence at the

defendant's residence, *see* Exhibit D at ¶ 56.   But the affidavit never even mentions the April 2,

2024 traffic stop.   *See generally* Exhibit D.   Instead, the pertinent photograph appears as part of

an attachment identifying the vehicle to be searched.   *See* Exhibit D at Attachment A.   That

attachment states "[t]he Vehicle is depicted below" and includes two photographs—only one of

which is from the traffic stop.   *See* Exhibit D at Attachment A.   The attachment does not even

identify that the defendant is the individual photographed alongside the vehicle.   *See* Exhibit D at

Attachment A.   In short, even if that photograph were stripped out of the warrant, it would have

no impact at all on the probable cause determination.   The photograph simply provided the Court

and any law enforcement officer appropriate visual guidance as to what to search, if authorized.

Even if that photograph were removed, the attachment included a separate, independent photograph of the vehicle for good measure.

But even if that were not the case, the defendant's invocation of the exclusionary rule would be meritless where, as here, the FBI was reasonably relying in good faith on a search warrant, *Cardoza*, 713 F.3d at 658, and the search was sufficiently attenuated from the traffic stop that the exclusionary rule would not apply, *see Utah v. Strieff*, 579 U.S. 232, 241 (2016) ("Evidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance.").

But, even if the Court finds fault in the traffic stop, finds that the defendant was seized at the time of the photograph, finds that the warrant lacked probable cause as to the vehicle, and finds that none of the exceptions to the exclusionary rule apply, the motion to suppress would still be inappropriate for a factual reason the defense never mentions: nothing was seized from the vehicle. There is nothing to suppress.   Because the warrant was valid, the Court should deny the motion on the merits; but, barring that, the Court should deny the motion as moot.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the defendant's motion to suppress be denied.   Because none of the defendant's arguments raise a factual dispute that would give rise to an evidentiary hearing, the United States submits that the motion should be denied without an evidentiary hearing.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar Number 481052


By:      */s/ Anthony W. Mariano*
         ANTHONY W. MARIANO
         MA Bar No. 688559
         Trial Attorney, Detailee
         Capitol Siege Section
         United States Attorney's Office
         for the District of Columbia
         601 D Street N.W.
         Washington, D.C. 20530
         (202) 476-0319
         Anthony.Mariano2@usdoj.gov