IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                      Plaintiff,<br><br>v.<br><br>JARED WISE,<br><br>                      Defendant. | Case No. 1:23-cr-00184-RDM<br><br>Motion to compel discovery in support of Mr. Wise's claims of selective prosecution, selective enforcement, and vindictive prosecution |

Jared Lane Wise, by and through counsel, moves this Court to direct the government to provide discovery sufficient to show how charging decisions were made in his case and the reasons for extraordinary measures taken by law enforcement in investigating and arresting him, in support of his prospective claims for selective prosecution, selective enforcement, and vindictive prosecution.

## Table of Contents

| | | | |
|---|---|---|---|
| A. | BACKGROUND | | 3 |
| | 1. | Mr. Wise is Accused of Conduct in Connection with Events in Washington D.C. on January 6, 2021. | 3 |
| | 2. | Law Enforcement has Conducted Extensive and Extreme Amounts of Surveillance on Mr. Wise Attempting to Uncover a Larger Conspiracy that is Clearly not Present. | 5 |
| | 3. | Law Enforcement has Continued to Treat Mr. Wise Differently Compared to Other Similarly Situated Defendants. | 6 |
| B. | LEGAL STANDARD | | 8 |
| | 1. | Selective Prosecution | 8 |
| | 2. | Selective Enforcement | 10 |
| | 3. | Vindictive Prosecution | 11 |
| C. | ANALYSIS | | 12 |
| | 1. | Mr. Wise is being selectively prosecuted based on his political beliefs and activities, as can be seen in the different treatment of similarly situated left-wing offenders. | 12 |
| | 2. | Mr. Wise was subjected to selective enforcement by law enforcement, as evidenced by the peculiarly aggressive way he was investigated and arrested. | 16 |
| | 3. | Mr. Wise was subjected to vindictive prosecution when the government added a felony indictment to his misdemeanor charges after his refusal to sign a protective order. | 17 |
| D. | RELIEF REQUESTED | | 19 |

A.   **Background**

1. **Mr. Wise is Accused of Conduct in Connection with Events in Washington D.C. on January 6, 2021.**

On January 6, 2021, supporters of President Trump assembled around the U.S. Capitol. Supporters gathered that day for a variety of reasons. Some were there to protest perceived irregularities in the 2020 presidential election. Some may have been there with the intent to storm the Capitol. Some were they to show support for then-President Trump. They were not monolith with a singular reason for being there.

During this protest some individuals entered the Capitol Grounds and the Capitol itself and some committed crimes of varying severity, including physical assaults upon federal officers.

Mr. Wise was present near the Washington Monument and later at the Capitol Grounds. He also allegedly briefly entered and exited the Capitol building, used loaded language to directly criticize police officers for their use of force against the crowd, and shouted words that the government alleges aided and abetted assaults and civil disorder through "incitement." While moving about the Upper West Terrace, he allegedly yelled "kill 'em" when a confrontation occurred between Capitol police officers and protestors.  While the nearby skirmish between protesters and police unfolded above Mr. Wise on the Upper West Terrace, Mr. Wise did not engage in any acts of violence or vandalism. He had no influence or control over anyone else. He did not aid, abet, or incite anyone.

Undoubtedly, dire events did take place at and in the U.S. Capitol on January 6, 2021, and those events culminated a season of political disquiet during which attacks on government facilities and officers had become woefully common. The attack on the Capitol on January 6, 2021, was in large measure a mirror-image of attacks on federal facilities, including a federal courthouse, by left-

wing activists in Portland, Oregon. These activists were indignant at a perceived indifference of the government to racial bias and brutality in law enforcement during the summer of 2020. From July 21 through July 23, 2020, nightly assaults on the Hatfield Federal Courthouse in Portland led to arrests for a variety of crimes, including damage to federal property and physical assaults on federal officers. See Department of Justice, United States Attorney's Office press release dated July 24, 2020 (https://www.justice.gov/usao-or/pr/18-arrested-facing-federal-charges-after-weeknight-protests-federal-courthouse-portland, accessed 6/28/2024).

