```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLUMBIA
 2

 3   UNITED STATES OF AMERICA,
                                        Criminal Action
 4              Plaintiff,              No. 1: 23-184

 5         vs.                          Washington, DC
                                        October 21, 2024
 6   JARED LANE WISE,
                                          9:43 a.m.
 7              Defendant.
     _____/
 8

 9              TRANSCRIPT OF DAUBERT HEARING
           BEFORE THE HONORABLE RANDOLPH D. MOSS
10              UNITED STATES DISTRICT JUDGE

11   APPEARANCES:

12   For the Plaintiff:      Sarah Wilson Rocha
                             DOJ-CRM
13                           219 S. Dearborn Street
                             5th Floor
14                           Chicago, IL 60604

15                           Taylor Fontan
                             DOJ-USAO
16                           601 D Street, N.W.
                             Washington, DC 20530
17

18

19              APPEARANCES CONTINUED ON NEXT PAGE

20

21

22   Court Reporter:        SHERRY LINDSAY
                             Official Court Reporter
23                           U.S. District & Bankruptcy Courts
                             333 Constitution Avenue, NW
24                           Room 6710
                             Washington, DC 20001
25
```

```
 1                        APPEARANCES CONTINUED

 2

 3      For the Defendant:        Kurt David Hermansen
                                  FEDERAL PUBLIC DEFENDER
 4                                DISTRICT OF OREGON
                                  Eugene Office
 5                                859 Willamette Street
                                  Suite 200
 6                                Eugene, OR 97401

 7                                Peyton Elizabeth Lee
                                  FEDERAL PUBLIC DEFENDER
 8                                District of Oregon
                                  101 SW Main Street
 9                                Suite 1700
                                  Portland, OR 97204
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1              TABLE OF CONTENTS

2                  WITNESSES

3    Suzanne Best

4        Cross-examination continued by Ms. Rocha        5

5        Redirect examination by Mr. Hermansen          43

6        Recross-examination by Ms. Rocha              59

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                  P R O C E E D I N G S

2            THE COURTROOM DEPUTY:  We are on the record in

3  criminal case 23-184, the *United States of America versus Jared*

4  *Lane Wise*.

5            Starting with government counsel, please approach the

6  podium and state your appearance for the record.

7            MS. ROCHA:  Good morning, Your Honor.  Sarah Rocha

8  and Taylor Fontan for the United States.

9            THE COURT:  Good afternoon.

10           Good morning.

11           MR. HERMANSEN:  Good morning, Your Honor.

12  Supervisory Assistant Federal Public Defender, Kurt Hermansen

13  with Assistant Federal Public Defender Peyton Lee, on behalf of

14  Mr. Wise who is appearing by video.  Also ON the video is

15  defense expert, Dr. Suzanne Best.

16           THE COURT:  Okay.  Let me -- before we get going,

17  confer WITH Mr. Wise that it is his request that he be allowed

18  to participate today remotely and that he doesn't want to be

19  here in person.

20           Mr. Wise.

21           THE DEFENDANT:  Yes, sir.  Thank you for the option.

22           THE COURT:  Okay.  Thank you.

23           All right.  And I take it by the fact that Dr. Best

24  is on the line now that, Mr. Hermansen, that it is your request

25  that we proceed with her first today?
```

1          MR. HERMANSEN:  Yes, Your Honor.

2          THE COURT:  Okay.  And do you want to remind me where

3     we were?

4          MS. ROCHA:  The government had conducted some

5     questioning and was in the middle of that.

6          THE COURT:  So why don't you go ahead and continue.

7     And as you probably gathered from my minute order and this is

8     not directed at you in particular, but it has been my

9     experience that *Daubert* hearings oftentimes are not actually

10    *Daubert* hearings and that they are depositions.  And just given

11    time limitations, I really think it is important that we focus

12    on whether the witness is qualified and has an appropriate

13    opinion to offer at trial.

14         MS. ROCHA:  Understood, Your Honor.

15                   CROSS-EXAMINATION CONTINUED

16    BY MS. ROCHA:

17    Q.   Good morning, Dr. Best.  Can you hear me?

18    A.   I can't see you, but I can hear you.

19    Q.   Okay.  Great.  We'll -- I guess not -- I am not sure that

20    you saw me all that well the last time.  So if you have got any

21    questions along the way or you need me to repeat anything,

22    please just let us know.

23    A.   Okay.

24    Q.   Very, very briefly, I just want to make sure -- I have got

25    a number of questions for you.  But I want to make sure that we

1    are all speaking the same language when we use certain terms.

2    So I just want to go over a few things, briefly.  First, you

3    are -- the expertise that you are providing in this case is in

4    trauma; correct?

5    A.    I would use that term as a broad umbrella, underneath

6    which, you know, lies all different types of trauma reactions,

7    both during a trauma and following a trauma and trauma-related

8    conditions and disorders.

9    Q.    And you are not providing a particular opinion regarding

10   memory; correct?

11   A.    Only in respect to the specific symptom of dissociative

12   amnesia.

13   Q.    Understood.  So the symptom and how -- fair to say and how

14   trauma effects memory?

15   A.    Correct.

16   Q.    And how that can be a symptom in this case of PTSD?

17   A.    That is correct.

18   Q.    Okay.  Thank you.

19         You would agree with me that the DSM is the standard

20   according to the American Psychiatric Association for diagnoses

21   of all kinds of mental disorders; correct?

22   A.    Yes, I agree.

23              THE COURT:  Which DSM are you referring to?

24              MS. ROCHA:  That is a good question, Your Honor.

25   BY MS. ROCHA:

CROSS-EXAMINATION CONTINUED OF DR. BEST

1    Q.   I believe the current one, am I right, Dr. Best, it is

2    DSM-V TR?

3    A.   That is correct.

4    Q.   That is the one that you used in this case in your

5    analysis?

6    A.   Yes.

7    Q.   And in terms of the PTSD diagnosis, last time, I believe

8    we talked about sort of that first time criterion A, sort of,

9    that begins by identifying the trauma for PTSD?

10   A.   Yes.  Identifying whether someone has experienced a

11   diagnostically relevant trauma.

12   Q.   And that would apply to someone on -- that is experiencing

13   the trauma; correct?

14   A.   I'm sorry.  I am not sure I understand the question.

15   Q.   I guess where I am asking is that would apply to someone

16   who is the victim of a trauma or someone who is experiencing a

17   trauma?

18   A.   Again, that trauma can -- does not need to be directly

19   experienced.  It can be witnessed.  And it can also be

20   vicariously experienced, meaning heard about.

21   Q.   Understood.  If a person is threatening death or serious

22   injury, that would not fit the criteria; correct?

23   A.   Meaning if they are a potential perpetrator?

24   Q.   Yes.

25   A.   That is correct.

CROSS-EXAMINATION CONTINUED OF DR. BEST

1    Q.    You would agree with me that the DSM has a section on

2    dissociative disorders?

3    A.    Yes, it does.

4    Q.    And that is -- there is a relationship between those and

5    the stress-related disorders?

6    A.    Well, there is actually a relationship between stress

7    related disorders and mood disorders as well.  So there is --

8    they are -- they are intentionally defined under different

9    categories of disorders.  So dissociative disorders is an

10   entirely different section from trauma and stress-related

11   disorders.

12   Q.    Okay.  And here you did not diagnose Mr. Wise with any of

13   those dissociative disorders?

14   A.    No.  Because in my opinion, his dissociative symptoms are

15   better accounted for under the diagnosis of post-traumatic

16   stress disorder.

17   Q.    So that would include, for example, the particular part of

18   the DSM that deals with dissociative amnesia?

19   A.    That is correct, that the dissociative amnesia that he is

20   experiencing is a diagnostic symptom of PTSD.

21   Q.    You are not providing an opinion on dissociative amnesia?

22   A.    Not as a disorder itself, but as a symptom of PTSD.

23   Q.    Okay.  And in that sense what we are really talking about

24   is peritraumatic dissociation; is that correct?

25   A.    That is not a symptom of PTSD.  That is, in my opinion,

1    what he experienced at the time of the trauma and immediately

2    following.

3    Q.    And how did you determine that is what he experienced?

4    A.    Based on his report and on his symptoms, symptoms being

5    the significant disruption in his memory of the event.  And the

6    symptoms also that were reported by his housemate who told me

7    about how he was responding when he called her immediately

8    following the event.

9    Q.    Okay.

10   A.    So that was the collateral information.

11   Q.    Okay.  So his report, meaning what he told you about what

12   he remembered?

13   A.    Yes.  I mean, what -- or what he does not remember.

14   Q.    Sure.

15   A.    Yes.  Yes.  And his struggle to remember, but his

16   inability to do so.  And, again, the report by his housemate.

17   Q.    I just want to take them one by one to make sure I

18   understand.  So the report meaning what he told you as part of

19   that diagnostic interview in terms of what he remembered and

20   did not remember, that is one part of how you formed your

21   opinion?

22   A.    Yes.  And also the reaction he was having at the time.  So

23   his sense of overwhelm and panic, and, you know, that sort of a

24   reaction, yes.

25   Q.    Okay.  And then would that fall under the category of -- I

1   think the second thing you said was his symptoms, so meaning,

2   what he described to you about his symptoms and, I guess, in

3   addition what you observed?

4   A.   So what he was -- what he reported to me has to do with

5   his reaction at the time of the event and then his symptoms

6   have to do with the symptoms he was experiencing at the time

7   that I evaluated him.

8   Q.   Okay.  And then by the interview with his housemate, that

9   was based on his account to her; is that correct?

10  A.   That was based on her impressions of him, not necessarily

11  what he was saying, but how he was saying it.  So this was her

12  impressions based on her knowledge of him.  And, you know, how

13  she believed -- what she believed he was experiencing, so her

14  perception of his emotional expressions and how he was

15  responding at the time.

16  Q.   Would you agree with me that dissociation is a continuum,

17  sort of a spectrum of different things?

18  A.   Yes, definitely.

19  Q.   Where did -- in your analysis, where did Wise fall in that

20  spectrum?

21  A.   Oh, that is a difficult -- that is a very difficult

22  question.  You know, we don't -- it is hard to have anchor

23  points for these things.  But, you know, I would say at the

24  extreme end of the dissociative continuum, would be someone who

25  has dissociative identity disorder, for instance, what used to

1    be called multiple personality disorder, in which they take on

2    an entirely different persona or personality and switch back to

3    another and have no memory of anything they did as that other

4    personality.  So that is the most extreme example.

5         Other extreme examples have people who have more extended

6    experiences of flashbacks where they believe -- you know, they

7    spend three days believing they are in a combat zone, when it

8    is they are sitting at home in their living room.  So that

9    would be another extreme example.

10        I would say that Mr. Wise, as far as his reaction, when

11   you are thinking of it in terms of the symptom of dissociative

12   amnesia, people will often have sort of more spotty memories.

13   What we tend to look for is when someone has a real lacuna, a

14   real hole, a distinctive hole.  And he certainly has a

15   distinctive gap, very lengthy gaps in his memory of the

16   traumatic event.  And I think for me what I found significant

17   is that he, in my opinion, appears -- appeared to be in and

18   probably still appears to be truly struggling to remember these

19   things.  It is not as though he is denying them.

20        He has -- you know, he discussed listening to recordings

21   of his voice and seeing things.  He never denied, no, that was

22   not my voice.  So it is interesting to me clinically speaking,

23   that he acknowledges that was his voice.  He acknowledges he

24   said those things because he recognizes his own voice.  But he

25   still, even after hearing them, cannot remember them or even

CROSS-EXAMINATION CONTINUED OF DR. BEST

1   things he witnessed where it is -- at least my understanding is

2   it was clear that he was actually at a particular place at a

3   particular time, but he has no memory of seeing something that

4   would for people who are not dissociating, they would have

5   remembered.

6   Q.   So going back to my question though, do you have an

7   opinion -- maybe this is a better question rather than what is

8   your opinion is, do you have an opinion on where he falls

9   within that spectrum?

10  A.   We don't have a way of identifying -- I don't -- I am not

11  capable of identifying a specific -- you know, he is 50 out of

12  100.  We don't have a way of having anchor points like that.

13  Q.   Do you have an opinion on whether he blacked out as -- I

14  am going to use the -- I am not sure that is a medical term.

15  But that you have an opinion on whether that was part of his

16  dissociative state?

17  A.   I guess I am not clear either what you mean by the term

18  blacked out.  Do you mean lost consciousness?

19  Q.   Sure.  Let's start with that.  Do you have an opinion on

20  whether he lost consciousness?

21  A.   I did not hear or see of any evidence of that.

22  Q.   What about whether he was in some kind of fugue state?

23  A.   Well, that is another -- it depends on how you are using

24  that term also.  I think that dissociation -- a fugue state is

25  dissociation.  So it depends on how you are using that term.

1   Q.   Okay.  Would you agree with me that only Mr. Wise knows

2   with certainty if he was in a dissociative state on January 6?

3   A.   That is sort of paradoxical question.  Because if he was

4   in a dissociative state, he wouldn't know he was in a

5   dissociative state.  So I guess that is a -- that is sort of

6   like if you lost consciousness, you wouldn't know you lost

7   consciousness because you would be unconscious, so that is a

8   difficult -- that is not a question I can answer.

9   Q.   Okay.  But your use of the term is based on the symptoms

10  that he presented to you?

11  A.   Again, it is the symptoms he presented, his reported

12  memory loss.  It is also based on the report by his housemate

13  in terms of how he was expressing himself and what his

14  emotional reaction was at the time she was speaking with him.

15  So it is based on all of those things.

16  Q.   You have a section in your report titled mental state at

17  the time of the alleged offense.  Are you familiar with that?

18  A.   Yes, I can scroll down to that.

19  Q.   Am I correct that all of the information in that section

20  comes from the defendant?

21  A.   That is correct.

22  Q.   Did you do any analysis of -- did you do any analysis of

23  his mental state other than like record what he was telling

24  you?

25  A.   Well, I mean, these are clinical -- this is a clinical

1    evaluation, clinical interviews.  So the idea is that I use my

2    clinical background and training and experience to make

3    clinical interpretations based on just as I would if I was

4    doing therapy with someone.  I make clinical interpretations.

5    I form opinions based on my training and education and

6    experience.  And so in that sense it is not strictly just a

7    report.  It is a clinical interview where I make clinical

8    interpretations.

9    Q.   Did you do anything -- other than the interview with his

10   housemate, did you do anything to test or analyze what he was

11   telling you?

12   A.   Well, I did in terms of testing, I did give him testing,

13   yes.  And some part of the testing -- the PAI is a way of

14   indicating and interpreting how he is presenting himself and

15   whether he is presenting in a way that he is -- presenting

16   himself in an overly favorable light or overly pathological

17   light, such as malingering.  So I did administer that

18   particular assessment.

19   Q.   Maybe we'll go more granular.  The first sentence of that

20   section says Jared reported on January 6, 2021, he and his

21   friend, Josh, left the area near the Washington Monument where

22   Donald Trump was speaking and were walking towards the Capitol

23   grounds to meet another friend when they heard a loud

24   explosion.  Did you do anything to analyze, based on your

25   review of video from January 6, you know, when he would have

1    heard an explosion, whether that is -- whether his description

2    there is consistent with what happened?

3    A.    No, I did not further analyze that statement.

4    Q.    That would be the same for everything like for the

5    remainder of that section?

6    A.    Yes.

7    Q.    In the middle I think you say -- or in this section there

8    is a combination of things in italics and things in regular

9    font.  Am I correct that the italics are quotes of Mr. Wise?

10   A.    Yes, that is correct.

11   Q.    Okay.  In the middle of that first paragraph it says,

12   Jared noted that it did not cross his mind that the explosive

13   sound came from police throwing sting grenades.  Those words,

14   sting grenades, is that something you would call them or is

15   that something -- where did that term come from?

16   A.    So I think earlier on I defined what that was.  And that

17   was because he used a different term.  I have to find -- this

18   is earlier on in the evaluation.  I would have to search for

19   it, but he used a different term.  And okay.  He called them

20   stinger balls.  But and -- but then I just sort of

21   parenthetically, you know, they are otherwise known as sting

22   grenades.  I am familiar with these particular types of -- I am

23   going to use the word weaponry, just from all of my work with

24   law enforcement.  So that is the term that I am familiar with,

25   but he used the word stronger bomb.

1    Q.   Okay.  At the -- so in the italics, those are his words

2    so --

3            MR. HERMANSEN:  Your Honor, I am going to object.  I

4    don't see this going to the expert's reliability for a *Daubert*

5    hearing.

6            MS. ROCHA:  Your Honor, we are trying to find out the

7    basis of her opinion whether that is something that can be

8    tested, whether it is reliable.

9            THE COURT:  All right.  I will allow it.

10           MS. ROCHA:  And I don't think we have much more on

11   that.

12           THE COURT:  All right.  You may continue.

13   BY MS. ROCHA:

14   Q.   So am I correct that then the next session describes

15   Mr. Wise on the grounds.  And the end of that says, I just

16   stood there doing nothing?

17   A.   Yes.

18   Q.   Okay.  So in that section, he -- in that portion, is your

19   opinion that he had -- at that point was -- had any

20   dissociation?

21   A.   Well, these are the pieces that he remembers.  So in that

22   point, he starts talking -- he was talking about how he was

23   standing there in shock and unable to do anything, basically

24   doing nothing.  So that is a symptom of dissociation when

25   people describe being in shock and just standing there watching

1    and doing nothing.  That is a symptom of the beginning of a

2    dissociative state.

3    Q.    Okay.  And then he remembered walking towards the Capitol,

4    but has -- but in your report says that he has no memory of

5    entering the Capitol; is that correct?

6    A.    Correct.  That is correct.

7    Q.    So at that point, that would be under your analysis, the

8    gap in memory?

9    A.    Yes.  Yes.  So that is like a definite hole in his memory.

10   And he, to the extent that he expressed some real concern that

11   he thought he might have gone in a window versus going in a

12   door, which he seemed to feel was inappropriate to do.  So, you

13   know, he was relieved when he was -- later learned, much later,

14   that he had actually gone in a door rather than a window.  So

15   all of these things are just further evidence to me of, you

16   know, true memory gaps that would be symptomatic of

17   dissociation.

18   Q.    At that point did you review video or anything about his

19   entering into the Capitol?

20   A.    I did see a video, yes.

21   Q.    And were you able to make any determinations from the

22   video about what state he was in?

23   A.    No.  It wasn't like, you know, where I could actually

24   really see his face to see what his state is, no.

25   Q.    If you were able to see his face and let's say he was

1    making expressions, would that change your analysis?

2    A.    I guess, potentially.  I mean, really, though, watching a

3    video, unless you can really tell that they are in a state of

4    shock or, you know, really -- if someone is in a dissociative

5    state, you need to be there and actually be able to have a

6    conversation with them or try to get their attention.  I mean,

7    I have plenty of clients who dissociate in my office.  So I

8    know what that is.  And -- but it is more something that you

9    see that they are just completely checked out and you can't get

10   their attention and you have to say their name repeatedly and

11   things of that sort.

12         So it is a difficult thing to know from watching a video.

13   Q.    In that case someone might have, for example, like glassy

14   eyes?

15   A.    Potentially.

16   Q.    Not be able to kind of respond to stimulus in front of

17   them?

18   A.    Right, potentially.  I mean, potentially.

19   Q.    So then he is able to remember leaving the building, but

20   then there is -- and then are there any other times that you

21   are -- that you determined that he had a hole or gap in his

22   memory?

23   A.    Well, he doesn't have really any memory of the next two

24   hours.  He has very little memory of the next two hours.  And

25   he kept talking about how shocked he was to learn that he was

1    on the grounds for another two hours.  So that is a large gap

2    in his memory.

3    Q.   So for all of the statements in this section of the

4    report, you took his statements to you to be true; is that

5    correct?

6    A.   It is not for me to determine truth or nontruth.  This is

7    just his -- this is his reported state at the time, his

8    experience at the time, his recall of that experience.  And

9    then I make clinical interpretations based on that report.

10   This is just -- this is the nature of psychology and

11   psychological evaluations.

12   Q.   What test did you perform to confirm your conclusion that

13   he was experiencing peritraumatic dissociation?

14   A.   I did not conduct a specific test to determine

15   peritraumatic dissociation.

16   Q.   Did you perform the Peritraumatic Dissociative Experiences

17   Questionnaire?

18   A.   Right.  I did not actually -- so that can be done in an

19   interview as well.  I did not conduct that specific

20   questionnaire or interview.  I am highly familiar with it,

21   since I helped to coauthor it.  So basically that is basically

22   in my head and that is just part of what I check through when I

23   am conducting a clinical analysis.

24   Q.   So just for clarity, did you -- when you say it kind of

25   clicked through, is that something that you incorporated in

 1    your analysis or no?

 2    A.    It is in that I -- you know, I use that in my head as part

 3    of my interpretation of what symptoms he was experiencing at

 4    that time to help me determine was that peritraumatic

 5    dissociation or was that not.  So it is just more part of my

 6    experience and training and my work.  So I don't -- I didn't

 7    feel the need to formally conduct that interview, since I had

 8    all of this information from him.  And I was just using that to

 9    then determine whether it was consistent with peritraumatic

10    dissociation.

11    Q.    Did you perform the Peritraumatic Stress Inventory?

12    A.    No, I did not.  That is another inventory that came out of

13    the work that I did.  So that is another one that I just tend

14    to just understand and have in my head and I just click through

15    all of that as well.

16    Q.    How about the Dissociative Experiences Scale?

17    A.    No.  That is more of a measure of trait dissociation and I

18    didn't think that applied in this particular situation.  So

19    state dissociation is dissociative symptoms experienced at a

20    specific moment.  Trait dissociation has to do with are you

21    someone who generally or often, you know, completely loses

22    track of time or lose track of where you are going when you are

23    driving or something like that.  So I didn't think that was

24    applicable in Mr. Wise's situation since I did not see any

25    indication that he has a tendency toward trait dissociation.

1    Q.    What about the Dissociative Disorder Interview Schedule?

2    A.    I did not see any indication that would be an appropriate

3    measure either.

4    Q.    Did you do anything to rule out causes of his

5    peritraumatic dissociation other than PTSD?

6    A.    I'm sorry.  Could you repeat that?

7    Q.    Yeah.  Did you do anything to rule out causes of his

8    peritraumatic dissociation other than him let's just say

9    experiencing the events of January 6?

10    A.    Well, I did in terms of -- you know, I asked whether he

11    had ever had that type of experience before where he was unable

12    to recall events that were occurring in the midst of a trauma.

13    And he stated that he had never had that experience in the

14    past.  So I ruled out whether this was something that he was

15    indeed a trait dissociator or he had those experiences and

16    maybe was dissociating for a different reason.  So in that

17    sense, I did also -- just based on all of the history and

18    reports, I was able to rule out that he was under the influence

19    of a substance at the time.  So that would be something else

20    that you need to consider in those situations.

21    Q.    Did you exclude other physical issues as a cause of his

22    dissociation?

23    A.    I did in terms of -- I took a medical history.  He denied

24    ever having a full loss of consciousness.  There was no

25    indication that he had any traumatic brain injury at any point

1    in his career or prior to that.  So I did not -- and I did not

2    see any evidence of any cognitive disturbance or neurocognitive

3    issues.

4    Q.   What did you do to rule out other mental health conditions

5    as a cause of the peritraumatic dissociation?

6    A.   That was in conducting the other structured interview

7    where, when I do the structured interview, so the one that I

8    did for Axis I disorders, the mini, I am going through their

9    entire history.  So that is how I was able to determine whether

10   he had a history of prior mental health conditions, whether he

11   has any current mental health conditions that might better

12   account for his reaction at the time on January 6.

13   Q.   Did you do anything -- I think earlier today you said that

14   the criteria A for identifying trauma would not apply if

15   someone was the perpetrator.  Did you do anything to test for

16   him being the perpetrator of the trauma?

17   A.   No.  That -- no, I did not.  But there is not a -- it was

18   not a test, it was just based on his report.

19   Q.   Did you do anything to consider the impact of the -- of

20   events being legal?

21   A.   No.  That is not my purview.

22   Q.   You would agree, right, that dissociation is not an

23   uncommon feature in crimes of violence?

24   A.   That is not something specifically that I know one way or

25   the other.

CROSS-EXAMINATION CONTINUED OF DR. BEST

1    Q.    How about, you would agree that a forensic evaluation

2    should consider the circumstances surrounding an offense?

3    A.    That I should consider the circumstances surrounding an --

4    I am not clear about that question.  I'm sorry.

5    Q.    That is fine.  We can move on.  Would you agree that just

6    in all kinds of forensic work that a person presenting or a

7    person being malingering is an inherent possibility given the

8    nature of psychology and the way that you can conduct

9    evaluations?

10   A.    Yes.  That is why I tested -- I conducted an assessment

11   that would indicate malingering or not, the PAI.

12   Q.    What scale did you use as part of the PAI to test for

13   malingering?

14   A.    Well, so there is -- there are a couple of scales that are

15   indicative of that.  I am going to go back to my PAI here.  So

16   there is a scale on the PAI that determines whether someone is

17   faking bad, as we call it.  So there is a scale that helps to

18   determine whether they are presenting themselves in a light

19   that is overly pathological.

20   Q.    What is the name of that scale?

21   A.    I am so bad with acronyms.  I don't recall the acronym of

22   the scale.

23   Q.    What was his score?

24   A.    I don't have that information in front of me.  I can

25   certainly pull all of it out, but I don't have it in front of

CROSS-EXAMINATION CONTINUED OF DR. BEST

1  me currently.

2  Q.   If it is not in the report is it fair to state that you

3  didn't look at that in detail?

4  A.   Oh, no, I absolutely did.  But I don't tend to put scores

5  in reports generally, because it doesn't have a great deal of

6  meaning to other people except for other experts.  So what I do

7  is I take all of that information and then I interpret it and

8  then I put it into words rather than numbers.  So that was

9  quite some time ago that I did that.  So I don't have that, you

10 know, in my head.

11 Q.   Do you use -- as I understand it there are a number of

12 malingering scales or tests that are part of the PAI.  Do you

13 use the combination or do you use a particular one?

14 A.   A number of malingering scales as part of the PAI itself?

15 Q.   For example, my understanding is that there is something

16 called the Malingering Index or MAL?

17 A.   I see what you mean, yes.  So I look at all of those -- I

18 look at all of them, yes.

19 Q.   And how -- but you don't know what -- as I understand

20 there is a numerical score that is associated with the

21 malingering index.

22 A.   There are numerical scores associated with every scale.

23 Q.   But you don't know what his score is?

24 A.   I don't recall off the top of my head.  Again, I

25 interpreted all of this quite some time ago and I put it into

1    words rather than numbers, so I would have to review that.

2    Q.   Do the numbers exist somewhere?

3    A.   Yes, they do.

4    Q.   Where?

5    A.   I have them in the scoring -- I have the scoring of the

6    PAI.  I would -- again, I would have to pull it up.  I don't

7    have it in front of me right now.

8    Q.   Other than the PAI, I want to run through some other tests

9    for malingering.  And my question is just whether you conducted

10   this test as part of your analysis.  First, the Symptom

11   Validity Test?

12   A.   No, I did not.

13   Q.   The Structured Inventory of Malingering Symptomatology or

14   SIMS is the acronym?

15   A.   Yes.  No, I did not.

16   Q.   The Structures Interview of Reported Systems?

17   A.   No, I did not.

18   Q.   The Minnesota Multiphasic Personality Inventory-2?

19   A.   No, I did not.

20   Q.   The Millon Clinical --

21   A.   Millon.

22   Q.   Thank you -- Multiaxial Inventory?

23   A.   No, I did not.

24   Q.   The Miller Forensic Assessment of Symptoms?

25   A.   No, I did not.

CROSS-EXAMINATION CONTINUED OF DR. BEST          26

1   Q.   Tests of Memory Malingering?

2   A.   No, I did not.

3   Q.   Ray Fifteen-Item Test?

4   A.   No, I did not.

5   Q.   Word Memory Test?

6   A.   No, I did not.

7   Q.   Did you conduct a polygraph?

8   A.   No, I did not.

9   Q.   The Concealed Information Test?

10  A.   No, I did not.

11  Q.   And my understanding is it can sometimes either be known

12  as or has a relationship to the Guilty Knowledge Test and/or

13  the Concealed Knowledge Test?

14  A.   No, I did not.

15  Q.   The Autobiographical Implicit Association Test?

16  A.   No, I did not.

17  Q.   The Timed Antagonistic Response Alethiometer,

18  A-L-E-T-H-I-O-M-E-T-E-R?

19  A.   No, I did not.

20  Q.   Time Restricted Integrity Confirmation Test?

21  A.   No, I did not.

22  Q.   Dr. Best, are you making any opinions that are not in your

23  report?

24  A.   No, I am not.

25  Q.   Okay.

1          THE COURT:  I'm sorry.  I don't understand that

2    question or that answer.  Are you making any opinions, what

3    does that mean?

4          MS. ROCHA:  I want to make sure all of the opinions

5    she is giving in the case are contained within in the report.

6          THE COURT:  I see.  Okay.

7          MS. ROCHA:  A poorly worded question, Your Honor.

8          THE COURT:  Okay.  Fair enough.

9    BY MS. ROCHA:

10   Q.   In the section that begins with diagnostic discussion on

11   page 16 of your report, you wrote, "On January 6, 2021, Jared

12   Wise acted out of professional instinct and experience when he

13   ran toward rather than away from the sound of an explosion."

14        How did you determine that?

15   A.   Well, that is my opinion based actually primarily on all

16   of my clinical experience.  But also on research.  So that is

17   based on all of my decades of clinical experience working with

18   first responders as well as research on first responders.

19   Q.   And how did you test your opinion?

20   A.   That was not an opinion that I tested.  That is, again,

21   based on my clinical experience and training.

22   Q.   How do you know your opinions are reliable?

23   A.   Because I have significant clinical experience and

24   training working specifically with first responders.

25   Q.   Your opinion here is not based on your view of reviewing

1   video of January 6; is that right?

2   A.   Well, that goes into it, but I did not see the specific

3   video of him running towards an explosion, so it is not based

4   on something specific I saw.

5   Q.   And is this particular sentence, is that based on the

6   Capitol grounds or the Capitol itself?

7   A.   That was the grounds is my understanding from Mr. Wise's

8   report that he was on the grounds, but not actually in the

9   Capitol.  You are referring to the first sentence; is that

10  correct?

11  Q.   Correct.

12  A.   Yes, that was my understanding.

13            THE COURT:  Les me ask the question maybe a little

14  bit different, in a little bit different manner.

15            What principles or methodology did you use to make

16  that determination?

17            THE WITNESS:  Again, it is based on my clinical

18  experience working with hundreds of first responders and his

19  report of what he did in -- and veterans.  And his report of

20  what he did under those circumstances is highly consistent with

21  the report of the hundreds and hundreds of first responders

22  that I worked with, that that is their tendency, even when they

23  are off duty to run towards rather than away from a potentially

24  threatening event or when they think it is a circumstance in

25  which they can be of assistance.

CROSS-EXAMINATION CONTINUED OF DR. BEST                    29

1              THE COURT:  Okay.  Thank you.

2    BY MS. ROCHA:

3    Q.   And in that situation, you're evaluating him as a first

4    responder; correct?

5    A.   Well, I used that term.  That is very broad -- so law

6    enforcement, so retired law enforcement.

7    Q.   Did you consider him as the person committing the offense,

8    rather than the law enforcement person responding?  Did you

9    take that into account?

10   A.   Based on -- I guess, that is not -- it is not for me to

11   determine whether someone actually perpetrated something or

12   not.  I was just referring to what his initial reaction was

13   when he heard an explosion.

14              THE COURT:  So let me put this question again a

15   little bit differently to you.  It is, obviously, possible that

16   somebody who is trained as a first responder hears an explosion

17   or sees something going on and their instinct is to head

18   towards it.  It is also possible that someone who has mischief

19   on their minds and sees something going on, runs towards it.

20   How do you determine with any certainty which of those two it

21   is here, even with someone who has history of having been in

22   law enforcement?

23              THE WITNESS:  Well, I suppose it is not something I

24   can determine with any certainty.  I just consider whether that

25   is consistent with my training and experience with first

1    responders.  And, yes, it is consistent with that.

2              THE COURT:  Okay.

3              THE WITNESS:  That is just my expertise in that

4    particular area is what I applied to that.

5              THE COURT:  So maybe just to put a finer point on

6    this, rather than the conclusion being that Mr. Wise acted out

7    of professional instinct and experience, the conclusion based

8    on what you have just testified should be that based on my

9    experience, people from law enforcement will at times run

10   towards rather than away from the sound of an explosion.  And

11   that is based on my understanding that Mr. Wise was law

12   enforcement and that he did so, his actions were consistent

13   with that experience.  Is that a fair summary of your opinion?

14             THE WITNESS:  That is correct.

15             THE COURT:  I'm sorry.  I think we lost you for a

16   second there.

17             THE WITNESS:  Yes, Your Honor.  That is correct.

18             THE COURT:  Okay.  Thank you.  Okay.

19   BY MS. ROCHA:

20   Q.   Dr. Best, in your rule in your -- the earlier -- your Rule

21   16 disclosure states that his actions on the day are consistent

22   with behavior seen in individuals with law enforcement training

23   and experience.  One of those things being running toward

24   rather than away from the sounds of munitions or explosions.

25   Is that kind of what you were just explaining to the Court?

1  A.   That is what the judge pointedly explained for me, yes.

2  Q.   You had a few other items in that section.  Being

3  compelled to investigate a potential disturbance?

4  A.   I'm sorry.  Would you mind if I pulled that up?  Because I

5  don't have that on my screen.

6  Q.   That is fine.

7  A.   Okay.  I'm sorry.  So ahead.

8  Q.   Sure.  What you walked through with the Court is the first

9  item.  The second was whether his actions on the day are

10 consistent with behaviors seen in individuals with law

11 enforcement training and experience when faced with a traumatic

12 event being compelled to investigate a potential disturbance.

13 A.   I'm sorry.  Which bullet point are you on?

14 Q.   It is the very last bullet on the bottom of page 1.

15 A.   Okay.  Thank you.  Yes.  Yes.

16 Q.   And so the same thing are you saying that based on your

17 experience with law enforcement -- like with the members of the

18 military and law enforcement that you certainly have expertise

19 with that behavior is something that you are familiar with when

20 someone is faced with a traumatic event?

21 A.   Yes.  Well, I wouldn't say a traumatic event, per se.  But

22 I would say definitely when an individual with that background

23 and training hears something that might potentially be a

24 disaster or something where someone might potentially be under

25 threat that, yes, it is -- in my opinion and my experience,

1    that is a more very consistent response.

2    Q.   Do you have any other -- other than what the defendant

3    told you, do you have any other basis for your opinion about

4    his actions on that day being consistent with someone that was

5    compelled to investigate a potential disturbance?

6    A.   If you are speaking specifically toward that, no, I do not

7    have any other evidence other than his report.

8    Q.   Do you have an opinion on whether he was compelled to

9    investigate a potential disturbance?

10   A.   Based on his report and his described reaction, it is my

11   opinion that it was his instinct to run towards it and in

12   particular, because of his experience in Manhattan when there

13   was the bombing there and he was off duty at that time as well

14   and that was his response, it is consistent with his prior

15   history.

16            THE COURT:  Is this a psychiatric evaluation or more

17   an experiential, based on your experience, or is this -- or are

18   you drawing a psychological or psychiatric point here?

19            THE WITNESS:  It is a psychological evaluation.

20            THE COURT:  So what is the basis for that?  You can

21   say, based on my experience, Judge Moss does his best to judge

22   cases fairly.  And that is a psychiatric opinion because I have

23   spoken to him and I know from talking to other judges that that

24   is what judges try and do.  There are -- in some sense it is

25   something you could describe of virtually any sort of human

1    interaction or experience in some way.  So I am trying to draw

2    the line and figure out where the line is there and sort of

3    what body of literature there would be or methodology there

4    would be that says, this actually is not -- I have spoken to

5    hundreds if not thousands of people and they have experienced

6    the similar type of reaction versus saying here is how the

7    human brain works.  This is what was going on in the human

8    brain.  There are studies that have looked at these types of

9    issues.  And this is something that is different than simply

10   saying that defense counsel is going to make every reasonable

11   argument they can make in this case.  And based on my

12   experience, that is what really talented defense lawyers do.

13   And I have looked at these defense lawyers and they are

14   talented defense lawyers and, therefore, I can opine, Judge,

15   they have made every reasonable argument that could be made in

16   the defense in this case.  And so how do I wrestle with that

17   and sort of figure out what is a psychological or psychiatric

18   point that has to do with the manner in which the human brain

19   functions that can be studied and evaluated pursuant to some

20   methodology that someone can confirm or not versus sort of just

21   experiential stuff where, frankly, you wouldn't have to be a

22   psychiatrist or psychologist to do that evaluation?

23            You could go out and talk to 5,000 former law

24   enforcement officers and ask them questions and you get the

25   poll results.  And you say here is our poll results and

CROSS-EXAMINATION CONTINUED OF DR. BEST                    34

1    therefore we know how law enforcement officers typically

2    respond in circumstances like this.

3              THE WITNESS:  Well, that is actually how

4    psychological research works is that we are, in essence, doing

5    polls where we'll conduct, you know, very lengthy assessments,

6    but it still is primarily by self report.  This, you know, is

7    part and parcel.  So it seems that we are pulling out very

8    specific sentences and then using it as a way to discuss my

9    entire opinion --

10             THE COURT:  Well, I guess --

11             THE WITNESS:  -- when really this is just a piece of

12   my opinion that is multifaceted in terms of I did very lengthy

13   diagnostic interviews.  I collected his reported history.  I

14   did the collateral interview.  So it is based on all of those

15   things.

16             In terms of brain science, yes, I have been involved

17   in quite a number of psychophysiological studies.  And there is

18   also, you know, MRI brain studies and things like that that can

19   be indicative of how an individual will respond in certain

20   circumstances.  So, yes.  It is also physiologically consistent

21   with how an individual responds.

22             THE COURT:  Just to interrupt you for a second here.

23   My job is to figure out whether there is an appropriate

24   methodological basis for the opinions that you are expressing.

25   This is the very first sentence of the opinion you are

CROSS-EXAMINATION CONTINUED OF DR. BEST

1    expressing.  I have to figure out whether that is an

2    appropriate thing to say to a jury or not.  And in order to do

3    that, I need some evidence that, yes, here are studies that I

4    have done.  This is not just a matter of the fact that I have

5    spoken to a lot of people who described to me having a similar

6    experience.  I guess maybe that is sufficient, but that would

7    be a different set of arguments and not necessarily a

8    psychological opinion but more just experiential.  And I would

9    have to decide whether that was sufficient or not and whether

10   you had a sufficient number of cases and whether there was a

11   sufficient methodology and we would have to get into, I think,

12   somewhere how many cases you are really talking about, what

13   sort of positive responses you are talking about, whether there

14   are counterexamples to that and get into all of that.  Or you

15   can point me to studies and say, Judge, here are three articles

16   that support this.  There is a peer-reviewed study that looked

17   just at this issue in the Journal of Psychology.  And that is

18   the basis for it.  That is what I am trying to get at.

19            THE WITNESS:  I see.  I understand.

20            Well, I can't give you studies off the top of my

21   head, whether there is a specific study that speaks toward

22   whether a first responder would run toward a disaster or away

23   from it.  So there may well be.  I don't know off the top of my

24   head.  What I would say is that when I am with clients who --

25   or you know, well, I have also conducted hundreds and hundreds

1    of evaluations with first responders as part of my research.

2    But, you know, I am doing that through the lens of a trained

3    professional, a trained psychologist.  So it is a little

4    different than someone going and knocking on doors and

5    surveying first responders who doesn't have any background in

6    psychology.

7            On the other hand, again, psychology, for the most

8    part, is a soft, rather than a hard science.  So that is just,

9    you know, kind of part of what we deal with is that we base our

10   opinions largely on the report of others.

11   THE COURT:  Right.  But that is -- that is usually

12   somewhat different from sort of at least what I am hearing here

13   now.  Because you could have done a study on this or someone

14   else could have done a study on this.  And you are right, they

15   could have written up their study based on numbers of

16   interviews.  You would have some statistical analysis in that.

17   And you would try and judge it for statistical significance.

18   You would say, this is the numbers, this is what we have done

19   to verify the reports of what we are hearing.  This is the

20   controls that we have put in place.  We actually did a study of

21   others as well who were not first responders.

22           And we found that in 72 percent of the cases, first

23   responders ran towards the sound, whereas the average citizen

24   only 61 percent or 42 percent ran towards the sound.  And this

25   has been peer-reviewed and published versus a circumstance in

1    which it is much harder for me to evaluate where it says, I am

2    a trained psychologist.  I have spoken to a lot, a lot of

3    people who are first responders.  And this is my judgment based

4    on that conversation which makes it very hard to sort of

5    evaluate the soundness of the methodology.

6              THE WITNESS:  I understand that, Your Honor.  And

7    that study may well exist.  If it doesn't, it should.  But I

8    just don't know off the top of my head.  I can't tell you these

9    authors did -- you know, conducted that study at a specific

10   time.  I just don't know.

11             THE COURT:  Okay.  Fair enough.  Thank you.

12             MR. HERMANSEN:  Your Honor, may I make a point on

13   that subject?

14             THE COURT:  Sure.

15             MR. HERMANSEN:  So the United States Supreme Court's

16   most recent opinion on experts involved two experts.  It is the

17   *Diaz* opinion which we cite --

18             THE COURT:  Actually, let me stop you there, because

19   I will let both sides have argument when we are done with all

20   of this.  It will just be -- we are not going to get through

21   the hearing if we do the arguments in the midst of it.  Make a

22   note of this and come back and you can remind me that I raised

23   this issue and you can raise it in your argument.

24             MR. HERMANSEN:  I will remind you that experience is

25   enough for an expert opinion, so we can talk about *Diaz*.

1          THE COURT:  But I have got to believe though that

2    experience still has to be based on some scientific

3    methodology.

4          MR. HERMANSEN:  And in the *Diaz* case, it was a

5    mechanic and an agent who talked about drug couriers.

6          THE COURT:  Okay.

7          MS. ROCHA:  No further questions, Your Honor.

8          THE COURT:  Okay.  So before I go back to you,

9    Mr. Hermansen, can you tell me what -- as Dr. Best just

10   indicated, she said, there were a whole bunch of opinions I

11   reached and it is all sort of one whole and a lot of

12   evaluation.  I guess it would be helpful for me to have a list,

13   one, two, three, here is the opinions -- the specific opinion

14   that we want to offer to the jury in this case.  And so, you

15   know, opinion one as I understand it is that there is reason to

16   believe that Mr. Wise's memory is in fact incomplete because of

17   post-traumatic stress disorder that he suffered that day.

18          If there are other opinions, I would like to know

19   exactly what those opinions are, because that will help me

20   focus.  And the narrative is less helpful to me in that regard

21   for the reasons that I think sort of became apparent in our

22   discussion.

23          MR. HERMANSEN:  So the opinions are that -- and a lot

24   of them go into the PTSD and the peritraumatic PTSD or trauma.

25   So he experienced three kinds of trauma:  Personal trauma,

1    witnessed trauma and vicarious trauma.  And all of those led to

2    a post-traumatic stress diagnosis.  So that is the diagnosis.

3    There is one diagnosis in this case, PTSD.  As part of that

4    diagnosis and subsumed within that diagnosis is that he was in

5    a dissociative state while on the Capitol grounds and while

6    there at the Capitol on January 6.

7            That dissociative state caused a disruption of his

8    normally integrated functions of consciousness, memory,

9    identity and perception of the environment and that was

10   concurrent with that traumatic experience.

11           That caused his inability to recall.  So that is what

12   you are getting at, Your Honor, his memory, his inability to

13   recall.

14           THE COURT:  Okay.

15           MR. HERMANSEN:  And that is diagnostically part of

16   the PTSD diagnosis.

17           THE COURT:  Okay.

18           MR. HERMANSEN:  And then the final thing is what we

19   are kind of talking about now.  And that is what I am going to

20   argue falls under the experiential part of experts.  And that

21   is that based on Dr. Best's -- I mean, she is a nationally

22   renowned expert in PTSD and trauma related to law enforcement,

23   first responders, police, firefighters, federal agents of all

24   kinds.  And it is -- and Mr. Wise's behavior is consistent not

25   only with what she knows through both research and her clinical

1   experience, but also with her interview with him.  His -- what

2   he reported about hearing explosions and moving toward them is

3   both consistent with her experience, her research, her vast

4   experience and research and training, but also is buttressed by

5   his reporting of going to a bombing in Chelsea when he --

6   because he heard it from where he was living.  He went in

7   plainclothes and flip-flops and was the FBI agent on --

8            THE COURT:  At this point, I am not asking you for

9   the basis.  What I am hearing you say -- and correct me if I am

10  wrong about this.  There are only two ultimate opinions.  One

11  is an inability to recall and the other was that he moved

12  toward the explosion in the manner consistent with his

13  background in law enforcement; is that correct?  Or is there

14  anything else?

15           MR. HERMANSEN:  I think the PTSD diagnosis is an

16  ultimate conclusion because none of the other stuff makes sense

17  without it.

18           THE COURT:  Fine.  But what I am trying to get at is

19  you are not raising an insanity defense --

20           MR. HERMANSEN:  No.

21           THE COURT:  -- or lack of mental responsibility

22  defense.  And there are intermediate conclusions that may or

23  may not need to come in to support the ultimate conclusion of

24  inability to recall.  And it may be that it is appropriate to

25  testify that he was suffering from PTSD or he suffered from

1    PTSD as a result of that day and that explains why he can't

2    recall.  And as we were discussing this at the last hearing,

3    one of the reasons I take it you want this testimony in is that

4    you anticipate that Mr. Wise will testify.  And when he

5    testifies, he is not going to be able to recall all of the

6    events from that day and you want the jury to understand that

7    doesn't mean that he is being dishonest with the jury, but that

8    he truly can't remember all of the events of that day.  So that

9    goes to the memory issue and the PTSD.  And then I take it that

10   you want the jury also to draw an inference that to the extent

11   that Mr. Wise moved towards the commotion rather than away from

12   the commotion was not evidence of a desire by him to

13   participate in wrongdoing, but rather was based on an instinct

14   to help other people.  Is that fair?

15           MR. HERMANSEN:  Yes.

16           And then the third component would be a number of the

17   charges have an intent requirement.  And if he was in a

18   dissociative state at the time that they have -- that he has to

19   have a specific intent, when you are in a dissociative state,

20   you are not -- your cognitive functioning doesn't involve your

21   frontal lobes.  It uses your amygdala.  It is more of a

22   response.

23           THE COURT:  That, we'll have to talk -- one, I don't

24   think I have heard of lot of evidence about that today.

25           MR. HERMANSEN:  I think that was last time, we talked

REDIRECT EXAMINATION OF DR. BEST

1   about a little bit.  We touched on it.

2           THE COURT:  I guess, I am not sort of -- at least at

3   this point -- I may be convinced, but I am not sure I am

4   satisfied there is that basis for testifying here as to this.

5   But, also, I guess I may need briefing or analysis on the

6   question of where you cross the line between a lack of

7   knowledge because of a mental disability versus --

8           MR. HERMANSEN:  Lack of intent, not lack of

9   knowledge.

10          THE COURT:  I'm sorry.  Lack of intent because of a

11  disability, a mental disability versus an insanity-type

12  defense.  So, you know, did Hinckley, in fact, when he shot

13  Reagan was it because he -- his brain was not functioning

14  properly and that he was not acting based on his frontal lobe,

15  but based on his amygdala when he was doing that?  I just don't

16  have the answer to those questions.  I may need some analysis

17  and briefing on when the -- this type of cognitive issues that

18  you are talking about, whether they cross the line or not

19  between the limitations on insanity defenses that are in the

20  statute versus simply just evidence of whether he was able to

21  form the necessary intent.

22          And as I said, I just don't know the answer to the

23  question as we sit here now.  Okay.

24          But I interrupted you.  You are welcome to conduct

25  redirect if you would like.  In particular, if there is

REDIRECT EXAMINATION OF DR. BEST

1    anything you want to get into with respect to the issue that we

2    were just talking about about his ability to form an intent at

3    the time.

4                         REDIRECT EXAMINATION

5    BY MR. HERMANSEN:

6    Q.   Dr. Best, why don't we start with that.  Can you discuss

7    how being in a dissociative state on January 6 would impact

8    one's ability to have a specific intent to -- so one example

9    would be the specific intent to incite someone to commit an act

10   of violence.

11   A.   Yes.  So dissociation by definition means that the --

12   basically the mind is split off from the actual immediate

13   goings on or immediate environment to the extent that really

14   executive functioning is really impaired.  So, I mean, this is

15   why multiple personality disorder used to be called split

16   personality.  So it is this idea of being split off.  And the

17   splitting off occurs to an overwhelming of the mind, which is

18   why we refer to peritraumatic dissociation as being a proxy for

19   panic.  So someone is in a state of panic.  They are unable to

20   make cogent, rational decisions.

21   Q.   How is that different from insanity?

22   A.   Well, insanity is a legal term, so that is not in my

23   purview.

24   Q.   So the DSM doesn't talk about insanity?  It is not a

25   diagnostic --

1    A.    No, it is not.

2            THE COURT:  When you say can't make cogent, rational

3    decisions, it would be helpful for me to understand what you

4    mean by that and whether that means it is unintentional versus

5    unconsidered.  I have lots of cases all of the time where

6    people do things that they are mind boggled why they could have

7    done it.  But they, you know, react in a manner that they might

8    regard as irrational and emotional.

9            The example might be -- the classic example might be

10   of -- from the old days of finding one's, you know, spouse with

11   somebody else and shooting that person in an emotional state,

12   but there are lots of other examples.  You know, someone comes

13   along and they give you a good shove and you are really

14   offended and you turn around and punch them.  You say, oh, my

15   gosh, I am not a violent person, I can't believe I punched that

16   person, but I just reacted emotively to what happened to me.

17   Or someone comes up to you and uses fighting words and just the

18   most deeply offensive words you could possibly imagine,

19   spitting them in your face and you react violently in a way

20   that is completely inconsistent with your character.  How do I

21   unravel that?

22           THE WITNESS:  Yeah.  So dissociation does involve

23   emotion and a circumventing of rational responses by emotion,

24   but it is more than that in that it is also a state of mind

25   where the mind is actually checked out to the point that

1    they -- that you are not actually able to fully be present in

2    the situation.  It is not just an emotional reaction.  It is

3    that the brain basically is short-circuited to where you can't

4    take in fully what is going on.  People experience tunnel

5    vision where they can't see everything that is happening.  They

6    experience auditory issues where they can't hear everything

7    that is happening.  We call it tunnel hearing basically.  And

8    people are in this state.  They can be in a state where they

9    feel like they are watching something happening in a play

10   versus that they are actually present.  And then -- that is in

11   large part what then short-circuits the memory functioning so

12   they are unable to encode and store what is occurring in that

13   moment.  So it goes beyond an emotional reaction.

14           THE COURT:  So, Dr. Best, you may have more

15   experience -- I am sure you have more experience with this than

16   I do.  Have there been any cases in federal court where you

17   have been permitted to testify that someone lacked the

18   necessary intent because they were in a dissociative state?

19   And if so, can you point me to those cases?  Because I am going

20   to need to do some research here.  And if you know of cases

21   where you have testified and a federal judge has allowed you to

22   do so, that would be helpful.

23           THE WITNESS:  I will have to give that a little bit

24   of thought about the specifics.  I have to give some thought to

25   the specifics of that.  I have discussed dissociation on the

1    stand, definitely.  I don't want to misrepresent though,

2    because I want -- I am not entirely sure whether the term

3    intent came into play.  So that is something that I would need

4    to review my prior cases to consider whether specifically the

5    term intent came into play in that case.

6              THE COURT:  Fair enough.

7              Mr. Hermansen, my apologies again for interrupting,

8    but the floor is yours.

9    BY MR. HERMANSEN:

10   Q.   Dr. Best, could you please help us understand, using the

11   DSM-V, what you mean by the dissociative symptoms are better

12   accounted for under PTSD?  What does that mean?

13   A.   Well, yes.  So we are always having to make differential

14   diagnoses to determine -- because there is a lot of overlap in

15   different conditions and disorders.  And so that is part of the

16   differential diagnosis.  Is this a dissociative amnesia.  Is it

17   a dissociative disorder or can you better account for that

18   particular condition or symptom as a symptom of some other

19   disorder.

20             So let's say someone is suffering from insomnia.  Is their

21   insomnia related to nightmares as the trauma-related nightmares

22   that began after a traumatic event?  And if so, then that

23   insomnia actually fits under the diagnosis of PTSD.

24             In this particular case Mr. Wise's symptom of dissociative

25   amnesia fits under the umbrella of PTSD rather than

1    dissociative disorder.  That is also because this dissociative

2    amnesia is very specific to this one traumatic event, whereas

3    someone that has dissociative amnesia as a dissociative

4    disorder, they are experiencing it in all kinds of different

5    circumstances, not just relevant to a specific event.

6    Q.    So in this case when you put dissociative amnesia under

7    the umbrella of PTSD is that the correct thing to do under

8    DSM-V?

9    A.    In the differential diagnosis, again, you have to sort of

10   go through, does this meet criteria for a dissociative

11   disorder?  And the answer is, no, because this answer --

12   because his amnesia is very specific to a traumatic event, so

13   it is instead consistent with PTSD.

14   Q.    In addition to the clinical diagnostic interview and

15   testing and your experience did you also rely on an

16   independent -- on independent treatment records for Mr. Wise?

17   A.    Yes, I did.

18   Q.    How were those independent treatment records either

19   supportive or not supportive of your opinion?

20   A.    Well, I think it is significant that he presented for

21   treatment one week after January 6, according to the records.

22   And at that time, his treatment provider diagnosed him with

23   acute stress disorder.  I should say that acute stress disorder

24   is what you diagnose within the first month following a

25   traumatic event, after which if they continue to have symptoms,

REDIRECT EXAMINATION OF DR. BEST

1  that would fall under the category of PTSD.  So you can't

2  diagnose PTSD until one month after.

3      But his treatment provider did diagnose him with acute

4  stress disorder and then after that with PTSD.  And in the

5  treatment records, the treatment provider indicated just

6  continuing symptoms throughout the time that he was seeing

7  Mr. Wise.  And that was all -- and the treatment provider

8  specified that his symptoms were specific to or in reaction to

9  the events of January 6.

10  Q.   You were asked about whether someone who is in a

11  dissociative state would be glassy eyed and you said

12  potentially.  Why did you say potentially?

13  A.   Well, there are, you know, other -- not everyone has the

14  exact same expression on their face when they are dissociating,

15  so they can certainly appear that way.  They could appear to be

16  staring into space or they can also appear clear, but then they

17  are not hearing a single word that you are saying.  So I have

18  certainly had that experience clinically where they are someone

19  else, but they like very intently are somewhere else.  So you

20  have to then bring them back into the present.

21  Q.   Can someone who is in a dissociative state look normal to

22  the untrained eye?

23  A.   That is possible.

24  Q.   Can someone who is in a dissociative state look like they

25  are acting normally?

1    A.    Yes.  So -- well, it depends on how you define normal.

2    But I think I used in the last testimony, I think I used an

3    example of a veteran diving under a car, something like that.

4    They look very intent when they are doing that.  They certainly

5    don't look like they are spaced out.  They are doing something

6    unusual behaviorally, but they are looking as though they are

7    really intently, you know, defending themselves.

8    Q.    What is the gold standard for PTSD testing?

9    A.    The Clinician Administered PTSD Scale is considered the

10   gold standard in both forensic context and also, for instance,

11   in assessing PTSD in veterans with disability claims.

12   Q.    Is that what you did in this case?

13   A.    Yes, it is.

14   Q.    You were asked a number of questions about tests that you

15   didn't do.  A couple of them you had coauthored.  Do you feel

16   like you were able to give a full response as to why you didn't

17   conduct all of those tests that were ticked off.  Would you

18   like to add to that?

19   A.    I guess I would only reiterate, I did not find it

20   necessary to formally fill out a PDQ and a PDI.  I took all of

21   those symptoms into account in considering my opinion.

22   Q.    You also talked about faking bad.  And I seem to recall in

23   the gold standard PTSD testing that you did, there is something

24   built in there to make sure people aren't faking bad to get

25   disability.  Can you touch on that and explain how that works?

REDIRECT EXAMINATION OF DR. BEST

1    A.    That is correct, yeah.  And that is based on clinical

2    judgment and observation.  And one of the main things that we

3    look at is consistency.  And that is one of the most important

4    things actually as far as people's report.  So, yes.  As part

5    of the CAPS, you consider whether each symptom that you are

6    assessing is trauma related.  You consider whether each symptom

7    you are assessing is being reported in a consistent way and

8    whether in your clinical judgment the individual appears to be

9    malingering.

10        One thing we consider is whether someone appears to be a

11   relatively naive reporter.  By that I mean not someone who has

12   studied the DSM and is spewing out exactly what is written

13   there diagnostically or someone who has looked at a PTSD

14   checklist and is making statements that seem very much kind of

15   rote and coming straight out of the DSM.  So if someone is

16   describing their experiences in detail without using terms like

17   dissociation, which is not a term that Mr. Wise ever used in my

18   evaluation of him for instance, then that is also an indication

19   of whether someone may or may not be malingering.

20   Q.    I know you don't like acronyms, but do you remember what

21   CAPS stands for?

22   A.    Clinician Administered Point Scale.

23   Q.    You were also asked about your PAI scoring.  Is it normal

24   for you to not include those numbers and instead use a

25   narrative description that laypeople can understand?

REDIRECT EXAMINATION OF DR. BEST

1   A.   Yes.  I never include numbers in my reports.

2   Q.   Can you give us an approximation of how many times you

3   have testified as an expert?

4   A.   Forty-five, 50.

5          THE COURT:  How many in federal court?

6          THE WITNESS:  Excuse me?

7          THE COURT:  Of those, how many in federal court?

8   Because the standards are different.

9          THE WITNESS:  Yes.  I would have to be -- I would

10   have to really estimate, so forgive me if I am not accurate.

11   Eight times maybe, ten times in federal court, maybe more

12   actually.  Yeah, I would say more.

13          THE COURT:  Can I ask you to go back once again to

14   the question about the dissociative state and intent.  I

15   understand that intent is a legal term and that is in my

16   bailiwick more than yours.  But I guess I still want to

17   understand more of what it means.  And I can understand someone

18   being dissociated that they feel as though they are looking

19   down on events, they are not present themselves.  They may have

20   tunnel vision.  Their hearing may be affected.  But I have to

21   figure out whether that is something that really goes to intent

22   in the legal sense of the word and that, you know, when you put

23   one foot in front of the other, you are usually intending to

24   walk where you are going, even if you may not remember you did,

25   even if you may feel dissociated from those events.  So it

REDIRECT EXAMINATION OF DR. BEST

1    would be helpful for me to understand what you mean about being

2    in the dissociated state and how that relates to intentionality

3    versus desiring an outcome or acting emotionally or not.  But,

4    intentionality in the most literal sense of when you perform

5    that act is that something not that you thought about, not

6    something that you intended to do, but did you act with

7    intentionality?  Or is it, in fact, something where you have no

8    responsibility for your actions?  And so when the firefighter

9    runs into the building and grabs the baby and comes running out

10   with the baby and everyone says, congratulations, you are no

11   hero, you had no intention to run into that building, you were

12   in a dissociative state, therefore you don't deserve any praise

13   for what you did, because you weren't present.

14          So I am trying to understand what it means, if you

15   know.  And maybe it is too much of a legal question versus a

16   psychological question but of how the dissociative state

17   relates to intentionality.

18          THE WITNESS:  Well, I can speak to the psychological

19   piece, in terms of you actually used a really good example.

20   Because it actually is true that people when they are

21   dissociating, they are putting one foot in front of another.

22   But I cannot tell you the number of times that I have had --

23   like hundreds of times where I have had clients or people I am

24   evaluating say to me, I will find myself in the room or down

25   the street or something like that and I have no idea how I got

REDIRECT EXAMINATION OF DR. BEST

1    there, why I got there, what it is that I went there for.  And

2    I just stand there looking around saying, you know, what -- why

3    I am here?  So it is absolutely true that people can put one

4    foot in front of another without intent if they are in a

5    dissociative state.

6         THE COURT:  What about my example about the

7    firefighter, does he deserve praise or not for running into

8    that building?

9         THE WITNESS:  Well, I mean, if he does that in a

10   dissociative state, does he deserve praise?  I mean, he did it

11   because of his experience and training and instinct, even if he

12   wasn't fully present when he did it.  It is not -- does he

13   deserve praise or not?  He deserves praise in that the

14   resulting consequence was he saved a baby so -- and risked his

15   life without knowing it.  So I don't know, that is a difficult

16   one.

17        THE COURT:  Without knowing it, so that is helpful.

18   So you think that the person doesn't even know they were

19   running into the building then?

20        THE WITNESS:  Well, in that they -- right, were not

21   necessarily present when they did it.  It is, again, like the

22   veteran who dives under the car.  The veteran might also do

23   something where they think they are saving someone by grabbing

24   someone and diving under the car with them.  Now, is that an

25   act of heroism?  In a sense.  But it is -- you know, what are

REDIRECT EXAMINATION OF DR. BEST                    54

1    they accomplishing?  Nothing other than scraping somebody up

2    under a car.  So does it mean that someone deserves -- you

3    know, I certainly have worked with a lot of officers who won

4    awards and they don't feel as though they deserve it.  They

5    feel they were doing something on automatic or like body memory

6    or they feel like they were just doing their job.  So that is a

7    really multilayered example.  That is a difficult one for me.

8            THE COURT:  Okay.  And can you say anything to the

9    question of when Mr. Wise uttered the phrase or allegedly

10   uttered the phrase, "Kill 'em, kill 'em," whether that was

11   intentional or not.

12           THE WITNESS:  Well, again, so he doesn't have a

13   memory of it.  What I did was I asked him about the different

14   things that he is alleged to have said during this whole event.

15   And I asked him, for instance, do you remember yelling,

16   "Nazis"?  And he says, no, I don't remember doing that.

17           Is that consistent with something that you might say?

18           Yes, actually it is.

19           And he provided me with a lengthy explanation for why

20   he might say something like that.  And how he has said

21   something like that in the past.  So I went through each of the

22   statements that he is alleged to have made during that event.

23   And the one thing that he said is completely inconsistent is to

24   say, "kill 'em, kill 'em," because he doesn't believe that law

25   enforcement should be killed or attacked.  And so there is that

1    piece of it.

2              You know, could he form intent?  Again, his reported

3    reaction and symptoms and his inability to recall says to me

4    that he was at the time experiencing dissociation.  So, you

5    know, again, intent is a legal term.  That is a tough one for

6    me.  Was he able to engage rational decision making or was he

7    able to even engage emotional decision making?  I would say,

8    no, because he was not fully present in that experience.  He

9    was actually split off from his -- from the present experience.

10             THE COURT:  Are there any -- are there any studies on

11   dissociative state and intentionality?

12             THE WITNESS:  I don't know.  I would need to look

13   into that.

14             THE COURT:  Okay.  All right.  Thank you.

15             Mr. Hermansen, anything else?

16   BY MR. HERMANSEN:

17   Q.   Yeah.  On that point, I am just hoping you can explain

18   this a little bit better.  "If someone is in a dissociative

19   state and basically their executive functioning, their frontal

20   brain is almost as though it is disconnected from their

21   emotional functioning, more like their amygdala," what does

22   that mean?

23   A.   Well, I mean, our frontal brain, the executive functioning

24   is what make us different from a reptile.  And so it is true

25   that, you know, basically it is sort of like wiring.  If you

REDIRECT EXAMINATION OF DR. BEST

1    think about computer wiring, it is the wiring of that -- that
2    allows an individual to go from taking an experience into more
3    of a primal brain, especially when there is threat involved and
4    then allowing it to get all of the way through the circuitry to
5    the frontal brain to the executive functioning of the brain.
6    And that is the area of the brain through which we make
7    decisions.  So, you know, to be honest, I don't know where this
8    term intent falls in that.  Because, again, that is more of a
9    legal term.  I could speak towards motivation.  I can speak
10   towards decision making.  But intent I think, again, is like
11   insanity, it is more of a legal term.
12   Q.   So is this one of the areas in psychology where it is
13   backed up by hard science and by that, I mean, do brain scans
14   show what you're talking about now, that the frontal cortex is
15   used for executive functioning and that under stressful
16   situations, when someone -- or say like someone who is
17   experiencing PTSD symptoms, can we see in brain scans they are
18   using their amygdala instead of the frontal cortex?
19   A.   Yeah.  Well, you can see -- there are brain studies where
20   you can see what regions of the brain are lighting up, under
21   what circumstances.  And there are studies where people are
22   stressed by -- you know, we even developed things called trauma
23   scripts where we have a combat veteran, for instance, discuss
24   the worst traumatic event they experienced in combat.  And then
25   we turn it into a script and then we read it.  We also have

REDIRECT EXAMINATION OF DR. BEST

1    psychophysiological studies.  And then we are examining their

2    brain region as the -- their regions as they are hearing it.

3        There are psychological studies where they basically have

4    sounds -- they call it the sight and sounds of combat.  There

5    is a whole movie that was put together for this where they have

6    veterans watch this while they are measuring their

7    psychophysiological reactions.  And they are able to then make

8    determinations about what regions of the brain are being

9    activated and physiologically what they are experiencing.

10            THE COURT:  Would you say the same thing though and

11   would there be similar studies, for example, with somebody who

12   was just confronted with something that really makes them

13   extremely angry and upset, where all of a sudden their amygdala

14   starts firing instead of the frontal cortex, someone says

15   something to them or confronts them in some way that really

16   makes them mad or upset?

17            THE WITNESS:  I am not familiar with those specific

18   studies.  They may well exist.  I have been more focused in the

19   area of trauma and PTSD, so I am not familiar with a specific

20   study about that, but it may well exist.

21            THE COURT:  Okay.

22   BY MR. HERMANSEN:

23   Q.   I wanted to follow up on the judge's --

24            THE COURT:  By the way, 3 minutes then I have got to

25   break, because I have another case coming in.

1    BY MR. HERMANSEN:

2    Q.   I wanted to quickly follow up on the judge's hypothetical

3    regarding firefighters.  Like a firefighter who on instinct

4    runs into a burning building and saves a baby, is it possible

5    to act on instinct and not be in the dissociative state and

6    likewise or conversely --

7             THE COURT:  I understand that.  You are wasting your

8    time on this.

9             MR. HERMANSEN:  Okay.  I will move on.

10   BY MR. HERMANSEN:

11   Q.   Have you testified for the prosecution?

12   A.   I have.

13   Q.   Would it be helpful to be able to review and -- further

14   corroborate your opinions to look at confirmation that Mr. Wise

15   did go toward the bombing in Chelsea, New York?

16   A.   Well, you know, more data is more data, so that, you know,

17   it could just further corroborate that.

18   Q.   For that one data point, rather than just relying on what

19   he is telling you, you would have corroboration?

20   A.   Yes.

21            MR. HERMANSEN:  I think that is a good place to

22   break, Your Honor.

23            THE COURT:  All right.  So I can excuse the witness

24   at this point?

25            MS. ROCHA:  I think I have very brief follow up.

RECROSS-EXAMINATION OF DR. BEST

1        THE COURT:  I will give you 2 minutes and then

2   we'll --

3                    RECROSS-EXAMINATION

4   BY MS. ROCHA:

5   Q.    Dr. Best, in the discussion that you just had about

6   executive functioning, for executive functioning for someone

7   that is in a dissociative state, is that also on a spectrum?

8   A.    Yes.

9   Q.    So do you have an opinion here on where Mr. Wise fell on

10  January 6 in that spectrum of executive functioning for someone

11  in a dissociative state?

12  A.    I would say it is lack of memory for specific portions of

13  that event is indicative of the level of dissociation.  Again,

14  I can't pinpoint a specific number on a continuum.  And that

15  that then -- if he was -- had the inability to encode and store

16  those specific events that is indicative to me of also an

17  inability to fully engage executive functioning and make

18  rational decisions.  Now, again, I can't say where on that

19  continuum that would be.

20  Q.    Okay.  Is it your opinion that he spaced out?

21  A.    Well, you know, I am not sure what that term means

22  exactly.  Other than, you know, it is my opinion that he was

23  not present in the environment to the extent that he could

24  actually encode and store memories, so is that spacing out?  It

25  means that there was undoubtedly significant interference in

 1    his ability to take in what was going on in that moment and

 2    fully -- and so I don't know.  Basically his mind was split off

 3    from his present environment and body.

 4              THE COURT:  I'm sorry just to interrupt.  When you

 5    say his mind was split off, I take it what you are saying was

 6    the executive portion of his mind was split off, but not his

 7    emotional functioning?

 8              THE WITNESS:  Well, the emotional functioning could

 9    be as well, to a certain degree.  So someone might appear very

10    much flat and in shock.  And that means that actually their

11    emotional functioning is cut off as well.

12              THE COURT:  What about in his case?

13              THE WITNESS:  Well, he discussed being in shock as he

14    was witnessing events and being just sort of standing there

15    numb and in shock.  So I would say that there were

16    definitely -- now, this is -- we are talking about a very

17    lengthy event.  It wasn't something that happened in the course

18    of 2 minutes.  So there were times when he was probably fully

19    in shock and there were times where he was not.  So that is the

20    other piece of it that makes it a bit difficult to just sort of

21    characterize it as a whole.

22              THE COURT:  Okay.  Thank you.

23    BY MS. ROCHA:

24    Q.   You gave the example, I think, of a veteran and maybe with

25    the Blue Angles and are flying over.  And they find themselves

RECROSS-EXAMINATION OF DR. BEST

1   I believe last time you said kind of in a bush.  Is that your

2   opinion of what -- of the type of dissociative state that

3   happened here?

4   A.   No.  Because that is a flashback, so that is -- no, it is

5   not my opinion.

6   Q.   Okay.  When did Mr. Wise enter a dissociative state?

7   A.   Well, I think that he was in and out of dissociative

8   states.  So, you know, he -- again, you know, he started off

9   feeling very shocked and numb and helpless.  And that is the

10  beginnings of dissociation.  He has memories of certain things

11  where it felt surreal, which is another dissociative symptom.

12  He has memories that he was able to encode, but he was still in

13  this place of feeling very surreal and disoriented and

14  confused.  Then he went into a period where he has no memory at

15  all.  And he might have walked like a zombie up the stairs of

16  the Capitol, I don't really know.  But I am saying that was

17  then a greater dissociative state, then he had a period where

18  he actually became more clear and was talking to police

19  officers in the Capitol.  And then he had another period after

20  leaving the Capitol, that he was completely checked out, if

21  that is what you want to use.  And so, you know, that is how

22  dissociation works though.  It is kind of an ebb and flow and

23  periods where he was completely not present and periods where

24  he was a little more so.  And so --

25  Q.   I think I heard you say something about walking around

1    like a zombie.  Is it your opinion that he was in the range of

2    the spectrum that he was at that -- experiencing that level of

3    dissociation?

4    A.   I don't know.

5    Q.   I think otherwise we have also talked about maybe

6    dissociation you see yourself, but you think it is like a movie

7    or things look very surreal.  Can someone that experiences that

8    level of dissociation also have these memory gaps?

9    A.   Yes.

10              THE COURT:  All right.  One more question.

11              MS. ROCHA:  I don't think I have one, Your Honor.

12              THE COURT:  All right.  So I have another matter now

13    at 12:00.  And I have preliminary injunction proceeding at

14    2:00.  So I think let's come back at 2:30 and we'll continue.

15    But I can excuse Dr. Best.  Thank you, Dr. Best.  I appreciate

16    your patience and your appearance.

17              THE WITNESS:  Thank you.

18              THE COURT:  So I will see you all at 2:30.

19              (Recess taken at 12:00 p.m.)

20              THE COURTROOM DEPUTY:  We are back on the record with

21    criminal case 23-184, *United States of America versus Jared*

22    *Lane Wise* appearing via Zoom.

23              THE COURT:  All right.  So what would the parties

24    like to do next?  Do you want to offer some argument with

25    respect to Dr. Best's testimony or pick up some other issues

1    now and come back to that?  I am happy to entertain your views

2    on how we should proceed.

3           MR. HERMANSEN:  I would definitely today before we

4    leave like to talk about our motion to continue the trial.

5           THE COURT:  Okay.  Do you want to take that up now?

6    That is fine.

7           MR. HERMANSEN:  So, Your Honor, we have filed a

8    motion to continue the trial and we have various reasons that

9    support that.  One is that I do -- we just recently filed an

10   article with quotes from various judges from this court talking

11   about their concerns about unruly behavior right around the

12   election.  So that further supports putting it on the 7th of

13   January, which is one day after this certification.  I mean, I

14   have seen what they have done at the Capitol.  I am a lot more

15   secure that we are prepared this time and that President Biden

16   will be prepared if people try to be unruly during the

17   certification, so that is our first reason that trial would be

18   after everything is resolved.

19           THE COURT:  I guess -- I appreciate there may be

20   reasons to continue.  That one argument, I guess, I am not sure

21   I really understand it.

22           MR. HERMANSEN:  Because jurors would be deliberating

23   while we don't know who is going to win.

24           THE COURT:  That is a different argument.  I mean --

25           MR. HERMANSEN:  It is front and center of the

```
1    election.
2              THE COURT:  You have got to let me finish my
3    sentences when I am speaking.
4              MR. HERMANSEN:  Yes, Your Honor.
5              THE COURT:  What I was going to say was -- is that
6    what I don't get about it is that your argument is that there
7    is likely to be violence.  And I don't know why there would be
8    greater concern there would be violence in the -- right around
9    elections in the District of Columbia than there might be
10   around the certification, where you are actually asking to move
11   the case to the 7th and right around the time when there is the
12   certification.  And if the concern is that history might repeat
13   itself, you are making things worse rather than better by
14   moving it to the day after the certification.  And I am pretty
15   sure you wouldn't have wanted this trial to take place the day
16   after the certification back when the attacks on the Capitol
17   took place.
18              And I guess I am not -- I am not aware of anything
19   that would make one think that there is going to be violence in
20   the District of Columbia.  I am not sure who people would be
21   protesting against or what they would be doing in the District
22   of Columbia on Election Day or around Election Day versus
23   around the certification, which does take place uniquely in the
24   District of Columbia.
25              MR. HERMANSEN:  I am relying on all of the statements
```

1    that were quoted in the newspaper in the Associated Press from

2    judges of this courthouse and their concerns that there is

3    going to be violence right around the election.

4              THE COURT:  You know, I guess that -- whether they

5    said that or not, I guess the question is that whether that is

6    true or not.  And I just -- I don't guess I have any reason to

7    think it is true there is going to be violence around the

8    election day versus -- or that it is more likely there would be

9    violence around the Election Day than it is more likely there

10   would be violence around the certification, but maybe I am

11   wrong about that.  I don't know.  I have not certainly heard

12   anything from law enforcement or otherwise to think that we are

13   expecting riots.  I am not sure whether any protests or

14   anything is even planned around the District of Columbia around

15   Election Day.  It seems to me that if it is a close election,

16   then we may not know the results for several days afterwards.

17   But that doesn't mean that people are going to be rioting in

18   the District of Columbia over that.

19             MR. HERMANSEN:  That is the second component.  It is

20   likely, especially with Georgia requiring hand counting and

21   historic problems in Florida and a lot of the close states that

22   we won't know during the trial and that the jurors will be

23   distracted and anxious about, like, how is this election going

24   to come out?  And the politics around this election -- Vice

25   President Harris is talking about January 6 constantly.  The

```
1    media is -- I mean, we are back at a point right now where it
2    is a huge topic with Vice President Harris and her team's
3    talking points.  So it is going to be front and center of
4    people's minds, but that is just one reason why I think it
5    would be prudent to push it past the certification.
6              THE COURT:  Okay.
7              MR. HERMANSEN:  Which I am confident will happen on
8    the 6th, because the Capitol is fortified.  President Biden is
9    not going to be unprepared.  And I am confident that he will
10   have sufficient resources there, because I trust that he --
11             THE COURT:  Are you willing to represent to me that
12   you will not seek to move it again if I move it to the 7th?
13             MR. HERMANSEN:  That the other -- well, no, I can't
14   guarantee that because --
15             THE COURT:  Let me be candid with you, part of my
16   concern here -- and maybe this is the furthest thing from the
17   truth.  Your first rationale didn't make any sense to me.  And
18   part of my concern here is that what is actually going on here
19   is an intentional effort to delay the trial until after not
20   just the 7th but until after the 20th, in which there is
21   potentially a new president who may make different decisions
22   about the prosecutions of these cases.
23             MR. HERMANSEN:  Your Honor, I know you don't know me,
24   so jumping to that conclusion -- I will try not to be offended
25   by -- I have never -- I have practiced for more than 30 years.
```

1    Before I was accused of gamesmanship in this courtroom, I have

2    never had that happen.  I clerked for --

3            THE COURT:  Accused of what?

4            MR. HERMANSEN:  For the August -- my first request

5    for a continuance, you, the Court -- it was by video and the

6    Court said, this feels like gamesmanship when I asked for a

7    continuance.  I am a federal public defender who is dedicated

8    to -- as an officer of the court.  I worked for two years for

9    judges in the San Diego Superior Court.  I worked for five

10   years for the US District Court in San Diego.  I am an officer

11   of the court.  I am an honorable attorney who doesn't play

12   games.  I am a straight shooter.  And I am representing to you

13   that I wouldn't ask for January 7th -- I understand your

14   concern that, you know, we would try to push it past

15   January 20th.  The only reason I can't say for sure 100 percent

16   I am not going to ask for another continuance.  But I feel a

17   million times better about our ability to be prepared for

18   January 7th than I do about our inability to be prepared for

19   November 1st.

20            And I also feel a lot safer about that date.  I feel

21   like we have a lot of things that are still hanging out

22   unresolved.  And at this point, the government is allowed to

23   proceed on a theory -- and that is the Court, you know, I

24   respect whatever the Court decides.  But on a group assault

25   theory and on --

1          THE COURT:  I don't think I have decided that

2     question.

3          MR. HERMANSEN:  That is correct.  At this point, we

4     don't know.  And I would --

5          THE COURT:  So let me just be -- one of the reasons

6     that I just express the skepticism -- I think your reasons two,

7     three and four, I understand and can get my head around them.

8     Then reason one doesn't make a lot of sense to me, which is the

9     reason I raised the question I just did.  Because saying to the

10    Court, let's move the case until the day after the

11    certification because of the concerns about violence and

12    reactions just doesn't make sense to me, because that is what

13    there is a history of.  And there is not history of any action

14    or anything taking place around the election.

15          And it is not like the District of Columbia is a

16    swing state where there is going to be craziness around the

17    election in the District of Columbia.  And so I just -- the

18    reason I ask the question was because that rationale, which was

19    your first rationale just didn't make any sense to me.  The

20    other rationales are ones that I understand and I can get my

21    head around.

22          MR. HERMANSEN:  Fair enough.

23          MS. LEE:  I apologize to interrupt.  Mine reflects

24    source disconnected.  I wanted to make sure Mr. Wise is still

25    connected.  He is just --

1    THE COURTROOM DEPUTY:  He is still connected.

2    Mr. Wise, right, you are still connected?

3    THE DEFENDANT:  Yes.  I can see and hear you.  Thank

4    you.

5    THE COURTROOM DEPUTY:  We are having technical on the

6    other side.

7    MS. LEE:  I don't mind not being able to see him, so

8    long as he can still hear what we are having happen.

9    THE COURTROOM DEPUTY:  He has video.  Thank you.

10    THE COURT:  I appreciate that.  Thank you.

11    MR. HERMANSEN:  So I understand, Your Honor,

12    reasonable minds can differ on that.  The other reason I would

13    defer to argument for Ms. Lee on the group assault issues.  The

14    additional argument would be that the FBI file -- and again

15    today our expert, Suzanne Best, indicated that it would help

16    her be -- it would be further corroboration for her to confirm

17    instead of just having an opinion about malingering but to see,

18    yes, it is true, Mr. Wise did go to Chelsea.  He was the first

19    responder to hear a bomb, all of those things he told me were

20    true.  That will make her opinion stronger.  The other thing --

21    THE COURT:  Is there any reason to think that is in

22    the FBI files?  My understanding was that he went there in a

23    civilian capacity, not as a law enforcement officer.

24    MR. HERMANSEN:  No.  He was the FBI agent in charge

25    and led the case to a conviction.

 1           THE COURT:  I see.  So maybe the issue is not even a

 2   disputed one if he was the FBI agent in charge.

 3           MR. HERMANSEN:  Well, we don't have a stipulation.

 4   And our -- right now our expert is subject to cross-examination

 5   on a point that -- we heard a lot of questions today that go to

 6   like, oh, you are just basing it on what he told you.

 7           THE COURT:  Also I never understood -- when there was

 8   the request for the subpoena, I never understood that it was

 9   asking for his assignments.  I thought it was his personnel

10   record.

11           MR. HERMANSEN:  His assignments will show that he was

12   embedded in --

13           THE COURT:  No.  No.  I thought it wasn't asking for

14   his assignments.

15           MR. HERMANSEN:  I would think that his personnel

16   records would show where he was assigned.

17           THE COURT:  If that is what you are asking for, I

18   have got a very different view about the merits of -- to ask

19   for -- whatever cases an FBI --

20           MR. HERMANSEN:  No, it is not --

21           THE COURT:  I'm sorry.  I am speaking.  I was asking

22   about -- I thought you were asking about his personnel record,

23   not about the assignments that he had as an FBI agent, which

24   could be extremely intrusive.

25           MR. HERMANSEN:  We don't want anything that is

1    confidential or intrusive, just like the basics that he was in

2    Israel, he was in Yemen.  Nothing about, like, which terrorism

3    cases he worked on.  And we know he worked in Benghazi, because

4    he already talked about that.

5        And anything that would show he was embedded in a

6    place where he experienced trauma.  Because that trauma that he

7    experienced led up to the slow burn that the expert talked

8    about of when he did respond as a first responder on January 6,

9    it was more likely that he would then develop PTSD because

10   history of trauma is one of the components that she looked at

11   in assessing him with PTSD.  The other issue that we thought of

12   today in a specific email asking about, because we are still --

13   the FBI file is something we can hopefully get to today and

14   have a further status report so the Court can hear what is

15   going on with that -- is he had a number of psychological

16   assessments.  So right now Dr. Best has an assessment that he

17   got a week after January 6.  His FBI file would have his

18   original assessment and a number of other assessments like when

19   he went to learn Arabic, they did -- throughout his career I

20   think he probably had three or four different psychological

21   assessments.  Having those, if they are available -- and I

22   don't know if they are.  If those are available, that would

23   also help Dr. Best.

24       His training records we certainly need because those

25   go to the other expert, the use of force expert to show that he

1   was trained on use of force.  The other issue is the

2   suppression issue is still hanging out there.  And we have the

3   geofence warrant.

4               THE COURT:  Right.  But you just submitted your final

5   brief over the weekend, so that is hardly -- the fact that you

6   filed that motion late is not necessarily much of a reason for

7   delay.  I mean, you filed your motion late.  You could have

8   filed it earlier and you filed your final brief over the

9   weekend.

10              MR. HERMANSEN:  That was a reply.

11              THE COURT:  I understand.  It was only a reply

12  because you filed your motion late too with respect to the

13  geofence.

14              MR. HERMANSEN:  We are scrambling, Your Honor.  And

15  we are doing things as fast as we can.  It is a supplement to

16  our suppression motion which was filed on time.  The other

17  issue is --

18              THE COURT:  My point was just that it is -- I don't

19  think it is -- maybe you weren't intending to do this, but I

20  don't think it is fair to point the finger at anyone else and

21  say that there has been delay as a result of when the

22  government filed or the fact the motion is still pending.  I

23  obviously couldn't have decided that motion, because you just

24  filed your brief over the weekend.  That was my only point.

25              MR. HERMANSEN:  That is correct.  That is fair, Your

1    Honor.  The only issue that is pending out there is selective

2    and vindictive enforcement.  Are we going to get discovery

3    on -- and the -- we were waiting for the FBI file to see if we

4    have further support for that motion.

5          Our defense motions in limine have not been ruled on.

6    And then we got the government's exhibits.  We need time to

7    meet and confer and go over those.  And we genuinely want to

8    have as many stipulations as possible so that the trial is

9    streamlined for everyone.  And we need an opportunity to meet

10   and confer about that.

11         And another issue is measurements.  We had a

12   productive discussion today about measurements on the upper

13   west terrace.  To me, I don't understand this.  But the

14   argument is that, because it is a secure building, even the

15   assistant US attorney and the trial attorney in this case

16   aren't allowed to measure it so we can stipulate how big is the

17   planter box.  Is it 8 feet wide?  How tall is the wall that

18   Mr. Wise was standing near?  Is it 4 feet, 4 inches the way we

19   think it is?  They can't even -- Jason Manning who was on the

20   case told me, oh, like we'll get you access to it so you can

21   measure it.

22         I was told today, absolutely not.  They are not even

23   allowed to measure it.  And I just don't understand how a

24   planter box can't be measured so that we can stipulate to the

25   size of a planter box.  We could do it under seal.  We could

1    seal that part of the transcript.  I don't understand why that

2    would be a security secret.

3            So those -- all of those issues are pending, Your

4    Honor.  And I think all of those reasons combined and just

5    our -- and we filed a declaration of our paralegal.  We are

6    literally killing ourselves -- not literally, but it feels like

7    it.  Flying out here three times from the west coast, I mean --

8    I am not going to -- it is not easy trying a case all of the

9    way across the country and we are doing the best we can.

10           THE COURT:  Okay.  Let me hear from the government

11   then.

12           MS. FONTAN:  Your Honor, I think for the most part,

13   the government rests on the briefing that we have presented to

14   the Court.  As far as the election goes, I know we have had

15   discussions about that in the past.  I think in our hearing in

16   August and the Court did address potential safety concerns, if

17   it were to come up at trial.  But I think that question is best

18   left for if it -- if there is a potential that there could be a

19   safety issue, that is something we can address.

20           THE COURT:  What about just the issue that January 6

21   has become a major campaign issue and there are television

22   advertisements that are running and Vice President Harris is

23   talking about what happened that day.  And President Trump is

24   talking about what happened that day himself.  And Senator

25   Vance is talking about it.  They are all talking about that

1    day.  And they are all putting their own cast on the events of

2    that day.  And is that sufficient reason or concern to want to

3    wait with the trial, so we are not at the crescendo of a

4    campaign in which that is a prominent issue?

5                MS. FONTAN:  Sure, Your Honor.  And I appreciate that

6    concern.  Obviously, it was a huge moment in our country's

7    history, so people are going to talk about it.  But I don't

8    think that it is an issue that can't be discussed or resolved

9    in voir dire.  We talk about -- or ask all of the time in these

10   cases, what you have watched, what you have listened to.  And I

11   think if there is a concern, the Court can properly question

12   the witness on that.  The parties can ask the witnesses -- or

13   I'm sorry -- not the witnesses, the potential jurors on that

14   issue.  And I think a potential juror will say whether or not

15   they can put aside what they have seen on TV, whether they can

16   put aside, you know, all of the campaign ads or maybe lack

17   thereof that they have seen.  And we can still get a fair and

18   impartial jury that way.  So I don't think that --

19               While I appreciate that this is something that is in

20   the news, I think we have dealt with that for the last three

21   years.  And, again, I appreciate how the timing works out.  But

22   I think we can still ask those questions in voir dire to

23   pinpoint if there is bias and whether or not that potential

24   juror can be fair and impartial.  So I think we can get past

25   that by just the process of voir dire.

1          THE COURT:  And where are we with the FBI file?

2          MS. FONTAN:  Your Honor, Ms. Rocha is going to talk

3     about the status of the FBI file.

4          THE COURT:  Okay.

5          MS. ROCHA:  Your Honor, since the last time we were

6     here we did meet and confer and submitted the status report to

7     the Court.  I think I can give you an update on that and then

8     respond to the earlier statements, because I think that is more

9     productive.  From the government's perspective, we are still

10    working on two pieces in response to the file.  First, as to

11    the training materials, those were not part of what was

12    gathered for -- in response to the FOIA request and are not

13    part of what is considered his personnel file, so we went to a

14    separate division.  I am told that we think that we will be

15    able to provide information this week.  Although, that is still

16    being reviewed for law enforcement sensitive and classified

17    information.

18         THE COURT:  So how can I schedule the trial to go

19    forward, if we don't even know for sure that the defense is

20    going to get the material this week?  And we are now a little

21    over two weeks away from trial date, about two weeks away.

22         MS. ROCHA:  I think our broader point -- and I do

23    want to kind of make sure that everybody knows what we are

24    getting about the training material, but I can come back to

25    that.  Is these materials are not relevant.  They would not be

1    admissible.  These are things that clearly, you know, is the

2    defendant's personnel file.  So there are things that he

3    experienced or that he knew.  We are, you know, moving forward

4    with this process to respond to the subpoena.  But none of this

5    information really goes to any issue, you know, for the trial

6    itself.

7          In terms of the training material, I --

8          THE COURT:  But haven't we all agreed that I need --

9    this may not be the training material, but the FBI file has to

10   be produced before I can resolve the -- not the vindictive

11   prosecution, but the whatever the other prosecution motion is.

12         MS. ROCHA:  I think that is the point, Your Honor.

13   There is no vindictive prosecution motion.  And Ms. Fontan can

14   speak to those details.

15         THE COURT:  All right.

16         MS. ROCHA:  We have overlapping and related areas

17   that I think we can kind of each speak to.

18         THE COURT:  Okay.

19         MS. ROCHA:  In terms of the training, what is

20   available and what will be provided is essentially a

21   transcript.  So this is essentially, yeah, a listing as I

22   understand it with names and credit hours, essentially.  So

23   this is not a -- what will be provided is not a curriculum

24   or -- it is essentially like a transcript of one's training.

25         THE COURT:  It is going to show that he received the

1    following trainings?

2             MS. ROCHA:  Which is as good as the records are

3    maintained.  And given the length of time, my understanding is

4    that it also would not include anything from the -- when he was

5    in the academy.  This is sort of the system as the best they

6    have it with the way they are able to query it.

7             THE COURT:  Okay.

8             MS. ROCHA:  In terms of the personnel file, we have

9    reviewed those materials.  I do want to say, I think earlier

10   there was this conversation about things that he participated

11   in as an agent when we were here last time, which was part of

12   our concern about wanting to make sure that we were adequately

13   responding to the subpoena.  We had a discussion about this

14   being his personnel file, and not things that, you know, refer

15   to him in his kind of work capacity.  So what we have reviewed

16   and queried is his personnel file.  So this is not materials

17   that go to, you know, other things like his sort of job, you

18   know, things that he did as an agent or 302s he authored.  That

19   is not what is gathered.

20            But of the FOIA materials, there was sort of a subset

21   of that, which were personnel records.  We have also queried

22   his personnel -- the system they have for personnel records.

23   Those records have been to the extent, you know, anything in

24   there looked like it could meet the subpoena, that has been set

25   aside.  And it is in the process of being reviewed for law

1       enforcement sensitive and --

2               THE COURT:  When will that happen?

3               MS. ROCHA:  -- classified information.  I don't have

4       an update on that, Your Honor.  But the folks do recognize the

5       sensitivity and the urgency of the situation.  And we should be

6       able to provide an update on where things are with that this

7       week.  I will say there is one item the government withheld,

8       just only one thing to the best of my recollection.  And that

9       is a polygraph.  It is essentially a bunch of squigglies, Your

10      Honor.  And my understanding from the FBI is it doesn't mean

11      anything without the questions.  And, of course, the FBI is not

12      going to provide that kind of information.

13              But to the extent that there are things in what is

14      considered his personnel file and his personnel system, you

15      know, those are on their way.  I think in their motion defense

16      counsel talks about a third-party training that took place when

17      he became an agent.  You know, we have done our best to try to

18      gather and provide information about that.  But that is not

19      what, you know -- what we view as responsive to the subpoena.

20      I do think my recollection of what Dr. Best is also

21      inconsistent with that -- I am sure -- I think she said

22      something to the effect of, more information is always helpful,

23      not that she is not able to make her opinion.  Her opinion is

24      that he developed PTSD based on January 6, not the prior

25      events.  So I don't see how those are tied together.

1          THE COURT:  What about the psychological assessments?

2    Are there psychological assessments in his personnel file?

3          MS. ROCHA:  Your Honor, the first I heard of it --

4    the specific request was today.  There are things as part of

5    his background information as background investigation, that

6    were part of his personnel file.  The polygraph, for example,

7    is the one thing I know that we -- that was pulled out of that.

8    The rest of the materials that are in there, I don't -- off the

9    top of my head, I don't recall -- I certainly don't recall like

10   numerous multiple ones over time.  But to the extent there is

11   something like that in his personnel file, we have -- we have

12   set that for -- to be produced pending the restrictions on what

13   they deem to be law enforcement sensitive or classified.

14         THE COURT:  Okay.  All right.  I am happy to --

15         MS. LEE:  To the extent the Court would like any

16   further clarification about the defense's position on the FBI

17   file --

18         THE COURT:  Yes, that would be helpful.

19         MS. LEE:  -- I am prepared to address that.

20         I want to start where we ended there with the

21   psychological evaluation and testing.  I think for context I

22   want to be clear about the timeline.  And this is laid out in

23   our response to their motion to find this subpoena moot.  So

24   ECF 115.  We have been attempting to get these records for most

25   of the case.  Certainly, a direct request to the US Attorney's

1    Office by email in January of 2024 with a full listing of

2    everything we could think of that we believe to be relevant or

3    part of the file, that included psychological testing records,

4    personality testing.  So this is not the first time we have

5    requested it from the government.  I appreciate that there has

6    been change in the US Attorney's Office assignments to this

7    case, but it is not a new request from the defense.

8             THE COURT:  Although, maybe I should just ask counsel

9    to clarify but I was under the impression that the only thing

10   that is there is information that is in his BI, background

11   investigation.

12            MS. LEE:  So if there is psychological testing that

13   is part of the original hiring process, we certainly want that

14   if that --

15            THE COURT:  I guess maybe I misunderstood.  I assumed

16   what that meant was there was a question on the SF-86 form that

17   says, have you received psychiatric care in the past?  But

18   counsel can clarify as to what that is and he self reported

19   yes, I did; or I didn't, but maybe I am wrong about what she

20   was talking about.

21            MS. LEE:  I think there is actual testing done as

22   part of the hiring process and then I believe that is part of

23   the --

24            THE COURT:  Why is that -- I could see why -- well, I

25   guess I am not entirely sure why that is relevant based on

1    Dr. Best's testimony that the psychological issues here didn't

2    develop until January 6.

3              MS. LEE:  Your Honor, I guess I want to make two

4    points.  First as a framing matter, we don't believe at this

5    stage, we have to pass a relevance examination from the

6    government to apply the subpoena.  This subpoena was agreed to

7    in August in full.  The first we heard about a need for

8    clarification or further questions about that subpoena was the

9    September filing about September 25th.  I think about a week

10   before we were going to be back in court, the Court granted

11   with no objection from the government the subpoena in August

12   that we had been asking for separately for quite some time and

13   filed and requested.

14             THE COURT:  But the relevance is still of interest to

15   me because what we are talking about is scheduling a trial.

16   And if it is utterly irrelevant, why postpone the trial over

17   it?

18             MS. LEE:  Certainly, Your Honor.  And I wanted to

19   start with the government is in a sort of surprising

20   gatekeeping function here.  Usually we can subpoena records

21   more directly.  The case that the government cites for when an

22   ex parte application might be appropriate, the *Beckford* case

23   they cite, they cite it as a time where it is generally not

24   appropriate to use an ex parte proceeding for this.

25             But one of the cited examples is when somebody is

1    subpoenaing records about themself from a public agency, such

2    as federal or state social service agencies or for military

3    service as a time when an ex parte proceeding is appropriate,

4    that the defendant should be able to access those records,

5    their own records that happen to be held by the federal

6    government.

7           The relevancy question to the extent that we have to

8    present our defense.  And I think at this point we have played

9    our cards about what pieces we think are relevant.  Dr. Best

10    was examined very closely about the nature of her opinion

11    relying entirely on Mr. Wise's reports to her and questions

12    about whether she did anything to corroborate any of the

13    information that he was providing her.

14           THE COURT:  But she didn't rely on any past

15    psychiatric or psychological testing or assessment.  What she

16    was talking about is confirmation about whether, in fact, he

17    was the first person to run to the site of a bombing or whether

18    he was stationed in the Middle East.

19           MS. LEE:  I think both, Your Honor.  There were

20    questions about the nature of her diagnosis and the nature of

21    that trauma diagnosis and ruling out other psychological

22    explanations for dissociative amnesia or all of the examination

23    or *Daubert* hearing examination, I expect likely to show up

24    again at trial about the nature of her opinion.  To the extent

25    there are like psychological evaluations and assessments of

1    Mr. Wise during his FBI hiring process and his applications to

2    further teams, those go to Dr. Best's opinion.  She does use

3    the psychological evaluations from January that were the

4    records we are able to access, but --

5              THE COURT:  Let me just cut this short and just ask

6    the government whether there are psychological evaluations and

7    reports that were prepared and if so, why not give them to the

8    defense?

9              MS. ROCHA:  Your Honor, based on our review of what

10    is in the personnel file, again, they were focusing on making

11    sure that we were setting aside things so that they could be

12    reviewed with the goal of getting them to defense counsel, more

13    than looking at the minutia of all of the documents.  As I

14    stand here right now, nothing is coming to mind that is of the

15    level of what defense counsel is describing.  Nothing is coming

16    to my head other than, like I said, I know there was the

17    polygraph.  But I know there were, you know, different aspects

18    of the background investigation.  But I am not recalling --

19              THE COURT:  Do you know as a matter of FBI practice,

20    do they perform a psychological assessment when they hire

21    somebody as a special agent?

22              MS. ROCHA:  I don't know.

23              MS. LEE:  My information from Mr. Wise is that there

24    is personality and psychological testing at the hiring process,

25    at the process at which he was being considered for the

1    placement in Israel and he believes possibly as part of the

2    placement with the Fly Team.  So I do think there is some

3    degree of psychological evaluation and test that would be

4    relevant.  I agree that at our last hearing, we discussed not

5    seeking the case files he had worked on.  But placements are

6    going to be part of his personnel file, confirmation that he

7    worked in the New York office during this time period is

8    corroborative.

9              THE COURT:  Right.  But that is different from

10   saying, confirmation that he was the agent who was the agent on

11   scene for a bombing.

12             MS. LEE:  Certainly.

13             THE COURT:  Knowing he was in New York, that doesn't

14   strike me as terribly controversial.

15             MS. LEE:  I would hope not, but I expect a line of

16   questioning about what Dr. Best relied on and whether she took

17   Mr. Wise's word for it about a number of things.  I think for

18   her some more significant portions are the psychological

19   components although I do think placements are relevant to these

20   issues of underlying traumatic experiences that Mr. Wise has

21   told her about and are cumulative to the PTSD diagnosis we end

22   up with after January 6.

23             Dr. Rylant is a use of force expert.  And that a

24   component of Mr. Wise's training in the use of force over the

25   course of his career is part of any opinion that Dr. Rylant is

1    going to give about what a reasonable response is, what legal

2    force is, what somebody would know as legal force or perceive

3    as lawful force, the legal and ethics trainings as well as the

4    use of force trainings are a component.  And, again, I expect a

5    similar cross-examination to be a portion of the government's

6    questions about what Dr. Rylant knows of Mr. Wise's

7    understanding of these things and whether that entirely depends

8    on what is being reported to him.  We would like and we think

9    we are entitled to receive the full reports and background

10   information about his use of force, his legal and ethical

11   training as it relates to that testimony as well.

12          THE COURT:  Again, let's just make sure we are

13   covering this before we move on.

14          My understanding from the government is that the only

15   thing they are aware of after some investigation or transcripts

16   that show what courses he took.  Not the course materials or

17   video of him taking the class or whatever it might be, but that

18   is just presumably going to be a printout on such and such a

19   day you received such and such training.

20          MS. LEE:  I am surprised that is all the FBI

21   maintains, but if that is it, we would love that piece at the

22   very least.  And at this point, we still don't have those.

23          THE COURT:  When you say you would be surprised that

24   is all the FBI maintains, this is, obviously, speculation by

25   you and by me.  But what I would have thought is that is what

1  would be in someone's personnel file, but the training offices

2  presumably have books and all sorts of materials for their

3  classes.  But that is not what is in his personnel file.  That

4  is just what is in the training offices showing that when it

5  says that on such and such a date, he took the class on when it

6  is appropriate to use a baton.  And he took that class and it

7  may be that somewhere else, you know, there is an instructor

8  who has got an office packed full of materials they use for

9  particular classes, but that is not necessarily what we would

10  expect to see in his personnel file.

11       MS. LEE:  And I guess we had some of the discussion

12  two weeks ago about what feels a little bit like the Yogi Berra

13  logic of nobody goes there anymore, it is so crowded.  There is

14  a little bit of nothing is responsive exactly to this request,

15  but also it is all in so many places, that it is very hard to

16  gather into one place.  And I have heard a little bit of both

17  from the government.  To the extent the personnel file does not

18  contain the particular things we repeatedly requested, a list

19  would give us a place to start for separate subpoenas, right.

20  The defense has the ability to try to access.

21       THE COURT:  But you know the subpoena process here in

22  a criminal case, as you know well, is not discovery.  It is

23  for -- it is for trial where you have some substantial basis

24  for it and needing information for the trial itself.

25       And I have to say, you know, I don't know what the

 1    FBI makes public or not.  But starting to get into the

 2    materials that are used by the FBI for training its agents is

 3    probably something that is sensitive.

 4            MS. LEE:  And maybe we don't get there.  But we are

 5    at less than two weeks before the start of trial, two weeks to

 6    the start of evidence.  And I don't know what is or isn't in

 7    the personnel file.  I understand as of today, that is a list.

 8    But we don't have that to provide to Dr. Rylant.  We do think

 9    it is part of his opinion.  We don't have it still.  We don't

10    know where that leaves us on how much we do and don't know

11    about those trainings.

12            THE COURT:  Well, you do and do not know whatever

13    your client can tell you about those.  And there is no question

14    about his memory back then of events.  And you may want some

15    confirmation that is going to prevent any cross-examination on

16    the issues.  But he knows what training he received and he can

17    tell you.  And he can tell Dr. Best what training he received

18    and did not receive.  So it is not sort of a surprise to you.

19            MS. LEE:  To some degree, Your Honor.  But again for

20    the provision to an expert to prepare appropriately for trial,

21    I think it is important that we have those records.

22            And I will note, Mr. Wise worked in the FBI -- had a

23    long career in the FBI, was in the FBI for about 13 years.  I

24    might have that off slightly -- 13 years.  So and has been out

25    of the FBI for some period of time now.  So we are -- Mr. Wise

 1    is not saying he doesn't remember his FBI experience.  But this

 2    is quite a lot of time and quite a long period of time to

 3    cover.

 4            THE COURT:  It is, although it is a little hard to

 5    believe though that the defense would be, I was so upset by

 6    what I saw that day because it was so contrary to my training

 7    as an FBI agent that it provoked me to react that way, but I

 8    don't really remember what training I received as an FBI agent.

 9    That seems a little hard to square.

10            MS. LEE:  That is -- I don't want the Court to

11    mistake our position.  I think our position is simply that

12    there are significant portions of this we believe are relevant

13    to our expert opinions.  We have been asking for them for quite

14    some time.  It did appear controversial in August.  And at two

15    weeks out from trial, we have still not received what we

16    believed relevant to that -- relevant to the defense that

17    should be contained within Mr. Wise's file.

18            The ADL training, I understand there is a difference

19    of opinion about whether that is something that the FBI has

20    discoverable or responsive information about.

21            THE COURT:  What is ADL?

22            MS. LEE:  So there is -- as part of -- my

23    understanding as part of the FBI academy, there is an ADL

24    training about the factors that went into the Holocaust, that

25    it was a very moving part of being trained --

1          THE COURT:  I see.  Antidefamation League.

2          MS. LEE:  Yes, I apologize.  I didn't specifically

3     clarify that part.  Yes, the Antidefamation League, as I

4     understand, does a training with FBI agents.  Given the

5     statements the government seeks to introduce by Mr. Wise where

6     they believe he accused an officer of being a Nazi or like the

7     Gestapo, the context for his training on that is a significant

8     portion of it.  The government has said that training is

9     entirely held by a third party, that it is not -- there are no

10    records responsive to that.

11         To the extent there is a list of Mr. Wise's FBI

12    trainings that includes that, we think that is corroborative

13    information we would like access to.  To the extent the FBI

14    maintains any portion of -- whether that is the syllabus or

15    information about what that training is we have asked for it a

16    number of times.  And to the extent that there is not, we have

17    requested in our filings and I understand the government

18    objects to some certification that says, there are no

19    responsive records to that request.  And that is we believe a

20    common practice of requesting business records if there is not

21    something responsive, we would like some form of records or a

22    custodian response that says, there are not responsive records

23    to that portion of the request.

24         THE COURT:  Do you have the current list of

25    outstanding items at this point?

 1            MS. LEE:  We have the status update for the Court.  I

 2   can tell the Court what we have discussed is particular

 3   elements.  As I understand from what the government has

 4   indicated today, is that there has been more information

 5   pulled.  The status update has a reference that says, we should

 6   know more soon.  It sounds like today's on the record

 7   representation from the Government is that they have pulled

 8   some and expect some to come.

 9            What I understand those to include are use of force

10   trainings at the very least, employment records.  I don't know

11   if there is additional information.

12            THE COURT:  I'm sorry.  For the use of force

13   training, what you understand is it is just going to be a list

14   of which trainings he received or is it going to be the

15   materials from the training?

16            MS. LEE:  What was described by the government today

17   is there is a transcript, the listings of names and credit

18   hours of those.

19            THE COURT:  Right.  Okay.

20            MS. LEE:  It doesn't sound like the government

21   intends to turn over further detail about those trainings.  We

22   would like a full accounting of the trainings he has received.

23   We have done our best to enumerate the ways we think that would

24   be satisfied.

25            But at the very least, we have not received training

1    information.  We have not received psychological evaluations,

2    understanding we provided a follow-up email today saying, given

3    the cross-examination we -- like I said, we are asking

4    particularly for psychological components that have been

5    referenced in our January request to the government.  We are

6    asking for those.

7         The ADL training the government position is, they do

8    not have responsive records.  We do not have any certification

9    with regards to any topic.  They believe -- they don't believe

10   they have further responsive records.  We don't have any

11   certification that we have asked for about that.

12        The training as we have enumerated it and I will just

13   kind of describe the way the defense has tried to be as

14   particular as we can.  It covers use of force, it covers legal

15   and ethics trainings.  We have asked for the ADL training

16   portion.

17        THE COURT:  What do you mean by ethics trainings?

18        MS. LEE:  So as part of being an officer, the FBI

19   academy at the very least does legal or ethics.  Mr. Wise

20   couldn't remember exactly how it is described.  But there is

21   some form of agent legal or ethical training about their

22   behavior and that there are updates after the academy.  They

23   are, I think, about annual --

24        THE COURT:  Why would that be relevant in the case?

25   It is a little hard to believe that it would justify the use of

1    force -- I think that person was behaving unethically versus

2    using excessive force and hurting somebody in way they were not

3    entitled to hurt somebody, for example.

4        MS. LEE:  The second description I think is probably

5    a more accurate description.  I didn't think they are doing

6    kind of good, bad philosophy ethics training.

7        THE COURT:  You ought to give truthful testimony when

8    you are a witness, you ought to be truthful under the following

9    circumstances, here is when you can lie to a person that you

10   are investigating in order to try and trick them, things like

11   that.

12       MS. LEE:  Sure.  I think to the extent that it is

13   legal and ethics trainings, it is behaviors as an agent.  So

14   when Mr. Wise is observing officers' conduct that day, that is

15   in the text as a trained officer who understands there are

16   certain -- whether it is use of force or conduct towards the

17   protesters that is lawful conduct towards the protesters and

18   conduct that is not.

19       THE COURT:  I guess, can you give me an example of

20   what it would be that is not the excessive use of force that

21   would be relevant, to a -- I guess, an indirect self-defense of

22   others type hearing?

23       MS. LEE:  I think crowd dispersal is a component of

24   that, whether that is directly about the nature of the force or

25   that is about how the officers' conduct should have been

1    handled.  I don't know.

2          THE COURT:  I guess I have to say I am concerned

3    here.  I don't think this should turn into a trial of the

4    police officers on that day and a trial into whether there were

5    better ways they could have handled the crowd that day and they

6    should have been better prepared that day and all of that type

7    of stuff.  I don't think it is relevant.  And I think under

8    403, it would be substantially more prejudicial than probative

9    to start trying the Capitol Police or the FBI or the MPD for

10   sort of strategic, big picture type stuff.

11         If the defense is, I saw somebody hitting somebody

12   over the head and I know as a trained law enforcement officer

13   that that is excessive force, you cannot do that, that is the

14   equivalent of assault, that I get.

15         I don't get, the -- you know, they really should have

16   been better prepared.  They were using bike racks.  Who in the

17   world would use bike racks?  They should have had fences up.

18         MS. LEE:  Your Honor, I think I agree with -- yes.  I

19   don't think it would be either admissible or particularly

20   strategic on our part to be a discussion of the broader

21   tactical questions from the day.  But Mr. Wise's perceptions of

22   force being used around him, what his understanding from his

23   training was about that force, particularly for the period of

24   time that he is experiencing what leads up to where the assault

25   is charged.  But I also think for the kind of lead up for going

1    into the Capitol.  All of this, I think, can be objected to if

2    there are issues as we receive those records and they become

3    any portion of the expert's testimony.  But the force

4    components I think and the psychological components are sort of

5    unambiguously part of corroboration and information for our

6    experts.

7              I think I have made my record about the ADL portion

8    of it.  I will just note that the force component I think

9    includes sort of post-blast investigations, sort of a

10   discussion of the response to the explosions, as Mr. Wise is

11   first coming onto the scene.  And kind of a --

12             THE COURT:  That, I guess I didn't realize -- I mean,

13   unless there was a psychological assessment that was done of

14   him, I guess I didn't understand that is the sort of thing you

15   are seeking.  I mean, that sounds almost like a 302 and you

16   want a report what happened with the blast and events of that

17   day.

18             MS. LEE:  No, Your Honor, I apologize.  Not the

19   particulars of the Chelsea incident in New York, but the

20   trainings as the result of force.  I wanted to include those

21   are things like batons, ASPs, but also things like explosions

22   investigations, that part of training, we think again goes to

23   Mr. Wise's reasonableness of reaction.

24             THE COURT:  You mean, about when officers should use

25   flash bangs or things like that?

1          MS. LEE:  Use of those, but also responses to the

2     experience of an explosion, of a bomb, what you would do in

3     reaction to that.  That is a significant part of what

4     Mr. Wise's training is in the FBI is how to respond and address

5     something like a bomb going off.  So I just wanted to be clear

6     about the kind of scope of that training and the way that we

7     see it being a portion of the --

8          THE COURT:  I just want to make sure I have the list

9     right here.

10          MS. LEE:  Yes.

11          THE COURT:  My understanding of what you think is at

12     the core of what you need is, one, the list or transcript or

13     whatever anyone wants to call it, of the particular classes or

14     other training that Mr. Wise received and of particular

15     interest is the list of any classes that he received that he

16     participated in relating to the use of force or responding to

17     use of force against you.  Number two, any psychological

18     evaluations.  And number three is a certification of some type

19     that there are no records relating to the ADL training, other

20     than the fact he may have participated in it.  Do I have that

21     right?

22          MS. LEE:  I think that covers it, just the blast

23     investigation part I wanted to clarify, because I see that as

24     part of the use of force portion of his training.  I will add,

25     there is sort of a separate category.  We have asked for his

1    personnel reviews.  In our filing we described what we have

2    received from the government and was kind of rediscovered.

3    There are four reviews -- performance reviews we have received.

4    They cover three years, 2013, 2014 and 2015.  Mr. Wise was in

5    the FBI for 13 years.  He also filed -- and I believe the

6    government's response to this was it was an anonymous review

7    from what they can find and they cannot therefore access it.

8    We have the same request about certifying there is not an

9    ability to access a responsive record.  But with regards to the

10   vindictive prosecution motion and I understand that is a

11   separate issue the government wants to take up on whether that

12   motion is at issue still.  But the personnel reviews of

13   Mr. Wise and his review of his boss in the final moments before

14   leaving the FBI, I see that as --

15          THE COURT:  You want Wise's review of others, that

16   also I have never heard before.

17          MS. LEE:  That has been part of the request to the

18   government.  Mr. Wise -- what we believed was held in his file

19   but I understand the government is reporting is not is made

20   anonymously and --

21          THE COURT:  I see.  That is what you want the

22   certification for?

23          MS. LEE:  Yes.  That would be -- to the extent that

24   is not recoverable, we would want a certification that is not

25   recoverable regarding his review of his boss, again for the

1    kind of nature of his departure of the FBI.  I don't know that

2    this will become an issue in the trial, his performance or

3    effectiveness as an FBI, I didn't think it is one where we

4    think we would be delving into it, except in discussions we

5    have already had about expert opinions.  But there has

6    certainly been discussion in news media and inferences.  I

7    don't know their origins, but inferences about Mr. Wise's

8    departure from the FBI and being, I don't know if they say

9    substandard, put on poor terms or what.  So we certainly would

10   have a concern.  And we think his performance appraisals would

11   be responsive to any raised argument or implication that his

12   departure was on bad terms.

13            THE COURT:  So let me ask the government to come up

14   and respond as to each of these then and figure out where we

15   are.

16            All right.  Number 1 is the transcripts or lists of

17   any and all trainings that Mr. Wise received.  And I think you

18   have indicated that is in the works?

19            MS. ROCHA:  Yes, Your Honor.  That is with -- outside

20   of his personnel file, but given our prior conversations, we

21   went, you know, above and beyond to gather that.  So that is on

22   its way.

23            THE COURT:  On its way, but you don't know when?

24            MS. ROCHA:  My understanding is that we should expect

25   it later this week.  That was the latest I received I believe

1    on Friday.

2            THE COURT:  What about any psychological assessments,

3    are there any?

4            MS. ROCHA:  Your Honor, that is what I was trying to

5    answer.  I know that we looked through -- I think this goes

6    back to -- when the government came first, what personnel file

7    I think has a -- may have more amorphous description to defense

8    counsel than it means to the FBI.  So we have gathered records

9    to the extent that they are in the personnel file.  As a check

10   on that, we have looked at the material that were gathered in

11   response to the FOIA request that they submitted but then

12   withdrew.  To the extent there is something like that in there,

13   it would be in the -- as I say, Your Honor, from my review of

14   these materials, that didn't jump out at me.  But it is

15   possible that it was in there and I, of course, would have put

16   it in the -- see if that can be reviewed to be produced to

17   defendant.

18           THE COURT:  It seems to me on this one you ought to

19   be doing something more than looking at the personnel file and

20   saying it is not there.  Is seems to me that you can just ask

21   the question of whoever your contact is in the FBI and saying,

22   is there typically a psychiatric or psychological assessment

23   that is done when a new agent is hired?  Is there an assessment

24   that is done after officers may engage or special agents may

25   confront particularly stressful or disturbing events?  And

1    where are those files kept?  It may be at the -- kept in the

2    office of the psychiatrist, for example, or the social worker

3    or whoever it is in the FBI who handles these things.  I think

4    you can more affirmatively actually inquire about whether that

5    is something that actually is done typically.  And if so where

6    that would be.

7           MS. ROCHA:  If Your Honor is asking me to, I am happy

8    to do that.  I do want to just sort of take a step back though.

9    And I want to make sure -- because the subpoena requested

10   specific -- had a broad thing and then requested some

11   specifics.  We have worked on the broad category and on the

12   specifics.  This is something that now was not one of the

13   particular itemized items in the subpoena.  So while --

14          THE COURT:  Ms. Lee told me this was in an original

15   email that was sent to the US Attorney's Office.

16          MS. ROCHA:  I have been working, Your Honor, off of

17   the subpoena that Your Honor issued, which asked for records

18   and then identified certain categories of items.

19          THE COURT:  Okay.

20          MS. ROCHA:  So there may have been some request

21   months prior to the subpoena is not -- like we have been

22   working on what is in the subpoena.

23          THE COURT:  Fair enough.  But I will request that you

24   follow up in the way that I just suggested.

25          MS. ROCHA:  I am happy to do that, Your Honor.  I

1    just want to make sure -- the government has a concern we are

2    wandering into fishing expeditions and fishing expeditions

3    searching for needles in an ocean.  And so we are happy to do

4    that, but I want to make sure that we are not continuing to go

5    back.

6            THE COURT:  I have to say in general that I think

7    most of this discovery is pretty far from the core issues in

8    the case.  And I am bending over backwards to make sure that

9    the defense has every benefit of the doubt, but I don't

10   disagree with your notion that is does seem fairly remote from

11   the events of what occurred on January 6, particularly given

12   the expert testimony that whatever psychological condition that

13   existed occurred on that day or was a result of the events of

14   that day.  But nonetheless in an abundance of caution, I ask

15   that you do so.

16           MS. ROCHA:  Understood.

17           THE COURT:  ADL.

18           MS. ROCHA:  Yes.  So as to ADL, that was something

19   specified, so we did do follow up to try to understand what

20   that was.  We have provided defense counsel with some

21   information about that program, which clearly indicates that it

22   is part of, as I understand, a partnership between the

23   Antidefamation League and the Holocaust Museum.  And the

24   document you would be able to kind of match it up that he would

25   have received it at the time he went through the FBI training

1    academy.

2            The government considers that the -- you know, and

3    there is nothing about that in -- nothing about that particular

4    training in his personnel file.

5            THE COURT:  Including in that transcript?

6            MS. ROCHA:  I don't know -- I have not seen the

7    transcript.  I am a little bit more on solid ground, because I

8    have seen the personnel file.  The transcript I have not seen.

9    It is my understanding that transcript doesn't always include

10   information from when he first was at -- went to Quantico,

11   which this program would have been a part of.  So I don't

12   expect to see it there, it could certainly be a pleasant

13   surprise.

14           THE COURT:  So you are looking for that as well?

15           MS. ROCHA:  No, Your Honor.  We provided information

16   that they would be able to sort of match up the timing to say

17   that this program was something that agents went through as

18   part of the training academy at the time he went through the

19   training academy.  But this is a program conducted by ADL and

20   the Holocaust Museum.  The Government considers that like

21   sufficient to satisfy the subpoena.  My understanding is

22   defense counsel is sort of asking us to say, any other

23   documents about this program.  You know, at this point, you

24   know, where does it end, Your Honor?  And the government's

25   concern that -- I don't know how anything more than that would

1    be relevant or admissible.  Again, these are sort of third

2    parties.  I could -- anything that we -- even if we went

3    down -- continued to go down this path, at some point, you

4    know, what are we talking about here?  Like the entire holdings

5    of the Holocaust Museum.  I mean, it is just -- at this point,

6    the government has taken steps to satisfy this aspect of the

7    subpoena.

8            THE COURT:  So give me two sentences of what you have

9    done to satisfy this aspect.

10           MS. ROCHA:  We provided -- we asked specific

11   questions in response to their request.  We --

12           THE COURT:  Specific questions of --

13           MS. ROCHA:  What is this --

14           THE COURT:  I'm sorry.  Let me finish.

15           MS. ROCHA:  I'm sorry.

16           THE COURT:  Specific questions of the FBI or of

17   Quantico?

18           MS. ROCHA:  Of the FBI.

19           THE COURT:  So what about at Quantico, if that is

20   where you think he got the training?

21           MS. ROCHA:  I presume -- the person who was providing

22   us information was familiar with the program at Quantico as

23   well.

24           THE COURT:  Okay.

25           MS. ROCHA:  And this particular document that we

1    provided to defense counsel describes how agents and other law

2    enforcement officials have gone through this particular ADL

3    Holocaust Museum training and describes that training.

4            THE COURT:  So it would provide the dates and say, if

5    you were at Quantico on these dates, you would have been able

6    to participate in this training that was put on by the ADL or

7    the Holocaust Museum?

8            MS. ROCHA:  Yes.  It describes it very generally,

9    Your Honor, but it does describe it.

10            THE COURT:  Okay.  And then what about the personnel

11    reviews.  Have you, in fact, looked deep to ensure that you

12    found all of them?

13            MS. ROCHA:  Yes.  So my understanding is that is in

14    yet another -- held in yet another place within the FBI.  The

15    Government is very siloed, as you know, Your Honor.  But we

16    have asked -- we have asked again and again.  And what we keep

17    being told is that the documents that we have, that we have

18    given to defense counsel is all that is available.

19            THE COURT:  Okay.  What about Mr. Wise's complaint or

20    evaluation of his supervisors at the time he left?

21            MS. ROCHA:  So we inquired with the FBI as well about

22    what that might be.  That is not in his personnel file.  We

23    were, you know, given some information.  We met and conferred

24    with defense counsel to try to get some more information about

25    this particular thing, including whether this as we understood

1      it, was some of these evaluations are anonymous, whether this

2      could have been one of those, because that seemed to match up

3      with the description the best.  I believe from defense counsel,

4      they understood that, yes, that is possible that was anonymous.

5      I don't know how we can look for something that is anonymous.

6              THE COURT:  You might be able to if, for example, it

7      was dated.  And he tells you, this is the date that I submitted

8      it and I submitted it with criticisms of this official.  Again,

9      I don't know what the databases look like.  It may be you can

10     go into the database and say, yes, now we found it.

11             MS. ROCHA:  Your Honor, I don't know what particular

12     review.  I don't know -- it is what you are describing is not

13     something that the FBI themselves were able to sort of explain

14     to us how we could sort of back channel it or figure out that

15     way.  It is this amorphous, anonymous without this level of

16     specificity.  So this goes to again sort of like a fishing

17     expedition but for a very particular anonymous needle.

18             THE COURT:  Is the person who was assertedly the

19     subject of this anonymous upward evaluation somebody who played

20     any role in any way in the investigation or the decision to

21     refer this matter for prosecution?

22             MS. ROCHA:  No, Your Honor.  I believe it is someone

23     from the New York office given the time frame.  And very early

24     in the investigation, the government provided sort of where he

25     was stationed for what time periods.  And as part of that, a

1    name check was run through different various databases and no

2    derogatory information was located.  So this has been something

3    that, you know, through the process, you know --

4            THE COURT:  You know who the person is or at least

5    the defense can tell you who the person is in their view?

6            MS. ROCHA:  Correct.

7            THE COURT:  Have you confirmed that person did not

8    play any role in any way in the investigation or prosecution of

9    this case?

10           MS. ROCHA:  I have no reason to think that person had

11   any role in anything, was not part of the investigation.  The

12   investigation was done here in Washington.  And then,

13   obviously, there was a like a team in Texas.  That person, as I

14   understand it, is in New York.  So this is not related to the

15   investigation of him at all.

16           THE COURT:  You don't have any reason to believe that

17   person might not have called somebody they knew or said

18   anything to somebody here in Washington, DC about this case?

19           MS. ROCHA:  No, Your Honor.  I don't have any reason

20   to know what anonymous feedback Mr. Wise would have given.

21           THE COURT:  Okay.  And then finally what about the

22   locations where Mr. Wise served, has he received all of that

23   now?

24           MS. ROCHA:  He received that in very early discovery,

25   Your Honor.  Now, what it doesn't have is, you know, individual

1    cases.  So it says things like, you know, he was a special

2    agent in the Washington field office from this precise date to

3    that precise date.  But it is titles and assignments, what

4    squad he was on, that type of thing.

5              THE COURT:  Okay.  All right.  Thank you.

6              All right.  Ms. Lee, anything else on this?

7              MS. LEE:  Briefly, Your Honor.

8              THE COURT:  We have sort of jumped around topics.  We

9    were somewhere in the middle of the motion for a continuance

10   and now we are talking about the motion to enforce the subpoena

11   and the motion to treat the subpoena as moot.

12             MS. LEE:  I think it is a portion of the continuance,

13   so I see how we ended up here.  I want to add briefly so the

14   record is clear, our FOIA was withdrawn because we were told it

15   would be approximately 65 months or 67 months to respond to it.

16   And the subpoena was issued after we were told by a previous

17   AUSA that the FBI file would not be provided based on our

18   request directly from the government, so it was issued

19   subsequent to that January and other exchanges kind of

20   enumerating the name of our request.

21             The last part I wanted to clarify is just --

22             THE COURT:  Oh, go ahead.

23             What I am really hoping to do is I am trying to

24   narrow the scope of issues and just make sure that if I have

25   something I need to decide, I know what it is and you have

1    heard the government's response with respect to the -- I think

2    I was probably up to six categories.  Is there something as to

3    each of those categories, that -- other than that fact that

4    they are working on it that is a problem at this point?

5                    MS. LEE:  The only final piece is that what we have

6    received in terms of his placement, the discovery pages, we

7    have included those discovery pages, I believe, in our filing

8    as an attachment.  It is a summary exchange.  It is an agent on

9    this case summarizing into a page or two.  It is not the

10   records.  So to the extent that an agent is looking at and

11   confirming the records of his placement, the kind of records

12   that would be admissible records of his placements that I

13   assume are being looked at to write that summary report, we

14   haven't received those.

15                   THE COURT:  Right.  Well, so let me simply say to the

16   government with respect to that, if the government is going to

17   object to the admissibility of this document at trial then the

18   government needs to be prepared on very short order to then

19   provide the actually underlying documents.  Okay?

20                   MS. LEE:  Thank you.  That was the only clarification

21   I had on the categories.

22                   THE COURT:  All right.  Thank you.  All right.  So I

23   don't know if it is Ms. Fontan -- anything else on the

24   continuance issue we should come back to?  I mean, I can tell

25   you -- so here is my concern.  As you have probably gathered, I

1    am not terribly convinced by the argument that there is going

2    to be violence in the District of Columbia on Election Day and

3    therefore we ought to move the case to the day after the

4    certification of the election.  I do think that the argument

5    that there is going to be a perhaps greater focus on the

6    election that day and that the events of January 6 have become

7    somewhat of a campaign issue has some bearing on my thinking

8    about this.

9            There is still some discovery that needs to be

10   provided.  And I recognize this is remote discovery and that it

11   is -- quite frankly, I think some of my colleagues would have

12   simply said no to any of this.  As I said, I want to be as

13   generous as I can be consistent with actually getting the case

14   to trial with the defense in this regard.  But we still do have

15   the discovery that needs to be provided.

16           And I have got a couple of legal issues where I think

17   I am going to want additional briefing from the parties.  And I

18   am happy to tell you what those are now.  One issue is I know

19   that the parties have each -- I think maybe cited to two cases

20   with respect to the question that I was asking when Dr. Best

21   was testifying.  But I really am interested in this question of

22   how one, if at all, threads the needle between the statute on

23   mental defect defenses and testimony regarding the extent to

24   which a mental defect could prevent a defendant from forming

25   the required mens rea to commit the crime.  I am not sure I see

 1    the daylight there.  There may be some daylight there and I

 2    feel as though some additional briefing on that question would

 3    be helpful to the Court.  The other thing, which is far more

 4    important than that issue -- and I should say, I am -- that is

 5    not to say that I have concluded otherwise that this evidence

 6    with respect to the intent would come in or be appropriate

 7    anyway.  But I think that is an important element that I would

 8    want to consider.

 9              But the other issue which I think is far more

10    important is how aiding and abetting liability applies in this

11    context.  And the defense filed something again over the

12    weekend with respect to jury instructions and the First

13    Amendment issues.  And I have to say, I don't think the First

14    Amendment is actually the hard issue.  I am not saying it is

15    not an issue.  But I don't think it is a hard issue here.  And

16    I think the defense misstates what the *Brandenburg* standard is,

17    because the *Brandenburg* standard doesn't say, as the proposed

18    instruction from the defense suggests, that the government must

19    prove that the encouragement or the incitement actually

20    resulted in the acts of violence.  What *Brandenburg* says is

21    that it was likely to.  And that is not what the instruction --

22    proposed instruction says.

23              MR. HERMANSEN:  That is correct, Your Honor.

24    *Claiborne* -- *NAACP versus Claiborne* is after *Brandenburg*.  So

25    my initial jury instructions in ECF 113, do have the words

1    likely.  But then looking at *Claiborne* which is after.  And I

2    believe --

3              THE COURT:  I understand it is later in time.  It is

4    dealing with a very different circumstance in *Claiborne*.  But

5    we can put that aside for the moment.  And you are welcome to

6    try and continue to convince me that the *Brandenburg* standard

7    has evolved.  But that all is sort of beside the point, because

8    I think the far harder question which is not really developed

9    in the briefing is the extent to which aiding and abetting

10   requires actual causation and if so, what that causation

11   standard is.  And my law clerk has been digging into the law on

12   this issue and is going back and looking, you know, as far back

13   as common law cases from the 19th century, but also more recent

14   law, law review articles, commentary on it.  And I have to say

15   that I am not sure the law is terribly well settled on the

16   question of what type of causation standard is required.  There

17   are some commentators, for example, that have indicated that

18   there is not a causation requirement, at least in encouragement

19   cases.  And I am citing to an article by Christopher Kutz in

20   the "Criminal Law and Philosophy" from 2007 which says,

21   "Liability would lie even if it could be shown that S's attempt

22   at encouragements were actually dissuasive.  P might think

23   anything S thinks is a good idea is actually a poor one where P

24   might think that S's encouragement is simply irrelevant as his

25   heart is already hardened to the crime.  So long as P heard S

1    and S intended his words to be encouragement, S is an

2    accomplice."

3          There are cases that take a different view on that

4    question.  There is a 1981 decision from the Supreme Court of

5    Minnesota that reversed a conviction where there was no

6    evidence that the defendant's remarks had any influence on the

7    principal's decision to kill the victim.

8          And the Court says, "The law imposes liability for

9    actions which affect the principal."  And there are some other

10   cases on this topic.  But the parties really have not dug into

11   and briefed this issue.  And I think it is actually quite a

12   hard question.  I was thinking through hypotheticals in my own

13   mind about this.  And maybe I have mentioned some of these to

14   you or maybe I haven't.  But, you know, if someone gives

15   someone gun and says, take this gun, you know, with you while

16   you commit the robbery and the person leaves the gun in the car

17   and takes the knife and commits the robbery with the knife,

18   that might be sufficient.  It is sort of a matter of common

19   sense it seems like it is sufficient.  But I think

20   encouragement in actual active support cases may be different.

21   And in some cases, it may be that the nexus is an obvious nexus

22   where you have the labor leader in front of the hall and is

23   saying, we are going to go down the street and burn down the

24   factory.  And everyone saying, Yeah, yeah, yeah.  The leader

25   leads the person out and they go down and burn the place down.

1    Maybe you don't need testimony from each of the individuals

2    saying, yes, I did it, because it is what the labor leader

3    said.  I just don't know for sure what the answer is to this

4    question.  And it strikes me that it is somewhat different than

5    some of the other cases that my colleagues have had in this

6    context.  And that if you had somebody saying 1, 2, 3, heave,

7    1, 2, 3, ho', and you see the crowd moving, that is sort of on

8    its face sufficient to show that type of causation or at least

9    to allow a jury to -- or the fact finder, I think in one of

10   these cases it was Judge McFadden who was the fact finder

11   himself to reach the conclusion or if you have somebody who is

12   standing at the entrance to the famous tunnel telling people

13   who to -- when to go in and when to come out.  And you see them

14   responding to that, that may be different.  This case here, it

15   is really hard to know -- and I have looked at the video.  It

16   is hard to know.  And it is not obvious from looking at the

17   video where Mr. Wise says, "kill 'em, kill 'em" and somebody

18   who was standing by peacefully at that time and picks up a

19   stick and starts whacking somebody with the stick.

20        So I think this is an important issue in this case.

21   And it may be, by the way, that the answer to this question is

22   different for Count 1 than it is for Count 2 in that at least

23   the type of nexus where you are talking about an assault may be

24   different than the type of nexus required for a civil unrest

25   count.  I don't express a view on that.  But I think that is

1    something the parties should think about in providing further

2    briefing on this issue.

3         So I think, you know, in light of the fact that I am

4    going to need briefing on these additional issues, and in light

5    of the fact that I think that there -- it is going to be hard

6    to pick a jury -- I am not saying we couldn't pick a jury.  It

7    is going to be harder to pick a jury in the midst of the

8    election where both sides are actively, not only campaigning,

9    but running commercials relating to this and appearing on

10    television talking about it.  It is going to make it somewhat

11    trickier to pick a jury.  And given the fact that there are

12    still not firm dates for some of these FBI files.

13         My inclination would be to move it to the backup

14    date.  But my only concern, frankly, about doing that is we are

15    going to find ourselves back here in January facing the same

16    situation -- I have got two worries.  One is that we are going

17    to find ourselves back here in January with another request to

18    continue the trial and it is just a never-ending process.  And

19    there is a very strong public interest in bringing cases to

20    conclusion and to trial and not letting them drag on forever.

21    And this case has already dragged on for quite a long time.

22         And my other question is the motions deadline is long

23    since past.  And if I were to continue the case, I wouldn't

24    want that to be reopening everything and say, now we are going

25    to go back and file a whole series of additional motions.

1    Because I think that is just a step backward rather than

2    forward.  And there has been plenty of opportunity and

3    continuances and opportunities to file motions in this case.

4    So, you know, absent newly discovered evidence or something of

5    that nature, I don't see a basis for reopening the motions

6    practice at this time.

7            But I guess I would like to hear again what the

8    parties think about this, because I just -- as I said, my one

9    hesitation -- I don't think that is by any means necessary to

10   move the case.  I think we can get it done.  I think we will

11   really have to buckle down to get it done.  I think it will be

12   harder to pick a jury.  And I think people are going to step up

13   the tempo on a lot of these things including the briefing on

14   some of these issues where I need additional briefing.  I think

15   it can get done, but with a fairly substantial strain on all of

16   us.  I think it would be more comfortable to move the case to

17   the January window that we have reserved.

18           But I guess what I would like is -- and perhaps the

19   defense can't promise me with certainty.  But what I would like

20   if we are going to do this is a representation that unless, you

21   know, it turns out there is violence in the District of

22   Columbia on January 6 that is highly publicized that makes it

23   impossible or difficult even to pick a fair jury, that we are

24   sticking to that date and this is not a sliding scale that is

25   going to go on forever as we just not only turn every stone,

```
1   but turn over every stone two or three times.
2               MR. HERMANSEN:  That is completely fair, Your Honor.
3   So we are committed to doing that.
4               THE COURT:  Okay.  All right.  Anything else from the
5   government on this then?
6               MS. FONTAN:  I'm sorry, Your Honor.  Do you mind if
7   we have a quick moment?
8               THE COURT:  Yeah, of course.
9               MS. FONTAN:  Thank you.
10              (Pause.)
11              MS. FONTAN:  Thank you.
12              THE COURT:  Yes.
13              MS. FONTAN:  Your Honor, I mean, we, obviously, want
14  to be respectful of the Court's schedule.  Is there -- there
15  aren't any trial openings before that?
16              THE COURT:  I thought about that actually.  And the
17  problem is that on -- I think it is November 18th, I start a
18  three-week long RICO, double murder case.  And it may be a
19  little bit longer than three weeks.  It could be four weeks
20  possibly.
21              MS. FONTAN:  Okay.  And --
22              THE COURT:  And then I am starting on the 9th --
23  well, I am double booked on the 9th.  So I think the earliest,
24  frankly, that we could move it up to -- I am just not sure how
25  long the RICO murder case is going to take.  But I think it is
```

1    going to take us at least until mid-December at that point in

2    time and then you start running into the holidays, which makes

3    it harder to choose a jury as well.  And so we -- we are just

4    talking about few weeks difference one way or the other.  I am

5    happy to keep you posted and if it turns out that for reasons

6    that I think are probably unlikely that my RICO case is

7    resolved, then I would be happy to consider further doing

8    something in late November or early December in this case.

9         MS. LEE:  Just for the Court's notification, unless

10   something is changed, we had checked these -- that possibility

11   with our experts and could not find a setting that all three

12   were available for in those like if we were looking at later

13   November, early December.  Certainly, if the Court's calendar

14   changes, we will check again with our experts, but I did want

15   to make the parties and the Court aware of that.

16        THE COURT:  You are welcome to check with your

17   colleagues in the US Attorney's Office about this.  From what I

18   have been told I don't have any reason to think that -- the

19   case is *United States versus Greene,* for the benefit of both

20   sides, it is 19-CR-19.  I did a colloquy with the defendant and

21   he told me he did not want to plead, so it seems unlikely that

22   is going to happen.

23        MS. FONTAN:  Understood, Your Honor.  If we could

24   today just spend a little bit of time talking about a briefing

25   schedule --

1          THE COURT:  Yes.

2          MS. FONTAN:  For I think these issues that you just

3     discussed and also pertaining to the experts along with

4     potential *Daubert* -- well, *Daubert* hearings that are scheduled

5     for the week of trial.

6          THE COURT:  So with respect to the *Daubert* hearings,

7     I am happy to proceed either one of two ways.  If you want them

8     in person, I think the way to do it is just to do it during

9     trial.  And, you know, do it in the morning over the lunch

10    break or in the evening during the trial.  And hopefully they

11    won't be discovery-type *Daubert* hearings in which the

12    questioning takes a long time.  I think it ought to be

13    something we can do in an hour or so.  So my inclination would

14    be to do it then.  If the government rethinks things and says,

15    well, if they can give us the written materials the experts

16    want to rely on in advance, so we can give it to the Court to

17    follow along and you want to decide well, given the extension,

18    we are prepared to do it by video conference, would not only be

19    open to that, I would welcome it.  Because I think it is always

20    a burden on particularly the staff during trial to not only

21    have a full day of trial but to have hearings in the midst of

22    it.

23         MS. FONTAN:  Your Honor, it actually might -- I think

24    we would be amenable to doing it via video conference.  I think

25    in a weird way, it would be easier if we were all video

1   conferencing in so that we could share screens, particularly to

2   share video and video programs --

3       THE COURT:  Okay.

4       MS. FONTAN:  -- if the Court would be amenable to

5   doing that?

6       THE COURT:  Any objection from the defense to doing

7   it that way?

8       MS. LEE:  No.  That is certainly our preference when

9   we can.

10       THE COURT:  Okay.  So why don't we schedule that

11   then.  We can schedule that during the time we had scheduled

12   for the trial here.  And so if you want to pick some days from

13   the trial, you know that I am open.

14       I don't know if you need to check with the experts

15   first.

16       MS. LEE:  I think we --

17       THE COURT:  You know the experts were available for

18   trial so presumably --

19       MS. LEE:  Yes.  Late that first week or early in the

20   second week I think was when everyone had made arrangements,

21   certainly if that is by video I think that makes things all the

22   easier.

23       THE COURT:  So the 7th would probably be the best of

24   the days -- the 7th or the 12th would be the best day for me.

25       MR. HERMANSEN:  I think those both work for the

1    defense and experts.

2         MS. FONTAN:  Your Honor, you said the 7th?

3         THE COURT:  Yes.

4         MS. FONTAN:  The 7th works for us.

5         MS. LEE:  Your Honor, if I could propose -- I don't

6    want to take up two slots, but we would be able to have one

7    expert on the line.  I don't know if we wanted to do the

8    morning of the 7th or the morning of the 12th or if that is

9    worse for the calendar, so we could have one expert available

10   or if we could determine which one the Court would like to do

11   first so we can --

12        THE COURT:  So I have a hearing from 10:00 to 11:00

13   on the 7th, but I am free the rest of the day.  And folks on

14   the west coast may be just as happy to start at 11:00.  So we

15   could just start at 11:00.  Maybe do one before lunch starting

16   at 11:00 and then do one after lunch in the afternoon?  Does

17   that make sense?  As I said before, it is not just this case,

18   in my experience, *Daubert* hearings go on way too long.  But

19   I -- by both sides.  And everyone wants to sort of ask their

20   trial questions rather than ask the questions that go to the

21   admissibility of the expert report.  So I would ask you to be

22   as focused as you can with respect to those experts.  And their

23   testimony is on a fairly narrow topic, both of them, so I think

24   it should be manageable on that schedule.

25        MS. LEE:  So that would be all parties appearing by

1   video, 11:00 a.m. start for one expert, 1:00 p.m. start --

2              THE COURT:  Why don't you tell us who we want at

3   11:00 and then we can figure out who is going to come at 2:00

4   or 2:30?

5              MR. HERMANSEN:  Sure.  I will check with them and is

6   it okay if I email Ms. Walker and the parties?

7              THE COURT:  Yes, that is fine.  All right.  And then

8   I think that may be the thing to do is when we are done with

9   that or I am happy to set a schedule now.  I think after having

10  heard the testimony, it would be appropriate to allow further

11  briefing with respect to the expert testimony.  And I think

12  that will provide you with the opportunity to address this

13  question that I have raised.  My clerk did look briefly at the

14  cases that were cited.  And I think the two cases cited by the

15  defendant really are in apposite to the question that I have

16  posed.  One was a case in which it was an insanity defense.

17  And the other case was a sentencing case.  So I don't think

18  those really help on the question of whether testimony relating

19  to dissociative syndrome or whatever the proper expression is,

20  is appropriate at the guilt phase with respect to the intent of

21  the defendant, but I am happy to be better educated by both

22  sides on that issue.

23              I think the government does have some string cites or

24  cites to cases that have string cites that are a little bit

25  more on point.  But both sides should be free to address that

1    more fully in the briefing on the motion.  I am happy to also

2    just share some initial reactions to the extent it is helpful

3    for you.  And this is just preliminary so don't hold me to

4    this.  And you are welcome to try to convince me otherwise.

5    But one is, I think everyone would probably agree that Dr. Best

6    is an impressive doctor.  And she is -- obviously, has a lot of

7    areas of expertise.  And my inclination, at least

8    preliminarily, would be to allow her to testify with respect to

9    memory to the extent that is, in fact, an issue in the case.

10        And, obviously, it would be more prejudicial than

11    probative, substantially more prejudicial than probative to

12    have her testify about everything that was going on in

13    Mr. Wise's head, only to have the question of memory not, in

14    fact, be an issue in the case.  But to the extent memory is an

15    issue, that struck me as something that was likely admissible.

16    The concern that I would have or the guard rail that I would

17    have with respect to that is Rule 403 and exactly how far she

18    gets into her conversations with Mr. Wise in describing the

19    basis for her conclusions.

20        And my concern there under Rule 403 would be, one, to

21    the extent that it turns out his memory is not a particularly

22    important issue in the case or may not be an issue at all or it

23    may not be disputed that he has memory lapses -- to have her

24    testifying about all of her conversations with him about what

25    happened that day.  And even if he does himself decide to

1    testify in the case -- and it is not my role or counsel's role

2    to bind Mr. Wise to make a decision to that until he is ready

3    to make his decision about what he wants to do and it is his

4    decision about whether he testifies or not.

5         But even if he were to testify, I have some concern

6    under Rule 403 that at some point in the process, the testimony

7    about what he described to Dr. Best about the events of that

8    day and his impressions and his feelings and all of that,

9    becomes corroborative of his testimony in a way that doesn't

10   really substantially advance Dr. Best's conclusions and

11   testimony with respect to memory loss, but rather it is just a

12   way of saying, either you just heard or you are going to hear

13   Mr. Wise say all of these things on the stand and believe what

14   he is saying, because he told the same thing to his

15   psychologist or psychiatrist in the same detail and

16   therefore -- I am not saying counsel would argue this -- but

17   the jury might itself treat it as corroborative that that is,

18   in fact, what happened that day.  When in both cases it is just

19   a result of his own description of the events.

20        I think there is a way to manage that.  And it is

21   really just a question of what the guard rails are not that

22   Dr. Best can't testify about it.  But it may be that getting

23   into some detail with respect to exactly how he described the

24   events of the day and his impression about the events of the

25   day does cross the Rule 403 line.  And that was something I

1    would want to monitor carefully.

2            With respect to the evidence about trauma and PTSD,

3    to the extent that some of that is necessary to set up and to

4    explain the conclusions with respect to memory loss, that would

5    again preliminarily be appropriate.  But, again, I think that

6    there are 403 issues and guard rails that would need to be

7    placed on that.  For example, having Dr. Best testify that in

8    her opinion or view, Mr. Wise felt like everyone around him was

9    going to die, I am not sure whether that is necessary to the

10   conclusion about PTSD and memory.  And it does strike me that

11   it would raise at least significant 403 issues that I would

12   want the parties to have an opportunity to be heard on before I

13   allowed that type of testimony.  So we'll just have to take

14   that as it comes.

15           With respect to the dissociative intent, I am more

16   skeptical on that.  I need to be convinced as a matter of law

17   to start with that that type of testimony is appropriate.  But

18   I also am not yet persuaded, maybe I can be persuaded, but I am

19   not yet persuaded that Dr. Best can testify with sufficient

20   specificity about that.  And at this point of the day, he

21   couldn't have formed an intent and at this moment he could form

22   an intent and here he wouldn't form an intent.  But I also just

23   have questions -- maybe this does relate to the legal issue

24   about the extent to which the fact that one is acting in a

25   manner in which in the words of Mr. Hermansen, the amygdala is

1    taken over from the frontal lobe.  I am not sure that is, in

2    fact, a defense to intent or not.  And I guess I would

3    definitely want to hear and think a lot more about that

4    question.  I certainly know of plenty of cases whereby

5    comparison and analogy I should say, I am not meaning to say

6    they are comparators, because they are different.  But, for

7    example, where people with very low IQs can be convicted of

8    committing heinous crimes where their moral culpability may be

9    very diminished.  And you know from the Supreme Court that

10   somebody may be not be subject to the death penalty if their IQ

11   is low enough, it affects their moral culpability, but doesn't

12   say, you can't convict somebody of the crime in the first

13   place.  I am not saying that is this circumstance by any means.

14   But I am saying there are lots of circumstances in which people

15   may have some form of diminished responsibility or diminished

16   culpability because of what is going on neurochemically in

17   their heads, but -- and it wouldn't necessarily be a defense.

18   And that is a hard issue and one that I would want to hear from

19   the parties.

20            And I am also on the fence, quite frankly, about the

21   moving toward the explosion.  I am not quite sure exactly what

22   the relevance is of that testimony to start with.  And I am

23   also not yet sure there is an adequate experimental or even

24   experiential basis that can be reliable to testify in that

25   manner.  So certainly with respect to testifying as to what

1    Mr. Wise was doing that day, I think is going to be challenging

2    whether it is permissible or would be appropriate for Dr. Best

3    to testify that in her experience former law enforcement

4    officials will often go towards the events.  Maybe one thing

5    versus reaching the conclusion saying the reason I can testify

6    to a reasonable scientific certainty that the reason that

7    Mr. Wise moved forward was not because he was angry about the

8    election, that he was otherwise incensed in some way.  The

9    reason he moved forward was because he had this instinct that

10    it was necessary to protect other people and that was the only

11    reason.  I may be convinced on that yet.  And I am not saying

12    it is necessarily reasonable scientific certainty that is the

13    standard.  But under the *Daubert* standard I need to be

14    convinced there is a sufficient basis for reliability with

15    respect to that testimony.  So that is just my initial reaction

16    on Dr. Best.  But you are welcome to continue to convince me

17    otherwise with respect to all of that.

18              MR. HERMANSEN:  Would the Court like to hear argument

19    on that now?

20              THE COURT:  Up to you.  It seems to me that we are

21    going to have further briefing on it, so maybe we are better

22    off waiting on the further briefing.  If there is something you

23    want to add, I am happy to hear now, if you think it is

24    important.

25              MR. HERMANSEN:  If I may.

1          Your Honor, as the Court knows, the *Daubert* test is

2   also affected by *Kumho* and so --

3          THE COURT:  You are talking about the recent Supreme

4   Court decision?

5          MR. HERMANSEN:  Well, *Kumho Tires* --

6          THE COURT:  Oh, that case, yes.  Okay.

7          MR. HERMANSEN:  -- from 1999.

8          THE COURT:  That is correct.

9          MS. LEE:  Yes.

10          MR. HERMANSEN:  The government doesn't cite --

11          THE COURT:  I am familiar with the standard though.

12          MR. HERMANSEN:  So a witness can qualify as an expert

13   based on knowledge, skill, experience, training or education.

14   It is a liberal standard.  A witness may qualify as an expert

15   under Rule 702 based -- so examples based on a number of drug

16   deals they have participated in observing.  And then most

17   recently in the *Diaz* case --

18          THE COURT:  That was the case I thought you were

19   referring to, yes, I know.  But that case dealt with a

20   different topic.  It dealt with the distinction between when it

21   was permissible where a witness -- an expert witness to testify

22   about mental state indirectly by talking about the mental state

23   of others.

24          MR. HERMANSEN:  Correct.  And the two experts

25   testified -- I think it exemplifies really well and debunks the

1    motion that an expert has to base their opinion on science and

2    scientific certainty, because that is not the standard.

3              THE COURT:  That is true.  But when you put a

4    psychologist, right, and she is not a psychiatrist?

5              MR. HERMANSEN:  She is a doctor of psychology.

6              THE COURT:  Psychologist.  When you put a

7    psychologist on the stand and you talk about all of her

8    credentials and then she testifies that her opinion is this is

9    what was going on in his head, that strikes me as potentially

10   concerning.  Because the jurors may hear that and say, well,

11   she is a psychologist, she is an expert, she knows what is

12   going on in his head.  And if she has a basis in psychiatry or

13   psychology in research for making that determination, that is

14   one thing where her basis is, I have just spoken to a lot of

15   people under similar circumstance and this is how people under

16   those circumstances often react, that concerns me.  Because, as

17   I said, I might be well open to the notion she can testify that

18   I have spoken to a lot of people and this is how those people

19   react.  Where I start to get greater concern is where she is

20   saying, and I can tell you what was going on inside his head.

21             MR. HERMANSEN:  I agree with that and I agree with

22   the example regarding he went toward the sound of an explosion.

23   I don't think she can testify as saying, I know that the reason

24   he did that is because of his training and experience and he

25   told me about going toward a bomb in New York and so that is

1    why he did that.  He didn't do it because he was upset about

2    the election.

3            But she can -- so that is the experiential part of

4    her expertise.  Because she is an expert -- a nationally

5    renowned expert on first responders, law enforcement,

6    firefighters, federal, state law enforcement and how they

7    respond and has done research on it and --

8            THE COURT:  I asked whether she had done any research

9    on this and she said no.

10           MR. HERMANSEN:  Are we talking about like -- I

11   thought you asked her about intent.

12           THE COURT:  No.  I think I asked her about the

13   question of -- whether she had done any research on the

14   experiential point about -- do you remember the example I gave

15   to her, I said to her, have you done controls?  Have you said,

16   the average person will only 62 percent of the time go towards

17   the bomb whereas former law enforcement 78 percent of the time

18   and you have done controls and you have numbers you have

19   counted whether it has been peer-reviewed.  And I asked her

20   about that and she said, no, I am not familiar with that and I

21   have not done it, that it is based on just her experience.

22           MR. HERMANSEN:  Yeah, I understand that part.

23           So I think that is where it fits perfectly in line

24   with the *Diaz* case because you had a mechanic who testified

25   about cars and whether or not someone would know there was a

1  hidden compartment in that car, whether it was likely they

2  would know.  And you had -- and I know that mechanic, because I

3  am from San Diego.  And I know Agent Flood who testified that

4  in my experience in talking to people, because at the border

5  almost everyone has to cooperate to avoid the 10-year minimum

6  mandatory.  So Agent Flood -- I sat across from him and sat in

7  debriefs.  He has debriefed lots of people.  And he's

8  interviewed lots of my former clients when they came across the

9  border with drugs.  He testified, in my experience, most drug

10 couriers know.  So their mental state is they are aware of the

11 drugs.  That is pure experience.  There is no science.  All it

12 is is talking to people.  All I did was talk to people who

13 brought drugs.  And he said it is likely they would know.  So I

14 view both types -- that type of testimony especially, the

15 testimony that the Supreme Court said was perfectly fine --

16             THE COURT:  No.  But that is not what the question --

17 you have got to read the question presented that the Supreme

18 Court decided.  You can't say, but I know this witness and this

19 is what he was talking about.  It is a question of what the

20 Supreme Court decided in the case.  The Supreme Court was just

21 interpreting one of the rules of evidence and said that the

22 rule that said that typically you can't offer expert evidence

23 with respect to someone's state of mind -- or can't offer

24 evidence relating someone else's state of mind through an

25 expert that you can do so in these circumstances where you are

1    talking about experience with others.

2            MR. HERMANSEN:  Correct.

3            THE COURT:  I think they were just answering that

4    narrow question.  They weren't saying, we have done a *Daubert*

5    analysis and concluded this is all appropriate.

6            MR. HERMANSEN:  The case was about 704.  And the

7    reasoning includes, did the defendant get a fair trial?  And

8    the Supreme Court said, yeah, the trial wasn't tainted by that

9    kind of testimony, so I think that is --

10           THE COURT:  That is not the way the Supreme Court

11   works.  That may be the Court of Appeals work and they will

12   look at it.  But the Supreme Court was not saying, we have

13   examined the entire record in the case and we have examined the

14   expert reports and we concluded this was entirely fair, even

15   if -- they were just answering the question present.  That is

16   all the Supreme Court ever does.

17           I mean, I will go back and read the case, maybe there

18   was some dicta in there with respect to the *Daubert* issues.  I

19   didn't recall it had anything to do with *Daubert*.

20           MR. HERMANSEN:  And so switching to a District of

21   Columbia circuit case, I think that is the *Hite* case.  And this

22   may be what the Court was referring to was -- should control

23   the outcome here.  H-I-T-E.  And this is at page 15 -- starting

24   at page 15 of ECF 118.  "If a fact is relevant to determining

25   intent to commit an offense, the defendant is entitled to

1    present expert psychological testimony under 702 to rebut the

2    significance of that fact."  So that is D.C. Circuit 2014.

3         There the D.C. Circuit Court reversed Hite's

4    conviction for attempting to persuade a minor to have sex with

5    him because the District Court erred in excluding the

6    defendant's proffered psychological expert testimony.  The

7    psychiatrist would have testified about the difference between

8    a fantasy role play and desiring to engage in sex with a minor.

9    Like here, the government moved in limine to exclude the

10   psychological testimony arguing -- making the same arguments

11   that were made here and the D.C. Circuit reversed.

12        There, Hite needed to possess the intent to have sex

13   with minors to form the requisite mens rea.  But the District

14   Court reasoned that the expert testimony would confuse the jury

15   as to what intent it must find to determine Hite's guilt or

16   innocence.  That was error by the District Court.

17        Expert -- according to the Circuit Court here in DC,

18   expert testimony is admissible under Federal Rule of Evidence

19   702 if it will assist the jury to, "Understand the evidence or

20   determine a fact at issue."  And that case cites the *Gladish*

21   case approvingly, G-L-A-D-I-S-H.

22        THE COURT:  536 F.3d 646.

23        MR. HERMANSEN:  And there, knowing that the District

24   Court should have -- there, there was a reversal too.  The

25   District Court should have permitted the defendant's expert to

1    testify that it was unlikely given the defendant's psychology

2    that he would have acted on his intent.  And they give

3    different hypotheticals about intent.

4            So I -- that I think -- and that is just the D.C.

5    Circuit.  I cite to a number of Ninth Circuit cases and other

6    circuit cases that are equally helpful to Mr. Wise.

7            THE COURT:  All right.  I will -- it would be helpful

8    in your further briefing if you point me back to those cases.

9    I will certainly read them carefully.

10           MR. HERMANSEN:  Thank you, Your Honor.

11           THE COURT:  It is up to you.  You don't need to

12   respond now, because I really do need to return back to this

13   after I get further briefing from the parties.

14           MS. ROCHA:  My only question is, Your Honor, when

15   would you like the briefs?

16           THE COURT:  I would like them after the follow-up

17   *Daubert* hearings or -- I guess hearing, singular, which I think

18   we have scheduled for November 7th.

19           MS. ROCHA:  So Your Honor envisions we just do all of

20   the experts like in one consolidated briefing?

21           THE COURT:  Yes.

22           MS. ROCHA:  That is helpful.

23           THE COURT:  So you tell me when you want to file

24   after the 7th of November.

25           MS. ROCHA:  I would say -- I know Your Honor is going

1  into a trial, perhaps two week after that, but maybe we could

2  also revisit that after the -- after the 7th as well, so we

3  know what outstanding issues remain, but --

4          THE COURT:  Who should go first on the briefing?

5          MS. ROCHA:  I think we would, Your Honor.

6          THE COURT:  I would think so too.  You are seeking to

7  exclude the evidence.

8          MS. ROCHA:  Correct.  I think that is sort of like a

9  follow up to our motion.

10          THE COURT:  Why don't you file on or before the 21st

11  of November.

12          When would the defense like to respond?

13          MS. LEE:  The 28th is Thanksgiving, so if we could do

14  December 5th, two weeks.

15          THE COURT:  That is fine.  December 5th.

16          Then do you want a week for reply?

17          MS. ROCHA:  Yes, Your Honor.

18          THE COURT:  12th of December for reply.

19          And then we'll need to avoid having counsel have to

20  travel back and forth.  What about doing our final pretrial

21  conference on January 3rd?

22          MS. LEE:  Thank you, Your Honor.

23          THE COURT:  Okay.  And then when are we going to be

24  in a position to have finalized any briefing on the vindictive

25  and selective prosecution motions?  Where do we stand on that?

1    I want to make sure we are bringing everything to a close here

2    and that we are not.

3        MS. FONTAN:  Your Honor, it is my understanding that

4    we have completed briefing on those issues.

5        THE COURT:  There was the only question about whether

6    the defense felt that they needed to see the personnel file

7    before they made a final representation.

8        MS. ROCHA:  Your Honor, we could do a status report

9    at the end of the week on where we stand on those two items,

10   both the training transcript and the -- where they stand with

11   the redactions on the items from the personnel file.  That may

12   help Your Honor set a schedule.

13       THE COURT:  I will direct that you file a joint

14   status report on or before the 25th of October.  And in that

15   status report, let me know where we stand with respect to the

16   discovery, as well as if the parties believe there is a need

17   for any further briefing on the selective prosecution or

18   vindictive prosecution motions.  And propose a schedule for any

19   such additional briefing.

20       MS. LEE:  Your Honor, might I suggest that we could

21   mirror the schedule -- I don't know that we want to get too

22   much closer on filing briefs around Christmas, so perhaps we

23   can mirror the schedule suggested for motion on experts?

24       THE COURT:  Although, I guess you would flip the

25   order on that, since it is your motion?

1          MS. LEE:  Flip who's whose and have the 21st and the

2     5th and 12th as the --

3          THE COURT:  Any objection from the government to

4     doing it that way?

5          MS. ROCHA:  I think does Your Honor then still need

6     a -- I think the second half of Your Honor said the status

7     report would be then after receiving it would determine if we

8     need to -- are we assuming there will be those motions?

9          THE COURT:  I think why don't you -- so let's -- the

10    schedule will have if there is a need for anything further on

11    it.  But I think you should address in the joint status report,

12    both whether the parties think there is additional need for it

13    and if so, explain to me why there is that additional need.

14         MS. ROCHA:  Thank you, Your Honor.

15         THE COURT:  Okay.

16         MS. LEE:  And I apologize.  But Your Honor had

17    suggested -- so I understand the Dr. Best and other expert

18    motion briefing will be the November and December dates.  How

19    would the Court like to handle the briefing on the causation

20    question?  And I -- to the extent that the Court has thoughts

21    on this, we still have the outstanding question of the group

22    assault and --

23         THE COURT:  Yeah.  So on the group assaults, I have

24    to say, I have been thinking about that.  And this is actually

25    perhaps where my comment about Count 1 and Count 2 may be

1    different, might be a little bit more apropos, where you are

2    talking about a civil disorder count versus an assault count.

3    And I am open to hearing the parties' thinking about this.  I

4    tend to be sympathetic to the notion that at least with respect

5    to the assaults in Count 2, that it would be helpful for the

6    government to identify five individuals, who I think they have

7    already identified, and not leave the door open to it might be

8    someone else.  And if you look at your evidence now and you

9    think there is someone else out there who you think it might be

10   to tell us now who that is.  And I have to say that I think

11   that for a couple of reasons.  One, I do think it will assist

12   the defense in preparing the defense case.  It may also help

13   with respect to some of the causation issues.  And I can't

14   really answer the question -- if the causation is not required,

15   then it is less of a problem.  If causation is required then

16   the Government is going to have to prove who was caused anyway.

17   And causation can take a variety of different forms.  It can be

18   but for causation, it can be contributing causation, it may be

19   some effect.  I don't know exactly what the standard will be.

20   But knowing who the individuals will be could be significant.

21   It could aid the defense in narrowing the case and ease their

22   preparation.

23           And I also think that every lawyer wants to keep the

24   door open to every argument they might possibly want to make

25   someday.  But, on the other hand, it seems to me highly

1    improbable you are going to get to trial and you are going to

2    want to argue it to someone else at this point and you have

3    spent enough time dealing with this case that it is, I think,

4    improbable that you are going to then decide that, no, it was

5    someone who was further away who was actually the person we

6    have in mind.  And if it turns out you need six people instead

7    of five, that is something I would be open to.  But I am

8    sympathetic to the notion that it could just aid in the

9    administration of the case to identify who the individuals are

10   who the government alleges were aided and abetted.

11          I suppose -- I guess I am inclined to leave it there

12   unless the government says actually, Judge, we actually have

13   some other authority that we need to point to or if you want to

14   say that presumptively that is what I am going to require, but

15   in your briefing on the causation issue, if you think it should

16   come out otherwise, you can reopen the door at that point, but

17   that is my ruling for now is you should stick to the five.  But

18   if it turns out that the causation analysis leads to a more

19   open-ended result, then I would allow you to revisit it at that

20   point.

21          MS. FONTAN:  Your Honor, I think that is what the

22   government would prefer, just because I think they are pretty

23   interconnected, whether it is a group assault, we have to prove

24   that it is a but-for causation is a very different scenario

25   than, you know, another -- whatever the law says.  So we would

1    just -- and that be left open at this point until we -- I guess

2    until we have addressed -- if we are going to address it in the

3    causation briefing.

4          THE COURT:  What I would like to do is say

5    presumptively the five, but the defense should be prepared for

6    the possibility that if something comes up in the causation,

7    that I may revisit this and decide it is appropriate to open it

8    up more than that.  So don't say, well, now, Judge, that you

9    opened it up, we need more time to get ready.  But I do think

10   that presumptively I am inclined to limit it to the five.  But

11   I can be, if convinced on causation, that is more open ended

12   than my current instinct is, then I am open to reconsidering

13   that at that point.

14         MS. FONTAN:  Understood, Your Honor.  Just to

15   clarify, you are talking about for the 111(a); correct?

16         THE COURT:  That is what I was thinking about.  I do

17   think that I have a further question.  And I don't really know

18   the answer as well for the civil disturbance, but it does

19   strike me that the civil disturbance statute is written in more

20   open-ended terms and that it is not at all surprising to me

21   that one could aid and abet a civil disturbance, even though

22   that does require that there be some individuals who actually

23   do affirmatively interfere with law enforcement in what they

24   are doing that day.  But I still want briefing on these issues.

25   When you are briefing issues, if you are asking for my instinct

1    now, but don't hold me to this because I can be convinced

2    otherwise, the analysis could be different for civil

3    disturbance than it is for assault.

4         MS. LEE:  Understood, Your Honor.  With regards to

5    that briefing, could we clarify a briefing schedule, since we

6    don't need to wait for the experts on that portion and --

7         THE COURT:  I actually am thinking of this being

8    intertwined with the briefing on causation, because I think the

9    issues are closely related.

10        MS. LEE:  Yes.  I just wasn't sure that we set a

11   briefing schedule for the causation portion.  We have discussed

12   the FBI and vindictive portion mirroring the experts but --

13        THE COURT:  You are right, because I was actually

14   ahead of us all in my own head, but I forgot to say it out

15   loud.  Why not use the same briefing schedule that we just have

16   hit on.  And it may be a fairly big lift for everybody at the

17   same time.  But the government will go first on this because

18   they are the ones that have the burden of proof.  You will then

19   get a chance to respond and the government can file a reply,

20   but on the schedule I have already set for further briefing.

21        MS. LEE:  I think -- I would request that to the

22   extent that the Court -- let me talk with cocounsel for a

23   minute.

24        THE COURT:  Okay.

25        (Pause.)

1        MS. LEE:  Your Honor, I think because of the way this

2   would impact trial preparation for us, we would just ask to set

3   a time to argue it before January 3rd so that we are not in a

4   position where we --

5        THE COURT:  That is fair.  But we can -- is your

6   preference to do that by video conference or do it in person?

7        MS. LEE:  I think we can accommodate either.  If the

8   Court has a strong preference --

9        THE COURT:  I don't.  I was really trying to be

10  respectful of your travel obligations and Mr. Wise's interests.

11  And I would, frankly, in some sense leave it up to Mr. Wise.

12  And if you want to do it by video and that was okay with

13  Mr. Wise, that would be okay with me.  If you would like to do

14  it in person, I always think there is slight preference to

15  doing things in person, but I don't want to make you come

16  across the country unnecessarily.

17        MS. LEE:  I appreciate that.  Given that, it is our

18  request -- I think we would be happy to do it by video if the

19  government is comfortable doing that for the argument.

20        MS. FONTAN:  We have no objection to that.

21        MS. LEE:  Okay.

22        THE COURT:  So let's see if we can pick a date for

23  that.  It has to be after we are done with this additional

24  briefing.

25        Remind me what the date for the reply was.

1            MS. LEE:  The 12th of December, so I think we would

2     be looking at argument the week of December 16th, without

3     hitting the following week of Christmas.

4            THE COURT:  I am scheduled to be in trial all of that

5     week and actually currently scheduled for three trials that

6     week, although one of them I am 98 percent is not going to

7     happen.  One I think is going to happen and one I am not sure

8     about.  Let's see --

9            (Pause.)

10           THE COURT:  Well, let's put it down for December 12th

11    at noon.  And I may just have to do it and I may have to do it

12    in an hour and may have to do it over the lunch break.

13           MS. ROCHA:  Your Honor, I believe the replies are due

14    December 12th.

15           THE COURT:  I'm sorry.  I meant the 19th.  We'll do

16    it the 19th at noon --

17           MS. ROCHA:  Okay.  Thank you.

18           THE COURT:  -- over the lunch hour.  If it turns out

19    that the trials are done and I can move that, I would like to

20    do so and I will let you know.  But if I am in trial, that is

21    going to be my only option.  And we'll just have to limit

22    ourselves to an hour.

23           Let's see.  It is already 4:45.

24           So let me just run through quickly in hopefully ten

25    minutes the government's motions in limine, which I think are

1    all either relatively straightforward or that I should defer

2    until trial or defer until later.  I have already resolved the

3    first two, which are whether to preclude the government from

4    introducing evidence or -- whether to preclude the defendant

5    from introducing evidence of the exact locations of the cameras

6    and also to preclude the defendants from cross-examining the

7    Secret Service regarding exact locations of surveillance

8    cameras.  I have dealt with that.

9         The next one up is whether to preclude defendant from

10   offering a First Amendment defense.  And I think I need to

11   defer ruling on that until we have resolved this causation

12   question, which could be interrelated.

13        Whether to preclude the defendant from

14   cross-examining government witnesses regarding the use of

15   federal resources and the volume and timing of discovery.  I am

16   skeptical that would ever be appropriate.  But the defense

17   objects on the grounds it is premature.  If you want to raise

18   the issue at trial, you can do so.  I just request that you do

19   so before posing the question or offering the evidence at

20   trial.

21        And then whether to preclude the defendant from

22   cross-examining government witnesses regarding government

23   charging decisions and selective prosecution.  And Mr. Wise

24   does not intend to introduce evidence that someone else has

25   been charged.

1          Witness fraud and improper motives and bias could be

2    relevant.  And, again, I will defer that -- I will grant the

3    motion in part and then defer it in part.  To the extent there

4    is some reason to think that a particular witness is biased,

5    you are welcome to ask the questions.  Although, again, I am

6    skeptical that the amount of government resources will be

7    relevant or charging decisions will be relevant to that or

8    appropriate for the jury.  But I will defer ruling on that.  I

9    just ask that before you ask the question at trial, you let me

10   know so we can address it before anything -- the cat is out of

11   the bag in front of the jury.

12         Whether to preclude the defendant from introducing

13   evidence regarding business dealings with GED.  Is that

14   something the defense is seeking to do?

15         MS. LEE:  We understand the government does not

16   intend to call GED as a witness.  To that extent, we don't

17   expect that --

18         THE COURT:  Okay.  So I will simply deny that without

19   prejudice.  If it turns out it becomes an issue, you can raise

20   it.

21         With respect to the certain categories of multimedia

22   using various methods of authentication, I would very much

23   appreciate it if the parties use the additional time that I

24   provided to do what I think Mr. Hermansen offered to do, which

25   is to do their very best to try to narrow the issues in a way

1    that would streamline the trial.  So I will defer ruling on

2    that, but encourage parties to do everything in their power to

3    try to resolve what they can amongst themselves in advance of

4    trial.

5            Whether to admit certain statutes and records.  And

6    that, again, is an issue where I think the parties should

7    confer and see if they can stipulate on those issues.  I do

8    think that at least certain statutes and records will be

9    subject to jurisdiction notice.  But hopefully that is

10   something the parties can work out themselves, so I will defer

11   ruling on that.

12           Whether to allow cross-examination of law enforcement

13   witnesses as to the adequacy or preparation.  It does not

14   appear to me that the defense is seeking to do that.  So I will

15   grant that motion but, again, without prejudice.  If for some

16   reason, the defense wants to turn to that issue, you can let me

17   know and explain to me what the relevance is and why it would

18   be appropriate to get into those issues.

19           Whether to allow the defendant to introduce his own

20   out-of-court statements.  The defendant doesn't intend to do

21   so.  And so I will grant that motion as unopposed.

22           Whether the admission of defendant's statements at

23   trial would violate the First Amendment.  The defendant is not

24   seeking to preclude that introduction of his own statements on

25   First Amendment grounds, so I will, again, grant that motion.

1    But it is without prejudice if you see a basis to renew the

2    motion.

3            Whether to allow an entrapment defense.  The

4    defendant does not intend to raise an entrapment defense, so I

5    will deny that motion as moot.

6            Whether to allow the defendant to attempt to

7    introduce evidence that advocates for jury nullification.  The

8    defense obviously doesn't intend to do that, so I will deny

9    that motion as moot as well.

10           Whether what types of character evidence are

11   permissible, the defense does not intend to introduce

12   impermissible character evidence.  Again, I will just ask that

13   you raise the issue with me before getting into that at trial.

14   And also I will defer ruling on that question.  If there is

15   character evidence that is being offered, I will encourage you

16   to confer amongst yourselves about what would be appropriate

17   and what is not.  Whether to allow a defendant to introduce

18   evidence that he was ignorant of the law.  The defense does not

19   intend to claim ignorance of the law, so I will deny that

20   motion as moot.

21           Whether to allow the defendant to introduce evidence

22   of potential penalties or consequences.  Obviously, defendant

23   does not intend to elicit that type evidence, so I will deny

24   that as moot.

25           Whether to allow the defendant to argue self defense

1    or defense of others.  And the defense is reserving the right

2    to present that type of argument.  So I will defer ruling on

3    that question as well.

4          Whether to exclude Mr. Wise's statements referring to

5    law enforcement officers as Nazis or Gestapos and the

6    defense -- these are the defense motions.  I'm sorry.  And as

7    to that one, the defense says it would have no probative value

8    and that there also are statements that are also highly

9    prejudicial.  And the government asserts that the statements

10   are probative and they go to Mr. Wise's mental state at the

11   time.  I know there was a lot of back and forth today about

12   wanting records relating to the ADL, which was for purposes of,

13   I think, explaining those statements.

14         What is the defense's current position with respect

15   to the use of Mr. Wise's statements relating to Nazis and

16   Gestapo?

17         MS. LEE:  We continue to believe that the 403

18   balancing, those statements are substantially more prejudicial

19   in front of the jury than they are probative of the facts at

20   issue in this case.  To the extent that they will be allowed

21   in, we think there is contextual evidence we have asked for.

22   We are still asking for them to be excluded.

23         THE COURT:  My at least preliminary view on this and

24   the defense can renew their motion at trial on this, but my

25   preliminary view is that evidence is probative of Mr. Wise's

1    mental state at the time of the events that occurred.  But I

2    will allow you to renew the motion.  It is always difficult for

3    the Court to resolve some of these questions in the abstract

4    where I didn't see how the evidence fits in at trial.  You know

5    much more about the case than I do.  So I am going to grant

6    that motion -- I am going to deny the motion but without

7    prejudice to renew it as you deem appropriate.

8              Whether to exclude the use of the terms "rioter" or

9    "insurrectionist."  And the government says that it does not

10   necessarily intend to use the word insurrectionist.  And I do

11   think that the government should actually avoid using the word

12   insurrectionist, because that is a separate charge that

13   Mr. Wise is not charged with.  And the number of people who

14   were there that day who actually have been charged under the

15   insurrection statute is quite limited.  So I do think talking

16   about the group as insurrectionists is unduly prejudicial, so I

17   will direct that the government not use the term

18   insurrectionist and that you request that your witnesses

19   refrain from doing so as well.

20             With respect to rioters, my view is just the opposite

21   on that one.  I don't think it is that unduly prejudicial.  I

22   don't think there was any doubt there was a riot that was going

23   on that day.  And that is certainly the government's position

24   about what was happening that day.  And it actually relates to

25   the charge in this case, which is -- I think it is Count 1,

1    which is the civil disorder charge.  And so I think that is

2    fair game, so I will allow the government to use the word

3    rioter or rioters.

4         MS. LEE:  Your Honor, I apologize.  I didn't know if

5    the Court was moving on from that one.

6         THE COURT:  That is fine if you have anything to add.

7         MS. LEE:  I wanted a quick clarification.  Because I

8    think there are two different legal standards from a witness'

9    use of a term, versus a government's use of a term.  I

10   certainly understand that in closing argument the government

11   may use terms that are part of the argument for the

12   convictions, for example, "victim" is something courts have

13   considered as terms that the government is going to use,

14   because the government believes it has proven a crime.  But we

15   are still objecting to the term rioter for 403 reasons.  But I

16   wanted to be clear about whether the Court would allow

17   witnesses to use it, because I think it speaks to a legal

18   conclusion in exactly the way the Court has described, that it

19   is an element of that charge, I would ask that witnesses be

20   precluded from using that terminology.

21        THE COURT:  I am going to allow witnesses to use the

22   terminology.  But remind me -- and if you would like me to

23   instruct the jury at that time when it first comes up, to the

24   extent that it is a legal conclusion, that the witness is not

25   testifying as a legal expert with respect to what that word

1    means, that it is using it in a more colloquial sense, I am

2    happy to do that.

3            MS. LEE:  Thank you, Your Honor.  I will just -- to

4    complete my record.  My concern is it becomes a confusion I

5    think for the jury if we are allowing the use of the term in

6    two different ways we are allowing a witness to use it.  To the

7    extent the witness wants to describe particular facts, these

8    people were fighting, this person hit an officer, this is what

9    I saw was happing over here, I think that is appropriate.  The

10   term "rioter" I think particularly when it is going to be a

11   part of the offense --

12           THE COURT:  So I have seen many of these cases and it

13   has not been my perception in any case that jurors have had a

14   problem or been confused with respect to witnesses who are

15   generally testifying and the rioters then went here and the

16   rioters went there.  And I don't think it is particularly

17   prejudicial to Mr. Wise to use the words in that fashion.  And,

18   you know, I would perhaps be more concerned if I thought that

19   there actually was a substantial dispute about whether a riot

20   of some form took place that day.  I take it the defense was

21   not suggesting this was an entirely peaceful rally in which

22   there was no riot, in any event.

23           MS. LEE:  No, Your Honor, that wouldn't be my

24   suggestion.

25           THE COURT:  Okay.  All right.

1          Then whether to exclude evidence not proffered to

2   defense counsel.  And I guess I am not sure I entirely

3   understand what that means, if you simply mean evidence that

4   was not produced in discovery.

5          MS. LEE:  I think at this stage with -- we'll address

6   exhibits in a future pretrial conference.  I think that at this

7   point any particular objections to particular Government

8   Exhibits can be dealt with there.

9          THE COURT:  Okay.

10          MS. LEE:  I think when these filings were happening

11   back in August there was concern about what stage of discovery

12   we were at.  But I think if there are particular objections to

13   Government Exhibits, we'll raise those.

14          THE COURT:  I will defer on this.  If there are

15   particular objections, you can raise it at the time.

16          Whether to allow defense counsel to personally voir

17   dire.  We have talked about what my practice is in that regard.

18   I will stick to that.  I will let you ask follow-up questions

19   in an appropriate manner.

20          All right.  Anything else in the next two minutes you

21   think we can resolve today or should resolve today?

22          MS. ROCHA:  Your Honor, I think there is the briefing

23   that was just complete, as like the supplemental argument on

24   the motion to suppress.  In the government's perspective, I

25   think the briefing speaks for itself.  If Your Honor had quick

1    questions, we are happy to answer.

2              THE COURT:  Ms. Lee.

3              MS. LEE:  I think we would rest -- I think resting on

4    the briefings for that issue is fine.  The Court has exhibits

5    regarding each of the issues in the filings from the parties.

6              THE COURT:  Okay.  I will get you a decision on that

7    as well.

8              MS. FONTAN:  Your Honor, one more thing briefly.  The

9    government's -- I guess both parties' objections to exhibits or

10   maybe it is ours are due in two days.  Could we propose a --

11             THE COURT:  In your status report, why don't you

12   propose a new date for that?

13             MS. ROCHA:  Okay.

14             MS. FONTAN:  Okay.  Thank you, Your Honor.

15             THE COURT:  Okay.  Anything else?

16             MR. HERMANSEN:  No.  We did have an ex parte request.

17             THE COURT:  What is the ex parte request?  I'm sorry.

18   I just don't know what you are talking about.

19             MR. HERMANSEN:  We submitted an ex parte request.

20             THE COURT:  Do you want to come over here and tell me

21   what it is?  Because I am not sure what you are talking about.

22             THE COURT REPORTER:  On the record?

23             THE COURT:  Yes, let's seal this.  So I'm going to

24   seal this, but it is on the record.

25             (Conference held at the bench and sealed by order of

1    Judge Moss.)



16            (End of bench conference.)

17            THE COURT:  All right.  Thank you all.  This has been

18    a relatively productive day.  And I think we are moving forward

19    and I really am very much committed to resolving this case,

20    absent truly unusual or unexpected circumstances on the new

21    trial date.  So thank you, all.

22            (Proceedings concluded at 5:00 p.m.)

1                    C E R T I F I C A T E

2

3          I, SHERRY LINDSAY, Official Court Reporter, certify

4    that the foregoing constitutes a true and correct transcript of

5    the record of proceedings in the above-entitled matter.

6

7

8

9

10                       Dated this 26th day of October, 2024.

11

12                       _____
                         Sherry Lindsay, RPR
13                       Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25

BY MR. HERMANSEN: [6]   43/5 46/9
55/16 57/22 58/1 58/10
BY MS. ROCHA: [8]   5/16 6/25
16/13 27/9 29/2 30/19 59/4 60/23
MR. HERMANSEN: [65]   4/11 5/1
16/3 37/12 37/15 37/24 38/4 38/23
39/15 39/18 40/15 40/20 41/15
41/25 42/8 58/9 58/21 63/3 63/7
63/22 63/25 64/4 64/25 65/19 66/7
66/13 66/23 67/4 68/3 68/22 69/11
69/24 70/3 70/11 70/15 70/20
70/25 72/10 72/14 72/25 110/23
116/2 119/25 121/5 126/18 126/25
127/5 127/7 127/10 127/12 127/24
128/5 128/21 129/10 129/22 131/2
131/6 131/20 132/23 133/10 152/16
152/19 153/2 153/7 153/10
MS. FONTAN: [20]   74/12 75/5 76/2
116/6 116/9 116/11 116/13 116/21
117/23 118/2 118/23 119/4 120/2
120/4 135/3 138/21 139/14 141/20
152/8 152/14
MS. LEE: [66]   68/23 69/7 80/15
80/19 81/12 81/21 82/3 82/18
83/19 84/23 85/12 85/15 86/20
87/11 88/4 88/19 89/10 89/22 90/2
91/1 91/16 91/20 92/18 93/4 93/12
93/23 94/18 95/18 96/1 96/10
96/22 97/17 97/23 107/7 107/12
108/5 108/20 117/9 119/8 119/16
119/19 120/5 120/25 127/9 134/13
134/22 135/20 136/1 136/16 140/4
140/10 140/21 141/1 141/7 141/17
141/21 142/1 144/15 147/17 149/4
149/7 150/3 150/23 151/5 151/10
152/3
MS. ROCHA: [62]   4/7 5/4 5/14
6/24 16/6 16/10 27/4 27/7 38/7
58/25 62/11 76/5 76/22 77/12
77/16 77/19 78/2 78/8 79/3 80/3
84/9 84/22 98/19 98/24 99/4 100/7
100/16 100/20 100/25 101/16
101/18 102/6 102/15 103/10 103/13
103/15 103/18 103/21 103/25 104/8
104/13 104/21 105/11 105/22 106/6
106/10 106/19 106/24 133/14
133/19 133/22 133/25 134/5 134/8
134/17 135/8 136/5 136/14 142/13
142/17 151/22 152/13
THE COURT REPORTER: [1]   152/22
THE COURT: [239]
THE COURTROOM DEPUTY: [5]   4/2
62/20 69/1 69/5 69/9
THE DEFENDANT: [2]   4/21 69/3
THE WITNESS: [23]   28/17 29/23
30/3 30/14 30/17 32/19 34/3 34/11
35/19 37/6 44/22 45/23 51/6 51/9
52/18 53/9 53/20 54/12 55/12
57/17 60/8 60/13 62/17

**'**

**'em [6]**   54/10 54/10 54/24 54/24
113/17 113/17

**1**

**10-year [1]**   130/5
**100 [1]**   12/12
**100 percent [1]**   67/15
**101 [1]**   2/8
**10:00 [1]**   120/12
**111 [1]**   139/15
**113 [1]**   110/25
**115 [1]**   80/24
**118 [1]**   131/24
**11:00 [5]**   120/12 120/14 120/15
121/3
**11:00 a.m [1]**   121/1
**12:00 [2]**   62/13 62/19
**12th [7]**   119/24 120/8 134/18
136/2 142/1 142/10 142/14

**13 [3]**   88/23 88/24 97/5
**1004 [1]**   1/23 1/24 1/24
**16 [2]**   27/11 30/21
**16th [1]**   142/2
**1700 [1]**   2/9
**184 [3]**   1/4 4/3 62/21
**18th [1]**   116/17
**19 [1]**   117/20
**19-CR-19 [1]**   117/20
**1981 [1]**   112/4
**1999 [1]**   127/7
**19th [3]**   111/13 142/15 142/16
**1:00 [1]**   121/1
**1st [1]**   67/19

**2**

**200 [1]**   2/5
**20001 [1]**   1/24
**2007 [1]**   111/20
**2013 [1]**   97/4
**2014 [2]**   97/4 132/2
**2015 [1]**   97/4
**2021 [2]**   14/20 27/11
**2024 [3]**   1/5 81/1 154/10
**20530 [1]**   1/16
**20th [2]**   66/20 67/15
**21 [1]**   1/5
**219 [1]**   1/13
**21st [2]**   134/10 136/1
**23-184 [3]**   1/4 4/3 62/21
**25th [2]**   82/9 135/14
**26th [1]**   154/10
**28th [1]**   134/13
**2:00 [2]**   62/14 121/3
**2:30 [3]**   62/14 62/18 121/4

**3**

**30 [1]**   66/25
**302 [1]**   95/15
**302s [1]**   78/18
**333 [1]**   1/23
**3rd [2]**   134/21 141/3

**4**

**4 feet [1]**   73/18
**403 [9]**   94/8 122/17 122/20 123/6
123/25 124/6 124/11 147/17 149/15
**42 percent [1]**   36/24
**43 [1]**   3/5
**4:45 [1]**   142/23

**5**

**5,000 [1]**   33/23
**50 [2]**   12/11 51/4
**536 [1]**   132/22
**59 [1]**   3/6
**5:00 [1]**   153/22
**5th [4]**   1/13 134/14 134/15 136/2

**6**

**601 [1]**   1/16
**60604 [1]**   1/14
**61 percent [1]**   36/24
**62 percent [1]**   129/16
**646 [1]**   132/22
**65 [1]**   107/15
**67 [1]**   107/15
**6710 [1]**   1/24
**6th [1]**   66/8

**7**

**702 [3]**   127/15 132/1 132/19
**704 [1]**   131/6
**72 percent [1]**   36/22
**78 percent [1]**   129/17
**7th [15]**   63/12 64/11 66/12 66/20
67/13 67/18 119/23 119/24 120/2
120/4 120/8 120/13 133/18 133/24
134/2

**8**

**8 feet [1]**   73/17
**859 [1]**   2/5
**86 [1]**   81/16

**9**

**97204 [1]**   2/9
**97401 [1]**   2/6
**98 percent [1]**   142/6
**9:43 [1]**   1/5
**9th [2]**   116/22 116/23

**A**

**a.m [2]**   1/6 121/1
**abet [1]**   139/21
**abetted [1]**   138/10
**abetting [2]**   110/10 111/9
**ability [6]**   43/2 43/8 60/1 67/17
87/20 97/9
**able [29]**   17/21 17/25 18/5 18/16
18/19 21/18 22/9 41/5 42/20 45/1
49/16 55/6 55/7 57/7 58/13 61/12
69/7 76/15 78/6 79/6 79/23 83/4
84/4 101/24 102/16 104/5 105/6
105/13 120/6
**about [213]**
**above [2]**   98/21 154/5
**above-entitled [1]**   154/5
**absent [2]**   115/4 153/20
**absolutely [3]**   24/4 53/3 73/22
**abstract [1]**   148/3
**abundance [1]**   101/14
**academy [7]**   78/5 89/23 92/19
92/22 102/1 102/18 102/19
**access [7]**   73/20 83/4 84/4 87/20
90/13 97/7 97/9
**accommodate [1]**   141/7
**accomplice [1]**   112/2
**accomplishing [1]**   54/1
**according [3]**   6/20 47/21 132/17
**account [5]**   10/9 22/12 29/9 46/17
49/21
**accounted [2]**   8/15 46/12
**accounting [1]**   91/22
**accurate [2]**   51/10 93/5
**accused [3]**   67/1 67/3 90/6
**acknowledges [2]**   11/23 11/23
**acronym [2]**   23/21 25/14
**acronyms [2]**   23/21 50/20
**across [4]**   74/9 130/6 130/8
141/16
**act [5]**   43/9 52/5 52/6 53/25 58/5
**acted [3]**   27/12 30/6 133/2
**acting [4]**   42/14 48/25 52/3
124/24
**action [2]**   1/3 68/13
**actions [6]**   30/12 30/21 31/9 32/4
52/8 112/9
**activated [1]**   57/9
**active [1]**   112/20
**actively [1]**   114/8
**acts [1]**   110/20
**actual [4]**   43/12 81/21 111/10
112/20
**actually [52]**   5/9 8/6 12/2 17/14
17/23 18/5 19/18 27/15 28/8 29/11
33/4 34/3 36/20 37/18 44/25 45/1
45/10 46/23 50/4 51/12 52/19
52/20 54/18 55/9 59/24 60/10
61/18 64/10 66/18 100/4 100/5
108/19 109/13 110/14 110/19
111/22 111/23 112/11 116/16
118/23 136/24 138/5 138/12 138/12
139/22 140/7 140/13 142/5 148/11
148/14 148/24 150/19
**acute [3]**   47/23 47/23 48/3
**add [5]**   49/18 96/24 107/13 126/23
149/6
**addition [2]**   10/3 47/14
**additional [12]**   69/14 91/11
109/17 110/2 114/4 114/25 115/14

**additional...** **[5]** 135/19 136/12
136/13 141/23 144/23
**address [10]** 74/16 74/19 80/19
96/4 121/12 121/25 136/11 139/2
144/10 151/5
**addressed [1]** 139/2
**adequacy [1]** 145/13
**adequate [1]** 125/23
**adequately [1]** 78/12
**ADL [13]** 89/18 89/21 89/23 92/7
92/15 95/7 96/19 101/17 101/18
102/19 104/2 104/6 147/12
**administer [1]** 14/17
**Administered [2]** 49/9 50/22
**administration [1]** 138/9
**admissibility [2]** 108/17 120/21
**admissible [6]** 77/1 94/19 103/1
108/12 122/15 132/18
**admission [1]** 145/22
**admit [1]** 145/5
**ads [1]** 75/16
**advance [3]** 118/16 123/10 145/3
**advertisements [1]** 74/22
**advocates [1]** 146/7
**affect [1]** 112/9
**affected [2]** 51/20 127/2
**affects [1]** 125/11
**affirmatively [2]** 100/4 139/23
**after [33]** 11/25 46/22 47/21
47/25 48/2 48/4 61/19 63/13 63/18
64/14 64/16 66/19 66/20 68/10
71/17 85/22 86/15 92/22 99/24
107/16 109/3 110/24 111/1 120/16
121/9 133/13 133/16 133/24 134/1
134/2 134/2 136/7 141/23
**afternoon [2]** 4/9 120/16
**afterwards [1]** 65/16
**again [47]** 7/18 9/16 13/11 24/24
25/6 27/20 28/17 29/14 36/7 46/7
47/9 51/13 53/21 54/12 55/2 55/5
56/8 56/10 59/13 59/18 61/8 66/12
69/14 75/21 83/24 84/10 86/4
86/12 88/19 95/22 97/25 103/1
104/16 104/16 105/8 105/16 110/11
115/7 117/14 124/5 124/5 144/2
144/5 145/6 145/15 145/25 146/12
**against [2]** 64/21 96/17
**agencies [1]** 83/2
**agency [1]** 83/1
**agent [21]** 38/5 40/7 69/24 70/2
70/23 78/11 78/18 79/17 84/21
85/10 85/10 89/7 89/8 92/21 93/13
99/23 107/2 108/8 108/10 130/3
130/6
**agents [6]** 39/23 88/2 90/4 99/24
102/17 104/1
**ago [3]** 24/9 24/25 87/12
**agree [13]** 6/19 6/22 8/1 10/16
13/1 22/22 23/1 23/5 85/4 94/18
122/5 128/21 128/21
**agreed [2]** 77/8 82/6
**ahead [4]** 5/6 31/7 107/22 140/14
**aid [3]** 137/21 138/8 139/21
**aided [1]** 138/10
**aiding [2]** 110/10 111/9
**Alethiometer [1]** 26/17
**all [106]** 4/23 5/20 6/1 6/6 6/21
13/15 13/19 15/23 16/9 16/12
17/15 19/3 20/8 20/15 21/17 23/6
23/25 24/7 24/17 24/18 24/25 27/4
27/15 27/17 34/14 35/14 37/19
38/11 39/1 39/23 41/5 41/8 44/5
47/4 48/7 49/17 49/20 55/14 56/4
57/13 58/23 61/15 62/10 62/12
62/18 62/23 64/25 69/19 74/3 74/4
74/8 74/25 75/1 75/9 75/16 77/8
77/15 80/14 83/22 84/13 86/20
86/24 87/2 87/15 94/6 95/1 98/16
98/17 104/12 104/18 106/15 106/22
107/15 107/18 108/22 108/22 109/22

111/7 115/15 116/4 117/11 118/25
118/25 118/3 118/17 118/7 118/18
123/8 123/13 126/17 128/7 130/11
130/12 131/5 131/16 133/7 133/19
139/20 140/14 142/4 143/1 150/25
151/20 153/17 153/17 153/21
**alleged [3]** 13/17 54/14 54/22
**allegedly [1]** 54/9
**alleges [1]** 138/10
**allow [17]** 6/9 113/9 121/10
122/8 138/19 145/12 145/19 146/3
146/6 146/17 146/21 146/25 148/2
149/2 149/16 149/21 151/16
**allowed [7]** 4/17 45/21 67/22
73/16 73/23 124/13 147/20
**allowing [3]** 56/4 150/5 150/6
**allows [1]** 56/2
**almost [3]** 55/20 95/15 130/5
**along [4]** 5/21 44/13 118/3 118/17
**already [8]** 71/4 98/5 111/25
114/21 137/7 140/20 142/23 143/2
**also [57]** 4/14 7/19 9/6 9/22
12/24 13/12 21/17 27/16 29/18
34/18 34/20 35/25 40/1 40/4 41/10
42/5 44/24 47/1 47/15 48/16 49/10
49/22 50/18 50/23 53/22 56/25
59/7 59/16 62/5 62/8 67/20 70/7
71/23 78/4 78/21 79/20 87/15
94/25 95/21 96/1 97/5 97/16
111/13 118/3 122/1 124/18 124/22
125/20 125/23 127/2 134/2 137/12
137/23 143/6 146/14 147/8 147/8
**although [7]** 76/15 81/8 85/19
89/4 135/24 142/6 144/5
**always [6]** 46/13 79/22 102/9
118/19 141/14 148/2
**am [143]** 5/19 7/1 7/14 7/15 12/10
12/14 12/14 12/17 13/19 15/9
15/22 15/22 15/24 16/3 16/14
19/20 19/23 22/8 23/4 23/15 23/21
26/24 33/1 35/18 35/24 36/2 36/12
37/1 39/19 40/8 40/9 40/9 40/18
42/2 42/3 42/3 44/15 45/15 45/19
46/2 51/10 52/14 52/23 53/3 55/17
57/17 57/19 59/21 61/16 63/1
63/14 63/20 64/3 64/14 64/18
64/18 64/20 64/25 65/10 65/13
66/7 66/9 67/7 67/10 67/11 67/12
67/12 67/16 70/21 74/8 76/14
79/21 80/14 80/19 81/19 81/25
84/18 86/20 94/2 100/7 100/25
101/8 102/7 107/23 107/23 109/1
109/17 109/18 109/21 109/25 110/4
110/14 111/15 111/19 114/3 114/6
116/22 116/23 116/24 117/4 118/7
119/13 120/13 121/9 121/21 122/1
123/16 124/9 124/15 124/18 124/18
125/1 125/5 125/13 125/14 125/20
125/21 125/22 126/11 126/23
127/11 129/20 130/3 137/3 138/7
138/11 138/14 139/10 139/12 140/7
142/4 142/6 142/7 142/20 143/15
144/5 148/5 148/6 149/21 150/1
151/2 152/21 153/19
**amenable [2]** 118/24 119/4
**Amendment [5]** 110/13 110/14
143/10 145/23 145/25
**AMERICA [3]** 1/3 4/3 62/21
**American [1]** 6/20
**amnesia [12]** 6/12 8/18 8/19 8/21
11/12 46/16 46/25 47/2 47/3 47/6
47/12 83/22
**amongst [2]** 145/3 146/16
**amorphous [2]** 99/7 105/15
**amount [1]** 144/6
**amygdala [6]** 41/21 42/15 55/21
56/18 57/13 124/25
**analogy [1]** 125/5
**analysis [15]** 7/5 10/19 13/22
13/22 17/7 18/1 19/23 20/1 25/10
36/16 42/5 42/16 131/5 138/18
140/2

**analyze [3]** 14/10 14/24 15/3
**anchor [2]** 18/2 51/3
**Angles [1]** 60/25
**angry [2]** 57/13 126/7
**annual [1]** 92/23
**anonymous [8]** 97/6 105/1 105/4
105/5 105/15 105/17 105/19 106/20
**anonymously [1]** 97/20
**another [19]** 11/3 11/9 12/23
14/23 19/1 20/12 20/13 52/21 53/4
57/25 61/11 61/19 62/12 67/16
73/11 104/14 114/17 114/17 138/25
**answer [12]** 13/8 27/2 42/16 42/22
47/11 47/11 99/5 113/3 113/21
137/14 139/18 152/1
**answering [2]** 131/3 131/15
**Antagonistic [1]** 26/17
**anticipate [1]** 41/4
**Antidefamation [3]** 90/1 90/3
101/23
**anxious [1]** 65/23
**any [77]** 5/20 8/12 12/21 13/22
13/22 16/19 17/21 18/20 18/23
20/24 21/2 21/25 21/25 22/2 22/2
22/11 26/22 27/2 29/20 29/24 32/2
32/3 32/7 32/25 36/5 45/16 52/12
55/10 55/10 65/6 65/13 66/17
68/13 68/19 69/21 77/5 80/15
83/12 83/14 85/25 88/15 90/14
92/8 92/9 92/10 95/3 96/15 96/17
98/11 98/17 99/2 99/3 102/22
105/20 105/20 106/8 106/8 106/11
106/16 106/19 109/12 112/6 115/9
116/15 117/18 119/6 125/13 129/8
129/13 134/24 135/17 135/18 136/3
148/22 150/13 150/22 151/7
**anymore [1]** 87/13
**anyone [2]** 72/20 96/13
**anything [40]** 5/21 11/3 14/9
14/10 14/24 16/23 17/18 21/4 21/7
22/13 22/15 22/19 40/14 43/1 54/8
55/15 64/18 65/12 65/14 68/14
70/25 71/5 78/4 78/23 79/11 83/12
102/25 103/2 106/11 106/18 107/6
108/23 111/23 116/4 131/19 136/10
144/10 149/6 151/20 152/15
**anyway [2]** 110/7 137/16
**apologies [1]** 46/7
**apologize [5]** 68/23 90/2 95/18
136/16 149/4
**apparent [1]** 38/21
**Appeals [1]** 131/11
**appear [6]** 48/15 48/15 48/16 60/9
89/14 145/14
**appearance [2]** 4/6 62/16
**APPEARANCES [3]** 1/11 1/19 2/1
**appeared [1]** 11/17
**appearing [4]** 4/14 62/22 114/9
120/25
**appears [4]** 11/17 11/18 50/8
50/10
**applicable [1]** 20/24
**application [1]** 82/22
**applications [1]** 84/1
**applied [2]** 20/18 30/4
**applies [1]** 110/10
**apply [4]** 7/12 7/15 22/14 82/6
**apposite [1]** 121/15
**appraisals [1]** 98/10
**appreciate [9]** 62/15 63/19 69/10
75/5 75/19 75/21 81/5 141/17
144/23
**approach [1]** 4/5
**appropriate [24]** 5/12 21/2 34/23
35/2 40/24 82/22 82/24 83/3 87/6
110/6 121/10 121/20 124/5 124/17
126/2 131/5 139/7 143/16 144/8
145/18 146/16 148/7 150/9 151/19
**appropriately [1]** 88/20
**approvingly [1]** 132/21
**approximately [1]** 107/15
**approximation [1]** 51/2

**A**
apropos [1]  137/1
Arabic [1]  71/19
are [327]
area [4]  14/21 30/4 56/6 57/19
areas [3]  56/12 77/16 122/7
aren't [3]  49/24 73/16 116/15
argue [5]  39/20 123/16 138/2
141/3 146/25
arguing [1]  132/10
argument [22]  33/11 33/15 37/19
37/23 62/24 63/20 63/24 64/6
69/13 69/14 73/14 98/11 109/1
109/4 126/18 137/24 141/19 142/2
147/2 149/10 149/11 151/23
arguments [3]  35/7 37/21 132/10
around [24]  44/14 53/2 61/25
63/11 64/8 64/10 64/11 64/22
64/23 65/3 65/7 65/9 65/10 65/14
65/14 65/24 68/7 68/14 68/16
68/21 94/22 107/8 124/8 135/22
arrangements [1]  119/20
article [2]  63/10 111/19
articles [2]  35/15 111/14
as [191]
aside [5]  75/15 75/16 78/25 84/11
111/5
ask [25]  28/13 33/24 51/13 67/13
67/16 68/18 70/18 75/9 75/12
75/22 81/8 84/5 98/13 99/20
101/14 120/19 120/20 120/21 141/2
144/5 144/9 144/9 146/12 149/19
151/18
asked [20]  21/10 48/10 49/14
50/23 54/13 54/15 67/6 90/15
92/11 92/15 96/25 100/17 103/10
104/16 104/16 129/8 129/11 129/12
129/19 147/21
asking [18]  7/15 40/8 64/10 70/9
70/13 70/17 70/21 70/22 71/12
82/12 89/13 92/3 92/6 100/7
102/22 109/20 139/25 147/22
aspect [2]  103/6 103/9
aspects [1]  84/17
ASPs [1]  95/21
assault [9]  67/24 69/13 94/14
94/24 113/23 136/22 137/2 138/23
140/3
assaults [2]  136/23 137/5
assertedly [1]  105/18
asserts [1]  147/9
assessing [4]  49/11 50/6 50/7
71/11
assessment [10]  14/18 23/10 25/24
71/16 71/18 83/15 84/20 95/13
99/22 99/23
assessments [8]  34/5 71/16 71/18
71/21 80/1 80/2 83/25 99/2
assigned [1]  70/16
assignments [6]  70/9 70/11 70/14
70/23 81/6 107/3
assist [2]  132/19 137/11
assistance [1]  28/25
assistant [3]  4/12 4/13 73/15
associated [3]  24/20 24/22 65/1
Association [2]  6/20 26/15
assume [1]  108/13
assumed [1]  81/15
assuming [1]  136/8
attachment [1]  108/8
attacked [1]  54/25
attacks [1]  64/16
attempt [2]  111/21 146/6
attempting [2]  80/24 132/4
attention [2]  18/6 18/10
attorney [3]  67/11 73/15 73/15
Attorney's [4]  80/25 81/6 100/15
117/17
auditory [1]  45/6
August [6]  67/4 74/16 82/7 82/11
89/14 151/11

**AUSA [1]**  107/17
Autobiographical [1]  43/6
authored [1]  78/18
authority [1]  138/13
authors [1]  37/9
Autobiographical [1]  26/15
automatic [1]  54/5
available [7]  71/21 71/22 77/20
104/18 117/12 119/17 120/9
Avenue [1]  1/23
average [2]  36/23 129/16
avoid [3]  130/5 134/19 148/11
awards [1]  54/4
aware [4]  64/18 86/15 117/15
130/10
away [9]  27/13 28/23 30/10 30/24
35/22 41/11 76/21 76/21 138/5
Axis [1]  22/8

**B**
baby [4]  52/9 52/10 53/14 58/4
back [31]  11/2 12/6 23/15 37/22
38/8 48/20 51/13 62/14 62/20 63/1
64/16 66/1 76/24 82/10 88/14 99/6
100/8 101/5 105/14 108/24 111/12
111/12 114/15 114/17 114/25
131/17 133/8 133/12 134/20 147/11
151/11
backed [1]  56/13
background [9]  14/2 31/22 36/5
40/13 80/5 80/5 81/10 84/18 86/9
backup [1]  114/13
backward [1]  115/1
backwards [1]  101/8
bad [6]  23/17 23/21 49/22 49/24
93/6 98/12
bag [1]  144/11
bailiwick [1]  51/16
balancing [1]  147/18
balls [1]  15/20
bangs [1]  95/25
Bankruptcy [1]  1/23
base [2]  36/9 128/1
based [46]  9/4 10/9 10/10 10/12
13/9 13/12 13/15 14/3 14/5 14/24
19/9 21/17 22/18 27/15 27/17
27/21 27/25 28/3 28/5 28/17 29/10
30/7 30/8 30/11 31/16 32/10 32/17
32/21 33/11 34/14 36/15 37/3 38/2
39/21 41/13 42/14 42/15 50/1
79/24 81/25 84/9 107/17 127/13
127/15 127/15 129/21
basically [10]  16/23 19/21 19/21
43/12 45/3 45/7 55/19 55/25 57/3
60/2
basics [1]  71/1
basing [1]  70/6
basis [16]  7/32/3 32/20 34/24
35/18 40/9 42/4 87/23 115/5
122/19 125/24 126/14 128/12
128/14 146/1
baton [1]  87/6
batons [1]  95/21
be [281]
bearing [1]  109/7
became [3]  38/21 61/18 79/17
because [92]  8/14 11/24 13/3 13/7
15/17 24/5 27/23 31/4 32/12 32/22
36/13 37/18 38/16 38/19 40/6
40/16 42/7 42/10 42/13 45/18
45/19 46/2 46/14 47/1 47/11 47/12
51/8 52/13 52/20 53/11 54/24 55/8
56/8 57/25 61/4 63/22 66/8 66/10
66/14 68/9 68/11 68/12 68/18 71/3
71/6 71/9 71/12 71/24 72/12 72/23
73/14 76/8 82/15 89/6 96/23 100/9
102/7 105/2 107/14 110/17 111/7
113/2 115/1 115/8 118/19 123/14
125/6 125/16 126/7 126/9 128/2
128/10 128/16 128/24 129/1 129/4
129/24 130/2 130/4 132/5 133/12
138/22 140/1 140/8 140/13 140/17

141/1 148/12 149/7 149/14 149/17
152/24 157/23
Beckford [1]  82/22
become [4]  74/21 95/2 98/2 109/6
becomes [3]  123/9 144/19 150/4
been [40]  8/9 29/21 34/16 36/25
45/16 45/17 57/18 72/21 73/5
78/23 78/24 80/24 81/6 82/12
88/24 89/13 91/4 92/4 93/25 94/6
94/16 97/17 98/6 100/16 100/20
100/21 102/11 104/5 105/2 106/2
111/11 115/2 117/18 129/19 136/24
143/25 148/14 150/13 150/14
153/17
before [24]  1/9 4/16 21/11 38/8
63/3 67/1 77/10 82/10 86/13 88/5
97/13 97/16 116/15 120/15 120/17
124/12 134/10 135/7 135/14 141/3
143/19 144/9 144/10 146/13
began [1]  46/22
beginning [1]  17/1
beginnings [1]  61/10
begins [2]  7/9 27/10
behalf [1]  4/13
behaving [1]  93/1
behavior [5]  30/22 31/19 39/24
63/11 92/22
behaviorally [1]  49/6
behaviors [2]  31/10 93/13
being [36]  9/4 16/25 22/16 22/20
23/7 30/6 30/23 31/2 31/12 32/4
41/7 43/7 43/16 43/18 50/7 51/18
52/1 57/8 60/13 60/14 69/7 76/16
78/14 78/25 84/25 86/8 89/25 90/6
92/18 94/22 96/7 98/8 104/17
108/13 140/7 146/15
believe [29]  7/1 7/7 11/6 38/1
38/16 44/15 54/24 61/1 81/2 81/22
82/4 89/5 89/12 90/6 90/19 92/9
92/9 92/25 97/5 98/25 105/3
105/22 106/16 108/7 111/2 123/13
135/16 142/13 147/17
believed [4]  10/13 10/13 89/16
97/18
believes [2]  85/1 149/14
believing [1]  11/7
bench [2]  152/25 153/16
bending [1]  101/8
benefit [2]  101/9 117/19
Benghazi [1]  71/3
Berra [1]  87/12
beside [1]  111/7
best [41]  3/3 4/15 4/23 5/17 7/1
26/22 30/20 32/21 38/9 43/6 45/14
46/10 59/5 62/15 62/15 69/15
71/16 71/23 74/9 74/17 78/5 79/8
79/17 79/20 83/9 85/16 88/17
91/23 105/3 109/20 119/23 119/24
122/5 123/7 123/22 124/7 124/19
126/12 126/16 136/17 144/25
Best's [5]  39/21 62/25 82/1 84/2
123/10
better [13]  8/15 12/7 22/11 46/11
46/17 55/18 64/13 67/17 94/5 94/6
94/16 121/21 126/21
between [8]  8/4 8/6 42/6 42/19
101/22 109/22 127/20 132/7
beyond [2]  45/13 98/21
BI [1]  81/10
bias [2]  75/23 144/1
biased [1]  144/4
Biden [2]  63/15 66/8
big [3]  73/16 94/10 140/16
bike [2]  94/16 94/17
bind [1]  123/2
bit [15]  28/14 28/14 29/15 42/1
45/23 55/18 60/20 87/12 87/14
87/16 102/7 116/19 117/24 121/24
137/1
blacked [2]  12/13 12/18
blast [3]  95/9 95/16 96/22
Blue [1]  60/25

**B**

**body [3]**  33/3 54/5 60/3
**boggled [1]**  44/6
**bomb [6]**  15/25 69/19 96/2 96/5
128/25 129/17
**bombing [5]**  32/13 40/5 58/15
83/17 85/11
**booked [1]**  116/23
**books [1]**  87/2
**border [2]**  130/4 130/9
**boss [2]**  97/13 97/25
**both [19]**  6/7 37/19 39/25 40/3
49/10 83/19 87/16 114/8 117/19
119/25 120/19 120/23 121/21
121/25 123/18 130/14 135/10
136/12 152/9
**bottom [1]**  31/14
**box [3]**  73/17 73/24 73/25
**brain [20]**  21/25 33/7 33/8 33/18
34/16 34/18 42/13 45/3 55/20
55/23 56/3 56/5 56/5 56/6 56/13
56/17 56/19 56/20 57/2 57/8
**Brandenburg [5]**  110/16 110/17
110/20 110/24 111/6
**break [4]**  57/25 58/22 118/10
142/12
**brief [4]**  58/25 72/5 72/8 72/24
**briefed [1]**  112/11
**briefing [38]**  42/5 42/17 74/13
109/17 110/2 11/9 114/2 114/4
115/13 115/14 117/24 121/11 122/1
126/21 126/22 133/8 133/13 133/20
134/4 134/24 135/4 135/17 135/19
136/18 136/19 138/15 139/3 139/24
139/25 140/5 140/5 140/8 140/11
140/15 140/20 141/24 151/22
151/25
**briefings [1]**  152/4
**briefly [6]**  5/24 6/2 107/7 107/13
121/13 152/8
**briefs [2]**  133/15 135/22
**bring [1]**  48/20
**bringing [2]**  114/19 135/1
**broad [4]**  6/5 29/5 100/10 100/11
**broader [2]**  76/22 94/20
**brought [1]**  130/13
**buckle [1]**  115/11
**building [7]**  18/19 52/9 52/11
53/8 53/19 58/4 73/14
**built [1]**  49/24
**bullet [2]**  31/13 31/14
**bunch [2]**  38/10 79/9
**burden [2]**  118/20 140/18
**burn [3]**  71/7 112/23 112/25
**burning [1]**  58/4
**bush [1]**  61/1
**business [2]**  90/20 144/13
**buttressed [1]**  40/4

**C**

**calendar [2]**  117/13 120/9
**call [6]**  15/14 23/17 45/7 57/4
96/13 144/16
**called [7]**  9/7 11/1 15/19 24/16
43/15 56/22 106/17
**came [6]**  15/13 20/12 46/3 46/5
99/6 130/8
**cameras [2]**  143/5 143/8
**campaign [4]**  74/21 75/4 75/16
109/7
**campaigning [1]**  114/8
**can [143]**  5/17 5/18 6/16 7/18
7/19 7/19 13/8 13/18 16/7 18/3
19/18 23/5 23/8 23/24 26/11 28/25
29/24 32/20 33/11 33/14 33/19
33/20 34/18 35/15 37/22 37/23
37/25 38/9 43/6 45/8 45/19 46/17
48/15 48/16 48/21 48/24 49/25
50/25 51/2 51/13 51/17 52/18 53/3
54/8 55/17 56/9 56/17 56/19 56/20
58/23 62/7 62/15 68/7 68/20 69/3

69/8 69/12 71/13 71/14 72/15
73/4 73/11 74/1 74/9 74/20 74/25
75/11 75/12 75/15 75/19 75/20 75/17
75/22 75/24 75/24 76/7 76/18
76/24 77/10 77/13 77/17 81/18
82/20 88/13 88/16 88/17 91/2
92/14 93/9 93/19 95/1 97/7 99/16
99/20 100/4 105/5 105/9 106/5
108/24 109/13 111/5 115/10 115/15
118/13 118/15 118/16 119/9 119/11
120/11 120/22 121/3 124/18 124/19
125/7 125/24 126/5 127/12 128/17
128/20 128/23 129/3 130/25 135/23
137/17 137/17 137/18 138/16
139/11 140/1 140/19 141/5 141/7
142/22 142/19 143/18 144/10
144/19 145/3 145/7 145/10 145/16
147/24 151/8 151/15 151/21
**can't [26]**  5/18 18/9 35/20 37/8
41/1 41/8 44/2 44/15 45/3 45/5
45/6 48/1 59/14 59/18 66/13 67/15
73/19 73/24 75/8 115/19 123/22
125/12 130/18 130/22 130/23
137/13
**candid [1]**  66/15
**cannot [4]**  11/25 52/22 94/13 97/7
**capable [1]**  12/11
**capacity [2]**  69/23 78/15
**Capitol [17]**  14/22 17/3 17/5
17/19 28/6 28/6 28/9 39/5 39/6
61/16 61/19 61/20 63/14 64/16
66/8 94/9 95/1
**CAPS [2]**  50/5 50/21
**car [6]**  49/3 53/22 53/24 54/2
112/16 130/1
**cards [1]**  83/9
**care [1]**  81/17
**career [2]**  22/1 71/19 85/25 88/23
**carefully [2]**  124/1 133/9
**cars [1]**  129/25
**case [79]**  4/3 6/3 6/16 7/4 18/13
27/5 33/11 33/16 38/4 38/14 39/3
46/5 46/24 47/6 49/12 57/25 60/12
62/21 64/11 66/10 69/25 73/15
73/20 74/8 80/25 81/7 82/21 82/22
85/5 87/22 92/24 101/8 106/9
106/18 108/9 109/3 109/13 113/14
113/20 114/21 114/23 115/3 115/10
115/16 116/18 116/25 117/6 117/8
117/19 117/22 121/16 121/16 121/17
121/17 122/9 122/14 122/22 123/1
127/6 127/17 127/18 127/19 129/24
130/20 131/6 131/13 131/17 131/21
131/21 132/20 132/21 137/12
137/21 138/3 138/9 147/20 148/5
148/25 150/13 153/19
**cases [33]**  32/22 35/10 35/12
36/22 44/5 45/16 45/19 45/20 46/4
66/22 70/19 71/3 75/10 107/1
109/19 111/13 111/19 112/3 112/10
112/20 112/21 113/5 113/10 114/19
121/14 121/14 121/24 123/18 125/4
133/5 133/6 133/8 150/12
**cast [1]**  75/1
**cat [1]**  144/10
**categories [6]**  8/9 100/18 108/2
108/3 108/21 144/21
**category [4]**  9/25 48/1 96/25
100/11
**causation [21]**  111/10 111/10
111/16 111/18 113/8 136/19 137/13
137/14 137/15 137/17 137/18
137/18 138/15 138/18 138/24 139/3
139/6 139/11 140/8 140/11 143/11
**cause [2]**  21/21 22/5
**caused [3]**  39/7 39/11 137/16
**causes [2]**  21/4 21/7
**caution [1]**  101/14
**center [2]**  63/25 66/3
**century [1]**  111/13
**certain [9]**  6/1 34/19 60/9 61/10
93/16 100/18 144/21 145/5 145/8

**certainly [25]**  11/14 23/25 31/18
48/1 53/5 64/16 64/19 65/11 71/24
80/9 80/25 81/13 82/18 85/12 98/6
98/9 102/12 117/13 119/8 119/21
125/4 125/25 133/9 148/23 149/10
**certainty [7]**  13/2 29/20 29/24
115/19 126/6 126/12 128/2
**certification [17]**  63/13 63/17
64/10 64/12 64/14 64/16 64/23
65/10 66/5 68/11 90/18 92/8 92/11
96/18 97/22 97/24 109/4
**certify [1]**  154/3
**certifying [1]**  97/8
**challenging [1]**  126/1
**chance [1]**  140/19
**change [2]**  18/1 81/6
**changed [1]**  117/10
**changes [1]**  117/14
**channel [1]**  105/14
**character [4]**  44/20 146/10 146/12
146/15
**characterize [1]**  60/21
**charge [6]**  69/24 70/2 148/12
148/25 149/1 149/19
**charged [4]**  94/25 143/25 148/13
148/14
**charges [1]**  41/17
**charging [2]**  143/23 144/7
**check [7]**  19/22 99/9 106/1 117/14
117/16 119/14 121/5
**checked [4]**  18/9 44/25 61/20
117/10
**checklist [1]**  50/14
**Chelsea [4]**  40/5 58/15 69/18
95/19
**Chicago [1]**  1/14
**choose [1]**  117/3
**Christmas [2]**  135/22 142/3
**Christopher [1]**  111/19
**circuit [8]**  131/21 132/2 132/3
132/11 132/17 133/5 133/5 133/6
**circuited [1]**  45/3
**circuitry [1]**  56/4
**circuits [1]**  45/11
**circumstance [5]**  28/24 36/25
111/4 125/13 128/15
**circumstances [12]**  23/2 23/3
28/20 34/2 34/20 47/5 56/21 93/9
125/14 128/16 130/25 153/20
**circumventing [1]**  44/23
**cite [5]**  37/17 82/23 82/23 127/10
133/5
**cited [4]**  82/25 109/19 121/14
121/14
**cites [5]**  82/21 121/23 121/24
121/24 132/20
**citing [1]**  111/19
**citizen [1]**  36/23
**civil [7]**  113/24 137/2 139/18
139/19 139/21 140/22 149/1
**civilian [1]**  69/23
**Claiborne [4]**  110/24 110/24 111/1
111/4
**claim [1]**  146/19
**claims [1]**  49/11
**clarification [4]**  80/16 82/8
108/20 149/7
**clarify [7]**  81/9 81/18 90/3 96/23
107/21 139/15 140/5
**clarity [1]**  19/24
**class [3]**  86/17 87/5 87/6
**classes [4]**  87/3 87/9 96/13 96/15
**classic [1]**  44/9
**classified [3]**  76/16 79/3 80/13
**clear [9]**  12/2 12/17 23/4 48/16
61/18 80/22 96/5 107/14 149/16
**clearly [2]**  77/1 101/21
**clerk [2]**  111/11 121/13
**clerked [1]**  67/2
**clerked for [1]**  67/2
**click [1]**  20/14
**clicked [1]**  19/25

client [1] 88/13
clients [4] 18/7 35/24 52/23 130/8
clinical [20] 13/25 13/25 14/1 14/2 14/3 14/4 14/7 14/7 19/9 19/23 25/20 27/16 27/17 27/21 27/23 28/17 39/25 47/14 50/1 50/8
clinically [2] 11/22 48/18
Clinician [2] 49/9 50/22
close [3] 65/15 65/21 135/1
closely [2] 83/10 140/9
closer [1] 135/22
closing [1] 149/10
coast [2] 74/7 120/14
coauthor [1] 19/21
coauthored [1] 49/15
cocounsel [1] 140/22
cogent [2] 43/20 44/2
cognitive [3] 22/2 41/20 42/17
collateral [2] 9/10 34/14
colleagues [3] 109/11 113/5 117/17
collected [1] 34/13
colloquial [1] 150/1
colloquy [1] 117/20
COLUMBIA [12] 1/1 64/9 64/20 64/22 64/24 65/14 65/18 68/15 68/17 109/2 115/22 131/21
combat [4] 11/7 56/23 56/24 57/4
combination [2] 15/8 24/13
combined [1] 74/4
come [17] 15/15 37/22 40/23 62/14 63/1 65/24 74/17 76/24 91/8 98/13 108/24 110/6 113/13 121/3 138/16 141/15 152/20
comes [7] 13/20 44/12 44/17 52/9 124/14 139/6 149/23
comfortable [2] 115/16 141/19
coming [5] 50/15 57/25 84/14 84/15 95/11
comment [1] 136/25
commentary [1] 111/14
commentators [1] 111/17
commercials [1] 114/9
commit [4] 43/9 109/25 112/16 131/25
commits [1] 112/17
committed [2] 116/3 153/19
committing [2] 29/7 125/8
common [3] 90/20 111/13 112/18
commotion [2] 41/11 41/12
comparators [1] 125/6
comparison [1] 125/5
compartment [1] 130/1
compelled [4] 31/3 31/12 32/5 32/8
complaint [1] 104/19
complete [2] 150/4 151/23
completed [1] 135/4
completely [7] 18/9 20/21 44/20 54/23 61/20 61/23 116/2
component [6] 41/16 65/19 85/24 86/4 93/23 95/8
components [5] 71/10 85/19 92/4 95/4 95/4
computer [1] 56/1
Concealed [2] 26/9 26/13
concern [21] 17/10 64/8 64/12 66/16 66/18 67/14 75/2 75/6 75/11 78/12 98/10 101/1 102/25 108/25 114/14 122/16 122/20 123/5 128/19 150/4 151/11
concerned [2] 94/2 150/18
concerning [1] 128/10
concerns [5] 63/11 65/2 68/11 74/16 128/16
concluded [4] 110/5 131/5 131/14 153/22
conclusion [12] 19/12 30/6 30/7 40/16 40/23 66/24 113/11 114/20

124/10 126/5 149/18 149/24
concurred [4] 40/7 104/4 117/10 123/10 124/4
concurrent [1] 39/10
condition [2] 46/18 101/12
conditions [5] 6/8 22/4 22/10 22/11 46/15
conduct [13] 19/14 19/19 20/7 23/8 26/7 34/5 42/24 49/17 93/14 93/16 93/17 93/18 93/25
conducted [6] 5/4 23/10 25/9 35/25 37/9 102/19
conducting [2] 19/23 22/6
confer [6] 4/17 73/7 73/10 76/6 145/7 146/16
conference [7] 118/18 118/24 134/21 141/6 151/6 152/25 153/16
conferencing [1] 119/1
conferred [1] 104/23
confident [2] 66/7 66/9
confidential [1] 71/1
confirm [3] 19/12 33/20 69/16
confirmation [6] 26/20 58/14 83/16 85/6 85/10 88/15
confirmed [1] 106/7
confirming [1] 108/11
confront [1] 99/25
confronted [1] 57/12
confronts [1] 57/15
confuse [1] 132/14
confused [2] 61/14 150/14
confusion [1] 150/4
congratulations [1] 52/10
connected [3] 68/25 69/1 69/2
consciousness [6] 12/18 12/20 13/6 13/7 21/24 39/8
consequence [1] 53/14
consequences [1] 146/22
consider [12] 21/20 22/19 23/2 23/3 29/7 29/24 46/4 50/5 50/6 50/10 110/8 117/7
considered [5] 49/9 76/13 79/14 84/25 149/13
considering [1] 49/21
considers [2] 102/2 102/20
consistency [1] 50/3
consistent [19] 15/2 20/9 28/20 29/25 30/1 30/12 30/21 31/10 32/1 32/4 32/14 34/20 39/24 40/3 40/12 47/13 50/7 54/17 109/13
consolidated [1] 133/20
constantly [1] 65/25
constitutes [1] 154/4
Constitution [1] 1/23
contact [1] 99/21
contain [1] 87/18
contained [1] 27/5 89/17
CONTENTS [1] 3/1
context [5] 49/10 80/21 90/7 110/11 113/6
contextual [1] 147/21
continuance [6] 67/5 67/7 67/16 107/9 107/12 108/24
continuances [1] 115/3
continue [12] 5/6 16/12 47/25 62/14 63/4 63/8 63/20 111/6 114/18 114/23 126/16 147/17
continued [5] 1/19 2/1 3/4 5/15 103/3
continuing [2] 48/6 101/4
continuum [4] 10/16 10/24 59/14 59/19
contrary [1] 89/6
contributing [1] 137/18
control [1] 131/22
controls [3] 36/20 129/15 129/18
controversial [2] 85/14 89/14
conversation [3] 18/6 37/4 78/10
conversations [3] 98/20 122/18 122/24
conversely [1] 58/6
convict [1] 125/12

convicted [1] 125/7
convictions [1] 149/12
convince [3] 111/6 122/4 126/16
convinced [7] 42/3 109/1 124/16 126/11 126/14 139/11 140/1
cooperate [1] 130/5
core [2] 96/12 101/7
correct [40] 6/4 6/10 6/15 6/17 6/21 7/3 7/13 7/22 7/25 8/19 8/24 10/9 13/19 13/21 15/9 15/10 16/14 17/5 17/6 17/6 19/5 28/10 28/11 29/4 30/14 30/17 40/9 40/13 47/7 50/1 68/3 72/25 106/6 110/23 127/8 127/24 131/2 134/8 139/15 154/4
corroborate [3] 58/14 58/17 83/12
corroboration [3] 58/19 69/16 95/5
corroborative [4] 85/8 90/12 123/9 123/17
cortex [3] 56/14 56/18 57/14
could [56] 17/23 21/6 32/25 33/15 33/23 36/13 36/14 36/15 44/6 44/18 46/10 48/15 55/2 56/9 58/17 59/23 60/8 70/24 72/7 73/25 73/25 74/18 78/24 81/2 81/24 84/11 94/5 102/12 103/2 105/14 109/24 111/21 116/19 116/24 117/11 117/23 119/1 120/5 120/9 120/10 120/15 124/21 134/1 134/13 135/8 135/20 137/20 137/21 138/8 139/21 140/2 140/5 143/12 144/1 152/10
couldn't [4] 72/23 92/20 114/6 124/21
counsel [18] 4/5 33/10 79/16 81/8 81/18 84/12 84/15 99/8 101/20 102/22 104/1 104/18 104/24 105/3 123/16 134/19 151/2 151/16
counsel's [1] 123/1
count [9] 113/22 113/22 113/25 136/25 136/25 137/2 137/2 137/5 148/25
counted [1] 129/19
counterexamples [1] 35/14
counting [1] 65/20
country [2] 74/9 141/16
country's [1] 75/6
couple [4] 23/14 49/15 109/16 137/11
couriers [2] 38/5 130/10
course [6] 60/17 79/11 85/25 86/16 99/15 116/8
courses [1] 86/16
court [70] 1/1 1/22 1/22 30/25 31/8 45/16 51/5 51/7 51/11 63/10 67/5 67/6 67/8 67/9 67/10 67/11 67/23 67/24 68/10 71/14 74/14 74/16 75/11 76/7 80/15 82/10 82/10 89/10 91/1 91/2 110/3 112/4 112/8 117/15 118/16 119/4 120/10 125/9 126/18 127/1 127/4 130/15 130/18 130/20 130/20 131/8 131/10 131/11 131/12 131/16 131/22 132/3 132/5 132/14 132/16 132/17 132/24 132/25 136/19 136/20 140/22 141/8 145/20 148/3 149/5 149/16 149/18 152/4 154/3 154/13
Court's [4] 37/15 116/14 117/9 117/13
courthouse [1] 65/2
courtroom [1] 67/1
courts [2] 1/23 149/12
cover [2] 89/3 97/4
covering [1] 86/13
covers [3] 92/14 92/14 96/22
CR [1] 117/20
craziness [1] 68/16
credentials [1] 128/8
credit [2] 77/22 91/17
crescendo [1] 75/3
crime [4] 109/25 111/25 125/12

**C**

crime... [1]  149/14
crimes [2]  22/23 125/8
criminal [5]  1/3 4/3 62/21 87/22
111/20
criteria [3]  7/22 22/14 47/10
criterion [1]  7/8
criticisms [1]  105/8
CRM [1]  1/12
cross [5]  3/4 5/15 15/12 42/6
42/18 70/4 86/5 88/15 92/3 123/25
143/6 143/14 143/22 145/12
cross-examination [7]  3/4 5/15
70/4 86/5 88/15 92/3 145/12
cross-examining [3]  143/6 143/14
143/22
crowd [3]  93/23 94/5 113/7
crowded [1]  87/13
culpability [3]  125/8 125/11
125/16
cumulative [1]  85/21
current [5]  7/1 22/11 90/24
139/12 147/14
currently [2]  24/1 142/5
curriculum [1]  77/23
custodian [1]  90/22
cut [2]  60/11 84/5

**D**

D.C [4]  132/2 132/3 132/11 133/4
data [3]  58/16 58/16 58/18
database [1]  105/10
databases [2]  105/9 106/1
date [12]  67/20 76/21 87/5 105/7
107/2 107/3 114/14 115/24 141/22
141/25 152/12 153/21
dated [2]  105/7 154/10
dates [4]  104/4 104/5 114/12
136/18
DAUBERT [16]  1/9 5/9 5/10 16/4
83/23 118/4 118/4 118/6 118/11
120/18 126/13 127/1 131/4 131/18
131/19 133/17
David [1]  2/3
day [50]  30/21 31/9 32/4 38/17
41/1 41/6 41/8 63/13 64/14 64/15
64/22 64/22 65/8 65/9 65/15 68/10
74/23 74/24 75/1 75/2 86/19 89/6
93/14 94/4 94/5 94/6 94/21 95/17
101/13 101/14 109/2 109/3 109/6
118/21 119/24 120/13 122/25 123/8
123/18 123/24 123/25 124/20 126/1
139/24 148/14 148/23 148/24
150/20 153/18 154/10
daylight [2]  110/1 110/1
days [6]  11/7 44/10 65/16 119/12
119/24 152/10
DC [5]  1/5 1/16 1/24 106/18
132/17
deadline [1]  114/22
deal [2]  24/5 36/9
dealing [2]  111/4 138/3
dealings [1]  144/13
deals [2]  8/18 127/16
dealt [5]  75/20 127/19 127/20
143/8 151/8
Dearborn [1]  1/13
death [2]  7/21 125/10
debriefed [1]  130/7
debriefs [1]  130/7
debunks [1]  127/25
decades [1]  27/17
December [11]  117/1 117/8 117/13
134/14 134/15 134/18 136/18 142/1
142/2 142/10 142/14
December 12th [1]  142/10
December 16th [1]  142/2
December 5th [2]  134/14 134/15
decide [6]  35/9 107/25 118/17
122/25 138/4 139/7
decided [4]  68/1 72/23 130/18

130/20
decision [11]  55/6 55/7 56/10
105/20 112/4 112/7 123/2 123/3
123/4 127/4 152/6
decisions [7]  43/20 44/3 56/7
59/18 66/21 143/23 144/7
declaration [1]  74/5
dedicated [1]  67/7
deem [2]  80/13 148/7
deep [1]  104/11
deeply [1]  44/18
defect [2]  109/23 109/24
defendant [26]  1/7 2/3 13/20 32/2
83/4 99/17 109/24 117/20 121/15
121/21 131/7 131/25 143/4 143/9
143/13 143/21 144/12 145/19
145/20 145/23 146/4 146/6 146/17
146/21 146/22 146/25
defendant's [6]  77/2 112/6 132/6
132/25 133/1 145/22
defendants [1]  143/6
defender [5]  2/3 2/7 4/12 4/13
67/7
defending [1]  49/7
defense [68]  4/15 33/10 33/12
33/13 33/14 33/16 40/19 40/22
42/12 73/5 76/19 79/15 81/7 83/8
84/8 84/12 84/15 87/20 89/5 89/16
92/13 93/21 94/11 99/7 101/9
101/20 102/22 104/1 104/18 104/24
105/3 106/5 109/14 110/11 110/16
110/18 115/19 119/6 120/1 121/16
125/2 125/17 134/12 135/6 137/12
137/12 137/21 139/5 143/10 143/16
144/14 145/14 145/16 146/3 146/4
146/8 146/11 146/18 146/25 147/1
147/1 147/6 147/6 147/7 147/24
150/20 151/2 151/16
defense's [2]  80/16 147/14
defenses [2]  42/19 109/23
defer [12]  69/13 143/1 143/2
143/11 144/2 144/3 144/8 145/1
145/10 146/14 147/2 151/14
define [1]  49/1
defined [2]  8/8 15/16
definite [1]  17/9
definitely [6]  10/18 31/22 46/1
60/16 63/3 125/3
definition [1]  43/11
degree [3]  60/9 85/3 88/19
delay [3]  66/19 72/7 72/21
deliberating [1]  63/22
delving [1]  98/4
denied [2]  11/21 21/23
deny [6]  144/18 146/5 146/8
146/19 146/23 148/6
denying [1]  11/19
departure [3]  98/1 98/8 98/12
depends [4]  12/23 12/25 49/1 86/7
depositions [1]  5/10
derogatory [1]  106/2
describe [5]  16/25 32/25 92/13
104/9 150/7
described [9]  10/2 32/10 35/5
91/16 92/20 97/1 123/7 123/23
149/18
describes [4]  16/14 104/1 104/3
104/8
describing [4]  50/16 84/15 105/12
122/18
description [7]  15/1 50/25 93/4
93/5 99/7 105/3 123/19
deserve [5]  52/12 53/7 53/10
53/13 54/4
deserves [2]  53/13 54/2
desire [1]  41/12
desiring [2]  52/3 132/8
detail [5]  24/3 50/16 91/21
123/15 123/23
details [1]  77/14
determination [2]  28/16 128/13

determinations [2]  17/21 57/8
determine [12]  9/18 17/16 19/14
20/4 20/9 22/9 23/18 27/14 29/11
29/20 29/24 46/14 120/10 132/15
132/20 136/7
determined [1]  18/21
determines [1]  23/16
determining [1]  131/24
develop [2]  71/9 82/2
developed [3]  56/22 79/24 111/8
diagnose [4]  8/12 47/24 48/2 48/3
diagnosed [1]  47/22
diagnoses [2]  6/20 46/14
diagnosis [15]  7/7 8/15 39/2 39/2
39/3 39/4 39/4 39/16 40/15 46/16
46/23 47/9 83/20 83/21 85/21
diagnostic [6]  8/20 9/19 27/10
34/13 43/25 47/14
diagnostically [3]  7/11 39/15
50/13
Diaz [5]  37/17 37/25 38/4 127/17
129/24
dicta [1]  131/18
did [117]  8/12 9/3 9/20 10/19
10/19 11/3 12/21 13/22 13/22 14/9
14/10 14/12 14/12 14/17 14/24
15/3 15/12 15/15 17/18 17/20
19/12 19/14 19/16 19/18 19/19
19/24 20/11 20/12 20/13 20/24
21/2 21/4 21/7 21/10 21/17 21/21
21/23 22/1 22/1 22/4 22/8 22/13
22/15 22/17 22/19 23/12 24/4 24/9
25/12 25/15 25/17 25/19 25/23
25/25 26/2 26/4 26/6 26/7 26/8
26/10 26/14 26/16 26/19 26/21
27/14 27/19 28/2 28/15 28/19
28/20 29/7 29/8 30/12 34/12 34/14
36/20 37/9 42/12 47/15 47/17 48/3
48/12 49/12 49/19 49/23 51/24
52/6 52/13 53/10 53/12 53/21
54/13 58/15 61/6 68/9 69/18 71/8
71/19 74/16 76/6 78/18 81/19
83/12 88/18 89/14 101/19 106/7
113/2 117/14 117/20 117/21 121/13
128/24 129/1 130/12 131/7 152/16
didn't [21]  20/6 20/18 20/23 24/3
49/15 49/16 66/17 68/19 81/19
82/1 83/14 90/2 93/5 95/12 95/14
98/3 99/14 129/1 131/19 148/4
149/4
die [1]  124/9
Diego [3]  67/9 67/10 130/3
differ [1]  69/12
difference [3]  89/18 117/4 132/7
different [43]  6/6 8/8 8/10 10/17
11/2 15/17 15/19 21/16 28/14
28/14 33/9 35/7 36/4 36/12 43/21
46/15 47/4 51/8 54/13 55/24 63/24
66/21 70/18 71/20 84/17 85/9
106/1 111/4 112/3 112/20 113/4
113/14 113/22 113/24 125/6 127/20
133/3 137/1 137/17 138/24 140/2
149/8 150/6
differential [3]  46/13 46/16 47/9
differently [1]  29/15
difficult [9]  10/21 10/21 13/8
18/12 53/15 54/7 60/20 115/23
148/2
digging [1]  111/11
diminished [3]  125/9 125/15
125/15
dire [4]  75/9 75/22 75/25 151/17
direct [3]  80/25 135/13 148/17
directed [1]  5/8
directly [4]  7/18 82/21 93/24
107/18
disability [5]  42/7 42/11 42/11
49/11 49/25
disagree [1]  101/10
disaster [2]  31/24 35/22
disclosure [1]  30/21
disconnected [2]  55/20 68/24

discoverable [1]  89/20
discovered [1]  115/4
discovery [14]  73/2 87/22 101/7
106/24 108/6 108/7 109/9 109/10
109/15 118/11 135/16 143/15 151/4
151/11
discovery-type [1]  118/11
discuss [3]  34/8 43/6 56/23
discussed [8]  11/20 45/25 60/13
75/8 85/4 91/2 118/3 140/11
discussing [1]  41/2
discussion [9]  27/10 38/22 59/5
73/12 78/13 87/11 94/20 95/10
98/6
discussions [2]  74/15 98/4
dishonest [1]  41/7
disorder [17]  8/16 8/22 10/25
11/1 21/1 38/17 43/15 46/17 46/19
47/1 47/4 47/11 47/23 47/23 48/4
137/2 149/1
disorders [12]  6/8 6/21 8/2 8/5
8/7 8/7 8/9 8/9 8/11 8/13 22/8
46/15
disoriented [1]  61/13
dispersal [1]  93/23
dispute [1]  150/19
disputed [2]  70/2 122/23
disruption [2]  9/5 39/7
dissociate [1]  18/7
dissociated [3]  51/18 51/25 52/2
dissociating [4]  12/4 21/16 48/14
52/21
dissociation [32]  8/24 10/16
12/24 12/25 16/20 16/24 17/17
19/13 19/15 20/5 20/10 20/17
20/19 20/20 20/25 21/5 21/8 21/22
22/5 22/22 43/11 43/18 44/22
45/25 50/17 55/4 59/13 61/10
61/22 62/3 62/6 62/8
dissociative [58]  6/11 8/2 8/9
8/13 8/14 8/18 8/19 8/21 10/24
10/25 11/11 12/16 13/2 13/4 13/5
17/2 18/14 19/16 20/16 20/19 21/1
39/5 39/7 41/18 41/19 43/7 45/18
46/11 46/16 46/17 46/24 47/1 47/1
47/3 47/3 47/6 47/10 48/11 48/21
48/24 51/14 52/12 52/16 53/5
53/10 55/11 55/18 58/5 59/7 59/11
61/2 61/6 61/7 61/11 61/17 83/22
121/19 124/15
dissociator [1]  21/15
dissuasive [1]  111/22
distinction [1]  127/20
distinctive [2]  11/14 11/15
distracted [1]  65/23
DISTRICT [23]  1/1 1/1 1/10 1/23
2/4 2/8 64/9 64/20 64/21 64/24
65/14 65/18 67/10 68/15 68/17
109/2 115/21 131/20 132/5 132/13
132/16 132/23 132/25
disturbance [9]  22/2 31/3 31/12
32/5 32/9 139/18 139/19 139/21
140/3
disturbing [1]  99/25
dives [1]  53/22
diving [2]  49/3 53/24
division [1]  76/14
do [148]  5/2 9/16 10/4 10/6 12/6
12/8 12/13 12/18 12/19 13/22
13/22 14/9 14/10 14/24 16/23
17/12 20/20 21/4 21/7 22/4 22/7
22/13 22/15 22/19 24/6 24/11
24/12 24/13 25/2 25/3 27/22 29/20
32/2 32/3 32/6 32/8 32/24 33/12
33/16 33/18 33/22 35/2 37/21 44/6
44/20 45/16 45/20 45/22 47/7
49/15 49/15 50/20 52/6 53/22
54/15 56/13 59/9 62/24 62/24 63/5
63/9 67/18 72/19 73/25 76/22 78/9
79/4 79/20 84/19 84/20 85/2 85/19

88/8 88/10 88/12 88/12 90/24 92/7
115/7 115/13 95/11 96/15 96/21 96/23
100/8 100/25 101/3 101/15 101/19
107/23 109/4 109/14 110/25 115/20
116/6 118/8 118/8 118/9 118/13
118/14 118/18 120/7 120/10 120/15
120/16 121/8 123/3 129/1 129/14
130/25 131/19 133/12 133/19
134/13 134/16 134/25 135/8 137/11
139/4 139/9 139/16 139/23 141/6
141/6 141/12 141/13 141/18 142/11
142/11 142/12 142/15 142/20
143/18 143/18 144/14 144/24
144/24 144/25 145/2 145/7 145/14
145/20 146/8 148/5 148/10 148/15
150/2 152/20
doctor [2]  122/6 128/5
document [3]  101/24 103/25 108/17
documents [4]  84/13 102/23 104/17
108/19
does [40]  7/18 8/3 9/13 27/3
32/21 44/22 46/12 47/10 53/7 53/9
53/10 53/12 54/2 55/21 64/23 84/2
87/17 90/4 92/19 101/10 102/24
104/9 120/16 121/23 122/25 123/25
124/10 124/23 131/16 136/5 139/18
139/22 143/24 144/15 145/13 146/4
146/11 146/18 146/23 148/9
doesn't [27]  4/18 18/23 24/5 36/5
37/7 41/7 41/20 43/24 53/18 54/12
54/24 65/17 67/11 68/8 68/12
79/10 85/13 89/1 91/20 102/9
106/25 110/17 123/9 125/11 127/10
145/20 146/8
doing [30]  14/4 16/16 16/24 17/1
34/4 36/2 42/15 49/4 49/5 54/5
54/6 54/16 64/21 72/15 74/9 93/5
99/19 114/14 116/3 117/7 118/24
119/5 119/6 126/1 134/20 136/4
137/23 141/15 141/19 148/19
DOJ [2]  1/12 1/15
DOJ-CRM [1]  1/12
DOJ-USAO [1]  1/15
don't [132]  5/6 10/22 12/10 12/10
12/12 16/4 16/10 20/6 23/21 23/24
23/25 24/4 24/9 24/19 24/23 24/24
25/6 27/1 31/5 35/23 37/8 37/10
41/23 42/15 42/22 43/6 46/1 49/5
50/20 52/12 53/15 54/4 54/16
55/12 56/7 60/2 61/16 62/4 62/11
63/23 64/6 64/7 65/6 65/11 66/23
68/1 68/4 69/7 70/3 70/25 71/22
72/18 72/20 73/13 73/23 74/1 75/7
75/18 76/19 79/3 79/25 80/8 80/9
80/9 82/4 84/22 86/22 87/25 88/4
88/6 88/8 88/9 88/9 88/10 89/8
89/10 91/10 92/9 92/10 94/1 94/3
94/7 94/15 94/19 98/1 98/7 98/8
98/23 101/9 102/6 102/11 102/25
105/5 105/9 105/11 105/12 106/16
106/19 108/23 110/13 110/15 113/1
113/3 113/25 115/5 115/9 117/18
119/10 119/14 120/5 120/7 121/2
121/17 122/3 128/23 133/11 134/10
135/21 136/9 137/19 139/8 139/17
140/1 140/6 141/9 141/15 144/16
148/21 148/22 150/16 152/11
152/18
Donald [1]  14/22
done [30]  19/18 35/4 36/13 36/14
36/18 37/19 44/7 63/14 79/17
81/21 91/23 95/13 99/23 99/24
100/5 103/9 106/12 115/10 115/11
115/15 121/8 129/7 129/8 129/13
129/15 129/18 129/21 131/4 141/23
142/19
door [5]  17/12 17/14 137/7 137/24
138/16
doors [1]  36/4
double [2]  116/18 116/23
doubt [2]  101/9 148/22
down [11]  13/18 51/19 52/24 103/3

103/3 112/23 112/23 112/25 112/25
112/25 114/18
Dr [29]  4/23 5/17 26/22 30/20
38/9 39/21 43/6 45/14 46/10 59/5
62/15 62/15 62/25 71/16 71/23
83/9 84/2 85/16 86/6 88/8 88/17
109/20 122/5 123/7 123/10 124/19
126/2 126/16 136/17
Dr. [8]  4/15 7/1 79/20 82/1 85/23
85/25 123/22 124/7
Dr. Best [4]  7/1 79/20 123/22
124/7
Dr. Best's [1]  82/1
Dr. Rylant [2]  85/23 85/25
Dr. Suzanne [1]  4/15
drag [1]  114/20
dragged [1]  114/21
draw [2]  33/1 41/10
drawing [1]  32/18
driving [1]  20/23
drug [3]  38/5 127/15 130/9
drugs [3]  130/9 130/11 130/13
DSM [10]  6/19 6/23 7/2 8/1 8/18
43/24 46/11 47/8 50/12 50/15
DSM-V [3]  7/2 46/11 47/8
due [2]  142/13 152/10
dug [1]  112/10
during [11]  6/7 54/14 54/22 63/16
65/22 84/1 85/7 118/8 118/10
118/20 119/11
duty [2]  28/23 32/13

**E**

each [9]  50/5 50/6 54/21 77/17
98/14 108/3 109/19 113/1 152/5
earlier [7]  15/16 15/18 22/13
30/20 72/8 76/8 78/9
earliest [1]  116/23
early [5]  105/23 106/24 117/8
117/13 119/19
ease [1]  137/21
easier [2]  118/25 119/22
East [1]  83/18
easy [1]  74/8
ebb [1]  61/22
ECF [3]  80/24 110/25 131/24
educated [1]  121/21
education [2]  14/5 127/13
effect [2]  79/22 137/19
effectiveness [1]  98/3
effects [1]  6/14
effort [1]  66/19
Eight [1]  51/11
either [9]  12/17 21/3 26/11 47/18
94/19 118/7 123/12 141/7 143/1
election [20]  63/12 64/1 64/22
64/22 65/3 65/8 65/9 65/15 65/15
65/23 65/24 68/14 68/17 74/14
109/2 109/4 109/6 114/8 126/8
129/2
elections [1]  64/9
element [2]  110/7 149/19
elements [1]  91/3
elicit [1]  146/23
Elizabeth [1]  2/7
else [18]  21/19 36/14 40/14 44/11
48/19 48/19 55/15 72/20 87/7
107/6 108/23 116/4 137/8 137/9
138/2 143/24 151/20 152/15
else's [1]  130/24
email [5]  71/12 81/1 92/2 100/15
121/6
embedded [2]  70/12 71/5
emotion [2]  44/23 44/23
emotional [11]  10/14 13/14 44/8
44/11 45/2 45/13 55/7 55/21 60/7
60/8 60/11
emotionally [1]  52/3
emotively [1]  44/16
employment [1]  91/10
encode [4]  45/12 59/15 59/24
61/12

**E**

encourage [2]  145/2 146/15
encouragement [5]  110/19 111/18
 111/24 112/1 112/20
encouragements [1]  111/22
end [6]  10/24 16/15 85/21 102/24
 135/9 153/16
ended [5]  80/20 107/13 138/19
 139/11 139/20
ending [1]  114/18
enforce [1]  107/10
enforcement [31]  15/24 29/6 29/6
 29/8 29/22 30/9 30/12 30/22 31/11
 31/17 31/18 33/24 34/1 39/22
 40/13 54/25 65/12 69/23 73/2
 76/16 79/1 80/13 94/12 104/2
 126/3 129/5 129/6 129/17 139/23
 145/12 147/5
engage [5]  55/6 55/7 59/17 99/24
 132/8
enough [8]  27/8 37/11 37/25 46/6
 68/22 100/23 125/11 138/3
ensure [1]  104/11
enter [1]  61/6
entering [2]  17/5 17/19
entertain [1]  63/1
entire [4]  22/9 34/9 103/4 131/13
entirely [10]  8/10 11/2 46/2
 81/25 83/11 86/7 90/9 131/14
 150/21 151/2
entitled [4]  86/9 93/3 131/25
 154/5
entrance [1]  113/12
entrapment [2]  146/3 146/4
enumerate [1]  91/23
enumerated [1]  92/12
enumerating [1]  107/20
environment [4]  39/9 43/13 59/23
 60/3
envisions [1]  133/19
equally [1]  133/6
equivalent [1]  94/14
erred [1]  132/5
error [1]  132/16
especially [3]  56/3 65/20 130/14
essence [1]  34/4
essentially [5]  77/20 77/21 77/22
 77/24 79/9
estimate [1]  51/10
ethical [2]  86/10 92/21
ethics [6]  86/3 92/15 92/17 92/19
 93/6 93/13
Eugene [2]  2/4 2/6
evaluate [2]  37/1 37/5
evaluated [2]  10/7 33/19
evaluating [2]  29/3 52/24
evaluation [12]  14/1 15/18 23/1
 32/16 32/19 33/22 38/12 50/18
 80/21 85/3 104/20 105/19
evaluations [9]  19/11 23/9 36/1
 83/25 84/3 84/6 92/1 96/18 105/1
even [24]  11/25 11/25 28/22 29/21
 51/24 51/25 53/11 53/18 55/7
 56/22 65/14 70/1 73/14 73/19
 73/22 76/19 103/2 111/21 115/23
 122/25 123/5 125/23 131/14 139/21
evening [1]  118/10
event [19]  9/5 9/8 10/5 11/16
 28/24 31/12 31/20 31/21 46/22
 47/2 47/5 47/12 47/25 54/14 54/22
 56/24 59/13 60/17 150/22
events [24]  21/9 21/12 22/20 41/6
 41/8 48/9 51/19 51/25 59/16 60/14
 75/1 79/25 88/14 95/16 99/25
 101/11 101/13 109/6 123/7 123/19
 123/24 123/24 126/4 148/1
ever [5]  21/11 21/24 50/17 131/16
 143/16
every [8]  24/22 33/10 33/15 101/9
 115/25 116/1 137/23 137/24
everybody [2]  76/23 140/16

everyone [9]  48/13 52/10 73/9
 130/5
everything [9]  15/4 45/5 45/6
 63/18 81/2 114/24 122/12 135/1
 145/2
evidence [37]  12/21 17/15 22/2
 32/7 35/3 41/12 41/24 42/20 88/6
 110/5 112/6 115/4 124/2 130/21
 130/22 130/24 132/18 132/19 134/7
 137/8 143/4 143/5 143/19 143/24
 144/13 146/7 146/10 146/12 146/15
 146/18 146/21 146/23 147/21
 147/25 148/4 151/1 151/3
evolved [1]  111/7
ex [6]  82/22 82/24 83/3 152/16
 152/17 152/19
exact [3]  48/14 143/5 143/7
exactly [10]  38/19 50/12 59/22
 87/14 92/20 122/17 123/23 125/21
 137/19 149/18
examination [14]  3/4 3/5 3/6 5/15
 43/4 59/3 70/4 82/5 83/22 83/23
 86/5 88/15 92/3 145/12
examined [3]  83/10 131/13 131/13
examining [4]  57/1 143/6 143/14
 143/22
example [25]  8/17 11/4 11/9 18/13
 24/15 43/8 44/9 44/9 49/3 52/19
 53/6 54/7 57/11 60/24 80/6 93/3
 93/19 100/2 105/6 111/17 124/7
 125/7 128/22 129/14 149/12
examples [4]  11/5 44/12 82/25
 127/15
except [2]  24/6 98/4
excessive [3]  93/2 93/20 94/13
exchange [1]  108/8
exchanges [1]  107/19
exclude [6]  21/21 132/9 134/7
 147/4 148/8 151/1
excluded [1]  147/22
excluding [1]  132/5
excuse [3]  51/6 58/23 62/15
executive [10]  43/14 55/19 55/23
 56/5 56/15 59/6 59/6 59/10 59/17
 60/6
exemplifies [1]  127/25
exhibits [6]  73/6 151/6 151/8
 151/13 152/4 152/9
exist [4]  25/2 37/7 57/18 57/20
existed [1]  101/13
expect [8]  83/23 85/15 86/4 87/10
 91/8 98/24 102/12 144/17
expecting [1]  65/13
expedition [1]  105/17
expeditions [2]  101/2 101/2
experience [55]  5/9 14/2 14/6
 19/8 19/8 20/6 21/11 21/13 27/12
 27/16 27/17 27/21 27/23 28/18
 29/25 30/7 30/9 30/13 30/23 31/11
 31/17 31/25 32/12 32/17 32/21
 33/1 33/12 35/6 37/24 38/2 39/10
 40/1 40/3 40/4 45/4 45/6 45/15
 45/15 47/15 48/18 53/11 55/8 55/9
 56/2 89/1 96/2 120/18 126/3
 127/13 128/24 129/21 130/4 130/9
 130/11 131/1
experienced [12]  7/10 7/19 7/20
 9/1 9/3 20/19 33/5 38/25 56/24
 71/6 71/7 77/3
experiences [7]  11/6 19/16 20/16
 21/15 50/16 62/7 85/20
experiencing [14]  7/12 7/16 8/20
 10/6 10/13 19/13 20/3 21/9 47/4
 55/4 56/17 57/9 62/2 94/24
experiential [7]  32/17 33/21 35/8
 39/20 125/24 129/3 129/14
experimental [1]  125/23
expert [37]  4/15 37/25 39/22 51/3
 69/15 70/4 71/7 71/25 75/2 85/23
 88/20 89/13 98/5 101/12 120/7
 120/9 120/21 121/1 121/1 127/12

127/14 127/21 128/1 128/11 129/4
 129/8 129/12 130/1 131/4 132/1
 132/6 132/14 132/17 132/18 132/25
 136/17 149/25
expert's [2]  16/4 95/3
expertise [5]  6/3 30/3 31/18
 122/7 129/4
experts [18]  24/6 37/16 37/16
 39/20 95/6 117/11 117/14 118/3
 118/15 119/14 119/17 120/1 120/22
 127/24 133/20 135/23 140/6 140/12
explain [6]  49/25 55/17 105/13
 124/4 136/13 145/17
explained [1]  31/1
explaining [2]  30/25 147/13
explains [1]  41/1
explanation [1]  54/19
explanations [1]  83/22
explosion [11]  14/24 15/1 27/13
 28/3 29/13 29/16 30/10 40/12 96/2
 125/21 128/22
explosions [4]  30/24 40/2 95/10
 95/21
explosive [1]  15/12
express [2]  68/6 113/25
expressed [1]  17/10
expressing [3]  13/13 34/24 35/1
expression [2]  48/14 121/19
expressions [2]  10/14 18/1
extended [1]  11/5
extension [1]  118/17
extent [34]  17/10 41/10 43/13
 59/23 78/23 79/13 80/10 80/15
 83/7 83/24 87/17 90/11 90/13
 90/16 93/12 97/23 99/9 99/12
 108/10 109/23 111/9 122/2 122/9
 122/14 122/21 124/3 124/24 136/20
 140/22 144/3 144/16 147/20 149/24
 150/7
extreme [4]  10/24 11/4 11/5 11/9
extremely [2]  57/13 70/24
eye [1]  48/22
eyed [1]  48/11
eyes [1]  18/14

**F**

F.3d [1]  132/22
face [5]  17/24 17/25 44/19 48/14
 113/8
faced [2]  31/11 31/20
facing [1]  114/15
fact [24]  4/23 35/4 38/16 42/12
 52/7 72/5 72/22 83/16 96/20
 104/11 108/3 113/9 113/10 114/3
 114/5 114/11 122/9 122/14 123/18
 124/24 125/23 131/24 132/2 132/20
factors [1]  89/24
factory [1]  112/24
facts [2]  147/19 150/7
fair [19]  6/13 24/2 27/8 30/13
 37/11 41/14 46/6 68/22 72/20
 72/25 75/17 75/24 100/23 115/23
 116/2 131/7 131/14 141/5 149/2
fairly [5]  32/22 101/10 115/15
 120/23 140/16
faking [3]  23/17 49/22 49/24
fall [3]  9/25 10/19 48/1
falls [3]  12/8 39/20 56/8
familiar [10]  13/17 15/22 15/24
 19/20 31/19 57/17 57/19 103/22
 127/11 129/20
famous [1]  113/12
fantasy [1]  132/8
far [9]  11/10 50/4 74/14 101/7
 110/3 110/9 111/8 111/12 122/17
fashion [1]  150/17
fast [1]  72/15
favorable [1]  14/16
FBI [54]  40/7 69/14 69/22 69/24
 70/2 70/19 70/23 71/13 71/17 73/3
 76/1 76/3 77/9 79/10 79/11 80/16
 84/1 84/19 86/20 86/24 88/1 88/2

**FBI...** **[32]** 88/22 88/23 88/23
88/25 89/1 89/7 89/8 89/19 89/23
90/4 90/11 90/13 92/18 94/9 96/4
97/5 97/14 98/1 98/3 98/8 99/8
99/21 100/3 101/25 103/16 103/18
104/14 104/21 105/13 107/17
114/12 140/12
**feature [1]** 22/23
**federal [16]** 2/3 2/7 4/12 4/13
39/23 45/16 45/21 51/5 51/7 51/11
67/7 83/2 83/5 129/6 132/18
143/15
**feedback [1]** 106/20
**feel [13]** 17/12 20/7 45/9 49/15
51/18 51/25 54/4 54/5 54/6 67/16
67/20 67/20 110/2
**feeling [2]** 61/9 61/13
**feelings [1]** 123/8
**feels [3]** 67/6 74/6 87/12
**feet [2]** 73/17 73/18
**fell [1]** 59/9
**felt [3]** 61/11 124/8 135/6
**fence [1]** 125/20
**fences [1]** 94/17
**few [3]** 6/2 31/2 117/4
**field [1]** 107/2
**Fifteen [1]** 26/3
**Fifteen-Item [1]** 26/3
**fighting [2]** 44/17 150/8
**figure [8]** 33/2 33/17 34/23 35/1
51/21 98/14 105/14 121/3
**file [44]** 69/14 71/13 71/17 73/3
76/1 76/3 76/10 76/13 77/2 77/9
78/8 78/14 78/16 79/14 80/2 80/6
80/11 80/17 81/3 84/10 85/6 87/1
87/3 87/10 87/17 88/7 89/17 97/18
98/20 99/6 99/9 99/19 102/4 102/8
104/22 107/17 114/25 115/3 133/23
134/10 135/6 135/11 135/13 140/19
**filed [14]** 63/7 63/9 72/6 72/7
72/8 72/8 72/12 72/16 72/22 72/24
74/5 82/13 97/5 110/11
**files [4]** 69/22 85/5 100/1 114/12
**filing [4]** 82/9 97/1 108/7 135/22
**filings [3]** 90/17 151/10 152/5
**fill [1]** 49/20
**final [7]** 39/18 72/4 72/8 97/13
108/5 134/20 135/7
**finalized [1]** 134/24
**finally [1]** 106/21
**find [14]** 15/17 16/6 49/19 52/24
60/25 80/23 97/7 114/15 114/17
117/11 132/15
**finder [2]** 113/9 113/10
**finding [1]** 44/10
**fine [9]** 23/5 31/6 40/18 63/6
121/7 130/15 134/15 149/6 152/4
**finer [1]** 30/5
**finger [1]** 72/20
**finish [2]** 64/2 103/14
**firefighter [3]** 52/8 53/7 58/3
**firefighters [3]** 39/23 58/3 129/6
**firing [1]** 57/14
**firm [1]** 114/12
**first [54]** 4/25 6/2 7/8 14/19
15/11 25/10 27/18 27/18 27/24
28/9 28/18 28/21 29/3 29/16 29/25
31/8 34/25 35/22 36/1 36/5 36/21
36/22 37/3 39/23 47/24 63/17
66/17 67/4 68/19 69/18 71/8 76/10
80/3 81/4 82/4 82/7 83/17 95/11
99/6 102/10 110/12 110/13 119/15
119/19 120/11 125/12 129/5 134/4
140/17 143/3 143/10 145/23 145/25
149/23
**fishing [3]** 101/2 101/2 105/16
**fit [1]** 7/22
**fits [4]** 46/23 46/25 129/23 148/4
**five [7]** 51/4 67/9 137/6 138/7
138/17 139/5 139/10

**flash [1]** 95/25
**flashback [1]** 4/24
**flashbacks [1]** 11/6
**flat [1]** 60/10
**flip [3]** 40/7 135/24 136/1
**flip-flops [1]** 40/7
**Flood [2]** 130/3 130/6
**floor [1]** 1/13 46/8
**flops [1]** 40/7
**Florida [1]** 65/21
**flow [1]** 61/22
**Fly [1]** 85/2
**flying [2]** 60/25 74/7
**focus [3]** 5/11 38/20 109/5
**focused [2]** 57/18 120/22
**focusing [1]** 84/10
**FOIA [4]** 76/12 78/20 99/11 107/14
**folks [2]** 79/4 120/13
**follow [10]** 57/23 58/2 58/25 92/2
100/24 101/19 118/17 133/16 134/9
151/18
**follow-up [3]** 92/2 133/16 151/18
**following [7]** 6/7 9/2 9/8 47/24
78/1 93/8 142/3
**font [1]** 15/9
**Fontan [4]** 1/15 4/8 77/13 108/23
**foot [3]** 51/23 52/21 53/4
**force [26]** 71/25 72/1 85/23 85/24
86/2 86/2 86/3 86/4 86/10 91/9
91/12 92/14 93/1 93/2 93/16 93/20
93/24 94/13 94/22 94/23 95/3 95/8
95/20 96/16 96/19 96/24
**foregoing [1]** 154/4
**forensic [4]** 23/1 23/6 25/24
49/10
**forever [2]** 114/20 115/25
**forgive [1]** 51/10
**forgot [1]** 140/14
**form [12]** 14/5 42/21 43/2 55/2
81/16 90/21 92/21 124/21 124/22
125/15 132/13 150/20
**formally [2]** 20/7 49/20
**formed [2]** 9/20 124/21
**former [4]** 33/23 126/3 129/17
130/8
**forming [1]** 109/24
**forms [1]** 137/17
**forth [2]** 134/20 147/11
**fortified [1]** 66/8
**Forty [1]** 51/4
**Forty-five [1]** 51/4
**forward [6]** 76/19 77/3 115/2
126/7 126/9 153/18
**found [4]** 11/16 36/22 104/12
105/10
**four [4]** 68/7 71/20 97/3 116/19
**frame [1]** 105/23
**framing [1]** 82/4
**frankly [6]** 33/21 109/11 114/14
116/24 125/20 141/11
**fraud [1]** 144/1
**free [2]** 120/13 121/25
**Friday [1]** 99/1
**friend [2]** 14/21 14/23
**front [12]** 18/16 23/24 23/25 25/7
51/23 52/21 53/4 63/25 66/3
112/22 144/11 147/19
**frontal [9]** 41/21 42/14 55/19
55/23 56/5 56/14 56/18 57/14
125/1
**fugue [2]** 12/22 12/24
**full [8]** 21/24 49/16 81/1 82/7
86/9 87/8 91/22 118/21
**fully [8]** 45/1 45/4 53/12 55/8
59/17 60/2 60/18 122/1
**function [1]** 82/20
**functioning [16]** 41/20 42/13
43/14 45/11 55/19 55/21 55/23
56/5 56/15 59/6 59/6 59/10 59/17
60/7 60/8 60/11
**functions [2]** 33/19 39/8
**further [26]** 15/3 17/15 38/7

58/13 58/17 63/12 69/16 71/14
73/4 85/14 85/17 85/21 92/10
114/1 117/7 121/10 126/1 126/22
133/8 133/13 135/17 136/10 138/5
139/17 140/20
**furthest [1]** 66/16
**future [1]** 151/6

---

# G

**G-L-A-D-I-S-H [1]** 132/21
**game [1]** 149/2
**games [1]** 67/12
**gamesmanship [2]** 67/1 67/6
**gap [4]** 11/15 17/8 18/21 19/1
**gaps [3]** 11/15 17/16 62/8
**gatekeeping [1]** 82/20
**gather [3]** 79/18 87/16 98/21
**gathered [6]** 5/7 76/12 78/19 99/8
99/10 108/25
**gave [2]** 60/24 129/14
**GED [2]** 144/13 144/16
**general [1]** 101/6
**generally [5]** 20/21 24/5 82/23
104/8 150/15
**generous [1]** 109/13
**genuinely [1]** 73/7
**geofence [2]** 72/3 72/13
**Georgia [1]** 65/20
**Gestapo [2]** 90/7 147/16
**Gestapos [1]** 147/5
**get [39]** 4/16 18/6 18/9 33/24
35/11 35/14 35/18 37/20 40/18
43/1 49/24 56/4 64/6 68/7 68/20
71/13 73/2 73/20 75/17 75/24
76/20 80/24 88/1 88/4 94/14 94/15
104/24 115/10 115/11 115/15
128/19 131/7 133/13 135/21 138/1
139/9 140/19 145/18 152/6
**gets [1]** 122/18
**getting [6]** 39/12 76/24 84/12
109/13 123/22 146/13
**give [18]** 14/12 35/20 44/13 45/23
45/24 49/16 51/2 59/1 76/7 84/7
86/1 87/19 93/7 93/19 103/8
118/15 118/16 133/2
**given [15]** 5/10 23/7 78/3 90/4
92/2 98/20 101/11 104/18 104/23
105/23 106/20 114/11 118/17 133/1
141/17
**gives [1]** 112/14
**giving [1]** 27/5
**Gladish [1]** 132/20
**glassy [2]** 18/13 48/11
**go [35]** 5/6 6/2 14/19 23/15 33/23
38/8 38/24 47/10 51/13 56/2 58/15
69/18 70/5 71/25 73/7 76/18 78/17
84/2 101/4 103/3 105/10 107/22
112/23 112/25 113/13 114/25
115/25 120/18 120/20 126/4 129/16
131/17 134/4 140/17 147/10
**goal [1]** 84/12
**goes [10]** 28/2 41/9 45/13 51/21
74/14 77/5 87/13 95/22 99/5
105/16
**going [100]** 4/16 12/6 12/14 15/23
16/3 16/4 17/11 20/22 22/8 23/15
29/17 29/19 33/7 33/10 36/4 37/20
39/19 40/5 41/5 45/4 45/19 51/24
60/1 63/23 64/5 64/19 65/3 65/7
65/17 65/23 66/3 66/9 66/18 67/16
68/16 71/15 73/2 74/8 75/7 76/2
76/20 77/25 79/12 82/10 85/6 86/1
86/18 88/15 91/13 91/14 94/25
96/5 108/16 109/1 109/5 109/17
111/12 112/23 114/4 114/5 114/7
114/10 114/16 114/16 114/24
115/12 115/20 115/25 116/25 117/1
117/22 121/3 122/12 123/12 124/9
125/16 126/1 126/21 128/9 128/12
128/20 128/25 133/25 134/23
137/16 138/1 138/1 138/4 138/14
139/2 142/6 142/7 142/21 148/5

**G**

going... [6] 148/6 148/22 149/13
149/21 150/10 152/23
goings [1] 43/13
gold [3] 49/8 49/10 49/23
gone [3] 17/11 17/14 104/2
good [12] 4/7 4/9 4/10 4/11 5/17
6/24 44/13 52/19 58/21 78/2 93/6
111/23
gosh [1] 44/15
got [15] 5/20 5/24 38/1 52/25
53/1 57/24 64/2 70/18 71/17 73/6
87/8 103/20 109/16 114/16 130/17
government [72] 4/5 5/4 67/22
72/22 74/10 74/13 79/7 81/5 82/6
82/11 82/19 82/21 83/6 84/6 86/14
87/17 90/5 90/8 90/17 91/3 91/7
91/16 91/20 92/5 92/7 97/2 97/11
97/18 97/19 98/13 99/6 101/1
102/2 102/20 103/6 104/15 105/24
107/18 108/16 108/16 108/18
110/18 116/5 118/14 121/23 127/10
132/9 136/3 137/6 137/16 138/10
138/12 138/22 140/17 140/19
141/19 143/3 143/14 143/22 143/22
144/6 144/15 147/9 148/9 148/11
148/17 149/12 149/10 149/13 149/14
151/7 151/13
government's [11] 73/6 76/9 86/5
97/6 102/24 108/1 142/25 148/23
149/9 151/24 152/9
grabbing [1] 53/23
grabs [1] 52/9
grant [5] 144/2 145/15 145/21
145/25 148/5
granted [1] 82/10
granular [1] 14/19
great [2] 5/19 24/5
greater [4] 61/17 64/8 109/5
128/19
Greene [1] 117/19
grenades [3] 15/13 15/14 15/22
ground [1] 102/7
grounds [9] 14/23 16/15 19/1 28/6
28/7 28/8 39/5 143/17 145/25
group [6] 67/24 69/13 136/21
136/23 138/23 148/16
guarantee [1] 66/14
guard [3] 122/16 123/21 124/6
guess [38] 5/19 7/15 10/2 12/17
13/5 18/2 29/10 34/10 35/6 38/12
42/2 42/5 49/19 51/16 63/19 63/20
64/18 65/4 65/5 65/6 81/15 81/25
82/3 87/11 93/19 93/21 94/2 95/12
95/14 115/7 115/18 125/2 133/17
135/24 138/11 139/1 151/2 152/9
guilt [2] 121/20 132/15
Guilty [1] 26/12
gun [3] 112/15 112/15 112/16

**H**

H-I-T-E [1] 131/23
had [55] 5/4 16/19 16/19 17/14
18/21 20/7 21/11 21/11 21/13
21/13 21/15 21/25 22/10 31/2
35/10 48/18 49/15 52/11 52/22
52/23 59/5 59/15 61/17 61/19 67/2
70/23 71/15 71/20 73/11 74/14
78/13 82/12 85/5 87/11 88/22
94/17 98/5 100/10 106/10 108/21
112/6 113/5 113/6 117/10 119/11
119/20 126/9 129/8 129/13 129/24
130/2 131/19 136/16 150/13 151/25
half [1] 136/6
hall [1] 112/22
hand [3] 36/7 65/20 137/25
handle [1] 136/19
handled [2] 94/1 94/5
handles [1] 100/3
hanging [2] 67/21 72/2
happen [8] 66/7 67/2 69/8 79/2

83/5 117/22 142/7 142/7
happened [143] 2/4 4/14 61/6 61/9
61/3 74/23 74/24 95/16 122/25
123/18
happening [5] 45/5 45/7 45/9
148/24 151/10
happing [1] 150/9
happy [17] 63/1 80/14 100/7
100/25 101/3 109/18 117/5 117/7
118/7 120/14 121/9 121/21 122/1
126/23 141/18 150/2 152/1
hard [15] 10/22 36/8 37/4 56/13
87/15 89/4 89/9 92/25 110/14
110/15 112/12 113/15 113/16 114/5
125/18
hardened [1] 111/25
harder [5] 37/1 111/8 114/7
115/12 117/3
hardly [1] 72/5
Harris [3] 65/25 66/2 74/22
has [80] 5/8 5/12 7/10 8/1 10/4
10/25 11/13 11/14 11/20 12/3 17/4
17/4 18/24 20/20 20/25 22/11
26/12 29/18 29/21 33/18 36/25
38/2 41/18 45/21 47/3 48/13 50/11
50/13 54/20 61/10 61/12 61/14
69/9 71/16 72/21 74/21 77/9 78/24
81/5 85/20 87/8 87/20 88/24 89/19
90/8 91/3 91/4 91/5 91/22 92/13
97/17 98/5 99/7 101/1 101/9 103/6
106/2 106/22 109/7 111/7 111/11
114/21 115/2 122/6 122/23 128/1
128/12 129/7 129/19 130/5 130/7
136/20 141/8 141/23 143/24 149/14
149/18 150/13 152/4 153/17
have [355]
haven't [3] 77/8 108/14 112/14
having [13] 9/22 12/12 21/24
29/21 35/5 46/13 69/5 69/8 69/17
71/21 121/9 124/7 134/19
he [290]
he's [1] 130/7
head [19] 19/22 20/2 20/14 24/10
24/24 24/24 37/21 35/24 37/8 68/7
68/21 80/9 84/16 94/12 122/13
128/9 128/12 128/20 140/14
heads [1] 125/17
health [3] 22/4 22/10 22/11
hear [16] 5/17 5/18 12/21 45/6
69/3 69/8 69/19 71/14 74/10 115/7
123/12 125/3 125/18 126/18 126/23
128/10
heard [18] 7/20 14/23 15/1 29/13
40/6 41/24 61/25 65/11 70/5 80/3
82/7 87/16 97/16 108/1 111/25
121/10 123/12 124/12
hearing [20] 1/9 11/25 16/5 36/12
36/19 37/21 40/2 40/9 41/2 45/7
48/17 51/20 57/2 74/15 83/23 85/4
93/22 120/12 133/17 137/3
hearings [8] 5/9 5/10 118/4 118/6
118/11 118/21 120/18 133/17
hears [2] 29/16 31/23
heart [1] 111/25
heave [1] 113/6
heinous [1] 125/8
held [5] 83/5 90/9 97/18 104/14
152/25
help [9] 20/4 38/19 41/14 46/10
69/15 71/23 121/18 135/12 137/12
helped [1] 19/21
helpful [15] 38/12 38/20 44/3
45/22 52/1 53/17 58/13 79/22
80/18 110/3 122/2 133/6 133/7
133/22 137/5
helpless [1] 61/9
helps [1] 23/17
her [44] 4/25 9/7 10/9 10/10
10/11 10/12 10/13 16/7 39/25 40/1
40/3 40/3 40/3 66/2 69/16 69/16
69/20 79/23 79/23 83/10 83/11
83/13 83/20 83/24 85/18 85/21

122/8 122/12 122/18 122/19 122/23
122/24 123/4 123/20 124/1 128/8
128/14 129/4 129/11 129/12 129/15
129/15 129/19 129/21
here [51] 4/19 8/12 23/15 27/25
29/21 32/18 33/6 33/25 34/22 35/3
35/15 36/12 38/13 42/4 42/23
45/20 53/3 59/9 61/3 66/16 66/18
66/18 74/7 76/6 78/11 82/1 82/20
84/14 87/21 93/9 94/3 96/9 103/4
106/12 106/18 107/13 108/25
110/15 113/14 114/15 114/17
119/12 124/22 131/23 132/9 132/11
132/17 135/1 150/9 150/15 152/20
Hermansen [9] 2/3 3/5 4/12 4/24
38/9 46/7 55/15 124/25 144/24
hero [1] 52/11
heroism [1] 53/25
hesitation [1] 115/9
hidden [1] 130/1
highly [5] 19/20 28/20 115/22
137/25 147/8
him [31] 10/7 10/10 10/12 13/14
14/12 20/8 21/8 22/16 28/3 29/3
29/7 32/23 40/1 41/12 47/22 48/3
50/18 54/13 54/15 69/7 71/11
78/15 86/8 86/17 94/22 95/14
106/15 122/24 124/8 130/6 132/5
himself [6] 13/13 14/14 14/16
74/24 113/11 122/25
Hinckley [1] 42/12
hire [1] 84/20
hired [1] 99/23
hiring [4] 81/13 81/22 84/1 84/24
his [169]
historic [1] 65/21
history [12] 21/17 21/23 22/9
22/10 29/21 32/15 34/13 64/12
68/13 68/13 71/10 75/7
hit [2] 140/16 150/8
Hite [2] 131/21 132/12
Hite's [2] 132/3 132/15
hitting [2] 94/11 142/3
ho' [1] 113/7
hold [2] 122/3 140/1
holdings [1] 103/4
hole [4] 11/14 11/14 17/9 18/21
holidays [1] 117/2
Holocaust [6] 89/24 101/23 102/20
103/5 104/3 104/7
home [1] 11/8
honest [1] 56/7
Honor [89] 4/7 4/11 5/1 5/14 6/24
16/3 16/6 27/7 30/17 37/6 37/12
38/7 39/12 58/22 62/11 63/7 64/4
66/23 69/11 72/14 73/1 74/4 74/12
75/5 76/2 76/5 77/12 79/4 79/10
80/3 82/3 82/18 83/19 84/9 88/19
94/18 95/18 98/19 99/4 99/13
100/7 100/16 100/17 100/25 102/15
102/24 104/9 104/15 105/11 105/22
106/19 106/25 107/7 110/23 116/2
116/6 116/13 117/23 118/23 120/2
120/5 127/1 133/10 133/14 133/19
133/25 134/5 134/17 134/22 135/3
135/8 135/12 135/20 136/5 136/6
136/14 136/16 138/21 139/14 140/4
141/1 142/13 149/4 150/3 150/23
151/22 151/25 152/8 152/14
honorable [2] 1/9 67/11
hope [1] 85/15
hopefully [4] 71/13 118/10 142/24
145/9
hoping [2] 55/17 107/23
hour [4] 118/13 142/12 142/18
142/22
hours [5] 18/24 18/24 19/1 77/22
91/18
housemate [5] 9/6 9/16 10/8 13/12
14/10
how [71] 6/13 6/13 6/16 9/3 9/7
9/20 10/11 10/12 10/14 12/23

**H**

how... **[61]**  12/25 13/13 14/14
16/22 18/25 20/16 22/9 23/1 24/19
27/14 27/19 27/22 29/20 33/6
33/16 34/1 34/3 34/19 34/21 35/12
43/7 43/21 44/20 47/18 49/1 49/25
51/2 51/5 51/7 52/2 52/16 52/25
54/20 61/21 63/2 65/23 73/16
73/17 73/23 75/21 76/18 79/25
88/10 92/20 93/25 96/4 102/25
104/1 105/5 105/14 107/13 109/22
110/10 116/24 122/17 123/23
128/15 128/18 129/6 136/18 148/4
huge **[2]**  66/2 75/6
human **[4]**  32/25 33/7 33/7 33/18
hundreds **[7]**  28/18 28/21 28/21
33/5 35/25 35/25 52/23
hurt **[1]**  93/3
hurting **[1]**  93/2
hypothetical **[1]**  58/2
hypotheticals **[2]**  112/12 133/23

**I**

I'm **[20]**  7/14 21/6 23/4 27/1
30/15 31/4 31/7 31/13 42/10 60/4
70/21 75/13 91/12 103/14 103/15
116/6 142/15 147/6 152/17 152/23
idea **[4]**  14/1 43/16 52/25 111/23
identified **[2]**  100/18 137/7
identify **[2]**  137/6 138/9
identifying **[5]**  7/9 7/10 12/10
12/11 22/14
identity **[2]**  10/25 39/9
ignorance **[1]**  146/19
ignorant **[1]**  146/18
IL **[1]**  1/14
imagine **[1]**  44/18
immediate **[2]**  43/12 43/13
immediately **[2]**  9/1 9/7
impact **[3]**  22/19 43/7 141/2
impaired **[1]**  43/14
impartial **[2]**  75/18 75/24
impermissible **[1]**  146/12
implication **[1]**  98/11
Implicit **[1]**  26/15
important **[9]**  5/11 50/3 88/21
110/4 110/7 110/10 113/20 122/22
126/24
imposes **[1]**  112/8
impossible **[1]**  115/23
impression **[2]**  81/9 123/24
impressions **[3]**  10/10 10/12 123/8
impressive **[1]**  122/6
improbable **[2]**  138/1 138/4
improper **[1]**  144/1
inability **[9]**  9/16 39/11 39/12
40/11 40/24 55/3 59/15 59/17
67/18
inappropriate **[1]**  17/12
incensed **[1]**  126/8
inches **[1]**  73/18
incident **[1]**  95/19
incite **[1]**  43/9
incitement **[1]**  110/19
inclination **[3]**  114/13 118/13
122/7
inclined **[2]**  138/11 139/10
include **[7]**  8/17 50/24 51/1 78/4
91/9 95/20 102/9
included **[2]**  81/3 108/7
includes **[3]**  90/12 95/9 131/7
including **[3]**  102/5 104/25 115/13
incomplete **[1]**  38/16
inconsistent **[3]**  44/20 54/23
79/21
incorporated **[1]**  19/25
indeed **[1]**  21/15
independent **[3]**  47/16 47/16 47/18
index **[2]**  24/16 24/21
indicate **[1]**  23/11
indicated **[6]**  38/10 48/5 69/15

91/4 98/18 111/17
indicates **[1]**  8/1/2 14/2
indicating **[1]**  14/14
indication **[4]**  20/25 21/2 21/25
50/18
indicative **[4]**  23/15 34/19 59/13
59/16
indirect **[1]**  93/21
indirectly **[1]**  127/22
individual **[6]**  31/22 34/19 34/21
50/8 56/2 106/25
individuals **[7]**  30/22 31/10 113/1
137/6 137/20 138/9 139/22
inference **[1]**  41/10
inferences **[2]**  98/6 98/7
influence **[2]**  21/18 112/6
information **[33]**  9/10 13/19 20/8
23/24 24/7 26/9 76/15 76/17 77/5
79/3 79/12 79/18 79/22 80/5 81/10
83/13 84/23 86/10 87/24 89/20
90/13 90/15 91/4 91/11 92/1 95/5
101/21 102/10 102/15 103/22
104/23 104/24 106/2
inherent **[1]**  23/7
initial **[4]**  29/12 110/25 122/2
126/15
injunction **[1]**  62/13
injury **[2]**  7/22 21/25
innocence **[1]**  132/16
inquire **[1]**  100/4
inquired **[1]**  104/21
insanity **[8]**  40/19 42/11 42/19
43/21 43/22 43/24 56/11 121/16
insanity-type **[1]**  42/11
inside **[1]**  128/20
insomnia **[3]**  46/20 46/21 46/23
instance **[5]**  10/25 49/10 50/18
54/15 56/23
instead **[6]**  47/13 50/24 56/18
57/14 69/17 138/6
instinct **[11]**  27/12 29/17 30/7
32/11 41/13 53/11 58/3 58/5 126/9
139/12 139/25
instruct **[1]**  149/23
instruction **[3]**  110/18 110/21
110/22
instructions **[2]**  110/12 110/25
instructor **[1]**  87/7
insurrection **[1]**  148/15
insurrectionist **[4]**  148/9 148/10
148/12 148/18
insurrectionists **[1]**  148/16
integrated **[1]**  39/8
Integrity **[1]**  26/20
intend **[9]**  143/24 144/16 145/20
146/4 146/8 146/11 146/19 146/23
148/10
intended **[2]**  52/6 112/1
intending **[2]**  51/23 72/19
intends **[1]**  91/21
intent **[33]**  41/17 41/19 42/8
42/10 42/21 43/2 43/8 43/9 45/18
46/3 46/5 49/4 51/14 51/15 51/21
53/4 55/2 55/5 56/8 56/10 110/6
121/20 124/15 124/21 124/22
124/22 125/2 129/11 131/25 132/12
132/15 133/2 133/3
intention **[1]**  52/11
intentional **[2]**  54/11 66/19
intentionality **[5]**  52/2 52/4 52/7
52/17 55/11
intentionally **[1]**  8/8
intently **[2]**  48/19 49/7
interaction **[1]**  33/1
interconnected **[1]**  138/23
interest **[3]**  82/14 96/15 114/19
interested **[1]**  109/21
interesting **[1]**  11/22
interests **[1]**  141/10
interfere **[1]**  139/23
interference **[1]**  59/25
intermediate **[1]**  40/22

interpret **[1]**  24/7
interpretation **[1]**  16/18
interpretations **[4]**  14/3 14/4
14/8 19/9
interpreted **[1]**  24/25
interpreting **[2]**  14/14 130/21
interrelated **[1]**  143/12
interrupt **[3]**  34/22 60/4 68/23
interrupted **[1]**  42/24
interrupting **[1]**  46/7
intertwined **[1]**  140/8
interview **[14]**  9/19 10/8 14/7
14/9 19/19 19/20 20/7 21/1 22/6
22/7 25/16 34/14 40/1 47/14
interviewed **[1]**  130/8
interviews **[3]**  14/1 34/13 36/16
introduce **[7]**  90/5 143/24 145/19
146/7 146/11 146/17 146/21
introducing **[3]**  143/4 143/5
144/12
introduction **[1]**  145/24
intrusive **[1]**  70/24 71/1
inventory **[5]**  20/11 20/12 25/13
25/18 25/22
Inventory-2 **[1]**  25/18
investigate **[4]**  31/3 31/12 32/5
32/9
investigating **[1]**  93/10
investigation **[11]**  80/5 81/11
84/18 86/15 96/23 105/20 105/24
106/8 106/11 106/12 106/15
investigations **[2]**  95/9 95/22
involve **[2]**  41/20 44/22
involved **[3]**  34/16 37/16 56/3
IQ **[1]**  125/10
IQs **[1]**  125/7
irrational **[1]**  44/8
irrelevant **[2]**  82/16 111/24
is **[1023]**
is a **[1]**  13/5
isn't **[1]**  88/6
Israel **[2]**  71/2 85/1
issue **[50]**  35/17 37/23 41/9 43/1
70/1 71/11 72/1 72/2 72/17 73/1
73/11 74/19 74/20 74/21 75/4 75/8
75/14 77/5 97/11 97/12 98/2
108/24 109/7 109/18 110/4 110/9
110/14 110/15 110/15 111/12
112/11 113/20 114/2 121/22 122/9
122/14 122/15 122/22 122/22
124/23 125/18 132/20 138/15
143/18 144/19 145/6 145/16 146/13
147/20 152/4
issued **[3]**  100/17 107/16 107/18
issues **[32]**  21/21 22/3 33/9 42/17
45/6 62/25 69/13 74/3 82/1 85/20
88/16 95/2 101/7 107/24 109/16
110/13 114/4 115/14 118/2 124/6
124/11 131/18 134/3 135/4 137/13
139/24 139/25 140/9 144/25 145/7
145/18 152/5
it **[543]**
italics **[3]**  15/8 15/9 16/1
item **[3]**  26/3 31/9 79/7
itemized **[1]**  100/13
items **[6]**  31/2 90/25 100/13
100/18 135/9 135/11
its **[4]**  88/2 98/22 98/23 113/8
itself **[8]**  8/22 24/14 28/6 64/13
77/6 87/24 123/17 151/25

**J**

January **[35]**  13/2 14/20 14/25
21/9 22/12 27/11 28/1 39/6 43/7
47/21 48/9 59/10 63/13 65/25
67/13 67/15 67/18 71/8 71/17
74/20 79/24 81/1 82/2 84/3 85/22
92/5 101/11 107/19 109/6 114/15
114/17 115/17 115/22 134/21 141/3
January 20th **[1]**  67/15
January 3rd **[2]**  134/21 141/3
January 6 **[20]**  13/2 14/25 21/9

**J**

**January 6...** **[17]** 22/12 27/11 28/1 39/6 43/7 48/9 59/10 65/25 71/8 71/17 74/20 79/24 82/2 85/22 101/11 109/6 115/22
**January 6, 2021** **[1]** 14/20
**January 7th** **[1]** 67/18
**JARED** **[1]** 1/6 4/3 14/20 15/12 27/11 62/21
**Jason** **[1]** 73/19
**job** **[3]** 34/23 54/6 78/17
**joint** **[2]** 135/13 136/11
**Josh** **[1]** 14/21
**Journal** **[1]** 35/17
**judge** **[12]** 1/10 31/1 32/21 32/21 33/14 35/15 36/17 45/21 113/10 138/12 139/8 153/1
**judge's** **[2]** 57/23 58/2
**judges** **[5]** 32/23 32/24 63/10 65/2 67/9
**judgment** **[3]** 37/3 50/2 50/8
**jump** **[1]** 99/14
**jumped** **[1]** 107/8
**jumping** **[1]** 66/24
**jurisdiction** **[1]** 145/9
**juror** **[2]** 75/14 75/24
**jurors** **[5]** 63/22 65/22 75/13 128/10 150/13
**jury** **[25]** 35/2 38/14 41/6 41/7 41/10 75/18 110/12 110/25 113/9 114/6 114/6 114/7 114/11 115/12 115/23 117/3 123/17 132/14 132/19 144/8 144/11 146/7 147/19 149/23 150/5
**just** **[151]** 5/10 5/22 5/24 6/2 9/17 14/3 14/6 15/20 15/23 16/15 16/25 17/15 18/9 19/7 19/10 19/22 19/24 20/5 20/8 20/13 20/14 20/14 21/8 21/17 22/18 23/5 25/9 29/12 29/24 30/3 30/5 30/8 30/25 33/20 34/11 34/22 35/4 35/8 35/17 36/8 37/8 37/10 37/20 38/9 42/15 42/20 42/22 43/2 44/16 44/17 45/2 47/5 48/5 53/2 54/6 55/17 57/12 58/17 58/18 59/5 60/4 60/14 60/20 63/9 65/6 66/4 66/20 68/5 68/6 68/9 68/12 68/17 68/19 68/25 69/17 70/6 71/1 72/4 72/18 72/23 73/23 74/4 74/20 75/25 79/8 81/8 84/5 84/5 86/12 86/18 87/4 91/13 92/12 95/8 96/5 96/8 96/22 99/20 100/8 100/24 101/1 103/5 107/21 107/24 113/3 114/18 115/1 115/8 115/25 116/24 117/3 117/9 117/24 118/2 118/8 120/14 120/15 120/17 122/2 122/3 123/11 123/12 123/18 123/21 124/13 124/22 126/15 128/14 129/21 130/20 131/3 131/15 133/4 133/19 138/8 138/22 139/1 139/14 140/10 140/15 141/2 142/11 142/21 142/24 143/18 144/9 146/12 148/20 150/3 151/23 152/18
**justify** **[1]** 92/25

**K**

**keep** **[3]** 104/16 117/5 137/23
**kept** **[3]** 18/25 100/1 100/1
**kill** **[7]** 54/10 54/10 54/24 54/24 112/7 113/17 113/17
**killed** **[1]** 54/25
**killing** **[1]** 74/6
**kind** **[24]** 12/22 18/16 19/24 30/25 36/9 39/19 50/14 61/1 61/22 76/23 77/17 78/15 79/12 92/13 93/6 94/25 95/11 96/6 97/2 98/1 101/24 107/19 108/11 131/9
**kinds** **[5]** 6/21 23/6 38/25 39/24 47/4
**knew** **[2]** 77/3 106/17
**knife** **[2]** 112/17 112/17
**knocking** **[1]** 36/4

**know** **[188]**
**knowing** **[5]** 41/5 51/24 80/25 132/23 137/20
**knowledge** **[6]** 10/12 26/12 26/13 42/7 42/9 127/13
**known** **[2]** 15/21 26/11
**knows** **[7]** 13/1 39/25 76/23 86/6 88/16 127/1 128/11
**Kumho** **[2]** 127/2 127/5
**Kurt** **[2]** 2/3 4/12
**Kutz** **[1]** 111/19

**L**

**labor** **[2]** 112/22 113/2
**lack** **[7]** 40/21 42/6 42/8 42/8 42/10 59/12 75/16
**lacked** **[1]** 45/17
**lacuna** **[1]** 11/13
**laid** **[1]** 80/22
**LANE** **[3]** 1/6 4/4 62/22
**language** **[1]** 6/1
**lapses** **[1]** 122/23
**large** **[2]** 19/1 45/11
**largely** **[1]** 36/10
**last** **[12]** 5/20 7/7 31/14 41/2 41/25 49/2 61/1 75/20 76/5 78/11 85/4 107/21
**late** **[5]** 72/6 72/7 72/12 117/8 119/19
**later** **[6]** 17/13 17/13 98/25 111/3 117/12 143/2
**latest** **[1]** 98/25
**law** **[42]** 15/24 29/5 29/6 29/8 29/22 30/9 30/11 30/22 31/10 31/17 31/18 33/23 34/1 39/22 40/13 54/24 65/12 69/23 76/16 78/25 80/13 94/12 104/1 111/11 111/11 111/13 111/14 111/14 111/15 111/20 112/8 124/16 126/3 129/5 129/6 129/17 138/25 139/23 145/12 146/18 146/19 147/5
**lawful** **[2]** 86/3 93/17
**lawyer** **[1]** 137/23
**lawyers** **[3]** 33/12 33/13 33/14
**laypeople** **[1]** 50/25
**lead** **[1]** 94/25
**leader** **[3]** 112/22 112/24 113/2
**leads** **[3]** 94/24 112/25 138/18
**League** **[3]** 90/1 90/3 101/23
**learn** **[2]** 18/25 71/19
**learned** **[1]** 17/13
**least** **[17]** 12/1 36/12 42/2 86/22 91/10 91/25 92/19 106/4 111/18 113/8 113/22 117/1 122/7 124/11 137/4 145/8 147/23
**leave** **[4]** 63/4 137/7 138/11 141/11
**leaves** **[2]** 88/10 112/16
**leaving** **[3]** 18/19 61/20 97/14
**led** **[3]** 39/1 69/25 71/7
**Lee** **[6]** 2/7 4/13 69/13 100/14 107/6 152/2
**left** **[4]** 14/21 74/18 104/20 139/1
**legal** **[22]** 22/20 43/22 51/15 51/22 52/15 55/5 56/9 56/11 86/1 86/2 86/3 86/18 90/10 92/14 92/19 92/21 93/13 109/16 124/23 149/8 149/17 149/24 149/25
**length** **[1]** 78/3
**lengthy** **[5]** 11/15 34/5 34/12 54/19 60/17
**lens** **[1]** 36/2
**Les** **[1]** 28/13
**less** **[3]** 38/20 88/5 137/15
**let** **[20]** 4/16 5/22 29/14 37/18 37/19 64/2 66/15 68/5 74/10 84/5 98/13 103/14 108/15 135/15 140/22 142/20 142/24 144/9 145/16 151/18
**let's** **[13]** 12/19 17/25 21/8 46/20 62/14 84/8 116/2 136/9 141/22 142/8 142/10 142/23 152/23
**letting** **[1]** 114/20

**level** **[5]** 59/1 23 62/2 62/8 84/15 105/7 105/8
**liability** **[3]** 110/10 111/21 112/8
**liberal** **[1]** 127/14
**lie** **[2]** 93/9 111/21
**lies** **[1]** 54/6
**life** **[1]** 53/15
**lift** **[1]** 140/16
**light** **[5]** 14/16 14/17 23/18 114/3 114/4
**lighting** **[1]** 56/20
**like** **[101]** 12/12 13/6 13/23 15/4 17/9 17/23 18/13 20/23 31/17 34/2 34/18 38/18 42/25 45/9 48/19 48/24 49/3 49/5 49/16 49/18 50/16 50/20 52/23 52/25 53/21 54/5 54/6 54/20 54/21 55/21 55/25 56/10 56/16 58/3 61/15 62/1 62/6 62/24 63/4 65/23 67/6 67/21 68/15 70/6 71/1 71/2 71/18 73/20 74/6 77/24 78/17 78/24 80/9 80/11 80/15 83/25 84/16 86/8 87/12 90/6 90/13 90/21 91/6 91/20 91/22 92/3 93/10 95/15 95/21 95/21 95/25 96/5 99/12 100/21 102/20 103/4 105/9 105/16 106/13 107/1 112/19 115/7 115/18 115/19 117/12 120/10 124/8 126/18 129/10 132/9 133/15 133/16 133/20 134/8 134/12 136/19 139/4 141/13 142/19 149/22 151/23
**likely** **[11]** 64/7 65/8 65/9 65/20 71/9 83/23 110/21 111/1 122/15 130/1 130/13
**likewise** **[1]** 58/6
**limine** **[3]** 73/5 132/9 142/25
**limit** **[2]** 139/10 142/21
**limitations** **[2]** 5/11 42/19
**limited** **[1]** 148/15
**LINDSAY** **[3]** 1/22 154/3 154/12
**line** **[9]** 4/24 33/2 33/2 42/6 42/18 85/15 120/7 123/25 129/23
**list** **[9]** 38/12 87/18 88/7 90/11 90/24 91/13 96/8 96/12 96/15
**listened** **[1]** 75/10
**listening** **[1]** 11/20
**listing** **[2]** 77/21 81/1
**listings** **[1]** 91/17
**lists** **[1]** 98/16
**literal** **[1]** 52/4
**literally** **[2]** 74/6 74/6
**literature** **[1]** 33/3
**little** **[21]** 18/24 28/13 28/14 29/15 36/3 42/1 45/23 55/18 61/24 76/20 87/12 87/14 87/16 89/4 89/9 92/25 102/7 116/19 117/24 121/24 137/1
**living** **[2]** 11/8 40/6
**lobe** **[2]** 42/14 125/1
**lobes** **[1]** 41/21
**located** **[1]** 106/2
**locations** **[3]** 106/22 143/5 143/7
**logic** **[1]** 87/13
**long** **[10]** 69/8 88/23 89/2 111/25 114/21 114/22 116/18 116/25 118/12 120/18
**longer** **[1]** 116/19
**look** **[17]** 11/13 24/3 24/17 24/18 48/21 48/24 49/4 49/5 50/3 55/12 58/14 62/7 105/5 105/9 121/13 131/12 137/8
**looked** **[11]** 33/8 33/13 35/16 50/13 71/10 78/24 99/5 99/10 104/11 108/13 113/15
**looking** **[12]** 49/6 51/18 53/2 84/13 99/19 102/14 108/10 111/1 111/12 113/16 117/12 142/2
**lose** **[1]** 20/22
**loses** **[1]** 20/21
**loss** **[4]** 13/12 21/24 123/11 124/4
**lost** **[5]** 12/18 12/20 13/6 13/6 30/15
**lot** **[21]** 35/5 37/2 37/2 38/11

**lot... [17]**  38/23 41/24 46/14 54/3 63/14 65/21 67/20 67/21 68/8 70/5 89/2 115/13 122/6 125/3 128/14 128/18 147/11
**lots [5]**  44/5 44/12 125/14 130/7 130/8
**loud [2]**  14/23 140/15
**love [1]**  86/21
**low [2]**  125/7 125/11
**lunch [5]**  118/9 120/15 120/16 142/12 142/18

**M**

**mad [1]**  57/16
**made [8]**  33/15 33/15 54/22 95/7 97/19 119/20 132/11 135/7
**main [2]**  2/8 50/2
**maintained [1]**  78/3
**maintains [3]**  86/21 86/24 90/14
**major [1]**  74/21
**make [49]**  5/24 5/25 9/17 14/2 14/4 14/7 17/21 19/9 27/4 28/15 33/10 33/11 37/12 37/21 43/20 44/2 46/13 49/24 55/24 56/6 57/7 59/17 64/19 66/17 66/21 68/8 68/12 68/19 68/24 69/20 76/23 78/12 79/23 82/3 86/12 96/8 100/9 101/1 101/4 101/8 107/24 114/10 117/15 120/17 123/2 123/3 135/1 137/24 141/15
**makes [9]**  37/4 40/16 57/12 57/16 60/20 88/1 115/22 117/2 119/21
**making [11]**  18/1 26/22 27/2 50/14 55/6 55/7 56/10 64/13 84/10 128/13 132/10
**MAL [1]**  24/16
**malingering [14]**  14/17 23/7 23/11 23/13 24/12 24/14 24/16 24/21 25/9 25/13 26/1 50/9 50/19 69/17
**manage [1]**  123/20
**manageable [1]**  120/24
**mandatory [1]**  130/6
**Manhattan [1]**  32/12
**manner [7]**  28/14 33/18 40/12 44/7 124/25 125/25 151/19
**Manning [1]**  73/19
**many [7]**  35/12 51/2 51/5 51/7 73/8 87/15 150/12
**match [3]**  101/24 102/16 105/2
**material [5]**  76/20 76/24 77/7 77/9 99/10
**materials [13]**  76/11 76/25 78/9 78/16 78/20 80/8 86/16 87/2 87/8 88/2 91/15 99/14 118/15
**matter [8]**  35/4 62/12 82/4 84/19 105/21 112/18 124/16 154/5
**may [63]**  16/12 35/23 37/7 37/12 40/22 40/23 40/24 42/3 42/5 42/16 45/14 50/19 50/19 51/19 51/20 51/24 51/25 57/18 57/20 63/19 65/16 66/21 77/9 87/7 88/14 96/20 99/7 99/24 99/24 100/1 100/20 105/9 110/1 112/20 112/21 113/14 113/21 113/23 116/18 120/14 121/8 122/22 122/23 123/22 125/8 125/10 125/15 126/11 126/25 127/14 128/10 131/11 131/22 135/11 136/25 137/12 137/18 139/7 140/16 142/11 142/11 142/12 149/11
**maybe [32]**  12/7 14/19 21/16 28/13 30/5 35/6 51/11 51/11 52/15 60/24 62/5 65/10 66/16 70/1 72/19 75/16 81/8 81/15 81/19 88/4 109/19 112/13 112/14 113/1 120/15 124/18 124/23 126/4 126/21 131/17 134/1 152/10
**McFadden [1]**  113/10
**me [108]**  4/16 5/2 5/17 5/20 5/21 6/19 8/1 9/6 10/4 10/16 11/16 11/22 13/1 17/15 19/6 20/4 23/24

24/1 25/7 28/13 29/10 29/14 31/1 38/12 38/19 38/20 40/9 44/3 44/16 45/19 51/6 51/10 52/1 52/24 54/7 54/19 55/3 55/6 59/16 64/2 65/15 66/11 66/15 66/17 66/23 68/5 68/8 68/12 68/19 69/19 73/13 73/20 74/10 82/15 84/5 85/14 86/25 89/7 93/19 98/13 99/14 99/18 99/20 100/7 100/14 103/8 103/14 108/15 111/6 113/4 115/19 117/21 119/24 122/3 122/4 122/15 124/10 126/16 126/20 128/9 128/16 128/25 133/8 133/23 135/15 136/13 137/25 139/19 139/20 140/1 140/22 141/13 141/25 142/24 144/9 145/14 145/16 145/17 146/13 149/22 149/22 152/20
**mean [39]**  9/13 12/17 12/18 13/25 18/2 18/6 18/18 24/17 27/3 29/21 41/7 43/14 44/4 46/11 46/12 50/11 52/1 53/9 53/10 54/2 55/22 55/23 56/13 63/13 63/24 65/17 66/1 72/7 74/7 79/10 92/17 95/12 95/15 95/24 103/5 108/24 116/13 131/17 151/3
**meaning [7]**  7/20 7/23 9/11 9/18 10/1 24/6 125/5
**means [12]**  43/11 44/4 51/17 52/14 59/21 59/25 60/10 99/8 115/9 125/13 150/1 151/3
**meant [2]**  81/16 142/15
**measure [5]**  20/17 21/3 73/16 73/21 73/23
**measured [1]**  73/24
**measurements [2]**  73/11 73/12
**measuring [1]**  57/6
**mechanic [3]**  38/5 129/24 130/2
**media [2]**  66/1 98/6
**medical [2]**  12/14 21/23
**meet [6]**  14/23 47/10 73/7 73/9 76/6 78/24
**members [1]**  31/17
**memories [4]**  11/12 59/24 61/10 61/12
**memory [36]**  6/10 6/14 9/5 11/3 11/15 12/3 13/12 17/4 17/8 17/9 17/16 18/22 18/23 18/24 19/2 26/1 26/5 38/16 39/8 39/12 41/9 45/11 54/5 54/13 59/12 61/14 62/8 88/14 122/9 122/13 122/14 122/21 122/23 123/11 124/4 124/10
**mens [2]**  109/25 132/13
**mental [16]**  6/21 13/16 13/23 22/4 22/10 22/11 40/21 42/7 42/11 109/23 109/24 127/22 127/22 130/10 147/10 148/1
**mentioned [1]**  112/13
**merits [1]**  70/18
**met [1]**  104/23
**methodological [1]**  34/24
**methodology [6]**  28/15 33/3 33/20 35/11 37/5 38/3
**methods [1]**  144/22
**mid [1]**  117/1
**mid-December [1]**  117/1
**middle [5]**  5/5 15/7 15/11 83/18 107/9
**midst [4]**  21/12 37/21 114/7 118/21
**might [32]**  17/11 18/13 22/11 31/23 31/24 44/7 44/9 44/9 53/22 54/17 54/20 60/9 61/15 64/9 64/12 82/22 86/17 88/24 104/22 105/6 106/17 111/22 111/24 112/18 118/23 123/17 128/17 135/20 137/1 137/7 137/9 137/24
**military [2]**  31/18 83/2
**Miller [1]**  25/24
**million [1]**  67/17
**Millon [2]**  25/20 25/21
**mind [17]**  15/12 31/4 43/12 43/17

44/6 44/24 44/25 60/2 60/5 60/6 69/7 96/2 96/3 108/6 130/23 130/24 138/6
**minds [3]**  29/19 66/4 69/12
**Mine [1]**  68/23
**mini [1]**  22/8
**minimum [1]**  130/5
**Minnesota [2]**  25/18 112/5
**minor [2]**  132/4 132/8
**minors [1]**  132/13
**minute [2]**  5/7 140/23
**minutes [5]**  57/24 59/1 60/18 142/25 151/20
**minutia [1]**  84/13
**mirror [2]**  135/21 135/23
**mirroring [1]**  140/12
**mischief [1]**  29/18
**misrepresent [1]**  46/1
**misstates [1]**  110/16
**mistake [1]**  89/11
**misunderstood [1]**  81/15
**moment [7]**  20/20 45/13 60/1 75/6 111/5 116/7 124/21
**moments [1]**  97/13
**monitor [1]**  124/1
**month [2]**  47/24 48/2
**months [3]**  100/21 107/15 107/15
**Monument [1]**  14/21
**mood [1]**  8/7
**moot [6]**  80/23 107/11 146/5 146/9 146/20 146/24
**moral [2]**  125/8 125/11
**more [69]**  11/5 11/12 14/19 16/10 18/8 20/5 20/17 32/1 32/16 35/8 41/21 44/24 45/14 45/15 51/11 51/12 51/16 51/17 55/21 56/2 56/8 56/11 57/18 58/16 58/16 61/18 61/24 62/10 63/14 65/8 65/9 66/25 71/9 76/8 79/22 82/21 84/12 85/18 91/4 91/6 93/5 94/8 99/7 99/19 100/4 102/7 102/25 104/24 110/3 110/9 111/13 115/16 121/25 122/1 122/10 122/11 124/15 125/3 137/1 138/18 139/8 139/9 139/11 139/19 147/18 148/5 150/1 150/18 152/8
**morning [7]**  4/7 4/10 4/11 5/17 118/9 120/8 120/8
**MOSS [3]**  1/9 32/21 153/1
**most [11]**  11/4 36/7 37/16 44/18 50/3 52/4 74/12 80/24 101/7 127/16 130/9
**motion [37]**  63/4 63/8 72/6 72/7 72/12 72/16 72/22 72/23 73/4 77/11 77/13 79/15 80/23 97/10 97/12 107/9 107/10 107/11 122/1 128/1 134/9 135/23 135/25 136/18 144/3 145/15 145/21 145/25 146/2 146/5 146/9 146/20 147/24 148/2 148/6 148/6 151/24
**motions [10]**  73/5 114/22 114/25 115/3 115/5 134/25 135/18 136/8 142/25 147/6
**motivation [1]**  56/9
**motives [1]**  144/1
**move [13]**  23/5 58/9 64/10 66/12 66/12 68/10 86/13 109/3 114/13 115/10 115/16 116/24 142/19
**moved [5]**  40/11 41/11 126/7 126/9 132/9
**movie [2]**  57/5 62/6
**moving [8]**  40/2 64/14 77/3 89/25 113/7 125/21 149/5 153/18
**MPD [1]**  94/9
**Mr [12]**  3/5 4/14 4/17 4/20 4/24 8/12 11/10 13/1 15/9 86/6 89/17 144/24
**Mr. [69]**  16/15 20/24 28/7 30/6 30/11 38/9 38/16 39/24 41/4 41/11 46/7 46/24 47/16 48/7 50/17 54/9 55/15 58/14 59/9 61/6 68/24 69/2 69/18 73/18 83/11 84/1 84/23 85/17 85/20 85/24 88/22 88/25

**M**

Mr. .... [37]  90/5 90/11 92/19
93/14 94/21 95/10 95/23 96/4
96/14 97/4 97/13 97/18 98/7 98/17
104/19 106/20 106/22 113/17
122/13 122/18 123/2 123/13 124/8
124/25 126/1 126/7 133/6 141/10
141/11 141/13 143/23 147/4 147/10
147/15 147/25 148/13 150/17
Mr. Hermansen [4]  38/9 46/7 55/15
124/25
Mr. Wise [45]  16/15 30/6 30/11
41/4 41/11 47/16 48/7 50/17 54/9
58/14 59/9 61/6 68/24 69/2 69/18
73/18 84/1 84/23 85/20 88/22
88/25 90/5 92/19 93/14 95/10
96/14 97/4 97/13 97/18 98/17
106/20 106/22 113/17 122/18 123/2
123/13 124/8 126/1 126/7 133/6
141/11 141/13 143/23 148/13
150/17
Mr. Wise's [20]  22/24 28/7 38/16
39/24 46/24 83/11 85/17 85/24
90/11 94/21 95/23 96/4 98/7
104/19 122/13 141/10 147/4 147/10
147/15 147/25
MRI [1]  34/18
Ms [3]  3/4 3/6 76/2
Ms. [7]  69/13 77/13 100/14 107/6
108/23 121/6 152/2
Ms. Fontan [2]  77/13 108/23
Ms. Lee [4]  69/13 100/14 107/6
152/2
Ms. Walker [1]  121/6
much [12]  16/10 17/13 37/1 50/14
52/15 60/10 72/6 88/10 135/22
144/22 148/5 153/19
Multiaxial [1]  25/22
multifaceted [1]  34/12
multilayered [1]  54/7
multimedia [1]  144/21
Multiphasic [1]  25/18
multiple [3]  11/1 43/15 80/10
munitions [1]  30/24
murder [2]  116/18 116/25
Museum [5]  101/23 102/20 103/5
104/3 104/7
must [2]  110/18 132/15
my [125]  5/7 5/8 8/14 8/25 11/17
11/22 12/1 12/6 14/1 14/5 15/23
18/7 19/22 20/2 20/3 20/5 20/6
20/14 22/21 23/15 24/10 24/15
24/24 25/9 26/11 27/15 27/16
27/17 27/21 28/7 28/12 28/17
29/25 30/3 30/8 30/11 31/5 31/25
31/25 32/10 32/21 33/11 34/8
34/12 34/23 35/20 35/23 36/1 37/3
37/8 43/22 44/14 46/4 46/7 49/21
50/17 51/1 51/15 53/6 59/22 61/5
64/2 66/15 66/18 67/4 68/7 68/20
69/22 72/18 72/24 78/3 79/8 79/10
79/20 80/9 84/16 84/23 86/14 89/6
89/22 95/7 96/11 98/24 99/13
102/9 102/21 104/13 108/25 109/7
109/11 110/25 111/11 112/12 113/5
114/13 114/14 114/22 115/8 117/6
118/13 120/18 121/13 122/7 122/20
123/1 126/15 130/4 130/8 130/9
133/14 135/3 136/25 138/17 139/12
139/25 140/14 142/21 147/23
147/24 148/20 150/4 150/4 150/13
150/23 151/17
myself [1]  52/24

**N**

N.W [1]  1/16
NAACP [1]  110/24
naive [1]  50/11
name [4]  18/10 23/20 106/1 107/20
names [2]  77/22 91/17
narrative [2]  38/20 50/25

narrow [4]  107/24 120/23 131/4
narrowing [1]  137/21
nationally [2]  39/21 129/4
nature [9]  19/10 23/8 83/10 83/20
83/20 83/24 93/24 98/1 115/5
Nazi [1]  90/6
Nazis [3]  54/16 147/5 147/15
near [2]  14/21 73/18
necessarily [8]  10/10 35/7 53/21
72/6 87/9 125/17 126/12 148/10
necessary [7]  42/21 45/18 49/20
115/9 124/3 124/9 126/10
need [40]  5/21 7/18 18/5 20/7
21/20 35/3 40/23 42/5 42/16 45/20
46/3 55/12 71/24 73/6 73/9 77/8
82/7 96/12 107/25 113/1 114/4
115/14 119/14 124/6 124/16 126/13
133/11 133/12 134/19 135/16 136/5
136/8 136/10 136/12 136/13 138/6
138/13 139/9 140/6 143/10
needed [2]  132/12 135/6
needing [1]  87/24
needle [2]  105/17 109/22
needles [1]  101/3
needs [3]  108/18 109/9 109/15
neurochemically [1]  125/16
neurocognitive [1]  22/2
never [9]  11/21 21/13 51/1 66/25
67/2 70/7 70/8 97/16 114/18
never-ending [1]  114/18
new [12]  58/15 66/21 81/7 85/7
85/13 95/19 99/23 105/23 106/14
128/25 152/12 153/20
newly [1]  115/4
news [2]  75/20 98/6
newspaper [1]  65/1
next [7]  1/19 16/14 18/23 18/24
62/24 143/9 151/20
nexus [4]  112/21 112/21 113/23
113/24
nightmares [2]  46/21 46/21
Ninth [1]  133/5
no [78]  1/4 8/14 11/3 11/21 12/3
15/3 17/4 17/23 17/24 20/1 20/12
20/17 21/24 22/17 22/17 22/21
24/4 25/12 25/15 25/17 25/19
25/23 25/25 26/2 26/4 26/6 26/8
26/10 26/14 26/16 26/19 26/21
26/24 32/6 38/7 40/20 44/1 47/11
52/7 52/10 52/11 52/25 54/16 55/8
61/4 61/4 61/14 66/13 69/24 70/13
70/13 70/20 77/13 82/11 88/13
90/9 90/18 95/18 96/19 102/15
105/22 106/1 106/10 106/19 109/12
112/5 119/8 129/9 129/12 129/20
130/11 130/16 138/4 141/20 147/7
150/22 150/23 152/16
nobody [1]  87/13
none [2]  40/16 77/4
nonetheless [1]  101/14
nontruth [1]  19/6
noon [2]  142/11 142/16
normal [3]  48/21 49/1 50/23
normally [2]  39/8 48/25
not [309]
note [3]  37/22 88/22 95/8
noted [1]  15/12
nothing [10]  16/16 16/24 17/1
54/1 71/2 84/14 84/15 87/14 102/3
102/3
notice [1]  145/9
notification [1]  117/9
notion [4]  101/10 128/17 137/4
138/8
November [8]  67/19 116/17 117/8
117/13 133/18 133/24 134/11
136/18
November 18th [1]  116/17
November 1st [1]  67/19
November 7th [1]  133/18
now [34]  4/24 25/7 36/13 39/19

42/23 53/24 56/14 59/18 60/16
62/1 76/2 80/6 80/20 90/4 71/16
76/20 84/14 88/25 102/12 105/10
106/23 106/25 107/10 109/18
114/24 121/9 126/19 126/23 133/12
137/8 137/16 137/18 139/8 140/1
nullification [1]  146/7
numb [2]  60/15 61/9
number [19]  5/25 24/11 24/14
34/17 35/10 41/16 49/14 52/22
59/14 71/15 71/18 85/17 90/16
96/17 96/18 98/16 127/15 133/5
148/13
numbers [8]  24/8 25/1 25/2 36/15
36/18 50/24 51/1 129/18
numerical [2]  24/20 24/22
numerous [1]  80/10
NW [1]  1/23

**O**

object [2]  16/3 108/17
objected [1]  95/1
objecting [1]  149/15
objection [4]  82/11 119/6 136/3
141/20
objections [4]  151/7 151/12
151/15 152/9
objects [2]  90/18 143/17
obligations [1]  141/10
observation [1]  50/2
observed [1]  10/3
observing [2]  93/14 127/16
obvious [2]  112/21 113/16
obviously [10]  29/15 72/23 75/6
86/24 106/13 116/13 122/6 122/10
146/8 146/22
occurred [3]  101/11 101/13 148/1
occurring [2]  21/12 45/12
occurs [1]  43/17
ocean [1]  101/3
October [3]  1/5 135/14 154/10
off [21]  24/24 28/23 32/13 35/20
35/23 37/8 43/12 43/16 43/17
49/17 55/9 60/2 60/5 60/6 60/11
61/8 80/8 88/24 96/5 100/16
126/22
offended [2]  44/14 66/24
offense [5]  13/17 23/2 29/7
131/25 150/11
offensive [1]  44/18
offer [5]  5/13 38/14 62/24 130/22
130/23
offered [2]  144/24 146/15
offering [2]  143/10 143/19
office [11]  2/4 18/7 81/1 81/6
85/7 87/8 100/2 100/15 105/23
107/2 117/17
officer [8]  67/8 67/10 69/23 90/6
92/18 93/15 94/12 150/8
officers [8]  33/24 34/1 54/3
61/19 94/4 95/24 99/24 147/5
officers' [2]  93/14 93/25
offices [2]  87/1 87/4
official [4]  1/22 105/8 154/3
154/13
officials [2]  104/2 126/4
often [4]  11/12 20/21 126/4
128/16
oftentimes [1]  5/9
oh [7]  10/21 24/4 44/14 70/6
73/20 107/22 127/6
okay [76]  4/16 4/22 5/2 5/19 5/23
6/18 8/12 8/23 9/9 9/11 9/25 10/8
13/1 13/9 15/11 15/19 16/1 16/18
17/3 26/25 27/6 27/8 29/1 30/2
30/18 30/18 31/7 31/15 37/11 38/6
38/8 39/14 39/17 42/23 54/8 55/14
57/21 58/9 59/20 60/22 61/6 63/5
66/6 74/10 76/4 77/18 78/7 80/14
91/19 100/19 103/24 104/10 104/19
106/21 107/5 108/19 116/4 116/21
119/3 119/10 121/6 127/6 134/23

okay... [13]  136/15 140/24 141/12
141/13 141/21 142/17 144/18
150/25 151/9 152/6 152/13 152/14
152/15
old [1]  44/10
once [1]  51/13
one [87]  7/1 7/4 9/17 9/17 9/20
20/13 22/7 22/24 24/13 30/23
38/11 38/13 38/15 39/3 40/10 41/3
41/23 43/8 47/2 47/21 48/2 50/2
50/3 50/10 51/23 52/21 53/3 53/16
54/7 54/23 55/5 56/12 58/18 62/10
62/1 63/9 63/13 63/20 64/19 66/4
68/5 68/8 70/2 71/10 79/7 79/8
80/7 82/25 87/16 96/12 98/3 99/18
100/12 105/2 109/18 109/22 111/23
113/9 114/16 115/8 117/4 118/7
120/6 120/9 120/10 120/15 120/16
121/1 121/16 122/5 122/20 124/24
125/18 126/4 128/14 130/21 133/20
137/11 139/21 142/6 142/7 142/7
143/9 147/7 148/21 149/5 152/8
one's [3]  43/8 44/10 77/24
ones [3]  68/20 80/10 140/18
only [26]  6/11 13/1 36/24 39/25
40/10 49/19 67/15 72/11 72/24
73/1 79/8 81/9 86/14 108/5 108/20
114/8 114/14 115/25 118/18 118/20
122/13 126/10 129/16 133/14 135/5
142/21
open [13]  118/19 119/13 128/17
137/3 137/7 137/24 138/7 138/19
139/1 139/7 139/11 139/12 139/20
open-ended [2]  138/19 139/20
opened [1]  139/9
openings [1]  116/15
opine [1]  33/14
opinion [55]  5/13 6/9 8/14 8/21
8/25 9/21 11/17 12/7 12/8 12/8
12/13 12/15 12/19 16/7 16/19
27/15 27/19 27/20 27/25 30/13
31/25 32/3 32/8 32/11 32/22 34/9
34/12 34/25 35/8 37/16 37/17
37/25 38/13 38/15 47/19 49/21
59/9 59/20 59/22 61/2 61/5 62/1
69/17 69/20 79/23 79/23 83/10
83/24 84/2 85/25 88/9 89/19 124/8
128/1 128/8
opinions [16]  14/5 26/22 27/2
27/4 27/22 34/24 36/10 38/10
38/13 38/18 38/19 38/23 40/10
58/14 89/13 98/5
opportunities [1]  115/3
opportunity [4]  73/9 115/2 121/12
124/12
opposite [1]  148/20
option [2]  4/21 142/21
order [6]  5/7 35/2 93/10 108/18
135/25 152/25
OREGON [2]  2/4 2/8
original [3]  71/18 81/13 100/14
origins [1]  98/7
other [67]  11/3 11/5 13/23 14/9
18/20 21/5 21/8 21/21 22/4 22/6
22/25 24/6 24/6 25/8 25/8 31/2
32/2 32/2 32/3 32/7 32/7 32/23
36/7 38/18 40/11 40/16 41/14
44/12 46/18 48/13 51/23 54/1
59/22 60/20 62/20 66/13 68/20
69/6 69/12 69/20 71/11 71/18
71/25 72/1 72/16 77/11 78/17
83/21 84/16 96/14 96/19 102/22
104/1 107/19 108/3 110/3 110/9
112/9 113/5 114/22 117/4 121/17
126/10 133/5 136/17 137/25 138/13
others [7]  36/10 36/21 93/22
97/15 127/23 131/1 147/1
otherwise [9]  15/21 62/5 65/12
110/5 122/4 126/8 126/17 138/16
140/2

ought [5]  93/7 93/8 99/18 109/3
our [45]  33/25 36/9 38/20 55/23
63/4 63/17 67/17 67/18 69/15 70/4
70/4 72/16 73/5 74/5 74/5 74/15
75/6 76/22 78/12 79/17 80/23 83/8
83/9 84/9 85/4 89/11 89/11 89/13
90/17 91/23 92/5 94/20 95/5 97/1
98/20 107/14 107/17 107/20 108/7
117/11 117/14 119/8 134/9 134/20
141/17
ours [1]  152/10
ourselves [4]  74/6 114/15 114/17
142/22
out [61]  12/11 12/13 12/18 16/6
18/9 20/12 21/4 21/7 21/14 21/18
22/4 23/25 27/12 30/6 33/2 33/17
33/23 34/7 34/23 35/1 44/25 49/5
49/20 50/12 50/15 51/21 52/9
59/20 59/24 61/7 61/20 65/24
67/21 72/2 73/1 74/7 75/21 80/7
80/22 83/21 88/24 89/15 98/14
99/14 105/14 112/25 113/13 115/21
117/5 121/3 122/21 137/9 138/6
138/16 138/18 140/14 142/18
144/10 144/19 145/10 145/20
outcome [2]  52/3 131/23
outside [1]  98/19
outstanding [3]  90/25 134/3
136/21
over [22]  6/2 60/25 65/18 72/5
72/8 72/24 73/7 76/21 80/10 82/16
85/24 91/21 94/12 101/8 110/11
116/1 118/9 125/1 142/12 142/18
150/9 152/20
overlap [1]  46/14
overlapping [1]  77/16
overly [3]  14/16 14/16 23/19
overwhelm [1]  9/23
overwhelming [1]  43/17
own [8]  11/24 75/1 83/5 112/12
123/19 140/14 145/19 145/24

P

p.m [3]  62/19 121/1 153/22
packed [1]  87/8
page [6]  1/19 27/11 31/14 108/9
131/23 131/24
pages [2]  108/6 108/7
PAI [10]  14/13 23/11 23/12 23/15
23/16 24/12 24/14 25/6 25/8 50/23
panic [3]  9/23 43/19 43/19
paradoxical [1]  13/3
paragraph [1]  15/11
paralegal [1]  74/5
parcel [1]  34/7
parenthetically [1]  15/21
part [63]  8/17 9/18 9/20 12/15
14/13 19/22 20/2 20/5 23/12 24/12
24/14 25/10 34/7 36/1 36/8 36/9
39/3 39/15 39/20 45/11 46/15 50/4
66/15 66/18 74/1 74/12 76/11
76/13 78/11 80/4 80/6 81/3 81/13
81/22 81/22 85/1 85/6 85/25 88/9
89/22 89/23 89/25 90/3 92/18
94/20 95/5 95/22 96/3 96/23 96/24
97/17 101/22 102/11 102/18 105/25
106/11 107/21 129/3 129/22 144/3
144/3 149/11 150/11
parte [6]  82/22 82/24 83/3 152/16
152/17 152/19
participate [3]  4/18 41/13 104/6
participated [4]  78/10 96/16
96/20 127/16
particular [34]  5/8 6/9 8/17 12/2
12/3 14/18 15/22 20/18 24/13 28/5
30/4 32/12 42/25 46/18 46/24 87/9
87/18 91/2 92/14 96/13 96/14
100/13 102/3 103/25 104/2 104/25
105/11 105/17 144/4 150/7 151/7
151/7 151/12 151/15
particularly [10]  92/4 94/19

94/23 99/25 101/11 118/20 119/1
122/23 126/2 127/17 151/6
particulars [1]  95/19
parties [21]  62/23 75/12 103/2
109/17 109/19 112/10 114/1 115/8
117/15 120/25 121/6 124/12 125/19
133/13 135/16 136/12 144/23 145/2
145/6 145/10 152/5
parties' [2]  137/3 152/9
partnership [1]  101/22
party [2]  79/16 90/9
pass [1]  82/5
past [9]  21/14 54/21 66/5 67/14
74/15 75/24 81/17 83/14 114/23
path [1]  103/3
pathological [2]  14/16 23/19
patience [1]  62/16
Pause [3]  116/10 140/25 142/9
PDI [1]  49/20
PDQ [1]  49/20
peaceful [1]  150/21
peacefully [1]  113/18
peer [3]  35/16 36/25 129/19
peer-reviewed [3]  35/16 36/25
129/19
penalties [1]  146/22
penalty [1]  125/10
pending [4]  72/22 73/1 74/3 80/12
people [38]  11/5 11/12 12/4 16/25
24/6 30/9 33/5 35/5 37/3 41/14
44/6 45/4 45/8 49/24 52/20 52/23
53/3 56/21 63/16 64/20 65/17 75/7
113/12 115/12 125/7 125/14 126/10
128/15 128/18 128/18 130/4
130/7 130/12 130/12 138/6 148/13
150/8
people's [2]  50/4 66/4
per [1]  31/21
perceive [1]  86/2
percent [7]  36/22 36/24 36/24
67/15 129/16 129/17 142/6
perception [3]  10/14 39/9 150/13
perceptions [1]  94/21
perfectly [2]  129/23 130/15
perform [5]  19/12 19/16 20/11
52/4 84/20
performance [3]  97/3 98/2 98/10
perhaps [6]  109/5 115/18 134/1
135/22 136/25 150/18
period [7]  61/14 61/17 61/19 85/7
88/25 89/2 94/23
periods [3]  61/23 61/23 105/25
peritraumatic [12]  8/24 19/13
19/15 19/16 20/4 20/9 20/11 21/5
21/8 22/5 38/24 43/18
permissible [3]  126/2 127/21
146/11
permitted [2]  45/17 132/25
perpetrated [1]  29/11
perpetrator [3]  7/23 22/15 22/16
person [30]  4/19 7/21 23/6 23/7
29/7 29/8 44/11 44/15 44/16 53/18
83/17 93/1 93/9 103/21 105/18
106/4 106/5 106/7 106/10 106/13
106/17 112/16 112/25 118/8 129/16
138/5 141/6 141/14 141/15 150/8
persona [1]  11/2
Personal [1]  38/25
personality [8]  11/1 11/2 11/4
25/18 43/15 43/16 81/4 84/24
personally [1]  151/16
personnel [35]  70/9 70/15 70/22
76/13 77/2 78/8 78/14 78/16 78/21
78/22 78/22 79/14 79/14 80/2 80/6
80/11 84/10 85/6 87/1 87/3 87/10
87/17 88/7 97/1 97/12 98/20 99/6
99/9 99/19 102/4 102/8 104/10
104/22 135/6 135/11
perspective [2]  76/9 151/24
persuade [1]  132/4
persuaded [3]  124/18 124/18
124/19

**P**

pertaining [1]  118/3
Peyton [2]  2/7 4/13
phase [1]  121/20
philosophy [2]  93/6 111/20
phrase [2]  54/9 54/10
physical [1]  21/21
physiologically [2]  34/20 57/9
pick [9]  62/25 114/6 114/6 114/7
  114/11 115/12 115/23 119/12
  141/22
picks [1]  113/18
picture [1]  94/10
piece [6]  34/11 52/19 55/1 60/20
  86/21 108/5
pieces [3]  16/21 76/10 83/9
pinpoint [2]  59/14 75/23
place [16]  12/2 36/20 58/21 61/13
  64/15 64/17 64/23 68/14 71/6
  79/16 87/16 87/19 104/14 112/25
  125/13 150/20
placed [1]  124/7
placement [4]  85/1 85/2 108/6
  108/11
placements [3]  85/5 85/19 108/12
places [1]  87/15
plainclothes [1]  40/7
Plaintiff [2]  1/4 1/12
planned [1]  65/14
planter [3]  73/17 73/24 73/25
play [6]  45/9 46/3 46/5 67/11
  106/8 132/8
played [2]  83/8 105/19
plead [1]  117/21
pleasant [1]  102/12
please [3]  4/5 5/22 46/10
plenty [3]  18/7 115/2 125/4
podium [1]  4/6
point [49]  16/19 16/22 17/7 17/18
  21/25 30/5 31/13 32/18 33/18
  35/15 37/12 40/8 42/3 44/25 45/19
  50/22 55/17 58/18 58/24 66/1
  67/22 68/3 70/5 72/18 72/20 72/24
  76/22 77/12 83/8 86/22 90/25
  102/23 103/3 103/5 108/4 111/7
  117/1 121/25 123/6 124/20 129/14
  133/8 138/2 138/13 138/16 138/20
  139/1 139/13 151/7
pointedly [1]  31/1
points [4]  10/23 12/12 66/3 82/4
police [5]  15/13 39/23 61/18 94/4
  94/9
politics [1]  65/24
poll [2]  33/25 33/25
polls [1]  34/5
polygraph [4]  26/7 79/9 80/6
  84/17
poor [2]  98/9 111/23
poorly [1]  27/7
portion [15]  16/18 60/6 86/5 90/8
  90/14 90/23 92/16 95/3 95/7 96/7
  96/24 107/12 140/6 140/11 140/12
portion mirroring [1]  140/12
portions [3]  59/12 85/18 89/12
Portland [1]  2/9
posed [1]  121/16
posing [1]  143/19
position [8]  80/16 89/11 89/11
  92/7 134/24 141/4 147/14 148/23
positive [1]  35/13
possess [1]  132/12
possibility [3]  23/7 117/10 139/6
possible [7]  29/15 29/18 48/23
  58/4 73/8 99/15 105/4
possibly [4]  44/18 85/1 116/20
  137/24
post [4]  8/15 38/17 39/2 95/9
post-blast [1]  95/9
post-traumatic [3]  8/15 38/17
  39/2
posted [1]  117/5

postpone [1]  82/16
postponement [7]  80/23 81/22
  32/5 32/9 74/16 74/18 75/13 75/14
  75/23 118/4 146/22
potentially [11]  18/2 18/15 18/18
  18/18 28/23 31/23 31/24 48/12
  48/12 66/21 128/9
power [1]  145/2
practice [4]  84/19 90/20 115/6
  151/7
practiced [1]  66/25
praise [5]  52/12 53/7 53/10 53/13
  53/13
precise [2]  107/2 107/3
preclude [8]  143/3 143/4 143/6
  143/9 143/13 143/21 144/12 145/24
precluded [1]  149/20
prefer [1]  138/22
preference [4]  119/8 141/6 141/8
  141/14
prejudice [4]  144/19 145/15 146/1
  148/7
prejudicial [8]  94/8 122/10
  122/11 147/9 147/18 148/16 148/21
  150/17
preliminarily [2]  122/8 124/5
preliminary [4]  62/13 122/3
  147/23 147/25
premature [1]  143/17
preparation [2]  137/22 141/2
  145/13
prepare [1]  88/20
prepared [11]  63/15 63/16 67/17
  67/18 80/19 84/7 94/6 94/16
  108/18 118/18 139/5
preparing [1]  137/12
present [16]  45/1 45/10 48/20
  51/19 52/13 53/12 53/21 55/8 55/9
  59/23 60/3 61/23 83/8 131/15
  132/1 147/2
presented [5]  13/10 13/11 47/20
  74/13 130/17
presenting [5]  14/14 14/15 14/15
  23/6 23/18
president [7]  63/15 65/25 66/2
  66/8 66/21 74/22 74/23
Press [1]  65/1
presumably [3]  86/18 87/2 119/18
presume [1]  103/21
presumptively [3]  138/14 139/5
  139/10
pretrial [2]  134/20 151/6
pretty [3]  64/14 101/7 138/22
prevent [2]  88/15 109/24
previous [1]  107/16
primal [1]  56/3
primarily [2]  27/15 34/6
principal [1]  112/9
principal's [1]  112/7
principles [1]  28/15
printout [1]  86/18
prior [7]  22/1 22/10 32/14 46/4
  79/24 98/20 100/21
probably [11]  5/7 11/18 60/18
  71/20 88/3 93/4 108/2 108/25
  117/6 119/23 122/5
probative [7]  94/8 122/11 122/11
  147/7 147/10 147/19 147/25
problem [4]  108/4 116/17 137/15
  150/14
problems [1]  65/21
proceed [4]  4/25 63/2 67/23 118/7
proceeding [3]  62/13 82/24 83/3
proceedings [2]  153/22 154/5
process [12]  75/25 77/4 78/25
  81/13 81/22 84/1 84/24 84/25
  87/21 106/3 114/18 123/6
produced [4]  77/10 80/12 99/16
  151/4
productive [3]  73/12 76/9 153/18
professional [3]  27/1 30/7 36/3
proffered [2]  132/6 151/1

program [6]  101/21 102/11 102/17
  102/20 103/2 103/5
programs [1]  119/2
prominent [1]  75/4
promise [1]  115/19
proof [1]  140/18
proper [1]  121/19
properly [2]  42/14 75/11
propose [4]  120/5 135/18 152/10
  152/12
proposed [2]  110/17 110/22
prosecution [11]  58/11 77/11
  77/11 77/13 97/10 105/21 106/8
  134/25 135/17 135/18 143/23
prosecutions [1]  66/22
protect [1]  126/10
protesters [2]  93/17 93/17
protesting [1]  64/21
protests [1]  65/13
prove [3]  110/19 137/16 138/23
proven [1]  149/14
provide [8]  76/15 79/6 79/12
  79/18 88/8 104/4 108/19 121/12
provided [13]  54/19 77/20 77/23
  92/2 101/20 102/15 103/10 104/1
  105/24 107/17 109/10 109/15
  144/24
provider [4]  47/22 48/3 48/5 48/7
providing [6]  6/3 6/9 8/21 83/13
  103/21 114/1
provision [1]  88/20
provoked [1]  89/7
proxy [1]  43/18
prudent [1]  66/5
psychiatric [8]  6/20 32/16 32/18
  32/22 33/17 81/17 83/15 99/22
psychiatrist [5]  33/22 100/2
  123/15 128/4 132/7
psychiatry [1]  128/12
psychological [37]  19/11 32/18
  32/19 33/17 34/4 35/8 52/16 52/18
  57/3 71/15 71/20 80/1 80/2 80/21
  81/3 81/12 82/1 83/15 83/21 83/25
  84/3 84/6 84/20 84/24 85/3 85/18
  92/1 92/4 95/4 95/13 96/17 99/2
  99/22 101/12 132/1 132/6 132/10
psychologist [8]  33/22 36/3 37/2
  123/15 128/4 128/6 128/7 128/11
psychology [9]  19/10 23/8 35/17
  36/6 36/7 56/12 128/5 128/13
  133/1
psychophysiological [3]  34/17
  57/1 57/7
PTSD [37]  6/16 7/7 7/9 8/20 8/22
  8/25 21/5 38/24 38/24 39/3 39/16
  39/22 40/15 40/25 41/1 41/9 46/12
  46/23 46/25 47/7 47/13 48/1 48/2
  48/4 49/8 49/9 49/11 49/23 50/13
  56/17 57/19 71/9 71/11 79/24
  85/21 124/2 124/10
public [8]  2/3 2/7 4/12 4/13 67/7
  83/1 88/1 114/19
publicized [1]  115/22
published [1]  36/25
pull [2]  23/25 25/6
pulled [4]  31/4 80/7 91/5 91/7
pulling [1]  34/7
punch [1]  44/14
punched [1]  44/15
pure [1]  130/11
purposes [1]  147/12
pursuant [1]  33/19
purview [2]  22/21 43/23
push [2]  66/5 67/14
put [19]  24/4 24/8 24/25 29/14
  30/5 36/20 47/6 51/22 53/3 57/5
  75/15 75/16 98/9 99/15 104/6
  111/5 128/3 128/6 142/10
putting [3]  52/21 63/12 75/1

**Q**

qualified [1]  5/12

**Q**

**qualify [2]** 127/12 127/14
**Quantico [5]** 102/10 103/17 103/19 103/22 104/5
**queried [2]** 78/16 78/21
**query [1]** 78/6
**question [63]** 6/24 7/14 10/22 12/6 12/7 13/3 13/8 23/4 25/9 27/2 27/7 28/13 29/14 42/6 42/23 51/14 52/15 52/16 54/9 62/10 65/5 68/2 68/9 68/18 74/17 75/11 81/6 83/7 88/13 99/21 109/20 109/21 110/2 111/8 111/16 112/4 112/12 113/4 113/21 114/22 121/13 121/15 121/18 122/13 123/21 125/4 129/13 130/16 130/17 130/19 131/4 131/15 133/14 135/5 136/20 136/21 137/14 139/17 143/12 143/19 144/9 146/14 147/3
**questioning [3]** 5/5 85/16 118/12
**questionnaire [2]** 19/17 19/20
**questions [24]** 5/21 5/25 33/24 38/7 42/16 49/14 70/5 75/22 79/11 82/8 83/11 83/20 86/6 94/21 103/11 103/12 103/16 120/20 120/20 124/23 144/5 148/3 151/18 152/1
**quick [3]** 116/7 149/7 151/25
**quickly [2]** 58/2 142/24
**quite [13]** 24/9 24/25 34/17 82/12 89/2 89/2 89/13 109/11 112/11 114/21 125/20 125/21 148/15
**quoted [1]** 65/1
**quotes [2]** 15/9 63/10

**R**

**racks [2]** 94/16 94/17
**rail [1]** 122/16
**rails [2]** 123/21 124/6
**raise [8]** 37/23 124/11 143/17 144/19 146/4 146/13 151/13 151/15
**raised [4]** 37/22 68/9 98/11 121/13
**raising [1]** 40/19
**rally [1]** 150/21
**ran [2]** 27/13 36/23 36/24
**RANDOLPH [1]** 1/9
**range [1]** 62/1
**rather [19]** 12/7 17/14 24/8 25/1 27/13 28/23 29/8 30/6 30/10 30/24 36/8 41/11 41/13 46/25 58/18 64/13 115/1 120/20 123/11
**rational [5]** 43/20 44/2 44/23 55/6 59/18
**rationale [3]** 66/17 68/18 68/19
**rationales [1]** 68/20
**Ray [1]** 26/3
**rea [2]** 109/25 132/13
**reach [1]** 113/11
**reached [1]** 38/11
**reaching [1]** 126/5
**react [5]** 44/7 44/19 89/7 128/16 128/19
**reacted [1]** 44/16
**reaction [16]** 9/22 9/24 10/5 11/10 13/14 22/12 29/12 32/10 33/6 45/2 45/13 48/8 55/3 95/23 96/3 126/15
**reactions [4]** 6/6 57/7 68/12 122/2
**read [4]** 56/25 130/17 131/17 133/9
**ready [2]** 123/2 139/9
**Reagan [1]** 42/13
**real [3]** 11/13 11/14 17/10
**realize [1]** 95/12
**really [41]** 5/11 8/23 17/24 18/2 18/3 18/4 18/23 33/12 34/11 35/12 43/13 43/14 44/13 49/7 51/10 51/21 52/19 54/7 57/12 57/15 61/16 63/21 77/5 89/8 94/15

107/23 109/21 111/8 112/10 113/25
113/21 127/3 131/1 131/14 131/14
123/21 127/25 133/12 137/14
139/17 141/9 153/19
**reason [24]** 21/16 38/15 63/17 65/6 66/4 67/15 68/8 68/9 68/18 69/12 69/21 72/6 75/2 106/10 106/16 106/19 117/18 126/5 126/6 126/9 126/11 128/23 144/4 145/16
**reasonable [6]** 33/10 33/15 69/12 86/1 126/6 126/12
**reasonableness [1]** 95/23
**reasoned [1]** 132/14
**reasoning [1]** 131/7
**reasons [10]** 38/21 41/3 63/8 63/20 68/5 68/6 74/4 117/5 137/11 149/15
**rebut [1]** 132/1
**recall [15]** 19/8 21/12 23/21 24/24 39/11 39/13 40/11 40/24 41/2 41/5 49/22 55/3 80/9 80/9 131/19
**recalling [1]** 84/18
**receive [3]** 86/9 88/18 95/2
**received [22]** 77/25 81/17 86/19 88/16 88/17 89/8 89/15 91/14 91/22 91/25 92/1 96/14 96/15 97/2 97/3 98/17 98/25 101/25 106/22 106/24 108/6 108/14
**receiving [1]** 136/7
**recent [3]** 37/16 111/13 127/3
**recently [2]** 83/9 127/17
**Recess [1]** 62/19
**recognize [2]** 79/4 109/10
**recognizes [1]** 11/24
**recollection [2]** 79/8 79/20
**reconsidering [1]** 139/12
**record [15]** 4/2 4/6 13/23 62/20 70/10 70/22 91/6 95/7 97/9 107/14 131/13 150/4 152/22 152/24 154/5
**recordings [1]** 11/20
**records [37]** 47/16 47/18 47/21 48/5 70/16 71/24 78/2 78/21 78/22 78/23 80/24 81/3 82/20 83/1 83/4 83/5 84/4 88/21 90/10 90/19 90/20 90/21 90/22 91/10 92/8 92/10 95/2 96/19 99/8 100/17 108/10 108/11 108/11 108/12 145/5 145/8 147/12
**recoverable [2]** 97/24 97/25
**Recross [2]** 3/6 59/3
**Recross-examination [2]** 3/6 59/3
**redactions [1]** 135/11
**redirect [3]** 3/5 42/25 43/4
**rediscovered [1]** 97/2
**refer [3]** 43/18 78/14 105/21
**reference [1]** 91/5
**referenced [1]** 92/5
**referring [6]** 6/23 28/9 29/12 127/19 131/22 147/4
**reflects [1]** 68/23
**refrain [1]** 148/19
**regard [4]** 38/20 44/8 109/14 151/17
**regarding [10]** 6/9 58/3 97/25 109/23 128/22 143/7 143/14 143/22 144/13 152/5
**regards [3]** 92/9 97/9 140/4
**region [1]** 57/2
**regions [3]** 56/20 57/2 57/8
**regular [1]** 15/8
**reiterate [1]** 49/19
**relate [1]** 124/23
**related [11]** 6/7 8/5 8/7 8/10 39/22 46/21 46/21 50/6 77/16 106/14 140/9
**relates [3]** 52/2 52/17 86/11 148/24
**relating [7]** 96/16 96/19 114/9 121/18 130/24 147/12 147/15
**relationship [3]** 8/4 8/6 26/12
**relatively [3]** 50/11 143/1 153/18
**relevance [4]** 82/5 82/14 125/22

145/17
**relevant [19]** 7/11 47/5 76/25 81/2 81/25 83/9 85/4 85/19 89/12 89/16 89/16 92/24 93/21 94/7 103/1 131/24 144/2 144/7 144/7
**reliability [2]** 16/4 126/14
**reliable [3]** 16/8 27/22 125/24
**relied [1]** 85/16
**relieved [1]** 17/13
**rely [3]** 47/15 83/14 118/16
**relying [3]** 58/18 64/25 83/11
**remain [1]** 134/3
**remainder [1]** 15/5
**remarks [1]** 112/6
**remember [15]** 9/13 9/15 9/20 11/18 11/25 18/19 41/8 50/20 51/24 54/15 54/16 89/1 89/8 92/20 129/14
**remembered [4]** 9/12 9/19 12/5 17/3
**remembers [1]** 16/21
**remind [5]** 5/2 37/22 37/24 141/25 149/22
**remote [2]** 101/10 109/10
**remotely [1]** 4/18
**renew [4]** 146/1 147/24 148/2 148/7
**renowned [2]** 39/22 129/5
**reopen [1]** 138/16
**reopening [2]** 114/24 115/5
**repeat [3]** 5/21 21/6 64/12
**repeatedly [2]** 18/10 87/18
**replies [1]** 142/13
**reply [6]** 72/10 72/11 134/16 134/18 140/19 154/13
**report [35]** 9/4 9/11 9/16 9/18 13/12 13/16 14/7 17/4 19/4 19/9 22/18 24/2 26/23 27/5 27/11 28/8 28/19 28/19 28/21 32/7 32/10 34/6 36/10 50/4 71/14 76/6 95/16 108/13 120/23 135/8 135/14 135/15 136/7 136/11 152/11
**reported [12]** 9/6 10/4 13/11 14/20 19/7 25/16 34/13 40/2 50/7 55/2 81/18 86/8
**reporter [5]** 1/22 1/22 50/11 154/3 154/13
**reporting [2]** 40/5 97/19
**reports [8]** 21/18 24/5 36/19 51/1 83/11 84/7 86/9 131/14
**represent [1]** 66/11
**representation [3]** 91/7 115/20 135/7
**representing [1]** 67/12
**reptile [1]** 55/24
**request [28]** 4/17 4/24 67/4 70/8 76/12 80/4 80/25 81/7 87/14 90/19 90/23 92/5 97/8 97/17 99/11 100/20 100/23 103/11 107/18 107/20 114/17 140/21 141/18 143/18 148/18 152/16 152/17 152/19
**requested [6]** 81/5 82/13 87/18 90/17 100/9 100/10
**requesting [1]** 90/20
**require [2]** 138/14 139/22
**required [5]** 109/25 111/16 113/24 137/14 137/15
**requirement [2]** 41/17 111/18
**requires [1]** 111/10
**requiring [1]** 65/20
**requisite [1]** 132/13
**research [12]** 27/16 27/18 34/4 36/1 39/25 40/3 40/4 45/20 128/13 129/7 129/8 129/13
**reserved [1]** 115/17
**reserving [1]** 147/1
**resolve [5]** 77/10 145/3 148/3 151/21 151/21
**resolved [5]** 63/18 75/8 117/7 143/2 143/11

**R**

**resolving [1]**  155/19

**resources [3]**  66/10 143/15 144/6

**respect [34]**  4/11 43/1 62/25
67/24 72/12 108/1 108/16 109/20
110/6 110/12 118/6 120/22 121/11
121/20 122/8 122/17 123/11 123/23
124/2 124/4 124/15 125/25 126/15
126/17 130/23 131/18 135/15 137/4
137/13 144/21 147/14 148/20
149/25 150/14

**respectful [2]**  116/14 141/10

**respond [13]**  18/16 34/2 34/19
71/8 76/8 77/4 96/4 98/14 107/15
129/7 133/12 134/12 140/19

**responder [5]**  29/4 29/16 35/22
69/19 71/8

**responders [13]**  27/18 27/18 27/24
28/18 28/21 30/1 36/1 36/5 36/21
36/23 37/3 39/23 129/5

**responding [6]**  9/7 10/15 29/8
78/13 96/16 113/14

**responds [1]**  34/21

**response [15]**  26/17 32/1 32/14
41/22 49/16 76/10 76/12 80/23
86/1 90/22 95/10 97/6 99/11
103/11 108/1

**responses [3]**  35/13 44/23 96/1

**responsibility [3]**  40/21 52/8
125/15

**responsive [11]**  79/19 87/14 89/20
90/10 90/10 90/21 90/22 92/8
92/10 97/9 98/11

**rest [3]**  80/8 120/13 152/3

**resting [1]**  152/3

**Restricted [1]**  26/20

**restrictions [1]**  80/12

**rests [1]**  74/13

**result [6]**  41/1 72/21 95/20
101/13 123/19 138/19

**resulted [1]**  110/20

**resulting [1]**  53/14

**results [3]**  33/25 33/25 65/16

**rethinks [1]**  118/14

**retired [1]**  29/6

**return [1]**  133/12

**reversal [1]**  132/24

**reversed [3]**  112/5 132/3 132/11

**review [13]**  14/25 17/18 25/1 46/4
58/13 84/9 97/6 97/13 97/15 97/25
99/13 105/12 111/14

**reviewed [9]**  35/16 36/25 76/16
78/9 78/15 78/25 84/12 99/16
129/19

**reviewing [1]**  27/25

**reviews [5]**  97/1 97/3 97/3 97/12
104/11

**revisit [3]**  134/2 138/19 139/7

**RICO [3]**  116/18 116/25 117/6

**right [49]**  4/23 7/1 16/9 16/12
18/18 19/18 22/22 25/7 28/1 36/11
36/14 53/20 55/14 58/23 62/10
62/12 62/23 63/11 64/8 64/11 65/3
66/1 69/2 70/4 71/16 72/4 77/15
80/14 84/14 85/9 87/19 91/19 96/9
96/21 98/16 107/5 107/6 108/15
108/22 108/22 116/4 121/7 128/4
133/7 140/13 147/1 150/25 151/20
153/17

**riot [3]**  148/22 150/19 150/22

**rioter [4]**  148/8 149/3 149/15
150/10

**rioters [4]**  148/20 149/3 150/15
150/16

**rioting [1]**  65/17

**riots [1]**  65/11

**risked [1]**  53/14

**robbery [2]**  112/16 112/17

**Rocha [5]**  1/12 3/4 3/6 4/7 76/2

**role [6]**  105/20 106/8 106/11
123/1 123/1 132/8

**room [3]**  1/24 11/8 52/24

**Rouchard [1]**  101/5

**RPR [1]**  154/12

**rule [13]**  21/4 21/7 21/18 22/4
30/20 30/20 122/17 122/20 123/6
123/25 127/15 130/22 132/18

**ruled [2]**  21/14 73/5

**rules [1]**  130/21

**ruling [8]**  83/21 138/17 143/11
144/8 145/11 145/14 146/14 147/2

**run [9]**  25/8 28/23 30/9 32/11
35/22 52/11 83/17 106/1 142/24

**running [8]**  28/3 30/23 52/9 53/7
53/2 74/22 114/9 117/2

**runs [3]**  29/19 52/9 58/4

**Rylant [4]**  85/23 85/25 86/6 88/8

**S**

**S's [2]**  111/21 111/24

**safer [1]**  67/20

**safety [2]**  74/16 74/19

**said [34]**  10/1 11/24 22/13 38/10
42/22 48/11 54/14 54/20 54/23
61/1 65/5 67/6 79/21 84/16 90/8
92/3 106/17 109/12 109/12 113/3
115/8 120/2 120/17 128/17 129/9
129/15 129/15 129/20 130/13
130/15 130/21 130/22 131/8 136/6

**same [12]**  6/1 15/4 31/16 48/14
57/10 97/8 114/15 123/14 123/15
132/10 140/15 140/17

**San [3]**  67/19 67/10 130/3

**Sarah [2]**  1/12 4/7

**sat [2]**  130/6 130/6

**satisfied [2]**  42/4 91/24

**satisfy [3]**  102/21 103/6 103/9

**saved [1]**  53/14

**saves [1]**  58/4

**saving [1]**  53/23

**saw [5]**  22/14 28/4 89/6 94/11
150/9

**say [72]**  6/13 10/23 11/10 15/7
17/25 18/10 19/24 21/8 31/21
31/22 32/21 33/25 35/2 35/15
35/24 36/18 40/9 44/2 44/14 46/20
47/23 48/12 51/12 52/24 54/8
54/17 54/20 54/24 55/7 56/16
57/10 59/12 59/18 60/5 60/15
61/25 64/5 67/15 72/21 75/14 78/9
79/7 86/23 87/25 94/2 98/8 99/13
101/6 102/16 102/22 104/4 105/10
108/15 110/4 110/5 110/13 110/17
111/14 114/24 123/13 125/5 125/5
125/12 128/10 130/18 133/25
136/24 137/10 138/14 139/4 139/8
140/14

**saying [32]**  10/11 10/11 31/16
33/6 33/10 48/17 53/2 60/5 61/16
68/9 85/10 89/1 92/2 99/20 99/21
110/14 112/23 112/24 113/2 113/6
114/6 123/12 123/14 123/16 125/13
125/14 126/5 126/11 128/20 128/23
131/4 131/12

**says [27]**  14/20 15/11 16/15 17/4
33/4 37/1 52/10 54/16 55/3 57/14
81/17 87/5 90/18 90/22 91/5 107/1
110/20 110/22 111/20 112/8 112/15
113/17 118/14 138/12 138/25 147/7
148/9

**scale [10]**  20/16 23/12 23/16
23/17 23/20 23/22 24/22 49/9
50/22 115/24

**scales [3]**  23/14 24/12 24/14

**scans [2]**  56/13 56/17

**scenario [1]**  138/24

**scene [2]**  65/11 95/11

**schedule [17]**  21/1 76/18 116/14
117/25 119/10 119/11 120/24 121/9
135/12 135/18 135/21 135/23
136/10 140/5 140/11 140/15 140/20

**scheduled [5]**  118/4 119/11 133/18
142/4 142/5

**scheduling [1]**  82/15

**science [3]**  55/24 56/13
128/1 130/11

**scientific [4]**  38/2 126/6 126/12
128/2

**scope [2]**  96/6 107/24

**score [3]**  23/23 24/20 24/23

**scores [2]**  24/4 24/22

**scoring [3]**  25/5 25/5 50/23

**scrambling [1]**  72/14

**scraping [1]**  54/1

**screen [1]**  31/5

**screens [1]**  119/1

**script [1]**  56/25

**scripts [1]**  56/23

**scroll [1]**  13/18

**se [1]**  31/21

**seal [4]**  73/25 74/1 152/23 152/24

**sealed [1]**  152/25

**search [1]**  15/18

**searching [1]**  101/3

**second [8]**  10/1 30/16 31/9 34/22
65/19 93/4 119/20 136/6

**secret [2]**  74/2 143/7

**section [11]**  8/1 8/10 13/16 13/19
14/20 15/5 15/7 16/18 19/3 27/10
31/2

**secure [2]**  63/15 73/14

**security [1]**  74/2

**see [48]**  5/18 12/21 16/4 17/20
17/24 17/24 17/25 18/9 20/24 21/2
22/2 24/17 27/6 28/2 35/19 45/5
56/17 56/19 56/20 62/6 62/18 69/3
69/7 69/17 70/1 73/3 79/25 81/24
87/10 90/1 96/7 96/23 97/14 97/21
99/16 102/12 107/13 109/25 113/7
113/13 115/5 135/6 141/22 142/8
142/23 145/7 146/1 148/4

**seeing [3]**  11/21 12/3 48/6

**seek [1]**  66/12

**seeking [6]**  85/5 95/15 134/6
144/14 145/14 145/24

**seeks [1]**  90/5

**seem [3]**  49/22 50/14 101/10

**seemed [2]**  17/12 105/2

**seems [9]**  34/7 65/15 89/9 99/18
99/20 112/19 117/21 126/20 137/25

**seen [9]**  30/22 31/10 63/14 75/15
75/17 102/6 102/8 102/8 150/12

**sees [2]**  29/17 29/19

**selective [4]**  73/1 134/25 135/17
143/23

**self [4]**  34/6 81/18 93/21 146/25

**self-defense [1]**  93/21

**Senator [1]**  74/24

**sense [17]**  8/23 9/23 14/6 21/17
32/24 40/16 51/22 52/4 53/25
66/17 68/8 68/12 68/19 112/19
120/17 141/11 150/1

**sensitive [4]**  76/16 79/1 80/13
88/3

**sensitivity [1]**  79/5

**sent [1]**  100/15

**sentence [4]**  14/19 28/5 28/9
34/25

**sentences [3]**  34/8 64/3 103/8

**sentencing [1]**  121/17

**separate [5]**  76/14 87/19 96/25
97/11 148/12

**separately [1]**  82/12

**September [2]**  82/9 82/9

**September 25th [1]**  82/9

**series [1]**  114/25

**serious [1]**  7/21

**served [1]**  106/22

**service [3]**  83/2 83/3 143/7

**session [1]**  16/14

**set [9]**  35/7 78/24 80/12 121/9
124/3 135/12 140/10 140/20 141/2

**setting [2]**  84/11 117/11

**settled [1]**  111/15

**several [1]**  65/16

**sex [3]**  132/4 132/8 132/12
**SF [1]**  81/16
**SF-86 [1]**  81/16
**share [3]**  119/1 119/2 122/2
**she [34]**  10/13 10/13 13/14 27/5 38/10 39/21 39/25 71/10 79/21 79/23 81/19 83/12 83/14 83/15 84/2 85/16 122/6 122/17 128/4 128/5 128/8 128/11 128/11 128/11 128/12 128/17 128/19 128/23 129/3 129/4 129/8 129/9 129/13 129/20
**SHERRY [3]**  1/22 154/3 154/12
**shock [7]**  16/23 16/25 18/4 60/10 60/13 60/15 60/19
**shocked [2]**  18/25 61/9
**shooter [1]**  67/12
**shooting [1]**  44/11
**short [4]**  45/3 45/11 84/5 108/18
**short-circuited [1]**  45/3
**short-circuits [1]**  45/11
**shot [1]**  42/12
**should [37]**  23/2 23/3 30/8 37/7 47/23 54/25 63/2 79/5 81/8 83/4 89/17 91/5 93/25 94/3 94/6 94/15 94/17 95/24 98/24 108/24 110/4 114/1 120/24 121/25 125/5 131/22 132/24 132/25 134/4 136/11 138/15 138/17 139/5 143/1 145/6 148/11 151/21
**shove [1]**  44/13
**show [9]**  56/14 70/11 70/16 71/5 71/25 77/25 83/23 86/16 113/8
**showing [1]**  87/4
**shown [1]**  111/21
**side [1]**  69/6
**sides [6]**  37/19 114/8 117/20 120/19 121/22 121/25
**sight [1]**  57/4
**significance [2]**  36/17 132/2
**significant [11]**  9/5 11/16 27/23 47/20 59/25 85/18 89/12 90/7 96/3 124/11 137/20
**siloed [1]**  104/15
**similar [5]**  33/6 35/5 57/11 86/5 128/15
**simply [8]**  33/9 42/20 89/11 108/15 109/12 111/24 144/18 151/3
**SIMS [1]**  25/14
**since [7]**  19/21 20/7 20/24 76/5 114/23 135/25 140/5
**single [1]**  48/17
**singular [1]**  133/17
**sir [1]**  4/21
**sit [1]**  42/23
**site [1]**  83/17
**sitting [1]**  11/8
**situation [6]**  20/18 20/24 29/3 45/2 79/5 114/16
**situations [2]**  21/20 56/16
**six [2]**  108/2 138/6
**size [1]**  73/25
**skeptical [3]**  124/16 143/16 144/6
**skepticism [1]**  68/6
**skill [1]**  127/13
**sliding [1]**  115/24
**slight [1]**  141/14
**slightly [1]**  88/24
**slots [1]**  120/6
**slow [1]**  71/7
**so [322]**
**social [2]**  83/2 100/2
**soft [1]**  36/8
**solid [1]**  102/7
**some [74]**  5/4 12/22 14/13 17/10 24/9 24/25 25/8 32/24 33/1 33/19 35/3 36/16 38/2 42/16 45/20 45/24 46/18 57/15 62/24 62/25 82/12 85/2 85/18 86/15 87/11 87/23 88/14 88/19 88/25 89/14 90/18 90/21 91/8 91/8 92/21 96/18

**somebody [20]**  29/16 44/11 54/1 57/11 82/25 84/21 86/2 93/2 93/3 94/11 94/11 105/19 106/17 106/18 113/6 113/11 113/17 113/19 125/10 125/12
**someday [1]**  137/25
**someone [59]**  7/10 7/12 7/15 7/16 10/24 11/13 14/4 18/4 18/13 20/21 22/15 23/16 29/11 29/18 29/21 31/20 31/24 32/4 33/20 36/4 36/13 43/9 43/19 44/12 44/17 45/17 46/20 47/3 48/10 48/18 48/21 48/24 50/10 50/11 50/13 50/15 50/19 51/17 53/23 53/24 54/2 55/18 56/16 56/16 57/14 59/6 59/10 60/9 62/7 105/22 112/14 112/15 129/25 130/24 137/8 137/9 138/2 138/5 143/2
**someone's [2]**  87/1 130/23
**something [74]**  12/3 15/14 15/15 16/7 18/8 19/25 20/23 21/14 21/19 22/24 24/15 28/4 29/11 29/17 29/19 29/23 31/19 31/23 31/24 32/25 33/9 45/9 46/3 49/3 49/5 49/23 51/21 52/5 52/6 52/7 52/25 53/23 54/5 54/17 54/20 54/21 57/12 57/15 60/17 61/25 71/13 74/19 75/19 79/22 80/11 88/3 89/19 90/21 96/5 99/12 99/19 100/5 100/12 101/18 102/17 105/5 105/13 106/2 107/25 108/2 110/11 114/1 115/4 117/8 117/10 118/13 122/15 123/25 126/22 138/7 139/6 144/14 145/10 149/12
**sometimes [1]**  26/11
**somewhat [4]**  36/12 109/7 113/4 114/10
**somewhere [5]**  25/2 35/12 48/19 87/7 107/9
**soon [1]**  91/6
**sorry [19]**  7/14 21/6 23/4 27/1 30/15 31/4 31/7 31/13 42/10 60/4 70/21 75/13 91/12 103/14 103/15 116/6 142/15 147/6 152/17
**sort [48]**  7/8 7/8 9/23 10/17 11/12 13/3 13/5 15/20 18/11 32/25 33/2 33/17 33/20 35/13 36/12 37/4 38/11 38/21 42/2 47/9 55/25 60/14 60/20 78/5 78/17 78/20 82/19 88/18 94/10 95/4 95/9 95/9 95/14 96/25 100/8 102/16 102/22 103/1 105/13 105/14 105/16 105/24 107/8 111/7 112/18 113/7 120/19 134/8
**sorts [1]**  87/2
**sound [7]**  15/13 27/13 30/10 36/23 36/24 91/20 128/22
**soundness [1]**  37/5
**sounds [5]**  30/24 57/4 57/4 91/6 95/15
**source [1]**  68/24
**space [1]**  48/16
**spaced [2]**  49/5 59/20
**spacing [1]**  59/24
**speak [5]**  52/18 56/9 56/9 77/14 77/17
**speaking [1]**  6/1 11/22 13/14 14/22 32/6 64/3 70/21
**speaks [3]**  35/21 149/17 151/25
**special [3]**  84/21 99/24 107/1
**specific [29]**  6/11 12/11 19/14 19/19 20/20 28/2 28/4 34/8 35/21 37/9 38/11 43/8 43/9 47/2 47/5 47/12 48/8 57/17 57/19 59/12 59/14 59/16 71/12 80/4 100/10

**specifically [7]**  27/24 32/6 46/4 90/2
**specificity [2]**  105/16 124/20
**specifics [4]**  45/24 45/25 100/11 100/12
**specified [2]**  48/8 101/19
**spectrum [6]**  10/17 10/20 12/9 59/7 59/10 62/2
**speculation [1]**  86/24
**spend [2]**  11/7 117/24
**spent [1]**  138/3
**spewing [1]**  50/12
**spitting [1]**  44/19
**split [7]**  43/12 43/15 43/16 55/9 60/2 60/5 60/6
**splitting [1]**  43/17
**spoken [6]**  32/23 33/4 35/5 37/2 128/14 128/18
**spotty [1]**  11/12
**spouse [1]**  44/10
**squad [1]**  107/4
**square [1]**  89/9
**squigglies [1]**  79/9
**staff [1]**  118/20
**stage [3]**  82/5 151/5 151/11
**stairs [1]**  61/15
**stand [9]**  46/1 53/2 84/14 123/13 128/7 134/25 135/9 135/10 135/15
**standard [15]**  6/19 49/8 49/10 49/23 110/16 110/17 111/6 111/11 111/16 126/13 126/13 127/11 127/14 128/2 137/19
**standards [2]**  51/8 149/8
**standing [6]**  16/23 16/25 60/14 73/18 113/12 113/18
**stands [1]**  50/21
**staring [1]**  48/16
**start [17]**  12/19 43/6 80/20 82/19 87/19 88/5 88/6 94/9 116/17 117/2 120/14 120/15 121/1 121/1 124/17 125/22 128/19
**started [1]**  61/8
**starting [5]**  4/5 88/1 116/22 120/15 131/23
**starts [3]**  16/22 57/14 113/19
**state [55]**  4/6 12/16 12/22 12/24 13/2 13/4 13/5 13/16 13/23 17/2 17/22 17/24 18/3 18/5 19/7 20/19 24/2 39/5 39/7 41/18 41/19 43/7 43/19 44/11 44/24 45/8 45/8 45/18 48/11 48/21 48/24 51/14 52/2 52/12 52/16 53/5 53/10 55/11 55/19 58/5 59/7 59/11 61/2 61/6 61/17 68/16 83/2 127/22 127/22 129/6 130/10 130/23 130/24 147/10 148/1
**stated [1]**  21/13
**statement [1]**  15/3
**statements [16]**  19/3 19/4 50/14 54/22 64/25 76/8 90/5 145/20 145/22 145/24 147/4 147/8 147/9 147/13 147/15 147/18
**states [11]**  1/1 1/3 1/10 4/3 4/8 30/21 37/15 61/8 62/21 65/21 117/19
**stationed [2]**  83/18 105/25
**statistical [2]**  36/16 36/17
**status [11]**  71/14 76/3 76/6 91/1 91/5 135/8 135/14 135/15 136/6 136/11 152/11
**statute [4]**  42/20 109/22 139/19 148/15
**statutes [2]**  145/5 145/8
**step [3]**  100/8 115/1 115/12
**steps [1]**  103/6
**stick [4]**  113/19 113/19 138/17 151/18
**sticking [1]**  115/24
**still [31]**  11/18 11/25 34/6 38/2 51/16 61/12 67/21 68/24 69/1 69/2 69/8 71/12 72/2 72/22 75/17 75/22

**...**

(column 1 top continued)
**100/10 100/20 101/20 103/3 104/23** ...
**110/1 110/2 111/17 112/9 112/13**
**112/21 113/5 114/12 115/14 119/12**
**121/23 122/2 123/5 123/6 123/23**
**124/3 125/15 126/8 131/18 137/13**
**137/19 138/13 139/22 141/11 144/4**
**145/15 148/3 150/20**

**103/10 103/12 103/16**

**S**

still... [15]  76/9 76/15 82/14 86/22 88/9 89/15 97/12 109/9 109/14 114/12 136/5 136/21 139/24 147/22 149/15
stimulus [1]  18/16
sting [3]  15/13 15/14 15/21
stinger [1]  15/20
stipulate [3]  73/16 73/24 145/7
stipulation [1]  70/3
stipulations [1]  73/8
stone [2]  115/25 116/1
stood [1]  16/16
stop [1]  37/18
store [3]  45/12 59/15 59/24
straight [2]  50/15 67/12
straightforward [1]  143/1
strain [1]  115/15
strategic [2]  94/10 94/20
streamline [1]  145/1
streamlined [1]  73/9
street [6]  1/13 1/16 2/5 2/8 52/25 112/23
stress [10]  8/5 8/6 8/10 8/16 20/11 38/17 39/2 47/23 47/23 48/4
stress-related [2]  8/5 8/10
stressed [1]  56/22
stressful [2]  56/15 99/25
strictly [1]  14/6
strike [3]  85/14 124/10 139/19
strikes [2]  113/4 128/9
string [2]  121/23 121/24
strong [2]  114/19 141/8
stronger [2]  15/25 69/20
struck [1]  122/15
structured [3]  22/6 22/7 25/13
Structures [1]  25/16
struggle [1]  9/15
struggling [1]  11/18
studied [2]  33/19 50/12
studies [13]  33/8 34/17 34/18 35/3 35/15 35/20 55/10 56/19 56/21 57/1 57/3 57/11 57/18
study [9]  35/16 35/21 36/13 36/14 36/15 36/20 37/7 37/9 57/20
stuff [4]  33/21 40/16 94/7 94/10
subject [5]  37/13 70/4 105/19 125/10 145/9
submitted [6]  72/4 76/6 99/11 105/7 105/8 152/19
subpoena [22]  70/8 77/4 78/13 78/24 79/19 80/23 82/6 82/6 82/8 82/11 82/20 87/21 100/9 100/13 100/17 100/21 100/22 102/21 103/7 107/10 107/11 107/16
subpoenaing [1]  83/1
subpoenas [1]  87/19
subsequent [1]  107/19
subset [1]  78/20
substance [1]  21/19
substandard [1]  98/9
substantial [3]  87/23 115/15 150/19
substantially [4]  94/8 122/11 123/10 147/18
subsumed [1]  39/4
such [9]  14/17 83/1 86/18 86/18 86/19 86/19 87/5 87/5 135/19
sudden [1]  57/13
suffered [2]  38/17 40/25
suffering [2]  40/25 46/20
sufficient [12]  35/6 35/9 35/10 35/11 66/10 75/2 102/21 112/18 112/19 113/8 124/19 126/14
suggest [1]  135/20
suggested [3]  100/24 135/23 136/17
suggesting [1]  150/21
suggestion [1]  150/24
suggests [1]  110/18
Suite [2]  2/5 2/9

summarizing [1]  108/9
summed [1]  103/16
Superior [1]  67/9
supervisors [1]  104/20
Supervisory [1]  4/12
supplement [1]  72/15
supplemental [1]  151/23
support [5]  35/16 40/23 63/9 73/4 112/20
supportive [2]  47/19 47/19
supports [1]  63/12
suppose [2]  29/23 138/11
suppress [1]  151/24
suppression [2]  72/2 72/16
Supreme [12]  37/15 112/4 125/9 127/3 130/15 130/17 130/20 130/20 131/8 131/10 131/12 131/16
sure [51]  5/19 5/24 5/25 7/14 9/14 9/17 12/14 12/19 27/4 31/8 37/14 42/3 45/15 46/2 49/24 59/21 63/20 64/15 64/20 65/13 67/15 68/24 75/5 76/19 76/23 78/12 79/21 81/25 84/11 86/12 93/12 96/8 100/9 101/1 101/4 101/8 107/24 109/25 111/15 113/3 116/24 121/5 124/9 125/1 125/21 125/23 135/1 140/10 142/7 151/2 152/21
surprise [2]  88/18 102/13
surprised [2]  86/20 86/23
surprising [2]  82/19 139/20
surreal [3]  61/11 61/13 62/7
surrounding [2]  23/2 23/3
surveillance [1]  143/7
surveying [1]  36/5
Suzanne [3]  3/3 4/15 69/15
SW [1]  2/8
swing [1]  68/16
switch [1]  11/2
switching [1]  131/20
syllabus [1]  90/14
sympathetic [2]  137/4 138/8
symptom [16]  6/11 6/13 6/16 8/20 8/22 8/25 11/11 16/24 17/1 25/10 46/18 46/18 46/24 50/5 50/6 61/11
symptomatic [1]  17/16
Symptomatology [1]  25/13
symptoms [20]  8/14 9/4 9/4 9/6 10/1 10/2 10/5 10/6 13/9 13/11 20/3 20/19 25/24 46/11 47/25 48/6 48/8 49/21 55/3 56/17
syndrome [1]  121/19
system [3]  78/5 78/22 79/14
Systems [1]  25/16

**T**

TABLE [1]  2/11
tactical [1]  94/21
tainted [1]  131/8
take [23]  4/23 9/17 11/1 24/7 29/9 41/3 41/9 45/4 60/1 60/5 63/5 64/15 64/23 97/11 100/8 112/3 112/15 116/25 117/1 120/6 124/13 137/17 150/20
taken [3]  62/19 103/6 125/1
takes [1]  112/17 118/12
taking [3]  56/2 68/14 86/17
talented [2]  33/12 33/14
talk [11]  33/23 37/25 41/23 43/24 63/4 75/7 75/9 76/2 128/7 130/12 140/22
talked [8]  7/8 38/5 41/25 49/22 62/5 71/4 71/7 151/17
talking [41]  8/23 16/22 16/22 18/25 32/23 35/12 35/13 39/19 42/18 43/2 56/14 60/16 61/18 63/10 65/25 66/3 74/23 74/24 74/25 74/25 81/20 82/15 83/16 103/4 107/10 113/23 114/10 117/4 117/24 127/3 127/22 129/10 130/4 130/12 130/19 131/1 137/2 139/15 148/15 152/18 152/21
talks [1]  79/16

tall [1]  73/17
Taylor [2]  67/16 71/20
team [2]  85/2 106/13
team's [1]  66/2
teams [1]  84/2
technical [1]  69/5
television [2]  74/21 114/10
tell [16]  18/3 37/8 38/9 52/22 88/13 88/17 88/17 91/2 106/5 108/24 109/18 121/2 128/20 133/23 137/10 152/20
telling [4]  13/23 14/11 58/19 113/12
tells [1]  105/7
tempo [1]  115/13
ten [2]  51/11 142/24
tend [4]  11/13 20/13 24/4 137/4
tendency [2]  20/25 28/22
term [27]  6/5 12/14 12/17 12/24 12/25 13/9 15/15 15/17 15/19 15/24 29/5 43/22 46/2 46/5 50/17 51/15 55/5 56/8 56/9 56/11 59/21 148/17 149/9 149/9 149/15 150/5 150/10
terminology [2]  149/20 149/22
terms [22]  6/1 7/7 9/19 11/11 13/13 14/12 21/10 21/23 34/12 34/16 50/16 52/19 77/7 77/19 78/8 98/9 98/12 108/6 139/20 148/8 149/11 149/13
terrace [1]  73/13
terribly [3]  85/14 109/1 111/15
terrorism [1]  71/2
test [18]  14/10 19/12 19/14 22/15 22/18 23/12 25/10 25/11 26/3 26/5 26/9 26/12 26/13 26/15 26/20 27/19 85/3 127/1
tested [3]  16/8 23/10 27/20
testified [9]  30/8 45/21 51/3 58/11 127/25 129/24 130/3 130/9 132/7
testifies [3]  41/5 123/4 128/8
testify [17]  40/25 41/4 45/17 122/8 122/12 123/1 123/5 123/22 124/7 124/19 125/24 126/3 126/5 127/21 128/17 128/23 133/1
testifying [6]  42/4 109/21 122/24 125/25 149/25 150/15
testimony [29]  41/3 49/2 62/25 82/1 86/11 93/7 95/3 101/12 109/23 113/1 120/23 121/10 121/11 121/18 123/6 123/9 123/11 124/13 124/17 125/22 126/15 130/14 130/15 131/3 132/1 132/6 132/10 132/14 132/18
testing [13]  14/12 14/12 14/13 47/15 49/8 49/23 80/21 81/3 81/4 81/12 81/21 83/15 84/24
tests [5]  24/12 25/8 26/1 49/14 49/17
Texas [1]  106/13
text [1]  93/15
than [57]  12/7 13/23 14/9 17/14 21/5 21/8 24/8 25/1 25/8 27/13 28/23 29/8 30/6 30/10 30/24 32/2 32/7 33/9 36/4 36/8 41/1 44/24 45/15 46/25 51/16 54/1 58/18 59/22 64/9 64/13 65/9 66/25 67/18 84/13 84/16 88/5 94/8 96/20 99/8 99/19 102/25 108/3 110/4 113/4 113/22 113/24 115/1 116/19 120/20 122/10 122/11 138/25 139/8 139/12 140/3 147/19 148/5
thank [28]  4/21 4/22 6/18 25/22 29/1 30/18 31/15 37/11 55/14 60/22 62/15 62/17 69/3 69/9 69/10 107/5 108/20 108/22 116/9 116/11 133/10 134/22 136/14 142/17 150/3 152/14 153/17 153/21
Thanksgiving [1]  134/13
that [1409]
that is [1]  131/9

**their [48]** 11/8 18/6 18/10 18/10
22/8 28/22 29/17 29/19 36/15
46/20 48/14 50/16 51/20 54/6
55/19 55/19 55/20 55/21 56/18
57/1 57/2 57/6 57/13 60/10 63/11
65/2 75/1 79/15 79/15 80/23 83/5
87/2 92/21 98/7 103/11 106/5
120/19 120/22 125/8 125/10 125/11
125/17 128/1 130/10 137/21 144/25
145/2 147/24
**them [37]** 9/17 11/19 11/25 11/25
15/14 15/19 18/6 18/17 24/18 25/5
33/24 38/24 40/2 44/14 44/19
48/20 49/15 53/24 57/12 57/15
57/15 57/16 68/7 84/7 84/12 89/13
93/10 104/12 113/13 114/20 118/7
120/23 121/5 133/9 133/16 142/6
147/22
**themself [1]** 83/1
**themselves [7]** 23/18 49/7 51/19
60/25 105/13 145/3 145/10
**then [81]** 9/25 10/5 10/8 15/20
16/14 17/3 18/19 18/20 18/20 19/9
20/9 24/7 24/8 34/8 39/18 41/9
41/16 45/10 45/11 46/22 48/4
48/16 48/20 50/18 53/19 56/4
56/24 56/25 57/1 57/7 57/24 59/1
59/15 61/14 61/17 61/17 61/19
65/16 68/8 71/9 73/6 74/11 76/7
81/22 88/14 98/14 99/11 100/10
100/18 104/10 106/12 106/21
108/17 108/18 111/1 116/5 116/22
117/2 117/7 118/14 119/11 120/16
121/3 121/7 127/16 128/8 134/16
134/19 134/23 136/5 136/7 137/15
137/15 138/4 138/19 139/12 140/18
143/21 144/3 150/15 151/1
**theory [2]** 67/23 67/25
**therapy [1]** 14/4
**there [227]**
**therefore [6]** 33/14 34/1 52/12
97/7 109/3 123/16
**thereof [1]** 75/17
**these [39]** 10/23 11/18 13/25
15/22 16/21 17/15 33/8 33/13 37/8
62/8 66/22 75/9 76/25 77/1 80/24
85/19 86/7 98/14 99/14 100/3
103/1 104/5 105/1 112/13 113/10
114/4 114/12 115/13 115/14 117/10
118/2 123/13 130/25 139/24 147/6
148/3 150/7 150/12 151/10
**they [171]**
**thing [25]** 10/1 18/12 31/16 35/2
39/18 47/7 50/10 54/23 57/10
66/16 69/20 79/8 80/7 81/9 86/15
95/14 100/10 104/25 107/4 110/3
121/8 123/14 126/4 128/14 152/8
**things [50]** 6/2 10/17 10/23 11/19
11/21 11/24 12/5 14/15 15/8 15/8
17/15 18/11 30/23 34/15 34/18
44/6 50/2 50/4 54/14 56/22 61/10
62/7 64/13 67/21 69/19 72/15 77/1
77/2 78/10 78/14 78/17 78/18 79/6
79/13 80/4 84/11 85/17 86/7 87/18
93/10 95/21 95/21 95/25 100/3
107/1 115/13 118/14 119/21 123/13
141/15
**think [237]**
**thinking [7]** 11/11 109/7 112/12
136/24 137/3 139/16 140/7
**thinks [1]** 111/23
**third [4]** 41/16 79/16 90/9 103/1
**third-party [1]** 79/16
**this [243]**
**those [74]** 8/4 8/13 11/24 13/15
15/13 16/1 21/15 21/20 24/17
28/20 29/20 30/23 34/14 38/19
39/1 42/16 45/19 47/18 49/17
49/21 50/24 51/7 51/25 57/17
59/16 69/19 71/21 71/22 71/24

73/7 74/3 74/3 74/4 75/22 76/11
84/2 86/22 88/11 88/13 88/21 91/9
91/18 91/21 92/6 95/2 95/20 96/1
100/1 105/2 108/3 108/7 108/14
109/18 117/12 119/25 120/22
121/18 128/16 128/18 133/8 135/4
135/9 136/8 145/7 145/18 147/13
147/18 151/13
**though [16]** 11/19 12/6 18/2 38/1
46/1 49/6 51/18 54/4 55/20 57/10
61/22 89/5 100/8 110/2 127/11
139/21
**thought [13]** 17/11 45/24 45/24
52/5 70/9 70/13 70/22 71/11 86/25
116/16 127/18 129/11 150/18
**thoughts [1]** 136/20
**thousands [1]** 33/5
**threads [1]** 109/22
**threat [2]** 31/25 56/3
**threatening [2]** 7/21 28/24
**three [15]** 11/7 35/15 38/13 38/25
68/7 71/20 74/7 75/20 96/18 97/4
116/1 116/18 116/19 117/11 142/5
**three-week [1]** 116/18
**through [23]** 19/22 19/25 20/14
22/8 25/8 31/8 36/2 37/20 39/25
47/10 54/21 56/4 56/6 99/5 101/25
102/17 102/18 104/2 106/1 106/3
112/12 130/24 142/24
**throughout [2]** 48/6 71/19
**throwing [1]** 15/13
**ticked [1]** 49/17
**tied [1]** 79/25
**time [75]** 5/11 5/20 7/7 7/8 9/1
9/22 10/5 10/6 10/15 12/3 13/14
13/17 19/7 19/8 20/4 20/22 21/19
22/12 24/9 24/25 26/20 32/13
37/10 41/18 41/25 43/3 44/5 47/22
48/8 55/4 58/8 61/1 63/15 64/11
72/16 73/6 75/9 76/5 78/3 78/11
80/10 81/4 82/12 82/23 83/3 85/7
88/25 89/2 89/2 89/14 94/24
101/25 102/18 104/20 105/23
105/25 111/3 113/18 114/21 115/6
117/2 117/24 118/12 119/11 129/16
129/17 138/3 139/9 140/17 141/3
144/23 147/11 148/1 149/23 151/15
**Timed [1]** 26/17
**timeline [1]** 80/22
**times [13]** 18/20 30/9 51/2 51/11
51/11 52/22 52/23 60/18 60/19
67/17 74/7 90/16 116/1
**timing [3]** 75/21 102/16 143/15
**Tires [1]** 127/5
**titled [1]** 13/16
**titles [1]** 107/3
**today [20]** 4/18 4/25 22/13 41/24
63/3 69/15 70/5 71/12 71/13 73/12
73/22 80/4 88/7 91/14 91/16 92/2
117/24 147/11 151/21 151/21
**today's [1]** 91/6
**together [2]** 57/5 79/25
**told [18]** 9/6 9/11 9/18 32/3
69/19 70/6 73/20 73/22 76/14
85/21 100/14 104/17 107/14 107/16
117/18 117/21 123/14 128/25
**too [6]** 52/15 72/12 120/18 132/24
134/6 135/21
**took [10]** 19/4 21/23 49/20 64/17
79/16 85/16 86/16 87/5 87/6
150/20
**top [5]** 24/24 35/20 35/23 37/8
80/9
**topic [5]** 66/2 92/9 112/10 120/23
127/20
**topics [1]** 107/8
**touch [1]** 49/25
**touched [1]** 42/1
**tough [1]** 55/5
**toward [12]** 20/25 27/13 30/23
32/6 35/21 35/22 40/2 40/12 58/15

125/21 128/22 128/25
**towards [2]** 14/22 28/3
46/23 29/18 29/19 30/10 32/11
36/23 36/24 36/24 56/19 56/10
93/16 93/17 126/4 129/16
**TR [1]** 7/2
**track [2]** 20/22 20/22
**trained [8]** 29/16 36/2 36/3 37/2
72/1 89/25 93/15 94/12
**training [61]** 14/2 14/5 20/6
27/21 27/24 29/25 30/22 31/11
31/23 40/4 53/11 71/24 76/11
76/24 77/7 77/9 77/19 77/24 79/16
85/24 86/11 86/19 87/1 87/4 88/2
88/16 88/17 89/6 89/8 89/18 89/24
90/4 90/7 90/8 90/15 91/13 91/15
91/25 92/7 92/12 92/15 92/21 93/6
94/23 95/22 96/4 96/6 96/14 96/19
96/24 101/25 102/4 102/18 102/19
103/20 104/3 104/3 104/6 127/13
128/24 135/10
**trainings [14]** 78/1 86/3 86/4
88/11 90/12 91/10 91/14 91/21
91/22 92/15 92/17 93/13 95/20
98/17
**trait [4]** 20/17 20/20 20/25 21/15
**transcript [12]** 1/9 74/1 77/21
77/24 91/17 96/12 102/5 102/7
102/8 102/9 135/10 154/4
**transcripts [2]** 86/15 98/16
**trauma [32]** 6/4 6/6 6/7 6/7 6/7
6/14 7/9 7/11 7/13 7/16 7/17 7/18
8/10 9/1 21/12 22/14 22/16 38/24
38/25 38/25 39/1 39/1 39/22 46/21
50/6 56/22 57/19 71/6 71/6 71/10
83/21 124/2
**trauma-related [2]** 6/7 46/21
**traumatic [15]** 8/15 11/16 21/25
31/11 31/20 31/21 38/17 39/2
39/10 46/22 47/2 47/12 47/25
56/24 85/20
**travel [2]** 134/20 141/10
**treat [2]** 107/11 123/17
**treatment [8]** 47/16 47/18 47/21
47/22 48/3 48/5 48/5 48/7
**trial [57]** 5/13 63/4 63/8 63/17
64/15 65/22 66/19 73/8 73/15
74/17 75/3 76/18 76/21 77/5 82/15
82/16 83/24 87/23 87/24 88/5
88/20 89/15 94/3 94/4 98/2 108/17
109/14 114/18 114/20 116/15 118/5
118/9 118/10 118/20 118/21 119/12
119/13 119/18 120/20 131/7 131/8
134/1 138/1 141/2 142/4 142/20
143/2 143/18 143/20 144/9 145/1
145/4 145/23 146/13 147/24 148/4
153/21
**trials [2]** 142/5 142/19
**trick [1]** 93/10
**trickier [1]** 114/11
**tried [1]** 92/13
**true [11]** 17/16 19/4 52/20 53/3
55/24 65/6 65/7 69/18 69/20 128/3
154/4
**truly [1]** 11/18 41/8 153/20
**Trump [2]** 14/22 74/23
**trust [1]** 66/10
**truth [2]** 19/6 66/17
**truthful [2]** 93/7 93/8
**try [15]** 18/6 32/24 36/17 63/16
66/24 67/14 79/17 87/20 93/10
101/19 104/24 115/6 122/4 144/25
145/3
**trying [10]** 16/6 33/1 35/18 40/18
52/14 74/8 94/9 99/4 107/23 141/9
**tunnel [4]** 45/4 45/7 51/20 113/12
**turn [7]** 44/14 56/25 91/21 94/3
115/25 116/1 145/16
**turns [7]** 115/21 117/5 122/21
138/6 138/18 142/18 144/19
**TV [1]** 75/15
**two [35]** 18/23 18/24 19/1 29/20

**T**

two... [31]   37/16 38/13 40/10
67/8 68/6 76/10 76/21 76/21 82/3
87/12 88/5 88/5 89/14 96/17 103/8
108/9 109/19 114/16 116/1 118/7
120/6 121/14 127/24 134/1 134/14
135/9 143/3 149/8 150/6 151/20
152/10
**type [20]**   21/11 33/6 42/11 42/17
61/2 93/22 94/6 94/10 96/18 107/4
111/16 113/8 113/23 113/24 118/11
124/13 124/17 130/14 146/23 147/2
**types [5]**   6/6 15/22 33/8 130/14
146/10
**typically [4]**   34/1 99/22 100/5
130/22

**U**

**U.S [1]**   1/23
**ultimate [3]**   40/10 40/16 40/23
**umbrella [3]**   6/5 46/25 47/7
**unable [4]**   16/23 21/11 43/19
45/12
**unambiguously [1]**   95/5
**uncommon [1]**   22/23
**unconscious [1]**   13/7
**unconsidered [1]**   44/5
**under [33]**   8/8 8/15 9/25 17/7
21/18 28/20 31/24 39/20 46/12
46/23 46/25 47/6 47/7 48/1 49/3
53/22 53/24 54/2 56/15 56/20
73/25 81/9 93/8 94/7 122/20 123/6
126/13 127/15 128/15 128/15 132/1
132/18 148/14
**underlying [2]**   85/20 108/19
**underneath [1]**   6/5
**understand [49]**   7/14 9/18 20/14
24/11 24/19 27/1 35/19 37/6 38/15
41/6 44/3 46/10 50/25 51/15 51/17
51/7 52/1 52/14 58/7 63/21 67/13
68/7 68/20 69/11 72/11 73/13
73/23 74/1 77/22 88/7 89/18 90/4
90/17 91/3 91/9 91/13 95/14 97/10
97/19 101/19 101/22 106/14 111/3
129/22 132/19 136/17 144/15
149/10 151/3
**understanding [20]**   12/1 24/15
26/11 28/7 28/12 30/11 69/22 78/3
79/10 86/7 86/14 89/23 92/2 94/22
96/11 98/24 102/9 102/21 104/13
135/3
**understands [1]**   93/15
**understood [11]**   5/14 6/13 7/21
70/7 70/8 101/16 104/25 105/4
117/23 139/14 140/4
**undoubtedly [1]**   59/25
**unduly [2]**   148/16 148/21
**unethically [1]**   93/1
**unexpected [1]**   153/20
**unintentional [1]**   44/4
**uniquely [1]**   64/23
**UNITED [8]**   1/1 1/3 1/10 4/3 4/8
37/15 62/21 117/19
**unless [5]**   18/3 95/13 115/20
117/9 138/12
**unlikely [3]**   117/6 117/21 133/1
**unnecessarily [1]**   141/16
**unopposed [1]**   145/21
**unprepared [1]**   66/9
**unravel [1]**   44/21
**unresolved [1]**   67/22
**unrest [1]**   113/24
**unruly [2]**   63/11 63/16
**until [12]**   48/2 66/19 66/20 68/10
82/2 117/1 123/2 139/1 139/2
143/2 143/2 143/11
**untrained [1]**   48/22
**unusual [2]**   49/6 153/20
**up [46]**   25/6 31/4 36/15 44/17
54/1 56/13 56/20 57/23 58/2 58/25
61/15 62/25 63/5 71/7 74/17 83/23

85/22 92/2 94/17 94/24 94/25
102/16 105/2 107/13 108/2 113/18
115/12 116/24 120/6 124/3 126/20
133/11 133/16 134/9 139/6 139/8
139/9 141/11 143/9 149/23 151/18
**update [5]**   76/7 79/4 79/6 91/1
91/5
**updates [1]**   92/22
**upper [1]**   73/12
**upset [4]**   57/13 57/16 89/5 129/1
**upward [1]**   105/19
**urgency [1]**   79/5
**us [23]**   5/22 46/10 51/2 55/24
67/10 73/15 80/25 81/6 87/19
88/10 100/15 102/22 103/22 105/14
115/16 117/1 117/17 118/15 120/4
121/2 137/10 140/14 141/2
**USAO [1]**   1/15
**use [53]**   6/1 6/15 12/14 13/9 14/1
15/23 20/2 23/12 24/11 24/13
24/13 28/15 50/24 61/21 71/25
72/1 82/24 84/2 85/23 85/24 86/4
86/10 87/6 87/8 91/9 91/12 92/14
92/25 93/16 93/20 94/17 95/24
96/1 96/16 96/17 96/24 140/15
143/14 144/23 147/15 148/8 148/10
148/17 149/2 149/9 149/9 149/11
149/13 149/17 149/21 150/5 150/6
150/17
**used [14]**   7/4 10/25 15/17 15/19
15/25 29/5 43/15 49/2 49/2 50/17
52/19 56/15 88/2 94/22
**uses [2]**   41/21 44/17
**using [13]**   12/23 12/25 20/8 34/8
46/10 50/16 56/18 93/2 94/16
144/22 148/11 149/20 150/1
**usually [3]**   36/11 51/23 82/20
**uttered [2]**   54/9 54/10
**utterly [1]**   82/16

**V**

**Validity [1]**   25/11
**value [1]**   147/7
**Vance [1]**   74/25
**variety [1]**   137/17
**various [4]**   63/8 63/10 106/1
144/22
**vast [1]**   40/3
**verify [1]**   36/19
**versus [21]**   4/3 17/11 33/6 33/20
36/25 42/7 42/11 42/20 44/4 45/10
52/3 52/15 62/21 64/22 65/8 93/1
110/24 117/19 126/5 137/2 149/9
**very [46]**   5/24 5/24 10/21 11/15
18/24 29/5 31/14 32/1 34/5 34/7
34/12 34/25 37/4 47/2 47/12 48/19
49/4 50/14 58/25 60/9 60/16 61/9
61/13 62/7 70/18 83/10 86/22
87/15 89/25 91/10 91/25 92/19
104/8 104/15 105/17 105/23 106/24
108/18 111/4 114/19 125/7 125/9
138/24 144/22 144/25 153/19
**veteran [5]**   49/3 53/22 53/22
56/23 60/24
**veterans [1]**   28/19 49/11 57/6
**via [2]**   62/22 118/24
**vicarious [1]**   39/1
**vicariously [1]**   7/20
**Vice [3]**   65/24 66/2 74/22
**victim [3]**   7/16 112/7 149/12
**video [25]**   4/14 4/14 14/25 17/18
17/20 17/22 18/3 18/12 28/1 28/3
67/5 69/9 86/17 113/15 113/17
118/18 118/24 118/25 119/2 119/2
119/21 121/1 141/6 141/12 141/18
**view [11]**   27/25 70/18 79/19 106/5
112/3 113/25 124/8 130/14 147/23
147/25 148/20
**views [1]**   63/1
**vindictive [1]**   73/2 77/10 77/13
97/10 134/24 135/18 140/12

**violate [1]**   145/23
**violence [12]**   23/4 47/10 64/7
64/8 64/19 65/3 65/7 65/9 65/10
68/11 109/2 110/20 115/21
**violent [1]**   44/15
**violently [1]**   44/19
**virtually [1]**   32/25
**vision [2]**   45/5 51/20
**voice [4]**   11/21 11/22 11/23 11/24
**voir [4]**   75/9 75/22 75/25 151/16
**volume [1]**   143/15
**vs [1]**   1/5

**W**

**wait [2]**   75/3 140/6
**waiting [2]**   73/3 126/22
**walk [1]**   51/24
**walked [2]**   31/8 61/15
**Walker [1]**   121/6
**walking [3]**   14/22 17/3 61/25
**wall [1]**   73/17
**wandering [1]**   101/2
**want [70]**   4/18 5/2 5/24 5/25 6/2
9/17 25/8 27/4 38/14 41/3 41/6
41/10 43/1 46/1 46/2 51/16 61/21
62/24 63/5 70/25 73/7 75/2 76/23
78/9 80/20 80/22 81/13 82/3 88/14
89/10 95/16 96/8 97/15 97/21
97/24 100/8 100/9 101/1 101/4
107/13 109/12 109/17 110/8 114/24
116/13 117/14 117/21 118/7 118/16
118/17 119/12 120/6 121/2 124/1
124/12 125/3 125/18 126/23 133/23
134/16 135/1 135/21 137/24 138/2
138/13 139/24 141/12 141/15
143/17 152/20
**wanted [12]**   57/23 58/2 64/15
68/24 82/18 95/20 96/5 96/23
107/21 120/7 149/7 149/16
**wanting [2]**   78/12 147/12
**wants [7]**   96/13 97/11 120/19
123/3 137/23 145/16 150/7
**warrant [1]**   72/3
**was [297]**
**Washington [7]**   1/5 1/16 1/24
14/21 106/12 106/18 107/2
**wasn't [6]**   17/23 53/12 60/17
70/13 131/8 140/10
**wasting [1]**   58/7
**watch [1]**   57/6
**watched [1]**   75/10
**watching [4]**   16/25 18/2 18/12
45/9
**way [45]**   5/21 12/10 12/12 14/13
14/15 22/24 23/8 33/1 34/8 44/19
48/15 50/7 56/4 57/15 57/24 73/18
74/9 75/18 78/6 79/15 89/7 92/13
93/2 96/6 98/22 98/23 100/24
105/15 105/20 106/8 113/21 117/4
118/8 118/25 119/7 120/18 123/9
123/12 123/20 126/8 131/10 136/4
141/1 144/25 149/18
**ways [4]**   91/23 94/5 118/7 150/6
**we [378]**
**we'll [13]**   5/19 14/19 34/5 41/23
59/2 62/14 73/20 124/13 134/19
142/15 142/21 151/5 151/13
**weaponry [1]**   15/23
**week [18]**   47/21 71/17 76/15 76/20
79/7 82/9 98/25 116/18 118/5
119/19 119/20 134/1 134/16 135/9
142/2 142/3 142/5 142/6
**weekend [4]**   72/5 72/9 72/24
110/12
**weeks [10]**   76/21 76/21 87/12 88/5
88/5 89/15 116/19 116/19 117/4
134/14
**weird [1]**   118/25
**welcome [7]**   42/24 111/5 117/16
118/19 122/4 126/16 144/5
**well [76]**   5/20 8/6 8/7 12/23
13/25 14/12 16/21 18/23 19/19

**well...** **[67]**   20/15 21/10 23/14
27/15 27/18 28/2 29/5 29/23 31/21
32/13 34/3 34/10 35/20 35/23
35/25 36/21 37/7 43/22 46/13
47/20 48/13 49/1 52/18 53/9 53/20
54/12 55/23 56/19 57/18 57/20
58/16 59/21 60/8 60/9 60/11 60/13
61/7 66/13 70/3 81/24 86/3 86/11
87/22 88/12 102/14 103/23 104/21
108/15 111/15 116/23 117/3 118/4
118/15 118/17 127/5 127/25 128/10
128/17 134/2 135/16 139/8 139/18
142/10 146/9 147/3 148/19 152/7
**went [17]**   40/6 53/1 54/21 61/14
69/22 71/19 76/13 89/24 98/21
101/25 102/10 102/17 102/18 103/2
128/22 150/15 150/16
**were [73]**   5/3 9/6 14/22 17/21
17/25 21/12 30/12 30/25 36/21
38/10 41/2 43/2 45/18 47/18 48/8
48/10 49/14 49/16 49/17 50/23
52/11 53/18 53/20 54/5 54/6 60/15
60/18 60/19 65/1 69/19 70/22 73/3
74/17 76/5 76/11 78/11 78/12
78/21 80/6 82/10 83/19 84/3 84/7
84/10 84/11 84/17 93/2 94/4 94/16
99/10 104/5 104/23 105/13 107/9
107/14 107/16 111/22 114/23
117/12 117/12 118/25 119/17
121/14 123/5 127/18 131/3 131/15
132/11 138/10 148/14 150/8 151/10
151/12
**weren't [3]**   52/13 72/19 131/4
**west [3]**   73/13 74/7 120/14
**whacking [1]**   113/19
**what [270]**
**whatever [9]**   67/24 70/19 77/11
86/17 88/12 96/13 101/12 121/19
138/25
**when [92]**   6/1 9/7 11/7 11/10
11/13 14/23 14/25 16/24 17/13
19/22 19/24 20/22 22/7 27/12
28/22 28/24 29/13 31/11 31/19
31/22 32/12 34/11 35/24 37/19
40/5 41/4 41/19 42/12 42/15 42/17
44/2 47/6 48/14 49/4 51/22 52/4
52/8 52/20 53/12 53/21 54/9 56/3
56/16 60/4 60/18 61/6 64/3 64/11
64/16 67/6 70/7 71/8 71/18 72/21
78/4 78/11 79/2 79/16 82/21 82/25
83/3 84/20 86/23 87/4 87/5 93/7
93/9 93/14 95/24 98/23 99/6 99/23
102/10 109/20 113/13 113/13 119/8
119/20 121/8 123/18 127/20 128/3
128/6 130/8 133/14 133/23 134/12
134/23 139/25 149/23 150/10
151/10
**where [97]**   5/2 7/15 10/19 10/19
11/6 12/1 12/8 14/7 14/21 15/15
17/23 20/22 21/11 22/7 25/4 31/24
33/2 33/21 34/5 37/1 40/6 42/6
44/5 44/25 45/3 45/5 45/6 45/8
45/16 45/21 48/18 51/24 52/7
52/23 53/23 56/7 56/12 56/19
56/21 56/23 57/3 57/5 57/13 59/9
59/18 60/19 61/11 61/14 61/17
61/23 61/23 64/10 66/1 68/16
70/16 71/6 76/1 79/6 80/20 82/23
87/23 88/10 90/5 94/24 98/3 98/14
100/1 100/5 102/24 103/20 105/24
106/22 109/16 111/23 112/5 112/22
113/17 113/23 114/8 115/14 125/7
125/8 127/21 128/14 128/19 128/19
129/23 130/25 134/25 135/9 135/10
135/15 136/25 137/1 141/4 145/6
148/4
**whereas [3]**   36/23 47/2 129/17
**whereby [1]**   125/4
**whether [99]**   5/12 7/10 12/13
12/15 12/20 12/22 14/15 15/1 15/1

16/7 16/8 20/9 21/10 21/14 22/9
29/24 31/9 32/8 34/23 35/1 35/9
35/9 35/10 35/13 35/21 35/22
42/18 42/20 44/4 46/2 46/4 48/10
50/5 50/6 50/8 50/10 50/19 51/21
54/10 65/4 65/5 65/13 75/14 75/15
75/23 83/12 83/16 83/17 84/6
85/16 86/7 89/19 90/14 93/16
93/24 94/4 97/11 100/4 104/25
105/1 121/18 123/4 124/9 126/2
129/8 129/13 129/19 129/25 130/1
135/5 136/12 138/23 143/3 143/4
143/9 143/13 143/21 144/12 145/5
145/12 145/19 145/22 146/3 146/6
146/10 146/17 146/21 146/25 147/4
148/8 149/16 150/19 151/1 151/16
**which [58]**   6/6 6/23 11/1 17/12
28/25 29/20 31/13 33/18 37/1 37/4
37/17 43/17 47/25 50/17 56/6
61/11 61/13 64/23 66/7 66/20 68/8
68/18 70/23 71/2 72/16 75/4 78/2
78/11 78/21 84/25 91/14 100/17
101/21 102/11 109/24 110/3 110/9
111/1 111/8 111/9 111/20 112/9
117/2 118/11 120/10 121/16 124/24
124/25 125/14 133/17 142/25 143/3
143/12 144/24 147/12 148/25 149/1
150/21
**while [7]**   39/5 39/5 57/6 63/23
75/19 100/13 112/15
**who [67]**   4/14 7/16 7/16 9/6 10/24
11/5 12/4 18/7 20/21 29/16 29/18
29/21 35/5 35/24 36/5 36/21 37/3
38/5 48/10 48/21 48/24 50/11
59/14 61/18 62/10 63/1 63/16
63/23 64/20 66/21 67/7 67/11
73/19 85/10 87/8 93/15 94/16
100/3 103/21 105/18 105/19 106/4
106/5 113/10 113/11 113/13 113/18
121/2 121/3 129/24 130/3 130/12
134/4 137/6 137/9 137/10 137/16
137/20 138/5 138/5 138/9 138/10
139/22 148/13 148/14 150/14
**who's [1]**   136/1
**whoever [2]**   99/21 100/3
**whole [6]**   38/10 38/11 54/14 57/5
60/21 114/25
**whose [1]**   136/1
**why [30]**   5/6 23/10 41/1 43/6
43/15 43/18 44/6 48/12 49/16 53/1
53/2 54/19 64/7 66/4 74/1 81/24
81/24 81/25 82/16 84/7 92/24
119/10 121/2 129/1 134/10 136/9
136/13 140/15 145/17 152/11
**wide [1]**   73/17
**will [85]**   11/12 16/9 30/9 34/19
37/19 37/20 37/24 38/19 41/4
45/23 52/24 58/9 59/1 62/18 63/16
65/22 66/7 66/9 66/12 66/24 69/20
70/11 75/14 76/14 77/20 77/23
79/2 79/7 88/22 92/12 95/8 96/24
98/2 100/23 115/10 115/11 117/14
121/5 121/12 126/4 129/16 131/11
131/17 132/19 133/7 133/9 135/13
136/8 136/10 136/18 137/11 137/19
137/20 140/17 140/18 142/20 144/2
144/2 144/6 144/7 144/8 144/18
145/1 145/8 145/10 145/14 145/21
145/25 146/5 146/8 146/12 146/14
146/15 146/19 146/23 147/2 147/20
148/2 148/17 149/2 150/3 151/14
151/18 151/18 152/6
**Willamette [1]**   2/5
**willing [1]**   66/11
**Wilson [1]**   1/12
**win [1]**   63/23
**window [3]**   17/11 17/14 115/17
**wiring [3]**   55/25 56/1 56/1
**WISE [57]**   1/6 4/4 4/14 4/17 4/20
8/12 10/19 11/10 13/1 15/9 16/15
27/12 30/6 30/11 41/4 41/11 47/16

48/7 50/17 54/9 58/14 59/9 61/6
62/2 65/23 68/3 73/3 73/18 84/1
84/23 85/20 88/22 89/25 90/5
92/19 93/14 95/10 96/14 97/4
97/13 97/18 98/17 106/20 106/22
113/17 122/18 123/2 123/13 124/8
126/1 126/7 133/6 141/11 141/13
143/23 148/13 150/17
**Wise's [23]**   20/24 28/7 38/16
39/24 46/24 83/11 85/17 85/24
86/6 89/17 90/11 94/21 95/23 96/4
97/15 98/7 104/19 122/13 141/10
147/4 147/10 147/15 147/25
**withdrawn [1]**   107/14
**withdrew [1]**   99/12
**withheld [1]**   79/7
**within [6]**   12/9 27/5 39/4 47/24
89/17 104/14
**without [12]**   40/17 50/16 53/4
53/15 53/17 79/11 105/15 142/2
144/18 145/15 146/1 148/6
**witness [15]**   5/12 58/23 75/12
93/8 127/12 127/14 127/21 127/21
130/18 144/1 144/4 144/16 149/24
150/6 150/7
**witness' [1]**   149/8
**witnessed [1]**   7/19 12/1 39/1
**witnesses [11]**   3/2 75/12 75/13
143/14 143/22 145/13 148/18
149/17 149/19 149/21 150/14
**witnessing [1]**   60/14
**won [1]**   54/3
**won't [2]**   65/22 118/11
**word [10]**   15/23 15/25 26/5 48/17
51/22 85/17 148/10 148/11 149/2
149/25
**worded [1]**   27/7
**words [10]**   15/13 16/1 24/8 25/1
44/17 44/18 110/25 112/1 124/25
150/17
**work [8]**   15/23 20/6 20/13 23/6
78/15 119/25 131/11 145/10
**worked [10]**   28/22 54/3 67/8 67/9
71/3 71/3 85/5 85/7 88/22 100/11
**worker [1]**   100/2
**working [7]**   27/17 27/24 28/18
76/10 100/16 100/22 108/4
**works [8]**   33/7 34/4 49/25 61/22
75/21 98/18 120/4 131/11
**world [1]**   94/17
**worries [1]**   114/16
**worse [2]**   64/13 120/9
**worst [1]**   56/24
**would [228]**
**wouldn't [10]**   13/4 13/6 31/21
33/21 64/15 67/13 114/23 124/22
125/17 150/23
**wrestle [1]**   33/16
**write [1]**   108/13
**written [4]**   34/15 50/12 118/15
139/19
**wrong [3]**   40/10 65/11 81/19
**wrongdoing [1]**   41/13
**wrote [1]**   27/11

---

**Y**

**yeah [14]**   21/7 44/22 50/1 51/12
55/17 56/19 77/21 112/24 112/24
112/24 116/8 129/22 131/8 136/23
**year [1]**   130/5
**years [8]**   66/25 67/8 67/10 75/21
88/23 88/24 97/4 97/5
**yelling [1]**   54/15
**Yemen [1]**   71/2
**yes [79]**   4/21 5/1 6/22 7/6 7/10
7/24 8/3 9/13 9/15 9/15 9/22 9/24
10/18 13/18 14/13 15/6 15/10
16/17 17/9 17/9 17/20 23/10 24/17
24/18 25/3 25/15 28/12 30/1 30/17
31/1 31/15 31/15 31/21 31/25
34/16 34/20 35/3 41/15 43/11
46/13 47/17 49/1 49/13 50/4 51/1

**Y**

**yes... [34]**  51/9 54/18 58/20 59/8
62/9 64/4 69/3 69/18 80/18 81/19
90/2 90/3 94/18 96/10 97/23 98/19
101/18 104/8 104/13 105/4 105/10
113/2 116/12 118/1 119/19 120/3
121/7 127/6 127/9 127/19 133/21
134/17 140/10 152/23
**yet [6]**  104/14 104/14 124/18
124/19 125/23 126/11
**Yogi [1]**  87/12
**York [7]**  58/15 85/7 85/13 95/19
105/23 106/14 128/25
**you [597]**
**you're [2]**  29/3 56/14
**your [159]**
**yours [2]**  46/8 51/16
**yourself [1]**  62/6
**yourselves [1]**  146/16

**Z**

**zombie [2]**  61/15 62/1
**zone [1]**  11/7
**Zoom [1]**  62/22