# In the United States District Court
## for the District of Columbia

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br><br>v.<br><br>JARED WISE,<br>Defendant. | Case No. 1:23-cr-00184-RDM<br><br>Supplement to defense motion (ECF 75) to compel discovery to support Wise's selective prosecution, selective enforcement, and vindictive prosecution allegations |

**Table of Contents**

I.     Introduction ..................................................................................................3

II.    Supplement to motion to compel discovery ...............................................3

    A.     FBI New York Office bias against and Wise based on his support of Trump.........................................................................................................3

    B.     A senior FBI official provided false information about Wise to the media...........................................................................................................5

    C.     Potential leaks from FBI to media regarding Wise and Project Veritas .........................................................................................................5

    D.     Wise's history as a federal whistleblower supports ordering disclosure. .................................................................................................. 6

    E.     Information from current FBI Special Agents (SAs) about FBI and DOJ political bias, misbehavior, and excesses related to January 6th (J6) investigations and prosecutions .........................................................7

    F.     Proposal by Wise to investigative journalist James O'Keefe of Project Veritas.......................................................................................... 9

    G.     The FBI did not attempt to interview Wise before his arrest. ...............10

    H.     Arrest conditions were unnecessarily harsh .........................................10

    I.     The indictment added two felony counts under suspect conditions. ...................12

    J.     The process is punishment (e.g., unfounded, defamatory labeling of Wise as a "Band 1 Operator" Terrorist) ............................................13

    K.     Wise's connection to senior FBI leaders directly involved in J6 investigations generally and specifically in Wise's case........................17

    L.     Government's fleeting defense of an improper traffic stop ...................19

M.    The FBI is violating its own policies by protecting one of its sources from criminal liability at the expense of Wise's rights as a victim of international wire fraud................................................. 20

N.    The "some evidence" standard is more than met here...........................................25

O.    Specific discovery requests ...................................................................................25

III.    Conclusion .................................................................................................................... 26

## I.    Introduction

The Defendant, Jared Lane Wise, filed a Motion to Compel Discovery in support of his claims of selective prosecution, selective enforcement, and vindictive prosecution. ECF 75. The government filed its opposition. ECF 89. Wise filed a Reply. ECF 93. At the motion hearing on this motion, it became evident that further factual support with assist the Court in ruling that discovery should be compelled. This supplement adds that further support.

Notably, Wise maintains that he has already met his burden to compel discovery in support of his claims. He has shown some evidence of similarly situated defendants being treated differently, which is not as high of a bar as the opposition claims. Wise has presented evidence supporting his claims of selective prosecution, selective enforcement, and vindictive prosecution and thus the Court should compel discovery of information supporting those claims. The opposition has failed to refute evidence that Wise has put forth, and thus Wise's motion should be granted.

## II.    Supplement to motion to compel discovery

Facts support Wise's view that the government seeks to punish him because of his prior employment as an FBI Special Agent (SA) and his consistent efforts to exercise his First Amendment rights to expose FBI, DOJ, and government corruption.

### A.  FBI New York Office bias against and Wise based on his support of Trump

Wise was assigned as a Supervisory Special Agent in the FBI's New York field office in June 2016, in the runup to the 2016 Trump's election as U.S. President. Wise avers that after his arrival to the New York office and before Trump's January 20, 2017, inauguration, Trump was scheduled to receive a security briefing by personnel from the New York FBI office. In a meeting involving the office's senior leadership, including Wise, Wise heard members of the FBI senior leadership disparage Trump before the briefing was to occur.

Wise further avers that in another instance, ASAC Charles Berger (Wise's direct supervisor) taunted Wise in a meeting of field office management because of Wise's support of Trump. Indeed, Mr. Wise avers that Berger exhibited a history of animosity towards Wise, beginning before Wise's arrival in New York when Berger moved Wise from the position for which he was selected by the FBI's formal process, in favor his own personal choice who had not been chosen.

In 2017, a SA who reported to Wise, and had personal connections to the Trump White House, came to Wise and explained that the White House wanted the SA to be detailed to the White House, and asked Wise how he should proceed. Wise informed his supervisor, Berger, and explained that it would be an outstanding opportunity for the SA, and that Wise supported the request. Berger sent the request up the FBI's management structure for approval. Soon after, Berger met with Wise, and angrily explained that FBI Deputy Director Andrew McCabe had declined the request and was upset that Wise and the SA had asked. Wise asked Berger how the FBI, as an Executive Branch agency, could refuse a White House request. Berger became angry with Wise, ordered him to inform the SA that his request had been denied and warned Wise against bringing up the subject again.

Wise avers that it was known in the office that Berger had a vendetta against Wise from the moment he arrived at the office, likely because Wise was selected by the formal career board for the Supervisory SA position over Berger's personal preference. Shortly before Wise left the FBI in 2017, he gave Berger an extremely poor performance review, which also seems likely to have upset Berger. After Wise left the FBI, he was told of multiple instances where Berger punished individuals who were sympathetic to Wise.