    In the aftermath of the January 6 protests, thousands of people have been charged with crimes for their alleged involvement. On April 12, 2023, more than two years after the events at the Capitol, the government filed a criminal complaint against Mr. Wise alleging probable cause to arrest him for violations of 18 U.S.C. § 1752(a)(1) and (2) (Entering and Remaining in a Restricted Building or Grounds and Disorderly and Disruptive Conduct in a Restricted Building or Grounds) and 40 U.S.C. § 5104(e)(2)(D) and (G) (Disorderly Conduct in a Capitol Building and Parading, Demonstrating, or Picketing in a Capitol Building). ECF 1, Criminal Complaint at 6. These misdemeanor charges apparently relate to the brief period that Mr. Wise entered the Capitol Building. On May 31, 2023, the government filed an indictment against Mr. Wise charging him with these violations and felony violations of 18 U.S.C. § 231(a)(3) (Civil Disorder) and 18 U.S.C. § 111(a)(1) (Assaulting, Resisting, or Impeding Certain Officers). Mr. Wise remains mystified as to the basis of these felony charges.

**2.     Law Enforcement has Conducted Extensive and Extreme Amounts of Surveillance on Mr. Wise Attempting to Uncover a Larger Conspiracy that is Clearly not Present.**

Law enforcement found it necessary to conduct a massive amount of surveillance of Mr. Wise during their investigation. *See* Ex. A (filed under seal). First, law enforcement found it necessary to search Mr. Wise's AT&T account for any information regarding the events of January 6, 2020, including subscriber information and evidence of motive, intent, planning, or conspiracy in a search warrant issued on May 5, 2022. ECF 57 Ex. A Att. B-II. This search included any of this kind of data from November 1, 2020, to February 1, 2021, well before and after the events on January 6. ECF 57 Ex. A Att. B-I. Law enforcement sought evidence showing that Mr. Wise was part of a larger conspiracy. ECF 57 Ex. A ¶ 48. After this search was conducted, law enforcement sought another search warrant of AT&T records, issued on November 23, 2022, this time asking for "voice mail, text, and multimedia messages" between November 3, 2020, to January 31, 2021. ECF 57 Ex. B Att. B-2 I(b). They further sought information that might tie Mr. Wise to some sort of conspiracy. ECF 57 Ex. B Att. B-2 II(b), (e)(v.), and (e)(vi.).

Law enforcement also conducted physical surveillance on Mr. Wise. They classified Mr. Wise as a Level I National Threat Band and a Level II Local Threat Band. WISE-000167.[1] This surveillance began in Texas in April of 2022. WISE-000216. This surveillance included monitoring Mr. Wise's movements throughout the day, including activities such as walking his dog. WISE-000222. Law enforcement followed and photographed Mr. Wise in places such as the car wash and reported on his clothing, including the fact that he wore a t-shirt advertising a Republican

---

[1] Notably the Government produced Discovery without Bates numbering it. So, the defense had to Bates number the Discovery and provide it back to the Government so everyone could be on the same page.

Page 5 — Motion to compel discovery in support of Mr. Wise's claims for selective prosecution, selective enforcement, and vindictive prosecution

politician, Carrie Isaac, and information about Ms. Isaac's political positions. WISE-000228. The surveillance was very intensive, detailing every move law enforcement could, with the log notes even stating when he made a "strange detour" by taking a different route to get coffee. WISE-000242. Law enforcement surveilled Mr. Wise's interactions with others, noting people that he came in contact with, as well as vehicles and identifying factors. WISE-000253. The surveillance continued into May 2022. WISE-000253.

The surveillance was renewed in November of 2022, with Mr. Wise living in the same location, seeking to identify Mr. Wise's patterns and behaviors again. WISE-000261. Law enforcement sought surveillance specifically on voting day. WISE-000261. However, law enforcement theorized and confirmed that Mr. Wise had moved away from his Texas residence in December 2022. WISE-000282. Surveillance continued in December when Mr. Wise had moved from Texas to Bend, OR. WISE-000269. Law enforcement at one point sought a pole camera to detail Mr. Wise's movements near his home, but it is undetermined whether this request was granted. WISE-000291. Law enforcement surveillance also followed Mr. Wise to Modesto, CA, where they surveilled Mr. Wise's parents' home. WISE-000347. After months of surveillance and investigation into Mr. Wise, law enforcement executed a search and arrest warrant issued on April 24, 2023 at Mr. Wise's residence in Bend, OR. WISE-002030.