**B.   A senior FBI official provided false information about Wise to the media.**

Mr. Wise avers that following his arrest, related to January 6th (J6), The New York Times and NBC both reported verifiably false and disparaging information related to Wise and his FBI career. One story quoted a "New York senior FBI official" as the source of the claims, and both stories included information that Wise believes most likely came from Berger. Wise seeks any information from the FBI that would support his belief of a bias against Wise by Berger, and any connection Berger might have to Wise's investigation or prosecution.

**C.   Potential leaks from FBI to media regarding Wise and Project Veritas**

After leaving the FBI in early 2017, Wise later worked from January 2018 to May 2018 with an investigative journalism organization called Project Veritas, where he engaged in lawful, First Amendment protected media activities. Project Veritas was founded and led by James O'Keefe. According to media reports, on October 2021, O'Keefe's New York apartment was searched by the FBI, and multiple phones, computers, and electronic media were seized. Per media reports, the search warrants were related to Project Veritas's alleged efforts to obtain the personal diary of President Biden's daughter, which contained politically damaging information. The search warrant took place long after Wise's connection to the organization and Wise was not involved with alleged efforts to obtain the diary.

Two days after the search of O'Keefe's apartment, Wise received two independent text messages from journalists Adam Goldman from the New York Times and William Turton from Bloomberg News asking about Wise's connection to Project Veritas. This was the first time Wise had ever heard from anyone regarding his brief employment with Project Veritas more than three years earlier, and he never had any previous contact with either Goldman or Turton. Notably, the

first time he was ever asked about his connection to Project Veritas occurred just two days after the FBI seized O'Keefe's devices.

Wise avers that both journalists likely received information connecting Wise to Project Veritas from someone inside the FBI with access to the items seized from O'Keefe. O'Keefe's phones and other items were seized and analyzed by the same New York FBI office that Wise worked in, and Wise suspects that it was someone who knew Wise personally or perhaps had some personal vendetta against him (e.g., Berger, given his position as a senior executive in the office). Thus, Wise seeks any information from the FBI related to these events.

### D. Wise's history as a federal whistleblower supports ordering disclosure.

In January 2019, Wise was retained to manage security operations for a government contractor. While working on the project, Wise was made aware of corruption related to the project by a sub-contractor, and potentially a United States government employee.

Wise informed the FBI immediately upon becoming aware. And Wise avers that he made the report to the FBI knowing that he was reporting single-source information which the sub-contractor and prime-contractor would know came from him, and that he was placing his significant consulting contract at risk. Regardless, he immediately made the report to the FBI, and indeed the contractor soon terminated Wise's contract once they learned that the FBI had been notified. Approximately six months after Wise first reported the information to the FBI, and after it became apparent that the FBI was doing little to investigate his concerns, Wise submitted a formal Qui Tam whistleblower complaint to the DOJ. *See* U.S. Dist. Ct. S. Dist. CA Case No. 20cv0223-MMA-MDD ECF 1 (Quit Tam Realtors' False Claims Act Complaint).

Wise's avers that in his interview with the FBI and DOJ related to his Qui Tam complaint, a DOJ attorney falsely implied that Wise must have been involved in the scheme and decided to make a whistleblower complaint to benefit himself. This was false and indicated revealed the DOJ's bias against Wise. Rather than being given credit for his personal sacrifice in reporting corruption, he instead was falsely accused by DOJ of perhaps being involved in the scheme.

### E. Information from current FBI Special Agents (SAs) about FBI and DOJ political bias, misbehavior, and excesses related to January 6th (J6) investigations and prosecutions

Mr. Wise avers that before his arrest, Wise received unsolicited texts from a current FBI SA, who knows Wise personally, expressing concern from the SA about specific behavior from the FBI and DOJ related to J6 investigations. The SA contacted Wise on the "Signal" messaging app and set the messages to auto-expire soon after being read, but Wise was able to capture screenshots from some, although not all,[1] of the messages before they auto-deleted. Mr. Wise believes the SA was not aware at the time of Wise's connection to J6 and was revealing his true concerns in the text messages.

In one message, the SA described political bias on the part of an Assistant United States Attorney (AUSA) and specific misconduct related to pressuring FBI SAs to withhold exculpatory information related to a J6 search warrant affidavit.

> "one of the AUSAs was a political hack that I had to deal with. We flat out refused to open a case on one guy and I ticked him off on that one. There were some shenanigans to be sure. He wanted some case agents to withhold some exculpatory material on a search warrant affidavit that cut against PC, and none of the agents in the division would sign it. From what I heard he found an agent in WFO to

---

[1] These screenshots were on the phone that FBI agents seized from Wise. So, the government possesses them.