### 3. Law Enforcement has Continued to Treat Mr. Wise Differently Compared to Other Similarly Situated Defendants.

Further adding to the FBI's extreme interest in Mr. Wise is the fact that they have refused to meet with Mr. Wise concerning a crime wherein Mr. Wise was a victim. Mr. Wise has made multiple attempts to contact the FBI with information that one G.E.D. defrauded Mr. Wise.

G.E.D. enticed Mr. Wise with a joint investment scheme, stealing Mr. Wise's money via international wire fraud. Once Mr. Wise began to question G.E.D. about the fraud, the FBI began investigating Mr. Wise about January 6. Mr. Wise believes that G.E.D. is the one who provided the tip to the FBI to protect himself as Mr. Wise was uncovering the fraud. Evidence from his cell phone clarifies the relative chronology. WISE-000438. Since then, Mr. Wise has contacted the FBI and/or the DOJ four times with documents, voice mails, emails, and texts relating to the fraud. Mr. Wise attempted to call the FBI's office in Portland on December 14, 2023. He then attempted to use the FBI tip line on January 2, 2024. On February 20, 2024, Mr. Wise's defense counsel sent an email to the FBI Special Agent and DOJ AUSA assigned to Mr. Wise's prosecution passing on important information about G.E.D. and requesting an in-person interview for Mr. Wise. Finally, Mr. Wise's defense counsel sent a second email to the Special Agent and AUSA on March 15 offering to share copious evidence and documents pertaining to G.E.D.'s activities and again requesting an in-person interview for Mr. Wise. The AUSA said in his email on March 15, 2024 that it was not up to him whether to pursue an investigation regarding G.E.D. On June 15, 2024, defense counsel wrote again with information Mr. Wise had received from the office of Congresswoman Lori Chavez-DeRemer to the effect that the FBI would not interview Mr. Wise without permission from the AUSA in his January 6 case. All of these attempts have resulted in Mr. Wise's tips being brushed off, making the FBI's interest in Mr. Wise's case all the more concerning as they seem to have no interest in investigating an international fraud case and would rather spend vast amounts of resources investigating Mr. Wise.

    In *Roviaro v. United States*, 353 U.S. 53, 59 (1957), the Court indicated that the government has a qualified privilege to withhold disclosure of the identity of informants. However, "once the

identity of the informer has been disclosed to those who would have cause to resent the communication, the privilege is no longer applicable." *Id.* at 59; *United States v. Day*, 384 F.2d 464, 465 (3d Cir. 1967). Notably, the D.C. Circuit overturned the quashing of a subpoena based on the informer's privilege. *Westinghouse Elec. Corp. v. City of Burlington, Vt.*, 351 F.2d 762, 771 (D.C. Cir. 1965)(finding the district court erred in using the informer's privilege as a broad reason to quash the entire subpoena). *Westinghouse* overturned the district court's order because *Roviaro* established that "once the identity is revealed, the privilege terminates." *Id.* at 768. *Roviaro* also states that the qualified privilege must give way when the contents of the informant's "communication is relevant and helpful to the defense" or is "essential to a fair determination of a cause." *Roviaro*, 353 U.S. at 60.

Here, the privilege is terminated because the government accidentally disclosed who the informant is, which only confirmed what Mr. Wise long suspected. To determine whether disclosure is needed, the court would normally employ a balancing test between "the public interest in protecting the flow of information" and "the individual's right to prepare his defense." *Id.* at 62. But because the privilege terminated when the government disclosed the informant's identity, Mr. Wise's right to prepare his defense is the only thing hanging in the balance. Although the government instructed the defense to delete the accidentally produced discovery (which has been done) the toothpaste can't be put back in the tube at this point.