> lean on to swear it out.  Then the judge eventually torched her when it came out what was withheld and the judge dismissed charges on some Proud Boys.  It's been night and day whether the agent or AUSA is in DC or the rest of the US in dealing with them".

The SA also wrote that another FBI SA was so upset about improper behavior by an AUSA related to J6 cases that he documented his concerns to the case file in an Electronic Communication (EC).

> "What I can say is that we all knew there was no conspiracy to storm the capital. But we couldn't convince these AUSAs. One accused one of our guys of being disloyal to the US. One of the guys got sick of the pressure to do a SW without PC and wrote an EC documenting the problems with the case and serialized it. DC flipped out and my friend said he's not going down for this nonsense".

In another text message the SA wrote of pressure from AUSAs to add additional information in a search warrant application that would falsely imply the subject was part of a conspiracy when he was not.

> "I've been fortunate. I have a good chain of command. Some AUSAs told me I needed additional language for a SW basically making it sound like my guy was part of some big conspiracy when he wasn't. I told em I wasn't swearing it out, and my SSRA backed me. About two months later the AUSA said he decided my language was ok as is"

In another text message the SA wrote about pressure from FBI senior leadership to open Domestic Terrorism cases for J6 subjects only predicated for trespassing.  He also acknowledged that many J6 subjects had likely been wrongly added to terrorism watchlists.

> "My ASAC did initially want everyone predicated for trespassing to be a 266 DT case. My SSRA and I decided that was stupid and they were gonna be 176 riot cases. If I recall, they sent out a pony for everyone to use that had some of the basic factual predication for the riot. Fine. But I think it included language to watchlist the subjects, even if it was all misdemeanors. So I'm sure a bunch of people were wrongfully watch listed"

The SA described widespread, "almost universal" views within the FBI that FBI and DOJ leadership are politically biased.

> "But even the most non-political people I know view people like Garland as a complete political hack. That's why he changed our deadly force policy recently. Almost everyone I know thinks the higher ups are too political, so I can say almost universal concern, but then I'm removed from DC and removed from HQC also. I do know when the agent action committee put their recent list of complaints together, politicization was #1"

When asked whether political influence was playing a role in J6 investigations, the SA replied:

> "Every agent I know feels the same way. But some of these people really believe it was some coordinated insurrection. And then we end up fighting with AUSAs when we get legit misdemeanor and submit them for charging and the AUSAs are trying to make them into felonies and getting mad at us because we won't swear out affidavits".

While these texts and accusations come from just one FBI agent, that agent has worked on many J6 investigations and speaks his concerns about specific misbehavior by the FBI and DOJ, including one instance that is documented in the case file by another agent.

Wise also spoke, before his arrest, with another FBI agent he has known for approximately 20 years. This agent holds a senior position within the FBI Counterterrorism Division and expressed concerns to Wise about the unusual focus given to J6 investigations.

### F. Proposal by Wise to investigative journalist James O'Keefe of Project Veritas

Following his receipt of the text messages from the current FBI agent, Wise contacted investigative journalist James O'Keefe, whom he knew personally from his time with Project Veritas, and proposed a lawful plan to report the agent's claims to the media. O'Keefe was not interested

in pursuing the proposal. Within days after Wise made the proposal to O'Keefe and the FBI rushed to arrest Wise while he was at his father's house.

Wise avers that the FBI may have learned of his proposal to O'Keefe and rushed to arrest Wise before he could make public the damaging information about FBI and DOJ misbehavior described by the FBI agent. If true, this would indicate that the FBI and DOJ sought to take actions to restrict Wise's First Amendment rights to lawfully expose wrongdoing by those very organizations, in the interest of protecting the organizations.

**G.   The FBI did not attempt to interview Wise before his arrest.**

The FBI made no attempt to interview Wise before arresting him. The FBI's investigation of Wise spanned more than 15 months before his arrest and included physical surveillance in at least three states, which provided multiple opportunities to attempt an interview. Rather than try to understand Wise's perspective of that day or learn what he may have witnessed that caused his reactions, the FBI instead chose to proceed directly to an arrest.

**H.   Arrest conditions were unnecessarily harsh**

In April 2023, the FBI tried to arrest Wise at his father's house. Wise's mother passed away unexpectedly on February 1, 2023, and Wise subsequently spent much of his time at his father's home to help him grieve and adjust to the loss of his wife of 52 years. The FBI had investigated Wise for more than a year, conducted surveillance in at least three different states, would likely have known that his mother had just died, and knew that he was no threat to anyone, but tried to arrest Wise at a location other than his home. To facilitate this sudden decision, the FBI tried to obtain information it already knew, such as a "location warrant." This suggests the possibility of improper use of FISA.