### B.     Legal Standard
#### 1.     Selective Prosecution

While the government has "broad discretion to enforce the Nation's criminal laws," the exercise of this discretion is "subject to constitutional constraints." *United States v. Armstrong*, 517 U.S. 456, 464 (1996). One of these constraints, springing from the equal protection component of

the Due Process Clause of the Fifth Amendment, bars selective prosecution "based on an unjustifiable standard such as race, religion, or other arbitrary classification." *Id.* (internal citations omitted). The Supreme Court has set a "demanding" standard for claims of selective prosecution, requiring defendants to produce "clear evidence" of both discriminatory effect and discriminatory purpose. *Id.* at 463-65. To obtain discovery on a claim of selective prosecution, a defendant must produce "some evidence tending to show the existence of the essential elements of the defense." *Id.* at 468 (quoting *United States v. Berrios*, 501 F.2d 1207, 1211 (2nd Cir. 1974)).

In applying *Armstrong*, the D.C. Circuit has established a two-pronged test requiring a showing that 1) the defendant was singled out for prosecution among others "similarly situated" and 2) the prosecution was improperly motivated, i.e. based on race, religion, or another arbitrary classification. *United States v. Washington*, 705 F.2d 489, 494 (D.C. Cir. 1983). Although the defendant does not need to prove the claim for which discovery is requested, he must make a "colorable claim" as to both discriminatory effect and discriminatory purpose. *Att'y Gen. of U.S. v. Irish People, Inc.*, 684 F.2d 928, 932 (D.C. Cir. 1982).

Regarding the discriminatory effect prong, the D.C. Circuit has interpreted "similarly situated" narrowly, to mean others who have engaged in similar conduct but have not been charged. *United States v. Blackley*, 986 F. Supp. 616, 618 (D.D.C. 1997). "Similarly situated" defendants are those whose circumstances present "no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them." *Branch Ministries v. Rossotti*, 211 F.3d 137, 145 (D.C. Cir. 2000) (quoting *United States v. Hastings*, 126 F.3d 310, 315 (4th Cir. 1997)).

Page 9 — Motion to compel discovery in support of Mr. Wise's claims for selective prosecution, selective enforcement, and vindictive prosecution

To satisfy the "discriminatory purpose" prong, a defendant must show that his prosecution is based on an unlawful or arbitrary classification. *Id.* at 144. Improper motivation may include prosecution based on political beliefs. *United States v. Navarro*, 627 F. Supp. 3d 1, 4 (D.D.C. 2022); https://ohr.dc.gov/protectedtraits. However, to satisfy this prong, a defendant most overcome a strong presumption that prosecutors have discharged their official duties properly. *Armstrong*, 517 U.S. at 464. When "one seeks permission to embark on discovery related to selective prosecution, it is not enough to simply state that the prosecutor was biased. Defendant must show that in his case, the decisionmaker acted with a discriminatory purpose." *United States v. Stone*, 394 F. Supp. 3d 1, 36 (D.D.C. 2019). This means that the government prosecuted that defendant "because of" his protected classification or activity. *Wayte v. United States*, 470 U.S. 598, 610 (1985).

### 2. Selective Enforcement

Claims of selective enforcement have traditionally been assessed according to the same two-prong *Armstrong* test as claims for selective prosecution, including in the D.C. Circuit. *See, e.g.*, *United States v. Dixon*, 486 F. Supp. 2d 40, 44-45 (D.D.C. 2007). However, several circuits have recognized key differences between a claim of selective treatment by prosecutors and a claim of selective treatment by law enforcement. This is essentially because "law enforcement officers do not enjoy the same strong presumption that they are constitutionally enforcing the laws that prosecutors do." *United States v. Sellers*, 906 F.3d 848, 853 (9th Cir. 2018) (vacating an order denying discovery on a claim of selective enforcement in a sting operation purportedly targeting Blacks and Hispanics). *Cf. United States v. Davis*, 793 F.3d 712, 720 (7th Cir. 2015) (upholding a discovery order in a case where a sting operation purportedly targeted Black people, the court noted that "[a]gents of the ATF and FBI are not protected by a powerful privilege or covered by a