Unaware of the arrest plans, Wise left his father's house and return to his home in Oregon before the arrest was attempted at his father's home. When arrested in Oregon on May 1, 2023, the FBI brought approximately 20 law enforcement officers, many who were brandishing rifles, to conduct the 6:00 a.m. arrest of Wise at his home for four non-violent misdemeanor charges. The FBI conducted a call-out arrest of Wise, forcing him to walk out of his home with his hands in the air, improperly dressed and barefoot on a cold morning, where the entire neighborhood could witness the humiliation of the arrest.

Wise avers that he committed no violence on J6, and indeed has never been violent a day in his life. During his nearly 13-year career with the FBI, Wise had no history of violence, misbehavior, or any disciplinary action, and maintained a Top Secret/SCI clearance for his entire career, despite working in some of the most difficult and stressful situations and locations in which the FBI operates. The FBI conducted physical surveillance on Wise for nearly a year in at least three different states before his arrest and had no information to justify such an extreme arrest operation.

Immediately after arresting Wise, the FBI asked a friend of Wise, who was present at the location of the arrest, about Wise's political views, religious beliefs, and the reason for him leaving the FBI. The FBI's priority on learning about these irrelevant and First Amendment protected interests are concerning and further support claims of a personal or political bias against Wise.

Following his arrest, Wise was taken directly to the federal courthouse in Eugene, Oregon, where he was held before his initial appearance. Mr. Wise avers that in the holding cell with Wise was another individual who was arrested the same day by the same FBI office that arrested Wise. The other individual, who admitted to having a previous criminal history involving violence, told Wise that he was arrested for "assault by strangulation." When Wise asked about the manner of

his arrest for "assault by strangulation," he said that the two FBI agents (from the same FBI field office as those who arrested Wise) simply knocked on his door and arrested him there by themselves.

The disparity between the intense manner of arrest for Wise for non-violent misdemeanor charges when he had no criminal history, and the arrest manner for an individual charged with violent crimes with a violent criminal history, is telling, especially when considering that both were arrested on the same day by the same FBI field office. Apparently, "the process is the punishment" concept commonly used to describe FBI and DOJ actions applies here with full force.

## I.    The indictment added two felony counts under suspect conditions.

There does not appear to be any additional information related to Wise's actions on J6 that were discovered between the time of his arrest on the four misdemeanor charges and the timing of the decision to add to felon y counts via indictment.

After arresting Wise and seizing his phone, the FBI obtained the texts mentioned above, and many other texts not included in this motion, from the FBI SA which were stored on Wise's phone. It is highly likely the FBI read those messages after Wise's arrest and before adding felony charges. Did the discovery of those text messages, which contained case the FBI and DOJ in a negative light, factor into the addition of more serious charges?

Wise was arrested on May 1, 2023. Mr. Wise avers that on May 4, 2023, journalist O'Keefe released a video on Twitter where he falsely accused Wise of trying to "trap" O'Keefe into committing a crime by lying to the FBI. The FBI would very likely have become aware of these tweets and video after Wise's May 1, 2023, arrest and adding the felony charges in late May 2023. Did the discovery of these false accusations by O'Keefe play any role in the government seeking to add the

felony indictment? Was O'Keefe acting as a Confidential Human Source (CHS) for the FBI? Did the FBI have a FISA facility on Wise through which they learned of his proposal to O'Keefe?

After his arrest, the government provided Wise with the standard Protective Order that all J6 defendants must sign to receive their discovery. Wise objected to the nature and stipulations of the Protective Order and filed a motion noting his arguments and refusal to sign given his desire for transparency and media access to what should be publicly available videos and information. Soon after, the government told Wise's counsel that Wise was being "difficult" and soon after sought the felony indictment. Was Wise's refusal to sign the Protective Order a factor in the decision to add felony counts?

Wise was not offered a formal plea agreement as was given to most J6 defendants not accused of conducting violence. The government made one informal comment to Wise that any plea offer would require Wise to plead guilty to at least one felony charge, but never presented any formal offer. This constitutes disparate treatment.

Wise has been charged with two serious felonies based on just a few words he is alleged to have uttered on J6. As thoroughly discussed in other filings, the treatment of Wise related to these charges appears to be unusual and extreme.

**J.   The process is punishment (e.g., unfounded, defamatory labeling of Wise as a "Band 1 Operator" Terrorist)**

The FBI has internally labeled Wise a "Band 1 Operator" terrorist related to his J6 investigation without any information to justify such a label. Mr. Wise avers that "Band 1" is the highest level of terrorist group assigned by the FBI, which includes groups such as ISIS and Al Qaeda, and any individual assigned this label is subsequently subjected to a severe diminishment of rights and protections.