presumption of constitutional behavior" like that granted to prosecutors under *Armstrong*); *United States v. Washington*, 869 F.3d 193, 220 (3d Cir. 2017) (in another sting case, ruling that "motions for discovery seeking information on putative claims of unconstitutional selective enforcement are not governed by strict application of the *Armstrong/Bass* framework"). The D.C. district court has recently acknowledged that "some jurisdictions recently have lowered the standard for discovery in selective-enforcement cases by jettisoning the 'similarly situated' requirement for the discriminatory effect prong and abandoning the discriminatory-intent prong entirely." *United States v. Eshetu*, 2023 WL 7384996 at *12 (D.C.C., November 8, 2023) (citing *Washington*, 869 F.3d at 219-21). Under the modified standard, the party seeking discovery on a claim of selective enforcement need only show "some evidence" of "discriminatory effect" such as statistical evidence or its equivalent. *Id.*

   3.    **Vindictive Prosecution**

To punish a person because he has done what the law allows him to do is a fundamental violation of due process. *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978). A presumption of vindictive prosecution may be applied when prosecutors do something detrimental to a defendant after the defendant's exercise of a legal right, such as the right to go to trial. *United States v. Goodwin*, 457 U.S. 368, 373 (1982). The Supreme Court has established a rigorous standard for claims of vindictive prosecution in the pre-trial setting, where the "give and take" of plea negotiations requires flexibility in charging decisions. *Id.* at 380–82. According to that rigorous standard, a defendant must establish that the increased charge was "brought *solely* to 'penalize' [him] and could not be justified as a proper exercise of prosecutorial discretion." *United States v. Slatten*, 865 F.3d 767, 799 (D.C. Cir. 2017) (quoting *Goodwin*, 457 U.S. at 380 n.12). However, the D.C. Court of

Appeals has clarified that *Goodwin* did not establish a per se rule, and that a presumption of vindictiveness may be applied in the pretrial setting if the defendant presents facts sufficient to show a "realistic likelihood" of vindictiveness. *United States v. Meyer*, 810 F.2d 1242, 1246 (D.C. Cir. 1987). The critical question is whether the defendant has presented facts sufficient to show that all the circumstances, taken together, support a realistic likelihood of vindictiveness. *Id.* If the defendant makes such a showing, the burden shifts to the government to show a lawful motivation for its charging decision. *United States v. Meadows*, 867 F.3d 1305, 1312 (D.C. Cir. 2017).

### C. Analysis

**1. Mr. Wise is being selectively prosecuted based on his political beliefs and activities, as can be seen in the different treatment of similarly situated left-wing offenders.**

Mr. Wise can easily show that he is being treated far more harshly than similarly situated offenders based on his political beliefs and activities. For example, in the summer of 2020, left-wing protesters enraged at a perceived lack of government response to racist conduct of law enforcement, assailed the federal courthouse in Portland, Oregon and other federal facilities and did battle with federal officers. Many protesters who, unlike Mr. Wise, physically assaulted federal officers, had their cases dismissed at the government's request. By one count, the government dismissed almost half of the 96 cases brought in connection with the violence, including charges of physically assaulting federal officers, in what appear to be policy-driven decisions. *Almost Half of Federal Cases Against Portland Rioters Have Been Dismissed*, Wall Street Journal, April 15, 2021 (https://www.wsj.com/articles/almost-half-of-federal-cases-against-portland-rioters-have-been-dismissed-11618501979, accessed June 28, 2024).

In contrast, Mr. Wise finds himself facing felony assault charges even though he never laid a hand on anyone and never committed an act of violence or vandalism. He can show therefore

"some evidence" of discriminatory effect because he can identify "similarly situated" defendants who committed far more culpable acts in virtually identical circumstances but were not, ultimately, prosecuted even for misdemeanors. As for discriminatory intent, the only possible explanation for the disparate treatment of Mr. Wise is his unlawful classification as a right-wing supporter of President Trump and his other activities, such as his tangential but publicized involvement with the controversial right-wing organization, Project Veritas.