Wise avers that adding an individual to these lists requires approval from just a small number of relatively low personnel, but once a person has been added, they are opened to many invasions of privacy via investigative authorities that aren't otherwise available to the FBI. Wise avers and discovery shows that he has been added to multiple terrorism watchlists maintained by the United States government, including (1) the Terrorism Screening Center (TSC) "selectee" list, (2) Financial Crimes Enforcement Network (FINCIN), (3) the national license plate reader system, and (4) he is listed as a "potential terrorist organization member" in the National Crime Information Center (NCIC), which is accessed by every law enforcement agency in the country. The FBI also falsely labeled Wise as "Armed and Dangerous" in his NCIC record.

Wise avers that because of his inclusions on these  lists, the government can monitor his financial transactions, track his vehicle anywhere in the United States, and subject him to invasive inspection every time he flies commercially. Moreover, law enforcement officers who search his name will believe that Wise is an armed threat and a potential terrorist.

Indeed, Wise has already been directly affected by these labels, as he was subjected to a likely illegal traffic stop by the California Highway Patrol partly due to this terrorism label on NCIC. He also receives the "SSSS" enhanced screening process when flying on commercial airlines. Based on years of working for the FBI conducting counterterrorism investigations around the world, Wise avers that the United States government has likely disseminated information labeling Wise as a terrorist to many foreign countries throughout the world. Wise is fully aware of the complications that this labeling and dissemination will have, including related to foreign travel and his finances, for the remainder of his life, regardless of the outcome of his trial.

Wise avers that he gave up a promising career in finance to join the FBI in response to the attacks on September 11th, 2001. He specifically requested to be assigned to the Washington Field Office, following completion of the FBI academy, because of his desire to work the most significant counterterrorism investigations. Indeed, during his nearly 13-year FBI career, Wise was assigned to some of the most respected counterterrorism squads and units in the FBI and led some of the most sensitive and high-profile investigations conducted by the organization during that time. He was also imbedded into other United States government agencies and departments to work on extremely sensitive programs. During all this time, Wise held a Top Secret/SCI security clearance and had no behavioral or disciplinary problems.

Wise further avers that for two years, he was assigned to a public corruption squad in the Washington Field Office, where he investigated members of the United States Congress and Washington, D.C. government. He was involved in several high-profile arrests of members of Congress and Washington, D.C. police officers.

In addition, Wise avers that he spent approximately five years on the Washington Field Office extraterritorial counterterrorism squad where he led investigations in the Middle East, Africa, and Eastern Europe, including countries such as Yemen, Bosnia, Kosovo, Nigeria, Liberia, Russia, Austria, and Montenegro. During that time, he worked on high-profile FBI terrorism investigations.

Wise avers that he then spent approximately 2.5 years on the FBI's Counterterrorism Division Fly Team, where he again worked internationally on critical FBI terrorism investigations in countries including Yemen, Uganda, Djibouti, Oman, Republic of Georgia, and Libya. As a

member of this unit, he deployed to Libya and led the FBI's Libya-based investigation into the attacks on the U.S. Mission in Benghazi, Libya.

Wise avers that in 2014 he became the FBI's first permanent Assistant Legal Attaché in Jerusalem, Israel, where he established new relationships with the intelligence and law enforcement agencies of the Palestinian Authority. Wise spent approximately 2.5 years working alone in the West Bank, a territory considered the highest threat level by the United States government, with the Palestinian Authorities combatting terrorist threats to United States interests. Due to his physical location in Jerusalem, he also worked with intelligence and law enforcement agencies from the state of Israel, successfully balancing the complications of working concurrently with both the Israelis and Palestinians.

Wise avers that in 2016 he supervised a counterterrorism squad in the FBI's New York Joint Terrorism Task Force, managing a squad of approximately 25 FBI personnel and Task Force Officers from numerous state, local and federal agencies. Wise's squad was responsible for investigating Homegrown Violent Extremists in the boundaries of New York City. During this time, Wise's squad successfully investigated and assisted the prosecution of the 2016 Chelsea bombing attack which injured approximately 30 individuals. Wise was the first FBI Agent to respond to the attack and managed the on-scene investigation overnight, and then his squad successfully managed the investigation through trial, resulting in a conviction and life sentence.

Mr. Wise avers that the FBI trained him throughout his career in the legal limitations of the use of force by law enforcement and ingrained in Wise the obligation to object to any misbehavior. The irony of Wise being labeled the highest level of "terrorist" himself, based on his reaction to witnessing police brutality, is hard to square.

Wise avers that he has witnessed numerous situations in his FBI career where U.S. citizens were detained in multiple foreign countries because of their inclusion on the FBI terrorism watchlist and understands well the risk that that his inclusion on the list poses for him related to future travel or simply life in the United States.

Rather than treat Wise objectively based on the entirety of his life, character and career, the FBI apparently chose to treat him more severely because of his background.