District courts have heard similar arguments from other (dissimilar) defendants and rejected them. *See*, e.g., *United States v. Rhodes*, No. 22-CR-15 (APM), 2022 WL 3042200, at *4–5 (D.D.C. Aug. 2, 2022); *United States v. Judd,* 579 F. Supp. 3d 1, 7 (D.D.C. Dec. 28, 2021). In both cases, the Court ruled that Portland protesters were not "similarly situated" because of the uniquely dangerous nature of the January 6 protests, especially as the event took place during a busy workday at the Capitol. However, this does not mean it is not a close question, especially here where Mr. Wise's actions (mere speech and expressive clapping and raising of arms) pales in comparison to the concerted actions of the defendants engaged in *Judd* and *Rhodes*.

Here are the disparate facts from *Judd*, which show that case is inapposite when compared with Mr. Wise's alleged conduct:

- USCP officers arrayed themselves in a line across the inside of the tunnel.
- Rioters tried to push through that line to enter the Capitol. The rioters and officers packed the narrow tunnel.
- Judd joined the crowd pushing against USCP officers.
- Although Judd was not face-to-face with the officers, he was inside the tunnel.

- Surveillance footage depicts Judd yelling for the crowd behind him to pass up riot shields stolen from USCP officers.

- The same footage also shows Judd helping to move two shields from the back of the crowd to the front.

- Moments later, Judd lit a firecracker on fire and hurled it into the line of USCP officers guarding the tunnel.

- The lit firecracker landed at the feet of the officers but failed to explode.

- Judd remained near the entrance to the tunnel for the next hour.

- Video recordings depict him chanting with the crowd and encouraging others to enter the tunnel.

- Video also shows Judd hoisting an American flag into the air after nearby rioters hurl a long object at the USCP officers in the tunnel.

- Judd then re-entered the tunnel and joined rioters pushing the officers.

*Judd*, 579 F. Supp. at 3.

Despite Judd's serious actions, the Court there characterized the defendant's arguments as "nontrivial," noting the contrast between the felony charges faced by Mr. Judd, who used a firecracker to "intimidate" officers, and Portland defendants whose charges of physically assaulting federal officers had been ultimately dropped. *Judd*, 579 F. Supp. 3d at 5-6. The Court rejected the government's argument that there was uniformity in the initial charging decisions, calling it "absurd and untenable." *Id.* at 6. Overall, the Court found "a troubling theme that emerges from a wholesale analysis of the Government's decisions in Portland," and its ruling was based almost exclusively on the greater dangerousness of a daytime assault. *Id.* at 7. The Court also took notice of specific defendants in the Portland riots who physically assaulted officers but had their felony charges dismissed, and referenced defense counsel's tabulation of even more disturbing data along

the same lines (*Id.*; for the data, *see* No. 1:21-cr-00040-TNM, ECF 138). Where the Court was troubled, despite Judd's serious conduct, this Court should be doubly troubled given Mr. Wise's supremely less culpable conduct.

Moreover, the conduct at issue in *Rhodes*, shows that *Rhodes* is inapposite. There the defendants were charged "based upon their involvement in a concerted plan to use force to … obstruct an official proceeding through, among other measures:

> (1) extensive planning and preparation through encrypted communications;
>
> (2) training for unconventional warfare;
>
> (3) traveling to Washington, D.C., with weapons, ammunition, and tactical gear;
>
> (4) storing weapons and ammunition across the Potomac River as part of a Quick Reaction Force;
>
> (5) entering the U.S. Capitol in a military-style formation wearing tactical gear;
>
> (6) attempting to force their way past law enforcement to move deeper into the Capitol Building;
>
> (7) targeting an official proceeding; and
>
> (8) in the particular case of Mr. Meggs, walking towards the Speaker of the House's offices but not finding her.

*Id.* at *5 (formatting enhanced).

Because Mr. Wise did not engage in any of these, or similar activities, *Rhodes* is inapposite.