### K.  Wise's connection to senior FBI leaders directly involved in J6 investigations generally and specifically in Wise's case

Throughout Wise's FBI career, Wise worked with and became personally acquainted with many current high-ranking FBI personnel with direct involvement in the J6 investigations in general and his in particular. These individuals include:

**Paul Abbate** is the current Deputy Director of the FBI and worked closely with Wise in Libya for more than a month while jointly leading the FBI's investigation into the attacks on the U.S. mission in Benghazi, Libya. Mr. Wise avers that FBI whistleblowers have made public disclosures of improper bias and misbehavior by **Abbate** related to the FBI's J6 investigations. If **Abbate** does indeed have an improper bias or political agenda, it seems that he would have a strong incentive to vigorously prosecute a former FBI agent that he knows personally. Having been directly involved in briefing the FBI Director and Deputy Director during his time in the FBI, Wise believes that **Abbate** would have been briefed once the FBI became aware of the politically sensitive issue that a former agent was the subject of a J6 investigation.

**Steve D'Antuono** is the former Assistant Director in Charge (ADIC) of the Washington Field Office which is leading the J6 investigations. Wise avers that in this role, **D'Antuono** made numerous public appearances on behalf of the FBI speaking about the FBI's efforts related to J6.

**D'Antuano** and Wise served on the same squad for approximately two years, including approximately one year where their desks were side-by-side. The government has provided evidence in Discovery that indicate **D'Antuono** may have been in direct contact with the FBI's CHS "GED" related to GED's reporting of Wise. It is highly unusual for an ADIC to be in direct communication with a CHS, as there are three levels of management (Supervisory Special Agent (SSA), an Assistant SA in Charge (ASAC) and a SA in Charge (SAC)) between an ADIC and a Special Agent (SA), which normally manages CHSs. It is even more unusual for an ADIC to be in direct contact with a CHS who is reporting on a subject that the ADIC knows personally and about which the ADIC may have a personal agenda or motivation.

**Jonathon Snow** has served as the Assistant SA in Charge (ASAC) of the FBI's Sacramento Office which would have executed the planned arrest of Wise in April, 2023 at his father's house in California. Wise and **Snow** were roommates for five years when both were new FBI agents in the Washington Field Office. When Wise left the FBI, **Snow** became upset that he left and soon cut off all contact with Wise.

**Omar Molina** is a high-ranking executive (Section Chief) in the FBI's Counterterrorism Division and was an FBI Academy classmate of Wise. **Molina** and Wise had not spoken for many years until suddenly **Molina** contacted Wise in early April 2023. The government has provided no discovery related to the conversation between Wise and **Molina**. Was this conversation related to Wise's investigation or sudden and hastily planned arrest at his father's house in early April?

**Charles Berger** was an ASAC in the New York field office and directly supervised Wise, and his relationship with Wise was described thoroughly above. Wise avers that shortly before leaving the FBI, he gave Berger the worst possible scores in the annual performance review of

supervisors that FBI employees complete. Immediately after his arrest, Wise was the victim of defamatory claims in multiple media reports by organizations including the New York Times and NBC, and given the nature of the claims, he believes that the information most likely came from Berger.

Given the personal connections between Wise and these individuals in senior positions of FBI leadership who have direct involvement in J6 investigations in general or his in particular, Wise is requesting any documents or communications related to these individuals that mention Wise or have any connection to his investigation or prosecution.

## L.   Government's fleeting defense of an improper traffic stop

As thoroughly explained in early motions in this case, Wise believes he was subjected to an improper traffic stop by the California Highway Patrol (CHP) on April 2, 2023, just days before the FBI rushed to arrest him at his father's home. The government used information from the traffic stop in its search warrant for Wise, and Wise sought to suppress the search warrant based on its inclusion.

Wise avers that he has learned more information about the stop through his Public Records Act requests to the CHP, which strongly supports his view that his status on the terrorism watchlist in NCIC (submitted by the FBI) improperly contributed to the officer's decision to conduct the traffic stop. It seems likely that the government learned from the CHP that there were problems with the traffic stop, and that this contributed to its decision to no longer defend the stop related to the motion to suppress.

Wise avers that the government's actions related to the stop indicate that it is not concerned with treating Wise fairly, as they were prepared to defend a stop they knew or should have

known was improper, and only dropped their defense after it became clear that Wise had inde-
pendently obtained evidence that would be problematic for the CHP and government.

### M. The FBI is violating its own policies by protecting one of its sources from criminal liability at the expense of Wise's rights as a victim of international wire fraud.

Following his arrest, Wise has made multiple attempts to provide information to the FBI
regarding a crime in which he is the victim, but the FBI and DOJ refuse to meet or discuss the
allegations. The information is concrete evidence of an international fraud scheme by an associate
of Wise's named "GED," who is a United States citizen residing full-time in France. In late 2020,
GED proposed to Wise a joint investment in a real estate property in France, and Wise agreed to
contribute approximately $190,000. GED then stole Wise's investment via a fraudulent scheme
involving international wire transfers and forged documents, which ultimately gave GED full own-
ership of the property and left Wise with nothing.