Rather than looking to *Rhodes*, this Court should look to recent order granting a motion to dismiss for selective prosecution on very similar facts. *United States v. Rundo*, No. CR 18-00759-CJC-1-2, 2024 WL 725114, at *13–14 (C.D. Cal. Feb. 21, 2024) (granting a motion to dismiss for selective prosecution because members of a right-wing political group were charged under the Anti-Riot Act while members of Antifa and related far-left groups engaging in similar conduct were

not charged). There, the court rightly stated that "the government cannot make charging decisions based solely on Defendants' reprehensible speech and beliefs." *Id.*

Mr. Wise urges the Court to give a fresh examination of this issue in his case. In both *Rhodes* and *Judd*, the Court ruled that defendants had failed to identify similarly situated defendants because of the uniquely dangerous circumstances of the January 6 protests. However, whatever the cumulative dangerousness of the unlawful acts of these several thousand protesters, individual defendants should not be disadvantaged by the actions of others. How a defendant is "situated" should be based on that defendant's own actions. The *actual* dangerousness of Mr. Wise's conduct (i.e., whether his mere words created an imminent danger for police officers) is precisely at issue in his case. This sets him apart from the defendants in *Rhodes* and *Judd*, and the discrepancy between his treatment and that of the Portland protesters constitutes glaring evidence of discriminatory effect.

Consequently, Mr. Wise respectfully ask this Court for an opportunity to discover whether his political beliefs or activities, such as his tangential involvement with the right-wing Project Veritas, have played any role in the unusually harsh charging decisions in his case.

> 2. **Mr. Wise was subjected to selective enforcement by law enforcement, as evidenced by the peculiarly aggressive way he was investigated and arrested.**

Law enforcement began investigating Mr. Wise long after the events of January 6. The FBI spent fifteen months subjecting Mr. Wise to surveillance in an investigation that spanned three states. When arrested, he was subject to a "call out" arrest at his home by a team of armed officers, using a method generally reserved for dangerous offenders. The FBI never sought an interview with Mr. Wise, as seems to have been done with many January 6 suspects. No explanation has been

given for this treatment of Mr. Wise as a suspect, which is striking especially considering his own lengthy and illustrious career as a supervisory agent with the Bureau and his total lack of a criminal record. Indeed, Mr. Wise believes that he may have been subjected to overly aggressive investigation because of his past as an FBI agent and, later as a whistleblower in a case subsequently investigated by the FBI.

It seems unlikely that the Portland protesters mentioned above were subjected to this level of scrutiny by law enforcement. However, given that Mr. Wise believes the attention of law enforcement was partly the result of his background as an FBI agent, it is more difficult for him to point to similarly situated individuals receiving different treatment from law enforcement. Mr. Wise urges the court to grant him limited discovery using the modified standard adopted by some circuits. The modified standard, as contemplated by the Court in *Eshetu*, only requires some evidence of discriminatory effect, without the additional burden of showing the existence of similarly situated individuals. The extraordinary way in which the FBI investigated Mr. Wise is sufficient to show some evidence that law enforcement saw reasons to single him out from others.

Consequently, Mr. Wise asks the Court to allow him to obtain information to learn what reasons law enforcement had to treat his case as special, whether these reasons were lawful, and whether they have unduly influenced the peculiar charges brought by the government.

> 3. **Mr. Wise was subjected to vindictive prosecution when the government added a felony indictment to his misdemeanor charges after his refusal to sign a protective order.**

After his arrest, the prosecutor presented Mr. Wise with a standard protective order submitted to all January 6 defendants as a condition for receiving discovery. Although most defendants just go with the flow and don't know or think to object, Mr. Wise believes in transparency in

government and thus refused to sign the protective order. Notably, beyond informally objecting to the protective order and seeking to have it narrowed given his desire for governmental transparency, Mr. Wise also opted to later file a formal objection seeking judicial intervention (ECF 11, 15), which the Court granted in part (ECF 17). Mr. Wise should be free to ask for transparency without fear of reprisal. Mr. Wise was exercising his constitutional rights both in refusing to sign the protective order and in filing his motion.

Before filing his formal objections to the protective order, Mr. Wise's attorney, on May 24, 2023, had already spoken with the assigned AUSA and learned that because Mr. Wise was refusing to sign the order the prosecution viewed Mr. Wise as being difficult. During that call the AUSA also forecast that at least one felony charge would be brought against Mr. Wise. Therefore, it appears that a decision was made between May 9 and May 24, 2021, to file one or more felony charges against Mr. Wise.