Wise avers that GED closed on the real estate transaction in September 2021. Soon after,
Wise began to have serious concerns about the status of his investment and the arrangement in
general. In late 2021, Wise began to question GED and accuse him of engaging in some sort of
unknown scam to steal Wise's investment. In January 2022, GED provided information to the FBI
that Wise was present in Washington, D.C. on January 6, 2021. GED provided information about
Wise to the FBI to protect himself from consequences of his own crime against Wise, as he began
to realize that Wise was uncovering GED's fraud. GED correctly believed that providing infor-
mation to the FBI about Wise (GED's own victim) and J6 would help inoculate himself from any
liability related to his own scheme to defraud Wise.

Since his arrest in May 2023, Wise has made numerous attempts to contact the FBI and
DOJ in effort to provide information related to GED's fraud scheme and to schedule an in-person

meeting where he could explain the situation in detail and provide 90 pieces of evidence including documents, emails, videos, voice messages, and text messages. The first attempt was on December 14, 2023, when Wise called the FBI's Portland, Oregon office and spoke with an agent for approximately 10-15 minutes. The second attempt was on January 2, 2024, when Wise provided information via the FBI's online tip form. The third effort was on February 20, 2024, when Wise's defense counsel sent an email to the FBI SA and DOJ AUSA assigned to Wise's prosecution, providing details of the fraud, and requesting an in-person meeting. The fourth was on March 15, 2024, when Wise's defense counsel again sent a second email to the SA and AUSA requesting an opportunity to present evidence implicating GED in the international fraud scheme.

The only response from either the FBI or DOJ related to any of these four submissions was an email reply in March 2024 from the AUSA assigned to Wise's prosecution stating that he was unable to help or become involved and that Wise needed to submit a tip via the FBI's online form.

> "Wise remains free to report any crimes or potential crimes he has knowledge of or is a witness to the FBI or any other agency through their public tips platforms or by providing such tips in-person at an FBI office. Contacting me or Special Agent Stone is not the most direct route. Whether he is interviewed further about something beyond his pending January 6, 2021 cases is not up to me and I will not comment on it."

Wise avers that beginning on April 23, 2024, he began to seek the help of his United States Congressperson in scheduling a meeting with the FBI. On May 21, 2024, he spoke with a member of the Congressperson's staff who explained that they had spoken directly with an FBI agent in the Bend, Oregon office and requested that the FBI meet with Wise. The agent told the staff member that the FBI would contact Wise's defense attorney after consulting with the AUSA on Wise's prosecution, but to date there has been no response to Wise or his defense counsel. Wise spoke

again with the congressional staffer on June 14, 2024, who told Wise that the FBI told her that the FBI was willing to meet with Wise, but that they cannot without the permission of the AUSA assigned to his prosecution.

On July 8, 2024, Wise's defense made another request for a meeting to the new AUSA assigned to his case without success. In August 2024, the government sought new charges against Wise related to him contacting GED about GED's fraud, but those efforts were not successful. In response to failing to secure a new indictment, the government then obtained revised release conditions which prevented Wise from having any direct or indirect contact with GED. Wise avers that on September 5, 2024, his Congressperson met directly with the SA in Charge (SAC) of the FBI's Portland, Oregon office and requested that the FBI meet with Wise. Nothing resulted from these requests.

In November 2024, Wise's counsel sent a new request to the third AUSA on Wise's case, and on November 20, 2024, the AUSA emailed Wise's counsel the following:

> "Our office has no involvement in, or objection to, or opposition to Jared Wise speaking with or reporting conduct to the FBI about matters unrelated to this case".

Following this statement from the government, Wise called the FBI office in Bend, Oregon on November 20, 2024, and left a message notifying the FBI that the AUSA on his case did not object to the FBI interviewing Wise and requested a meeting. To date, Wise has never received any contact from the FBI and has not been granted an interview despite his numerous efforts over the last 12 months.

Wise avers that the specifics of the crime — international wire fraud involving United States citizens in an amount of at least $190,000 — fall directly within the FBI's investigative

responsibility, as clear from its own website. https://www.fbi.gov/about/faqs/where-is-the-fbis-authority-written-down

> "Federal law gives the FBI authority to investigate all federal crime not assigned exclusively to another federal agency (28, Section 533 of the U.S. Code)."

The FBI's website makes the following promises to victims of federal crimes, but it refuses to meet with Wise to accept his evidence, although he is the victim of a crime that falls within the FBI's area of responsibility (international wire fraud involving U.S. citizens in the amount of at least $190,000). https://www.fbi.gov/how-we-can-help-you/victim-services/rights-of-federal-crime-victims

Under the Victims' Rights and Restitution Act (VRRA), 34 U.S.C. § 20141, victims are entitled:

- To be notified they have been the victim of a federal crime;
- To be informed of the place where they may receive medical and social services;
- To be informed of public and private programs available for counseling, treatment, and other support services;
- To receive reasonable protection from a suspected offender and persons acting in concert with or at the behest of the suspected offender;
- To know the status of the investigation of the crime, to the extent it is appropriate and it will not interfere with the investigation;
- To have personal property being held for evidentiary purposes maintained in good condition and returned as soon as it is no longer needed for evidentiary purposes.