On May 31, 2021, the government filed the present Indictment, which contains the same four misdemeanor charges from the Complaint, and which adds two additional felony charges.[2] Those felony charges raise serious constitutional concerns because mere words form the basis for

---

[2] The Indictment charges the following six counts; the first two counts are the felonies that the prosecution added after Mr. Wise invoked his right to challenge the proposed protective order:
1. 18 U.S.C. §§ 231(a)(3), 2 (Civil Disorder and Aiding and Abetting).
2. 18 U.S.C. §§ 111(a)(1), 2 (Assaulting, Resisting, or Impeding Certain Officers and Aiding and Abetting).
3. 18 U.S.C. § 1752(a)(l) (Entering and Remaining in a Restricted Building or Grounds).
4. 18 U.S.C. § 1752(a)(2) (Disorderly and Disruptive Conduct in a Restricted Building or Grounds).
5. 40 U.S.C. § 5104(e)(2)(D) (Disorderly Conduct in a Capitol Building).
6. 40 U.S.C. § 5104(e)(2)(G) (Parading, Demonstrating, or Picketing in a Capitol Building).
ECF No. 9.

the government's forcible assault and civil disobedience charges. The government's possible theory is that mere words spoken from afar (*not* mere feet away) during a skirmish were intended by Mr. Wise to aid and abet unspecified perpetrators by inciting them to violence.

The timing of the felony charging decision (i.e., on the heels of Mr. Wise's decision to challenge the protective order) creates a reasonable likelihood that the government decided to file additional felony charges against Mr. Wise in retaliation for his exercise of a constitutionally protected right. Consequently, Mr. Wise asks the Court to allow him to obtain discovery that would clarify the timing and reasons for adding felony charges to the Indictment that were not in the Complaint, and whether the reasons for adding those felony counts were lawful or amounted to vindictive prosecution.

### D.     Relief Requested

For the reasons set forth above, this Court should order the government to produce or make available for in camera review the following:

- Documents pertaining to Mr. Wise's employment with the FBI, including his FBI personnel file.

- Documents pertaining to Mr. Wise being added to any terrorist watchlist and known instances of other J6 defendants being improperly added to terrorist watchlists.

- Documents pertaining to internal complaints or committee information pertaining to politicization of the FBI or the Justice Department's approach to January 6 prosecutions.

- Any communications or documents mentioning or related to Mr. Wise to or from FBI officials with whom he had a personal working relationship, including but not limited to Paul Abbate, Steven D'Antuano, Jonathon Snow, Omar Molina, and Charles Berger.

- Any information possessed by the FBI or the Justice Department pertaining to Mr. Wise's relationship with Project Veritas and its director James O'Keefe, and any documents related to Mr. Wise's lawful political activities generally.

- Any information related to the Qui Tam whistleblower complaint filed by Mr. Wise with the FBI, and any information related to any investigation of Mr. Wise stemming from that whistleblower complaint.

- Any information pertaining to the timing and reasons for the unusual felony counts included in the government's May 31, 2023 Indictment.

- Any information on other individuals from January 6 or other protests indicted on felony Forcible Assaults on Officers (18 U.S.C. § 111(a)(1)) or Civil Disorder (18 U.S.C. § 231(a)(3)) — based on words they allegedly uttered.

- All documents shedding light on the reasons for the unusually aggressive investigation of Mr. Wise conducted by law enforcement.

- Any information related to the FBI's sources of information leading to Mr. Wise's arrest, including but not limited to any information involving G.E.D.

- Any information related to FISA or 702 searches related to Mr. Wise.

Respectfully submitted on July 3, 2024.

*s/Kurt David Hermansen*
Kurt David Hermansen, Cal. Bar 166349
Supervisory Assistant Federal Public Defender
859 Willamette St. Suite 200
Eugene, OR  97401
Tel: (619) 436-8117
Fax: (541) 465-6975
Email: kurt_hermansen@fd.org