Wise avers that the FBI is ignoring his claims and refusing to meet because it is seeking to protect GED, due to his providing them with information against Wise. Wise believes that the FBI has opened GED as an informant or Confidential Human Source. If the FBI were to meet with Wise and accept the information implicating GED in a complex international fraud scheme of at least $190,000 (and possibly up to $700,000 with an additional victim as alleged by a third party with direct knowledge), it would create a complicated situation in which it would need to account

for criminal activity by one of its sources, and the information might also impact the prosecution of Wise. Hence, the easiest strategy to prevent the dilemma is to simply refuse to meet with Wise and never learn of the claims.

Wise avers that the FBI is knowingly protecting one of its sources who has conducted criminal activity, which is reminiscent of the FBI protecting mob boss Whitey Bulger for many years. The FBI Domestic Investigations Operations Guide (DIOG) and 2020 Attorney General Guidelines related to FBI use of CHSs prohibits allowing sources to freely commit crime, but Wise avers that is what the FBI is doing via its refusal to accept information implicating one of its sources in criminal activity. *See* https://www.justice.gov/oip/foia-library/foia-processed/general_topics/ag_guidelines_FBI_human_confidential_sources_2/dl

Wise avers that the disparity in actions by the FBI and DOJ indicate bias against Wise, in that they will not meet him to learn of their CHS's crimes against Wise.

Notably, on September 11, 2024, a French court ruled in favor of Wise in his civil lawsuit against GED for fraud related to the purchase of the France property. The court invalidated the French corporation that GED created to defraud Wise, placed a financial lien in Wise's interest against the property, and issued a judgement against GED in favor of Wise.

Wise avers that regardless of whether the government's harsh treatment of Wise and protection of GED are explained by a "prosecutorial discretion," the relevant point is that their behavior strongly indicates a personal, vindictive agenda against Wise.

**N. The "some evidence" standard is more than met here.**

In sum, the information described above and in prior pleadings is strong evidence of bias against Wise, well beyond the lower standard of "some evidence" required to support ordering that the government produce responsive discovery.

**O. Specific discovery requests**

- The EC serialized to a case file documenting "problems with the case" as described in the texts from the FBI SA to Wise

- Any information related to a generic directive or recommendation to add J6 defendants to any terrorism watchlists rather than on an individual justification

- Any information related to known instances of J6 defendants, including Wise, being improperly added to any terrorism watchlists, as described by the FBI SA in his texts to Wise

- Any information related to the "Agent Action Committee" listing politicization of the FBI as its number one complaint, as described by the FBI SA in his texts to Wise

- Any information on any known instance, complaint or report by any FBI or DOJ personnel regarding political bias or general misbehavior by the FBI or DOJ related to J6 investigations or prosecutions

- Any communications or documents mentioning or related to Wise from the FBI officials listed above with whom he has a personal relationship

- Any information or documents relating to the decision to add felony charges to Wise, before or after his arrest, including related to any of the potential reasons described above

- Any information related to Wise's submissions about "GED" and any related action or decisions taken or not taken related to Wise or GED

- Any information related to any leak investigations or any other information related to Project Veritas, Adam Goldman or William Turton as they pertain to Wise

- Any information, communications or documents related to any connection between Wise and James O'Keefe or Project Veritas

- Any information related to the Qui Tam whistleblower complaint filed by Wise, including any FBI investigation and the subsequent decision by DOJ to not intervene

- Any information related to known FISA facilities or 702 searches related to Wise

- Any information related to the any decision on when, where and how to conduct the arrest of Wise

- Any information justifying the labeling of Wise as a "Band 1 Operator" terrorist, inclusion on any terrorism watchlists including Terrorism Screening Center or FINCIN, and labeling of Wise as a "potential member of a terrorist organization" and "armed and dangerous" in NCIC

- Any information indicating that the FBI or DOJ were aware that the CHP stop of Wise was improper or that the related FD-302 contained false claims

## III.    Conclusion

For the above reasons, the Court should grant Wise's motion to compel discovery in support of his claims of selective prosecution, selective enforcement, and vindictive prosecution.

Respectfully submitted on December 17, 2024.

*s/Kurt David Hermansen*
Kurt David Hermansen, Cal. Bar 166349
Supervisory Assistant Federal Public Defender
859 Willamette St. Suite 200
Eugene, OR 97401
Tel: (619) 436-8117
Fax: (541) 465-6975
Email: kurt_hermansen@fd.org